1

**PROOF OF SERVICE**
(Shalaby v. Irwin – USDC, Northern District of California, Case No: C 06 7026 MJJ)

2

I, the undersigned, declare as follows:

3

I am a citizen of the United States, over the age of 18 years, and not a party to, or interested in the within

4
entitled action. I am an employee of BOWLES & VERNA LLP, and my business address is 2121 N. California Blvd., Suite 875,
Walnut Creek, California 94596.

5

On August 16, 2007, I served the following document(s):

6

7
**THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE;
DECLARATION OF CATHLEEN S. HUANG; REQUEST TO TAKE JUDICIAL NOTICE; and [PROPOSED] ORDER**

8
on the following parties in this action addressed as follows:

9
*Attorneys for Plaintiffs*                          *Attorneys for Defendant and Third Party Plaintiff*
Mark D. Epstein                                      *Bernzomatic and Defendant The Home Depot*

10
Alborg, Veiluva & Epstein LLP                        J. Phillip Moorhead
200 Pringle Avenue, Suite 410                        Keller, Price & Moorhead

11
Walnut Creek, CA 94596                               229 Avenue I, 2nd Floor
Tel:    (925) 939-9880                               Redondo Beach, CA 90277-5600

12
Fax:    (925) 939-9915                               Tel:    (310) 540-1332

13
_XXXX_    *(BY MAIL) I caused each such envelope, with postage thereon fully paid, to be placed in the United States mail at
Walnut Creek, California. I am readily familiar with the business practice for collection and processing of mail in this*

14
*office. That in the ordinary course of business said document(s) would be deposited with the U.S. Postal Service in
Walnut Creek on that same day. I understand that service shall be presumed invalid upon motion of a party served if*

15
*the postal cancellation date or postage meter date on the envelope is more than one day after the date of deposit for
mailing contained on this affidavit.*

16
___    *(BY PERSONAL SERVICE) I delivered each such envelope by hand to each addressee above.*

___    *(BY OVERNIGHT DELIVERY) I caused each envelope, with delivery fees provided for, to be deposited in a box*

17
*regularly maintained by UPS/FEDERAL EXPRESS. I am readily familiar with Bowles & Verna's practice for collection
and processing of correspondence for overnight delivery and know that in the ordinary course of Bowles & Verna's*

18
*business practice the document(s) described above will be deposited in a box or other facility regularly maintained by
UPS/FEDERAL EXPRESS or delivered to an authorized courier or driver authorized by UPS/FEDERAL EXPRESS to*

19
*receive documents on the same date that it is placed at Bowles & Verna for collection.*

___    *(BY FACSIMILE) By use of facsimile machine number (925) 935-0371 or (925) 256-1755, I served a copy of the*

20
*within document(s) on the above interested parties at the facsimile numbers listed above. The transmission was
reported as complete and without error. The transmission report was properly issued by the transmitting facsimile*

21
*machine.*

22
I declare under penalty of perjury under the laws of the State of California that the foregoing is true and

23
correct, and that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.
Executed on August 16, 2007, at Walnut Creek, California.

24

25
_Donna Withrow_
DONNA WITHROW

26

27

28

| | |
|---|---|
| 1 | RICHARD A. ERGO (# 110487)<br>CATHLEEN S. HUANG (# 219554) |
| 2 | BOWLES & VERNA LLP<br>2121 N. California Boulevard, Suite 875 |
| 3 | Walnut Creek, California 94596<br>Telephone: (925) 935-3300 |
| 4 | Facsimile: (925) 935-0371<br>Email: raergo@bowlesverna.com |
| 5 | chuang@bowlesverna.com |

**ORIGINAL FILED**

**AUG 16 2007**

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

6 Attorneys for Third Party Defendant
7 Worthington Industries, Inc.

8

## UNITED STATES DISTRICT COURT

9

### NORTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  ANDREW SHALABY, an individual, and SONIA | Case No.: C06-07026 MJJ |
| 12  DUNN-RUIZ an individual, | |
| | Judge Martin J. Jenkins |
| 13        Plaintiffs, | |
| | **DECLARATION OF CATHLEEN S.** |
| 14        vs. | **HUANG IN SUPPORT OF THIRD PARTY**<br>**DEFENDANT WORTHINGTON** |
| 15  IRWIN INDUSTRIAL TOOL COMPANY, THE | **INDUSTRIES, INC.'S MOTION TO** |
|     HOME DEPOT, INC., and DOES 2 through 100, | **TRANSFER VENUE** |
| 16  inclusive, | |
| | Date:      September 25, 2007 |
| 17        Defendants. | Time:      9:30 a.m.<br>Ctrm:      11, 19th Floor |
| 18 | |
| 19  BERNZOMATIC, | **BY FAX** |
| 20        Third Party Plaintiff, | |
| 21        vs. | |
| 22  WESTERN INDUSTRIES, INC., | |
|     WORTHINGTON INDUSTRIES, AND ROES 2 | |
| 23  through 100, inclusive, | |
| 24        Third Party Defendants. | |

25

        I, CATHLEEN S. HUANG, declare:

26

        1.      I am an attorney at law duly admitted to practice before all the courts of the State of

27

California and am an associate at the law firm of Bowles & Verna LLP, counsel for Third Party

28

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                                    1
DEC. OF CATHLEEN S. HUANG IN SUPPORT OF WORTHINGTON'S MOTION TO TRANSFER VENUE

1   Defendant Worthington Industries, Inc. ("Worthington") herein.  If called as a witness, I could and

2   would competently testify to the facts stated herein.

3         1.     Attached hereto as **Exhibit A** is a true and correct copy of the relevant excerpts from the

4

5   deposition transcript of Randy Stephens.

6         2.     Attached hereto as **Exhibit B** is a true and correct copy of the relevant excerpts from the

7   deposition transcript of Warren Ratliff.

8         3.     Attached hereto as **Exhibit C** is a true and correct copy of the relevant excerpts from the

9   deposition transcript of Robert Price.

10         4.     Attached hereto as **Exhibit D** is a true and correct copy of the relevant excerpts from the

11   deposition transcript of Joe Russo.

12

13

14        I declare under penalty of perjury under the laws of the State of California that the foregoing is

15   true and correct.  Executed this _16_ day August, 2007, at Walnut Creek, California.

16

17

18                CATHLEEN S. HUANG

19

20

21

22

23

24

25

26

27

28

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ          2

DEC. OF CATHLEEN S. HUANG IN SUPPORT OF WORTHINGTON'S MOTION TO TRANSFER VENUE

# EXHIBIT A

ORIGINAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


ANDREW SHALABY and SONIA DUNN-RUIZ, )
                                     )
              Plaintiffs,            )
                                     )
vs.                                  )  No. C06-07026CW
                                     )
NEWELL RUBBERMAID, INC., RUBBERMAID, )
INCORPORATED, and THE HOME DEPOT,    )
INC.,                                )
                                     )
              Defendants.            )
_____)


DEPOSITION OF RANDY T. STEPHENS

Taken at San Diego, California

April 17, 2007


Reported by Catherine Gautereaux, CSR
Certificate No. 3122

EXHIBIT A

9

1    A    No.

2    Q    What's your business address?

3    A    2211 Pacific Beach Drive.

4    Q    That's in San Diego?

5    A    San Diego, California, yes, sir.

6    Q    And the ZIP code?

7    A    92109.

8    Q    And the business phone?

9    A    That would be Area Code (858) 581-4219.

10   Q    And your home address?

11   A    Let's see.  I just moved.  I can give you

12   where I live.

13   Q    Well, I'm only asking so if we need to get

14   ahold of you if you were to decide Campland is not

15   paying you enough and you were to move away.

16   A    I live in an RV park.  So my mailing address

17   is 42566 Escolacata -- this is a mouthful --

18   E-s-c-o-l-a-c-a-t-a, Drive, okay.  And that's in

19   Temecula.  That's my permanent address.

20   Q    What's the ZIP code up there in Temecula?

21   A    It is 92592.

22   Q    All right.  And your date of birth?

23   A    10/3/69.

24   Q    By whom are you currently employed?

25   A    Terra Vista Management; Campland on the Bay.

10

1     Q    So the company you work for is Terra Vista

2  Management?

3     A    Yes, sir.

4     Q    And the place you work at is Campland --

5     A    Yes, sir.

6     Q    -- on the Bay?  You're jumping in on me a

7  little bit.

8     A    Oh.  Sorry.

9     Q    She is going to scream at me pretty soon if we

10  don't stop.  How long have you worked at Campland on the

11  Bay, roughly?

12     A    Roughly, coming on three years.

13     Q    And your current position there?

14     A    I am a ranger.

15     Q    How long have you held that position?

16     A    The three years I've been there.

17     Q    Okay.  Who is your immediate supervisor at the

18  present time?

19     A    Darrin Sessler.  D-a-r-r-i-n, S-e-s-s-l-e-r.

20     Q    How long has Darrin been your immediate

21  supervisor, roughly?.

22     A    Roughly, I want to say a year, a year and a

23  half.  They changed over supervisors.

24     Q    Was Therese Kiel a supervisor of yours at one

25  time?

11

1       A       Yes, sir.

2       Q       Is that immediately prior to Darrin?

3       A       Yes.  She is Darrin's predecessor.

4       Q       Okay.  Do you know which of them was your

5    supervisor in April of 2006?

6       A       That would have been Therese Kiel.

7       Q       All right.  Were you on duty at Campland on

8    the Bay on the evening of April 21, 2006, when a camper

9    named Andrew Shalaby suffered burns at his campsite?

10      A       Yes, sir, I was.

11      Q       Do you recall that event, at least somewhat?

12      A       Yes, I do.  Yeah, to a decent degree of --

13      Q       Okay.  How did you personally become aware of

14   Mr. Shalaby's incident?

15      A       A woman came up to the ranger gate.  This is

16   what I was told.  I was radioed to go to, I believe it

17   was, site D19, regarding a personal injury of a man

18   severely burned at the site, at which time I -- we asked

19   that 911 be called from our gate.

20      Q       Let me stop you there.

21      A       Yeah.

22      Q       You didn't -- you weren't contacted by the

23   person who came to the gate; you were radioed in?

24      A       I was radioed by Warren.

25      Q       Mr. Ratliff?

35

1    A    Right.  In fact, I remember them actually

2  packaging -- well, Mr. Shalaby, pretty much, to my

3  knowledge, actually stepped and sat onto the gurney

4  because of his injuries.  And they were -- they had him

5  in a -- in a semi-prone thing and they were loading him

6  in and, I believe, probably doing the standard -- I

7  remember them giving him oxygen.  And I'm not sure if

8  they started an IV line or stuff like that.  And then

9  once they had him packaged and they were ready to go, I

10  guided them out with lights and sirens.

11    Q    Now, you made reference to trying to comfort

12  Mr. Shalaby, putting a coat and blankets on him, telling

13  him that 911 had been called, et cetera.  Did you have

14  any conversations directly with him about what had

15  happened?

16    A    Varying -- it wasn't so much a conversation as

17  to when he was rocking back and forth, he just kept

18  saying, "I'm an idiot.  I can't believe I'm so stupid,"

19  something regarding this.

20            And we were telling him, "Just calm down."

21  You know, "We got help on the way."  And, you know, it

22  was coherently, but yet he was -- you could tell -- you

23  know, he was rocking back and forth, "This is all my

24  fault."  You know, "I'm so stupid."

25            He felt bad, basically, I think, for --

42

1      Q      Okay.  You said it was burst open.  I assume

2  by that you mean the cylinder?

3      A      The cylinder itself, right where the -- I

4  don't know if you've ever seen a propane cylinder, but

5  right at the top, where it domes and then creates the

6  threads, it was burst just beyond the threads at the

7  neck.

8      Q      Anyway, the cylinder that you're talking about

9  is roughly the shape of like a two-liter bottle, right?

10     A      Yeah.  Yeah, but slightly slimmer and -- yeah.

11     Q      The sides essentially go straight up and then

12  taper like shoulders into a neck that's threaded?

13     A      Right.  Right.  Exactly.

14     Q      And the place that you saw -- are we talking

15  about a hole, a crack, or what did you see that had

16  burst?

17     A      Well, if I use this right here -- it's

18  glass -- but right at the -- if this is the neck of the

19  bottle right here, it was split approximately two and a

20  half inches long.

21     Q      That's the length?

22     A      Long.  And maybe a quarter-inch wide.

23     Q      Okay.  So we are talking basically about,

24  like, a slit or a crack as opposed to a round hole?

25     A      Yeah.  Like a split.  It was kind of

43

1    elliptical-shaped, I guess.

2        Q    Okay.  And that was near where the -- or at

3    the point where the shoulders of the cylinder become the

4    threaded neck?

5        A    Right.  It was right at the neck.  Right at

6    the base of the neck.

7        Q    All right.  In or below the threads?

8        A    Below the threads.

9        Q    And basically running in the same direction as

10    the threads, as opposed to perpendicular to them?

11        A    Right.  Right.

12        Q    Did you observe in any way, shape or form,

13    either by manipulating it or looking at it or in any

14    other fashion, whether the torch was all the way onto

15    the cylinder?

16        A    That, I don't know.

17        Q    Okay.  Did you observe any damage to the

18    torch, as opposed to the crack you've talked about in

19    the cylinder?

20        A    No, no.  It was -- I didn't want to touch it

21    too much because I thought it was still -- I don't know.

22    I didn't notice the crack.  I didn't notice if the torch

23    body was still on the torch tip.

24        Q    Did you make any observations, however

25    unscientific they may have been, as to whether it

48

1    A    Yes, sir.

2    Q    Other than the crack that you saw at the neck

3 of the cylinder, and I think you said something about

4 maybe part of the label had pulled away, do you remember

5 seeing any other damage to the cylinder?

6    A    Besides the crack?  No, I don't remember.

7    Q    Besides the crack and the label issue?

8    A    No, sir.

9    Q    Okay.  Had you ever seen torches and cylinders

10 of this nature before the date of this incident?

11    A    Yes, sir.

12    Q    And have you used them before?

13    A    Yes, sir.

14    Q    Have you ever actually used MAPP?

15    A    Yes, sir.

16    Q    What other types of compressed gases have you

17 used?

18    A    Propane, MAPP gas, larger tanks with

19 oxyacetylene cutting torches, that kind of stuff when I

20 was in the Navy.

21    Q    So you've used this type of equipment several

22 times before?

23    A    Yes, sir.

24    Q    And your conclusion that the cylinder involved

25 in this incident was filled -- or let me -- at least,

49

1   that one time, with MAPP gas, was that based solely upon

2   the fact that it was yellow, or did you see some

3   labeling that indicated that it was MAPP?

4        A    I think it was solely because I know that that

5   color is reserved for MAPP gas only.  Propane cylinders

6   come in a very variance of colors, but MAPP gas has to

7   be in a yellow -- yellow cylinder.

8        Q    Based upon your observations, did it appear

9   that the torch that was involved in this incident, the

10  one you saw at that location -- was it, in your opinion,

11  the appropriate torch for that cylinder?

12       A    See, that's -- that's where -- to my

13  recollection -- now, I've seen the pictures, but to my

14  recollection, he -- to my recollection, it was the wrong

15  torch tip on the wrong type of cylinder.  That's to my

16  recollection.

17       Q    Okay.

18       A    Once again, I did see it at a distance.  I

19  never actually touched it.

20       Q    So you've seen different types of torches used

21  for different types of gases; is that what you're

22  saying?

23       A    Yes, sir.

24       Q    What's the difference between the torches?

25  What might have been wrong with this one, that caught

50

1  your attention?

2      A    For some reason, I remember it to be the type

3  that only goes on propane bottles; the difference being

4  in the size, the type of fire being introduced, and the

5  igniting.  You know, there is an -- actually, a flame

6  arrester on a MAPP gas cylinder -- or, excuse me -- on a

7  torch body, not cylinder.

8      Q    But as you sit here today, you are not a

9  hundred percent sure?

10     A    I am not a hundred percent on that.

11     Q    Do you know why they use different types of

12  torches for propane versus MAPP?

13     A    Why they use different types of torch tips.  I

14  know it has something to do with the flame arrester,

15  because the smaller propane tip withstands so much heat

16  before it burns out and the larger one is -- the larger

17  MAPP gas tip can take a higher heat than a propane tip

18  can.

19     Q    Is it your understanding that MAPP burns at a

20  higher temperature than propane?

21     A    Extremely higher.

22     Q    Okay.  What -- if you know, from your

23  experience, what are MAPP gas cylinders used for,

24  normally?

25     A    Yes, I do know.  They're used for excessive

61

1    looking back a year later.

2        Q    Understood.

3        A    I don't know exactly why I worded it that way,

4    but I just know that it is worded that way.

5        Q    Was the San Diego Fire Department -- I think

6    you said it was Station 21 that responded?

7        A    Yes.  Yes, I know it was engine -- they call

8    it Engine Company 21.  So it would have been a fire

9    engine, not a --

10        Q    At some point in time that evening, did the

11    fire department take possession of the cylinder and

12    torch?

13        A    That, I don't know.  I don't believe so,

14    because I myself remember asking the engineer -- and I

15    believe Warren did, too.  I can't state for sure --

16    whether they needed to collect the torch and torch body

17    for evidence.

18        Q    Limiting it only to your conversation, so that

19    Warren can speak for himself -- you had a conversation

20    with someone from the fire department --

21        A    Yes.  I don't remember exactly who it was.

22        Q    You had a conversation with someone at the

23    fire department, asking them if they wanted you to

24    collect and provide them the torch and the cylinder?

25        A    Yes.

62

1     Q    And what was their response?

2     A    No.  That the gentleman in question, the

3  patient, as they stated, had already told them, and that

4  it was an accident.

5     Q    Okay.  Did you have any follow-up

6  conversations with anybody at the fire department, in

7  the days or weeks after this incident, making sure that

8  they didn't change their mind and want the torch or the

9  cylinder?

10    A    No, sir.

11    Q    Okay.  Do you know what became of the torch

12 and the cylinder after that evening?

13    A    I, myself, saw it the following day in the --

14 still in the truck bed.  Once again, I didn't touch it,

15 because I didn't exactly know why it was there.  And if

16 it's not yours, don't touch it, you know.  But after

17 that, I did not see it again.

18    Q    Okay.  By "truck bed," you're talking about

19 the Toyota?

20    A    The Toyota Tacoma ranger truck, yes.

21    Q    So you saw it -- did you say it was the

22 following day or the same day?

23    A    It would have been the following day, when I

24 came on the shift.

25    Q    So the last time you saw the torch or the

# EXHIBIT B

# ORIGINAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


ANDREW SHALABY and SONIA DUNN-RUIZ, )
                                     )
            Plaintiffs,              )
                                     )
vs.                                  )  No. C06-07026CW
                                     )
NEWELL RUBBERMAID, INC., RUBBERMAID, )
INCORPORATED, and THE HOME DEPOT,    )
INC.,                                )
                                     )
            Defendants.              )
_____)




DEPOSITION OF WARREN L. RATLIFF, JR.

Taken at San Diego, California

April 17, 2007




Reported by Catherine Gautereaux, CSR
Certificate No. 3122

8

1      A    Yes, sir.

2      Q    Any questions on what's going to happen before

3 we get started?

4      A    No, sir.

5      Q    Okay.  Let's get your full name for the

6 record, please.

7      A    It would be Warren L. Ratliff, Jr.  Middle

8 name, Lee.

9      Q    And what's your business address, Mr. Ratliff?

10     A    2211 Pacific Beach Drive, San Diego,

11 California 92109.

12     Q    And what's the phone number there?

13     A    To our --

14     Q    Main number.

15     A    The main number would be (858) 581-4200.

16     Q    And if we were to call that number and ask for

17 you, they could track you down?  Or maybe not?

18     A    Maybe not.

19     Q    Do you have a better number?

20     A    Yes.

21     Q    What would that number be?

22     A    (858) 581-4219.

23     Q    Okay.  What's your home address?

24     A    Is 1666 Garnet Avenue, G-a-r-n-e-t, No. 116 --

25 or 119.  I'm sorry.

9

1    Q    San Diego?

2    A    San Diego, California.

3    Q    Same ZIP?

4    A    92109.

5    Q    Okay. Just for reference purposes, what's

6    your date of birth?

7    A    June 11th, 1960.

8    Q    Okay. By whom are you currently employed,

9    Mr. Ratliff?

10   A    Would be Terra Vista Management; Campland on

11   the Bay.

12   Q    Terra Vista Management is the employer, and

13   the location is Campland on the Bay?

14   A    Yes. It would be the property location.

15   Q    And the official business address for Campland

16   on the Bay is that 2211 Pacific Beach Drive?

17   A    Yes.

18   Q    Okay. How long have you worked at Campland on

19   the Bay, roughly?

20   A    Five years.

21   Q    What's your current position with Campland?

22   A    With Campland, park ranger supervisor.

23   Q    So you supervise other park rangers?

24   A    The whole staff, yes.

25   Q    Okay. And how many rangers does that entail?

17

1  department personnel to arrive so that you could take

2  them to the incident scene?

3      A    Yes, sir.

4      Q    And did you ride with them?  Did you take one

5  of the golf cars or carts?  Did you take your Toyota?

6  How did you get to the incident scene?

7      A    The ranger truck.

8      Q    And you knew where the incident occurred

9  because the campers that reported it to you told you

10  what campsite they were at or what --

11      A    The campsite where they were at.

12      Q    Great.  Give me your best estimate in feet,

13  yards, miles, or whatever, how far it would have been

14  from the gate, where you were working, over to the

15  incident site by way of travel.  Not the way the crow

16  flies, but how far did you have to drive to get there,

17  roughly?

18      A    I would estimate anywhere from 300 to

19  400 yards.

20      Q    So it would have only taken you probably a

21  minute or less to get there?

22      A    Yes, sir.

23      Q    Mr. Ratliff, when you arrived at the campsite

24  where the incident had occurred, who else was already

25  there?

18

1      A     Several campers and guests that were in other

2   sites; my ranger staff, Randy; I believe, the

3   gentleman's wife or girlfriend -- I'm not sure of that.

4   I recall one child, and the fire truck with its crew,

5   and the paramedics and their crew.

6      Q     And they were basically traveling with you?

7      A     Yes.  They were behind me.

8      Q     While you were there at the campsite where the

9   incident had happened, did anyone else arrive?  And by

10   that I would include, did any police respond or

11   ambulance or anything else?

12      A     The ambulance did come behind the fire staff.

13      Q     Were they in the same --

14      A     Yes.

15      Q     -- caravan, basically?  Did any police

16   agencies respond at all?

17      A     No, sir.

18      Q     I realize there were a lot of different people

19   there doing a lot of different things, and right now

20   this question pertains to you specifically, Mr. Ratliff.

21         Did you make a list anywhere of the names of

22   the fellow campers that came to the site, that were

23   milling about, that might have information?

24      A     I did not make a list of names.

25      Q     Whether or not you know any of their names,

19

1    did you speak with any of them about what happened?

2        A    Yes, I did.

3        Q    Do you have any recollection, as you sit here

4    today, of what any of these people told you?

5        A    Well, I have different stories from each

6    individual.

7        Q    All right.  I know it would be difficult to

8    put a name with a story, but maybe you could do it

9    chronologically or in your mind, "This person that

10   looked like this said 'X'."  Can you kind of tell us the

11   various stories that you heard?

12            MR. STEPHAN:  I'll just object.  Vague as to

13   time.  I guess, talking about that night?

14            MR. MOORHEAD:  Yes.

15   BY MR. MOORHEAD:

16       Q    I'm just talking about there, at the site

17   things that were told to you.

18       A    Well, when I arrived on the site, I secured

19   the site, observed the individual.  We tried to help the

20   fire department take care of that individual, first.

21            At that time I had Randy continue to do --

22   stay with him and monitor him and the campsite itself.

23   I then went to the first campsite to the left of that

24   campsite -- those were the individuals that also made

25   the original call, I guess, for 911 -- and spoke to

20

1   them.

2         The one female in that group gave me a story

3   of -- that the guest in that site was trying to light

4   the campfire with the torch and it would not light, and

5   was banging the torch on the side of the fire ring.

6        Q    Okay.

7        A    Another guest --

8        Q    Now, I don't want to go further because I want

9   to make sure I understood the question.  A lady from the

10  campsite to the left of Mr. Shalaby's campsite --

11  Mr. Shalaby being the individual that was injured -- to

12  the left as you're facing --

13       A    Facing his campsite.

14       Q    His campsite.  A woman in that group told you

15  that she had observed him trying to light the campfire

16  unsuccessfully and banging the torch on -- what did you

17  say?  On the campfire ring?

18       A    On the campfire ring.

19       Q    Then, did somebody else give you a story?

20       A    Another individual in that same campsite said

21  that he heard the gentleman was frustrated at not being

22  able to fight -- or to light the campfire.  And that was

23  it in that group.

24       Q    Okay.  Before we move on, 'cause there may be

25  others, when you arrived, was there a campfire burning

31

1    all were.  And the only conversation that took place was

2    trying to initially get their address and name, all my

3    original statements.  And I couldn't get that out of

4    her.

5        Q    Okay.  Before we get too far away from it,

6    back to the torch:  In addition to this bend, did you

7    see anything else that appeared to be wrong with the

8    torch?

9        A    Just that I thought that it could have been

10   put on wrong or not all the way in the on position.

11       Q    Okay.  You mean when it was attached to the

12   cylinder, it might not have been attached all the way?

13       A    Right.

14       Q    Okay.  How about missing paint, scratches,

15   dents, anything like that?

16       A    It appeared to me to be normal wear and tear.

17       Q    I don't think I asked you this.  About what

18   time was it that you learned of this incident, roughly?

19       A    That I learned of the incident?

20       Q    Yes.

21       A    Approximate times were between 10:15 p.m. and

22   10:30.

23       Q    P.m.?

24       A    Yes, sir.

25       Q    Were you able to determine from any source at

35

1    combustion?

2        A    Any --

3        Q    Any soot?

4        A    No, sir.

5        Q    Okay.  All right.  Then, going back to

6    something you told us earlier, you gathered up the torch

7    and the cylinder and at some point in the process, I

8    believe, before you went back to the gate, you had a

9    first conversation with fire department personnel about

10   what to do with the cylinder and the torch?

11       A    Yes.

12       Q    And that was with an engineer?

13       A    Was the engineer that I talked to at the --

14   was the first person I brought it to his attention.

15       Q    Okay.  And he told you he would have to check

16   with his captain?

17       A    He said, "Let me check with my captain, and I

18   will get back to you."  He was making a report in the

19   ambulance with Mr. Shalaby at that time.

20       Q    Okay.  And then, at some later point in time,

21   did he answer your question as to whether you needed to

22   keep it or not?

23       A    Yes, sir.

24       Q    How much later was that answer?

25       A    I'd estimate four to five minutes.

36

1    Q    Okay.  So you were still at the incident

2 scene?

3    A    Yes, sir.

4    Q    Okay.  And at that point in time the engineer

5 came to you and said, "We don't need you to keep it"?

6    A    Yes, sir.  And he said to dispose of it

7 however we dispose of them.

8    Q    Did he say why he didn't want you to keep it?

9    A    No, sir.

10    Q    Did anybody connected with the fire

11 department -- captain, engineer, paramedics or anybody

12 else -- indicate to you what information they had

13 gathered about how the incident occurred?

14    A    No, sir.

15    Q    All right.  Then, after the engineer told you

16 he had checked with his captain and you didn't need to

17 keep the cylinder or the torch, what became of them?

18    A    Well, that's when I had made my initial -- or

19 my thorough investigation of the cylinder and then took

20 it to -- back to our ranger station, and it was to be in

21 our possession for about two to three days.

22    Q    That was the last time you saw it, anyway?

23    A    Yes, sir.

24    Q    Okay.  And by the "ranger station," are we

25 talking about that large building just beyond the guard

37

1   gate, or is there a different spot?

2        A    No.  The ranger gate itself.

3        Q    Were you the one who transported the equipment

4   from the incident site to the gate shack?

5        A    Yes, sir.

6             MR. EPSTEIN:  I don't mean to interrupt you.

7   We have about five minutes before we need to call in.

8             MR. MOORHEAD:  Aren't they supposed to call

9   us?

10            MR. EPSTEIN:  Oh, I apologize.

11            MR. MOORHEAD:  We can go off the record for a

12  second.

13            (Discussion off record.)

14  BY MR. MOORHEAD:

15       Q    Did you personally dispose of the cylinder and

16  torch, or did somebody else do that?

17       A    I believe another staff did during the day.

18       Q    Did you submit the torch or the cylinder to

19  anyone else for examination, evaluation, and testing

20  before telling somebody else to get rid of it?

21       A    No, sir.

22       Q    So as far as you know, you're the only one who

23  took a look at it?

24       A    Yes, sir.  I believe Randy was also there with

25  me at the time, and we were discussing it.

56

1    it sounded like you have some experience with welding or

2    torches, some background that precedes your work at

3    Campland; is that correct?

4        A    That is correct, yes.

5        Q    Can you tell me:  What is the nature of your

6    prior experience with welding?

7        A    I was a certified welder for the Navy.

8        Q    Okay.

9        A    And in the civil service -- or civil world.

10        Q    Is that part of the Navy, or you were a

11    welder --

12        A    I was a Seabee, which is steelworker.

13        Q    When did you join the Navy?

14        A    That was 1979.

15        Q    Other than the Navy, is the Seabee -- is that

16    part of the Navy?

17        A    Yes.

18        Q    Have you served in any other branch of the

19    service?

20        A    No.

21        Q    And were you stationed here in San Diego?

22        A    No.

23        Q    Where were you stationed?

24        A    Gulfport, Mississippi.

25        Q    How long were you in the Navy before you --

58

1    program.

2    BY MR. EPSTEIN:

3        Q    While you were in the Navy, what applications

4    did you apply your welding skills to?

5        A    Oxyacetylene weld, mig weld, tig weld, arc

6    weld, brazing.

7        Q    Can you describe the types of projects you

8    worked on, or did you work on ships in dry dock repair?

9        A    Mainly, heavy structural steel.

10       Q    While you were a member of the Seabees, where

11   were you stationed then?

12       A    Gulfport, Mississippi.

13       Q    And did you work on projects, for example,

14   with the US -- the Army Corps of Engineers?

15       A    I'm not for sure.  I know there was Navy --

16   Army Corps of Engineer projects for girl scouts,

17   national forests, you know, that kind of stuff.

18       Q    You mentioned various types of -- it sounds

19   like welding gases or fuels you used.  Acetylene was one

20   of them?

21       A    Yes.

22       Q    Are you familiar with MAPP gas?

23       A    Yes, I am.

24       Q    While you were in the Navy, did you have

25   occasion to use MAPP gas torches?

59

1      A    Yes.

2      Q    Can you tell me what -- to the best of your

3  knowledge, what MAPP gas is, what its components are?

4      A    Well, no, not actually, I guess, but -- I know

5  about it, but --

6      Q    All right.  In your experience, what did you

7  use MAPP gas torches for?

8      A    Mainly for plumbing projects, when a lot of

9  condensation in the water was present.

10     Q    To your knowledge, is MAPP gas typically used

11 in the plumbing industry?

12     A    Yes.

13     Q    After you were discharged or got out of the

14 Navy, what was the next job you took?

15     A    I don't remember the place.  It was --

16     Q    What type of work?

17     A    It was a contractor doing water tanks for the

18 fire engines -- for fire trucks.

19     Q    Fabricating them or --

20     A    Fabricating them, yes.  Welding.

21     Q    So if I understand correctly, you were -- you

22 worked for a company that fabricated water tanks for

23 fire trucks?

24     A    Yes.

25     Q    And you would help weld the tanks together?

62

1    A    Yes.

2    Q    Between the time you left Mercer County

3  Sheriff' Department and came to work in Campland, did

4  you have any jobs where part of your official duties was

5  to weld?

6    A    Yes.

7    Q    Okay.  Where else would that have been?

8    A    I worked for myself.

9    Q    In what capacity?

10    A    Plumbing, electrical construction.

11    Q    Basically, self-employed contractor?

12    A    Yes.  Yeah.

13    Q    And where did you -- was that here in

14  California?

15    A    Yes.

16    Q    Approximately how many years did you do that?

17  Were you in business for yourself?

18    A    Probably two or three years, I think it was.

19    Q    Is this before you came to Campland?

20    A    Yes.

21    Q.    And you did some plumbing during that time?

22    A    Yes.

23    Q    And while you did the plumbing work, did you

24  have occasion to weld or solder pipes together?

25    A    Yes.

63

1    Q    And when you did that, did you ever use MAPP

2  gas torches?

3    A    Yes, all the time.

4    Q    All right.  Do you remember the brand name of

5  the MAPP gas torches you used, that you tended to use?

6    A    Mainly, Benzomatic (sic).

7    Q    Does Burnzomatic sound right?

8    A    Burnzomatic.

9    Q    Is that the one with the yellow tank?

10   A    Yes.  Home Depot.

11   Q    You would buy it at Home Depot or other

12  hardware stores?

13   A    Yes.

14   Q    Is it accurate to say that you have some

15  working knowledge and familiarity with MAPP gas torches?

16   A    Yes.

17   Q    And with the Burnzomatic brand in particular?

18   A    Yes.

19   Q    Have you ever been able to -- strike that.

20  While you were self-employed as a plumber/fix-it guy --

21   A    Yeah, here you go.

22   Q    -- did you ever have occasion to purchase or

23  come upon MAPP gas torches manufactured by another

24  company other than -- strike that.

25        Let me rephrase my question.  Did you ever

64

1    have occasion to purchase another brand of torch, other

2    than Burnzomatic?

3        A    I don't recall.

4        Q    All right.  And I believe you mentioned

5    earlier that you've done some welding while you've been

6    at Campland?

7        A    Yes.  Soldering with MAPP gas, yes.

8        Q    Is part of your duties there to help maintain

9    the place?

10       A    That was my previous job before the park

11   ranger position I hold now.

12       Q    You were hired as a maintenance person?

13       A    Yes.

14       Q    And part of what you did at that time was to

15   fix -- or repair the plumbing?

16       A    Yes.

17       Q    And part of -- when you did plumbing work

18   there, part of what you did was to weld or solder pipes?

19       A    Yes.

20       Q    Do you still have occasion to do that at

21   Campland?

22       A    Not at Campland, no.

23       Q    I imagine you probably fix some things around

24   your home?

25       A    And other people's homes.

65

1      Q      Okay.  Do you happen to own -- at the present,

2   do you own a MAPP gas torch?

3      A      I just ran out and threw it away the other

4   day.

5      Q      Is there a reason that you did that?

6      A      I was done with it.  I was going to go buy a

7   new one.

8      Q      So is it accurate to say to this day you still

9   have occasion to use MAPP gas torches from time to time?

10     A      Yes.

11     Q      Can you give me an estimate of how many times

12  a year you might use one?

13     A      Whenever my friends call or somebody needs a

14  plumber.

15     Q      It's usually the most inopportune time?

16     A      Yes.

17     Q      So on the -- going back, then, for a moment to

18  the night of the incident in April of 2006, involving

19  Mr. Shalaby, when you -- I believe you testified that

20  you -- when you came upon the scene and did a survey,

21  you saw the torch on the ground some three feet behind

22  Mr. Shalaby; is that correct?

23     A      Yes.

24     Q      And at some point after you saw it, you went

25  and picked it up?

66

1        A    Yes.

2        Q    Okay.   When you did that, were you familiar

3    with the torch that you saw?

4        A    Yes.

5        Q    Was that the same type of torch that you had

6    used in the past?

7        A    Yes.

8        Q    And was there any -- was there any doubt in

9    your mind that it was a Burnzomatic brand torch?

10       A    No, I don't believe so.

11       Q    When you -- skipping a little bit ahead in

12   your testimony, when you spent some time observing the

13   torch, I believe you testified that that was after you

14   had spoken with the fire department personnel about

15   whether or not they wanted you to keep it or not?

16       A    Yes.  I secured the -- pretty much secured the

17   torch; in the meantime, was worried about Mr. Shalaby's

18   well-being, first.  I just did not want the torch to end

19   up in the wrong hands.

20       Q    Okay.  And when you -- can you tell me

21   approximately how long you spent examining the torch?

22       A    Oh, probably, I'd say an hour.  During my

23   entire report writing.

24       Q    And was that back at the -- I forget what you

25   call that -- the front gate?  Was that back at the

67

1  station?

2      A     In my -- in the office.  In my office.

3      Q     You call it the ranger station?

4      A     Well, the ranger station and my office are two

5  different places.

6      Q     Are they in the same general vicinity?

7      A     It's the next building behind it.

8      Q     I actually haven't had the benefit of seeing

9  the location.  But, basically, you spent an hour or so

10  examining the torch back at your office?

11      A     Yes.

12      Q     And I believe you testified that the labels

13  had not been destroyed on the torch, they had not been

14  burned off?

15      A     No, sir.  It appeared normal wear and tear to

16  me.

17      Q     To the best of your recollection, did the

18  front label say "Burnzomatic" on it?

19      A     I don't recall the -- the "MAPP" is what

20  catches -- caught my eye.

21      Q     Getting back to the breach or the hole you

22  described at the point where the nipple or the thread

23  joins the neck of the bottle, is that about roughly the

24  area of the tank where you saw the hole?

25      A     Yes.

68

1      Q      Was it, in fact, a hole that you saw, and was

2 there --

3      A      It appeared to be a crack forced open,

4 outward.

5      Q      It was forced open, outward?

6      A      Like an explosion outward.

7      Q      From inside the bottle towards the outside?

8      A      From inside the container, yes.  It was a

9 crack, and just one side of the crack appeared to be a

10 U-shape form.

11      Q      I apologize to the court reporter.  I think I

12 was jumping in and speaking over you, which is something

13 I always tell the witness not to do.  But in this case,

14 I was doing it, so --

15            And just so the record is clear, because I do

16 think I was speaking over you, you were saying that the

17 crack appeared to have been forced outward from inside

18 the neck of the tank?

19      A      Yes.

20      Q      And you believe that it was roughly a U-shaped

21 crack or hole?

22      A      No.  It appeared to be a straight line.  Just

23 the one side of the crack appeared to be more outward

24 than the other side of the crack.

25      Q      Okay.  Based on your experience working with

69

1    torches and the like, what did that indicate to you,

2    that hole, if anything?

3        A    Personally?

4        Q    Yes.

5        A    Abuse.

6        Q    In what -- why did it indicate abuse?

7        A    Appeared to me that the container was used

8    other than what it was for.

9        Q    Can you be any more specific?  In other words,

10   did it strike you that there had been some sort of force

11   applied, or what is it you're describing?

12       A    Just my personal opinion, you're asking me,

13   or --

14       Q    Yes.  That's all I can ask for.

15       A    Okay.  It appears to me that it was banged

16   against -- the top of the nozzle was banged against

17   something of a hard surface and not created the crack,

18   but maybe, in my experience, that weakened the

19   connection between the torch nozzle and the cylinder

20   itself.

21            I have experienced other employees, when

22   they -- in my presence, when they were not able to light

23   that torch, do several other abusive things to get it to

24   light.

25       Q    Have you ever -- in your experience, have you

70

1   seen a crack like that before?

2        A    Not that particular type of crack, no.

3        Q    Did the -- getting back to your testimony, you

4   described -- I'm going to roughly paraphrase it -- but

5   the crack appeared to have been forced outward.  Did

6   that give any indication to you of what had transpired

7   or caused the crack?

8        A    I was under the impression that was from the

9   explosion.

10       Q    Was there anything in particular about the

11  crack or otherwise about the tank you saw that suggested

12  to you that it had been -- may have been banged on a

13  hard surface?

14       A    It appeared to me that the torch was -- might

15  have been banged against something that might have

16  adjusted the thread area of where the torch nozzle and

17  the canister would connect and had -- may have weakened

18  that area in the process of being banged, I guess you

19  would say.

20       Q    Okay.  But was there anything -- other than

21  the existence of the hole or the crack itself, was there

22  anything else; for example, scratches in the paint,

23  blunt --

24       A    Oh, the threaded part was this -- from the

25  crack itself, was forced at a right angle of the

72

1      Q    It comes to a neck, kind of like

2  Mr. Moorhead's bottle here?

3            MR. MOORHEAD:  They call this portion

4  "threaded," which attaches to the top of the neck.  That

5  will help in the terminology when you are discussing it.

6            MR. EPSTEIN:  Sure.

7  BY MR. EPSTEIN:

8      Q    At the neck of this tank there is, then, a

9  threaded tip, if you want -- maybe made of copper.  Or

10  can you tell me what the metal is at the top?

11      A    I would assume, aluminum.

12      Q    Aluminum?

13      A    Aluminum.  Pressed aluminum.

14      Q    But, in any event, it's not painted yellow,

15  right, the part with the threads?

16      A    I don't recall.

17      Q    But at the point where the threaded metal

18  meets the neck of the tank that is not threaded, it

19  becomes bent?  If I understand you correctly, you saw

20  that bend, that right-angle bend you were talking about,

21  start at that point, where the threaded portion of the

22  bottle meets the neck?

23      A    Yeah.  At the end, the bottom of the last

24  thread, between the last thread and the cylinder itself

25  is where the bend took place, and the explosion -- or

73

1    the crack was in that same area.

2        Q    Got it.  Was it an actual 90-degree angle that

3    you saw?

4        A    No.  It was a slight-angle bend.

5        Q    Slight angle.  And the torch tip was still

6    attached to the threads?  It was still screwed on when

7    you picked it up?

8        A    When I picked it up, it was -- appeared to be

9    loose at the -- it didn't appear to be all the way

10   attached, or all the way screwed on.

11       Q    Got it.  And could you tell at that time

12   whether that was because -- and when I say that, I mean

13   the fact that the torch tip was not screwed all the way

14   on -- because it was not screwed all the way on

15   initially, or the force of whatever had happened had

16   forced --

17       A    I would not be able to tell you.  I don't have

18   that knowledge to answer that.

19       Q    Just bear with me.  I'm going to scan through

20   my notes.  I think Mr. Moorhead covered most of what I

21   was going to ask you, so I'm just going to condense

22   whatever remaining questions I do have.

23            Other than the one crack -- I'm going to use

24   the term "crack" -- you described up on the neck of the

25   bottle, did you see any other breaches in the metal

# EXHIBIT C

JUN 1 9 2007

1

2                   UNITED STATES DISTRICT COURT

3                 NORTHERN DISTRICT OF CALIFORNIA

4                                              COPY

5  ANDREW SHALABY, an individual,
   and SONIA DUNN-RUIZ, an        )
6  individual,                    )
                                  )
7          Plaintiffs,            )
                                  )
8      vs.                        )
                                  )   Case No. C 06 7026 CW
9  NEWELL RUBBERMAID, INC., a     )
   Delaware Corporation; THE HOME )
10 DEPOT, INC., a Delaware        )
   Corporation,                   )
11                                )
                                  )
12         Defendants.            )
                                  )
13

14

15

16

17

18             DEPOSITION OF ROBERT KEVIN PRICE

19                  San Diego, California

20                 Wednesday, May 30, 2007

21

22 Reported by:
   FRAUKE KUO
23

24

25

EXHIBIT C

5

1              San Diego, California, Wednesday, May 30, 2007,

2                        12:40 p.m. - 1:30 p.m.

3

4                        ROBERT KEVIN PRICE,

5    having been first duly sworn, was examined and testified

6    as follows:

7

8                            EXAMINATION

9    BY MR. MOORHEAD:

10        Q.    Let's begin by having you give us your full name

11   for the record, please.

12        A.    Robert Kevin Price.

13        Q.    Mr. Price, as I understand it from conversations

14   before we went on the record, you prefer to go by Kevin,

15   because your dad is also Robert.

16        A.    That's what I go by.

17        Q.    So if I call you Kevin today, will that be okay?

18        A.    That's fine.

19        Q.    What is your business address?

20        A.    Business address?  Where I work, you mean?

21        Q.    Yes.

22        A.    I am not sure of the address.  It's the fire

23   station.

24        Q.    Station 21?

25        A.    No.  It's in Pala now.

6

1    Q.   Does it have a station number there?

2    A.   They just have one station.

3    Q.   And it's Pala?

4    A.   P-a-l-a.

5    Q.   Pala -- P-a-l-a.  Okay.

6    And is there a good phone number there to reach

7 you, Kevin?

8    A.   It would be 760 Area Code, 742-1632.

9    Q.   Okay.  How about either a home number or a cell

10 phone number where we can reach you if we have trouble

11 reaching you at that number.

12    A.   My home number is (760) 510-1169.  My cell phone

13 is (760) 705-5247.  I don't call it very often, so it's

14 hard to remember.

15    Q.   I understand.  By whom are you currently

16 employed?

17    A.   Mercy Ambulance.

18    Q.   And in Pala?

19    A.   Yes.

20    Q.   And that's up in north county someplace?

21    A.   Yeah.

22    Q.   And what's your position with Mercy Ambulance?

23    A.   Paramedic.

24    Q.   Okay.  By whom were you employed on April the

25 21st, 2006?

7

1     A.    I was a student with Palomar College.

2     Q.    And in addition to studying at Palomar, were you

3  part-time employed or --

4     A.    Full-time student.

5     Q.    Were you interning?

6     A.    Yes.

7     Q.    Okay.  And with whom?

8     A.    It was Station 21, and Joe Russo was my preceptor

9  with San Diego Rural Metro.

10     Q.    All right.  On April the 21st, 2006, Kevin, were

11  you among San Diego Fire Department personnel that

12  responded to a call for emergency assistance at Campland

13  on the Bay involving burn injuries to an adult male?

14     A.    Yes.

15     Q.    If you can recall, what Fire Department vehicles

16  were dispatched to the scene?

17     A.    I believe it was Medic 21 and Engine 21.

18     Q.    Okay.  Medic 21 would have been a paramedic

19  ambulance?

20     A.    Yes.

21     Q.    Is that what you traveled in?

22     A.    Yes.

23     Q.    And you would have traveled there with Joe Russo.

24  And let me see if I can get some of the other names.

25     A.    Donald Renshaw, he was the EMT driver.

9

1    Q.    Okay.  It looks like about seven Fire Department

2  personnel responded to this incident.  Does that sound

3  essentially correct, with your recollection?

4    A.    That sounds right.

5    Q.    Now, none of the people that responded to this

6  particular incident had to be involved in fire

7  suppression; did they?  You didn't have to put out any

8  fires?

9    A.    No.

10   Q.    Some of you were involved in caring for the fire

11  victim or victims; is that correct?

12   A.    Correct.

13   Q.    And who would that have been?  You and who else?

14   A.    It was me.  And I think you said his name was

15  Daniel, the EMT driver, and Joe Russo.  We were the

16  transporting -- We were the ones that transported.  And

17  the engine was also on scene, but it was mainly us who

18  transported.

19   Q.    Tell me specifically what you did at the scene,

20  Kevin.

21   A.    As far as from the beginning of the call to the

22  end?

23   Q.    Let's just take it from when you arrived at the

24  site of the incident.

25   A.    Okay.  When I arrived at the site of the

10

1   incident, I remember he was sitting -- I think it was near

2   a camp fire.  He didn't have any inhalation burns.  He was

3   breathing okay.  First off, I got lung sounds, T-Sat which

4   was good.  He was breathing good.  At that point, we put a

5   burn dressing on, trying to maintain his body temperature.

6           He was at the back of the ambulance, so we

7   brought the gurney up next to him, assisted him to the

8   gurney, and got him in the back of the ambulance.

9       Q.   And transported?

10      A.   And transported.

11      Q.   Let's slow our speed cadence down and take it

12  step by step.

13      A.   Okay.

14      Q.   You arrive at the scene.  He is sitting

15  especially, you can recall, near a camp fire?

16      A.   Yes.

17      Q.   Okay.  Your first concern was his breathing, and

18  so you went and checked to see what his expiration rate

19  was, heart rate?

20      A.   Yes.

21      Q.   And you checked to see if there was soot or

22  particulates around the mouth and nose?

23      A.   Correct.

24      Q.   You checked his oxygen saturation rate --

25      A.   Yes.

12

1    A.    Yes.

2    Q.    All right. So you assessed the burn injuries,

3 and you put -- What did you describe you put on it, some

4 kind of compress or something?

5    A.    It's just called a burn dressing. It's just to

6 maintain his body temperature and try to keep moisture

7 inside.

8    Q.    Okay. And would you have been obtaining

9 information from him, like his height, his weight, his

10 allergies and things like that?

11    A.    Yes.

12    Q.    Okay. Now, we had Captain Spangler in here this

13 morning, and he kind of helped educate us as to how the

14 system worked at that time.

15         It's my understanding that the engine company

16 would have had a Palm Pilot, and the paramedic ambulance

17 would have maybe a couple of them. And he said he would

18 have been inputting some of the information that ends up

19 on the report, and you guys would have been inputting

20 others.

21    A.    Right.

22    Q.    Okay. If you look at the report -- And, by the

23 way, here is a copy of it if you don't have one with you.

24    A.    Okay.

25    Q.    Can you determine, from looking at it -- and take

13

1    your time looking at it, if you want -- what information

2    on there you inputted as opposed to him or someone else?

3        A.    Okay.   The vital signs -- The initial vital signs

4    were probably inputted by him.

5        Q.    Okay.   And that's on page 1.   You are talking

6    about his pulse, respiration, and blood pressure and

7    stuff?

8        A.    Right.

9        Q.    Okay.

10       A.    And on page 2, "History:  Allergies, Meds," that

11   could have been him or I.   I am not sure.   "Secondary"

12   could have been him or me, too, on page 2.

13       Q.    Okay.

14       A.    The "Intervention" was me.

15       Q.    Okay.   How about the "Special Questions

16   Narrative"?

17       A.    And the narrative, that was me.

18       Q.    Okay.   Then, below that, there is something we

19   determined means "Secondary Exam Narrative."   Is that

20   something you would have inputted, him, or someone else?

21       A.    That was me.

22       Q.    Okay.   And then, below that, there is an "I,"

23   which stands for --

24       A.    "Incident."

25       Q.    Okay.   So that's a brief description.

19

1    A.    Okay.

2    Q.    -- and we will mark it as Exhibit 8 to this depo

3   as well.

4            (Defendants' Exhibit No. 8 was marked for
             identification by the court reporter.)

5

6    MR. MOORHEAD:    Okay.

7   BY MR. MOORHEAD:

8    Q.    Now, the stuff that you input into the -- into

9   this report would have been done by a Palm Pilot?

10    A.    Correct.

11    Q.    Was that done at the scene, during transport,

12   after the call was over, or some combination of those?

13    A.    Combination.

14    Q.    Okay.  And when I look at the hard copy version

15   of this report, it appears that some of the print is in --

16   in bold.  Is that the stuff that's, basically, in the form

17   and you just fill in the blanks?

18    A.    I believe so.

19    Q.    Okay.  Do your best, if you can, Kevin, to read

20   for me what it was that you inputted under "History," just

21   so I am not guessing.  In other words, read it like you

22   were intending.  You don't have to use abbreviations.

23   What does it say?

24    A.    "Patient was kicking around a propane torch.  It

25   went into a fire and blew up and burned him.  Family

20

1  called 911."

2      Q.    Do you know -- and I realize it's been over a

3  year ago, and you have responded to many other things --

4  whether or not the information you gathered that goes into

5  the "History" section was obtained directly from

6  Mr. Shalaby, the patient, or from other sources?

7      A.    I --

8      Q.    Do you know whether that information was imparted

9  to you when you were at Mr. Shalaby's side?  In other

10 words, he could have heard somebody say how it happened

11 when that was communicated to you?

12     A.    Sorry.  I don't understand that question.

13     Q.    Okay.  I think you told us earlier you are not

14 sure whether what's in the "History" section was given to

15 you by Mr. Shalaby, by someone else at the scene, or

16 perhaps someone like Captain Spangler.

17     A.    Right.

18     Q.    What I am asking is:  Do you remember where you

19 received that information physically?  So I am asking

20 whether it was possible that Mr. Shalaby, if he wasn't the

21 reporting person -- whether he could have heard someone

22 else saying it, or is this told to you back at the

23 station, while you were en route, or by something where he

24 might not be able to hear?

25     A.    I am not sure, but I would think it would have

22

1  Fire Department that received -- that responded to the

2  scene that evening inspected it in any way?

3      A.   Not that I'm aware of.

4      Q.   Do you know if anyone photographed it in any way?

5      A.   Not that I'm aware of.

6      Q.   Do you know of any photographs that were taken at

7  the scene of the incident that day?

8      A.   No.

9      Q.   Do you have any idea, as you sit here today,

10 Kevin, what became of the propane torch that was mentioned

11 in the report?

12     A.   No.

13     Q.   Did you make any determination at the scene as to

14 whether the victim, at the time of the incident, was under

15 the influence of alcohol, medication, drugs, or anything

16 else?

17     A.   I do remember seeing beer bottles, I believe.  I

18 don't know if they were beer bottles, could have been

19 cans, but I don't remember whether or not he was under the

20 influence.  I didn't document it.

21     Q.   Okay.  I notice there is nothing in the report

22 about it.

23     A.   Right.

24     Q.   Do you have any independent recollection of --

25     A.   I do vaguely remember him being intoxicated, but

23

1   I am not sure.

2       Q.    Okay.   And if that -- if that is an accurate

3   recollection, what was the source of that information?   I

4   mean, did you smell it on his breath?

5       A.    I think that was just it.   It was just smelling

6   it on his breath.

7       Q.    You didn't take any blood tests to determine the

8   level of intoxication?

9       A.    We just checked his blood sugar.   We don't take

10   blood tests for that kind of thing.

11       MR. MOORHEAD:   I don't believe I have any other

12   questions for you at this time.   Mr. Epstein represents

13   the plaintiffs, and he may have some for you.

14

15                          EXAMINATION

16   BY MR. EPSTEIN:

17       Q.    Can I call you Kevin as well?

18       A.    Sure.

19       Q.    We met briefly off the record.   I am Mark

20   Epstein, for the record, and I represent the plaintiff,

21   Andy Shalaby, and his wife in this lawsuit.   I will do my

22   best to speak slower, realizing --

23       A.    Me too.

24       Q.    -- again, it would be good if we both did that.

25            Before I get to what I was going to ask you,

# EXHIBIT D

1

1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3

4   ANDREW SHALABY, an       )

    individual, and SONIA    )

5   DUNN-RUIZ, an individual, )

                         )

6          Plaintiffs,    )

                         )

7   vs.                 ) Case No. C 06 7065 CW

                         )

8   NEWELL RUBBERMAID, INC., a )

    Delaware Corporation, THE  )

9   HOME DEPOT, INC., a      )

    Delaware Corporation,     )

10                        )

         Defendants.    )

11   _____)

12

13

14               DEPOSITION OF:

15                JOE RUSSO

16         WEDNESDAY, APRIL 18, 2007

17

18

19

20

21

22 Reported by:  Sally D. Phelps

             CSR 3485

23

24

25

EXHIBIT D

10

1        Again if you were to say uh-huh Mr. Epstein and

2   I might say was that a yes, not because we're surprised

3   that you were saying uh-huh but because we want to make

4   sure when someone reads this later that they know that

5   that's what you were saying.

6        Like I told you before we got started I don't

7   expect this to last much more than an hour or so.  We're

8   going to try to get you out of here as soon as possible

9   but if you need to take break for whatever reason whether

10  it's work related or you just want to use the men's room

11  or whatever let us know.

12       Even though there is a light bulb hanging from

13  here I don't have a rubber hose.  I'm not going to try to

14  punish you in any way.  I'm going to get your best

15  testimony and get you on your way.

16       Do you have any questions about what we're going

17  to do before we get started?

18       A.   No.

19       Q.   If any come up please feel free to stop us and

20  ask us so we can clarify it for you. I should probably

21  get an address from you.  Do you have an address you can

22  give me?

23       A.   Home address or work address?  I'll give you

24  work address.

25       Q.   All right.  That's fine.

11

1      A.   Now, I know we said I can't look at them, but

2 can they tell me my work address?

3      Q.   If you don't remember it say I don't remember

4 what my work address is.

5      A.   I don't remember what it is right off the

6 moment.

7      Q.   Is it a station number?

8      A.   Well, let me give you this address here.  It's

9 1010 Second Avenue, suite No. 300, San Diego 92101.

10     Q.   Okay.  Is that probably the best address to try

11 to find you if we need you in the future on this case?

12     A.   For this case, yes.

13     Q.   What's your date of birth, Joe?

14     A.   6/24/70.

15     Q.   By whom are you currently employed?

16     A.   San Diego Medical Services Enterprise.  It's a

17 Rural/Metro Corporation.

18     Q.   That's their address on Second Avenue that you

19 gave me?

20     A.   That is our fire department headquarters where

21 all EMS is taken care of for the fire department and

22 Rural/Metro.

23     Q.   How long have you worked for San Diego Medical

24 Services Enterprise?

25     A.   Off and on now for approximately four years,

14

1    Q.    Depending on the information that came in?

2    A.    Depending on the information they retained.

3    Q.    The paramedic vehicle that you rode on was an

4    ambulance as well as the equipment?

5    A.    I was on the paramedic ambulance, not the

6    engine.

7    Q.    Right.    That one was truly an ambulance in the

8    sense you could transport people from the scene?

9    A.    Correct.    It was a paramedic ambulance.

10    Q.    Did any other, for the sake of example, private

11    company ambulances respond to that incident if you can

12    recall?

13    A.    No.

14    Q.    In all these questions, Joe, I'm just asking for

15    your best recollection.    So they may seem kind of

16    specific, but just give me your best recollection on some

17    of these things.

18          Upon your arrival do you know what your role was

19    on this particular call?

20    A.    Yes.    At that point I had an intern as I do now,

21    and it was my job to oversee the intern as he does

22    patient care.    And our job is strictly patient assessment

23    and care.

24    Q.    Was that intern Mr. Price?

25    A.    Correct.

22

1  thought may have occurred.

2      Q.  Did anybody assist you in that function?

3      A.  Bonnie may have and also Captain Spangler.

4      Q.  Captain Spangler may have or you're sure he did?

5      A.  May have.

6      Q.  As part of that function -- when I use that

7  function in the rest of these questions in that area I'm

8  talking about that information gathering function as

9  opposed to treatment.

10     A.  Okay.

11     Q.  In that function that you were performing did

12 you interview the victim at all?

13     A.  I did not but my intern did.

14     Q.  So now we're talking about Mr. Price?

15     A.  Robert Price, yes.

16     Q.  Were you present when that interview took place?

17     A.  Yes.

18     Q.  What information was gathered from the victim

19 concerning what had happened?  Again if there is

20 something there that will help you feel free to refer to

21 it, if there is not anything there --

22     A.  There is.  I have his initial of what he got,

23 and I stood over him and my best recollection was I

24 remember the patient stating that he kicked something.

25 He kicked the thing into the fire and it exploded.

23

1    Q.  Did he elaborate at that time on what he meant

2 by the thing?

3    A.  He did say it was a propane.

4    Q.  So you understood that he was telling you that

5 he had kicked some type of compressed gas cylinder into a

6 campfire basically?

7    A.  Yes.

8    Q.  All right.  Mr. Price would have been present

9 when he made that statement because he was the one that

10 was actually interviewing him.

11    A.  Yes.

12    Q.  Were there any more members of your fire

13 department team that would be able to confirm or disprove

14 that this is what he was saying that you know of?

15    A.  I don't know.  Maybe all of them, maybe none.  I

16 don't know.

17    Q.  But you're sure at least you and Mr. Price,

18 Robert Price?

19    A.  Correct.

20    Q.  Any other information, limiting it just now to

21 the victim, that was provided to you about what had

22 happened?  In other words, maybe he elaborated on why he

23 kicked it into the fire, how he kicked it into the fire,

24 or maybe it wasn't him that kicked it into the fire it

25 was somebody else in his presence, anything like that?

29

1    scene?  Do you know whether anybody from the fire

2    department, whether it be the engine company or the

3    paramedics with whom you were working took custody of it

4    at the scene?

5        A.  No, I don't know.

6        Q.  No, you don't know?

7        A.  No, I do not know.

8        Q.  If such a thing were to occur would that be

9    something typically the engine company would do?

10       A.  Ask me that one more time.

11       Q.  Sure.  If somebody from the fire department

12   decided that items at the scene needed to be taken into

13   custody as part of your overall investigation is that

14   something that would typically be done by the folks in

15   the engine company?

16       A.  Yes.

17       Q.  Does the fire department as a whole, I'm

18   including the paramedics, EMT's, engine companies, do

19   they in the typical instance like this one reach a final

20   consensus conclusion as to what happened or do they just

21   have you put out a report like that and that's the end of

22   the story?

23       A.  On my end this is what we do.  We put out a

24   report like this, and that's the end of the story.  On

25   their end I do not know.  We're one entity but we're

30

1    separate.

2        Q.   Let me show you what we were provided as a

3    report in connection with this.  Maybe you can compare

4    that with what you've got in front of you.  If there is

5    additional stuff we need to get from you we'll make

6    copies of that.

7        A.   This is exactly what I have.

8        Q.   Okay.  Nothing less, nothing more?

9        A.   Nothing less.  Only the top sheets of paper

10   about this whole meeting.

11           MR. MOORHEAD:  Okay.  We don't need those.

12   We're going to mark this as the next exhibit in order.

13   This will be Exhibit 8.

14           (Exhibit 8 marked for identification.)

15   BY MR. MOORHEAD:

16       Q.   You've had an occasion I guess because you knew

17   you were coming here to take a look at this so you're

18   familiar essentially with what's in it?

19       A.   I took a brief look, yes.  This came to me on

20   very short notice.

21       Q.   Because I'm not familiar with the process maybe

22   I'm going to go through it in more detail than is

23   necessary, but the first section of this looks like it's

24   called call information, and it looks like somebody has

25   recorded where the incident occurred, a phone number,

45

1    loaded miles would -- actually looking back that loaded

2    miles is the amount of miles it took to get from there to

3    the hospital.

4         Q.   From Campland to the hospital?

5         A.   Correct.

6         Q.   It looks like below is the list of responding

7    fire department personnel?

8         A.   Yes.

9         Q.   Your name is in bolder print.  Maybe you're more

10   important; is that right?

11        A.   Because I was the paramedic on record.  Not any

12   more important.

13        Q.   Then it looks like there is a place for the

14   patient to sign if he wants to?  Is that it?

15        A.   Correct.  That's actually would be our

16   signatures.

17        Q.   Okay.

18        A.   That would actually be.

19        Q.   This one that I have doesn't bear your

20   signature?

21        A.   Neither does this one.  Maybe only the original

22   does.

23        Q.   You would expect if we found the original it

24   would have your signature on it?

25        A.   I hope so.

May 01 07 05:10p      William R. Phelps          8583147800                  p.3

SDMSE Patient Report - FS06035953                                    Page 1 of 4

---

Edit AuditReport

SAN DIEGO MEDICAL SERVICES ENTERPRISE - Billing Report - 04/21/2006 -
M21

---

INC#: FS06035953 QA Net#: 2412526 TapChart ID: 8528936003228463569

**Call Information (From CAD)**

**Demographics**                          **Incident Times**
Address:  2211 Pacific Beach Dr          TimeInQue:   04/21/2006
City:     SAN DIEGO                      22:09:23
Zip:      92109                          Assigned:    04/21/2006
Phone:    949-340-5572                   22:10:58
Notes:    45m, burns to legs and         Enroute:     04/21/2006
hands                                    22:12:34
                                         Staged:
Dispatch: Burns / Explosion (L1)         On Scene:    04/21/2006
Hospital: UCSD Medical Center            22:16:47
                                         Depart:      04/21/2006
                                         22:31:41
                                         Arrive Hosp: 04/21/2006
                                         22:45:22
                                         Clear:       04/21/2006
                                         23:21:12

---

**Patient Information (From TapChart)**
Name: Shalaby, Andrew W DOB: 10/07/1960
C/C: Moderate Status Burn - 45 Y/O M 180 lbs.
GCS: 15 RTS: 12


**BRIM:**
GCS: 15      B: Normal
E: 4         R: Oriented X 3
V: 5         I: Spont
M: 6         M: Obeys Cmds

**VITALS:**
Pulse: 62
Resp:  18
BP:    130/70
EKG:   NSR No Ect No ST Ch
Eyes:  R: 3 mm PERL L: 3 mm PERL
LOC:   GCS: 15  E: 4  V: 5  M: 6
Lungs: R: Clear L: Clear
Sat:   96% a O2 - 100% p O2
Skins: Normal Normal Normal
Sugar: 102
Temp:

A π EXHIBIT 3
Deponent RUSSO
Date 4/16/07 Rptr: Phelps
www.DEPOBOOK.com

P 0440

May 01 07 05:11p     William R. Phelps          8583147800               p.4

SDMSE Patient Report - FS06035953                                  Page 2 of 4

| Date | Time | Pulse | BP | Resp | EKG |
|------|------|-------|-----|------|-----|
| 04/22/2006 | 21:22:29 | 62 | 130/70 | 18 | NSR - No Ect - No ST Ch |
| 04/22/2006 | 21:39:00 | 62 | 110/p | 18 | |
| 04/22/2006 | 21:39:00 | 62 | 110/p | 18 | |

History:       aniexty

Allergies:     PCN

Medications:   zoloft, xanax

SECONDARY:

Head:          Negative - Unremarkable
Upper Extrem:  Lt Rt Hand 2nd degree burn.
Chest:         Negative - Unremarkable
Abdomen:       Negative - Unremarkable
Back:          Negative - Unremarkable
Pelvis:        Negative - Unremarkable
Lower Extrem:  Lt Rt Lower leg 2nd degree burn.


INTERVENTION:

04/22/2006 21:39:58 EKG Monitor - NSR
04/22/2006 21:40:20 Sat before O2 - 96%
04/22/2006 21:40:22 Sat with O2 - 100%
04/22/2006 21:42:00 NS 1000 ml 500 Fluid Bolus BHO - Robert Price
(Intern)
04/22/2006 21:43:00 O2 4 LPM w/ Canula SO - Robert Price(Intern)
04/22/2006 21:43:00 MS 4 mg IVP SO - Robert Price(Intern)
04/22/2006 21:43:00 MS 4 mg IVP BHO - Robert Price(Intern)
04/22/2006 21:45:25 Blood Sugar - 102


Special Questions Narrative:
Burn caused by explosion. No cooling measures before EMS arrival. No
associated SOB. Burn did not occur in a confined space.

2' Exam Narrative:
Total 1' burns: %. Total 2' burns: %. Total 3' burns: %. There are
circumferential burns. Burns involve the feet. No soot in pt's
airway. No singed nasal hair. No singed facial hair.

I:
45 Y/O male found in sitting position.
C:
Burn -

                                                              P 0441

http://10.200.100.3/cadview/viewTapChartReport.asp?id=8528936003228463569&fs=FS0...  7/12/2006

May 01 07 05:11p    William R. Phelps    8583147800    p.5

SDMSE Patient Report - FS06035953                                    Page 3 of 4

H:
pt was kicking around a proane torch it went into the fire and blew
up and burned him. family called 911.
A:
pt a/ox4. vitals listed. secondary. no neck or back pain, no loc. pt
had 3rd degree burns to outside of his left hand. and 2nd degree to
both calfes circumfrentially. approx 18% bsi.
R:
listed
T:
No change in patient while enroute hospital. Full report given to
receiving facility. IV(s) patent and flowing well.

burn center criteria.

Assigned Base:    30
Base Contacted:   35
Requested Hosp:   35
Nearest Hosp:     30
Destination:      UCSD Medical Center
Dest Reason:      Resource Issue
Resource Issue:   Burn
Loaded Mileage:   7
Transport Codes: 3 10


Robert Spangler P0311 E21-City of San Diego ALS

Alfred Allen III H9696 E21-City of San Diego ALS

Christopher Herse H9587 E21-City of San Diego ALS

Bonnie Martin P1253 E21-City of San Diego ALS

Daniel Nenow I11431 M21-City of San Diego ALS

Robert Price(Intern) I6904 M21-City of San Diego ALS

Joseph Russo P1748 M21-City of San Diego ALS



Patient Person Signature: _____


SDMSE - Billing

Patient Address:                                         P.0442
7525 Leviston

http://10.200.100.3/cadview/viewTapChartReport.asp?id=8528936003228463569&fs=FS0...  7/12/2006

May 01 07 05:11p          William R. Phelps                8583147800                    p.6

SDMSE Patient Report - FS06035953

Lecerrito CA 94530

Restock List

# Code    Item

7 90009 Gloves, Latex Free pair
1 82110 Sheet, Fitted
1 82100 Sheet, Flat
1 82145 Pillow Case
1 85100 ECG Pads Adult
1 84663 Glucose Strips
1 91009 IV Solution- 1000 ml
1 21001 IV Tubing- Maxi
1 90011 IV Tubing- Select 3
1 22061 IV Cath 14-20 ga
3 87100 Alcohol Prep
1 25211 Tourniquet
1 73010 4X4 Non-sterile
1 25221 Veniguard
1 10500 Oxygen
1 52101 Nasal Canula
1 01055 MS

P 0443

1 │ RICHARD A. ERGO (# 110487)
   │ CATHLEEN S. HUANG (# 219554)          FILED
2 │ BOWLES & VERNA LLP
   │ 2121 N. California Boulevard, Suite 875
3 │ Walnut Creek, California 94596          AUG 1 6 2007
   │ Telephone: (925) 935-3300
4 │ Facsimile: (925) 935-0371              RICHARD W. WIEKING
   │ Email: raergo@bowlesverna.com        CLERK, U.S. DISTRICT COURT
5 │        chuang@bowlesverna.com       NORTHERN DISTRICT OF CALIFORNIA

6 │ Attorneys for Third Party Defendant
   │ Worthington Industries, Inc.

7 │

8 │

9 │               UNITED STATES DISTRICT COURT

10│             NORTHERN DISTRICT OF CALIFORNIA

11│ ANDREW SHALABY, an individual, and SONIA   │ Case No.: C06-07026 MJJ
   │ DUNN-RUIZ an individual,
12│                                            │ Judge Martin J. Jenkins
   │              Plaintiffs,
13│                                            │ THIRD PARTY DEFENDANT
   │       vs.                                 │ WORTHINGTON INDUSTRIES, INC.'S
14│                                            │ REQUEST FOR JUDICIAL NOTICE IN
   │ IRWIN INDUSTRIAL TOOL COMPANY, THE         │ SUPPORT OF MOTION TO TRANSFER
15│ HOME DEPOT, INC., and DOES 2 through 100,   │ VENUE
   │ inclusive,
16│                                            │ Date:     September 25, 2007
   │              Defendants.                   │ Time:     9:30 a.m.
17│                                            │ Ctrm:     11, 19th Floor

18│ ────────────────────────────────
19│ BERNZOMATIC,                               │          BY FAX
   │              Third Party Plaintiff,
20│
   │       vs.
21│
   │ WESTERN INDUSTRIES, INC.,
22│ WORTHINGTON INDUSTRIES, AND ROES 2
   │ through 100, inclusive,
23│
   │              Third Party Defendants.
24│

25│        Pursuant to Federal Rules of Evidence Rule 201, Third Party Defendant Worthington Industries,

26│ Inc. requests that the Court take judicial notice of the following:

27│

28│

Bowles & Verna LLP    CASE NO.: C06-07026 MJJ                    1
2121 N. California Blvd   ─────────────────────────────────────────────────────────
Suite 875            THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC'S REQUEST FOR JUDICIAL NOTICE
Walnut Creek 94596              IN SUPPORT OF MOTION TO TRANSFER VENUE

1.    Plaintiffs' First Amended Complaint attached hereto as **Exhibit A.**

2.    The Joint Case Management Statement attached hereto as **Exhibit B**.

Dated: August ____ 16 ____, 2007                    BOWLES & VERNA LLP

By: _____
RICHARD A. ERGO
Attorneys for Third Party Defendant
Worthington Industries, Inc.

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                         2

THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC'S REQUEST FOR JUDICIAL NOTICE
IN SUPPORT OF MOTION TO TRANSFER VENUE

**EXHIBIT A**