1  MICHAEL J. VEILUVA (State Bar No. 100419)
   MARK D. EPSTEIN (State Bar No. 168221)
2  ALBORG, VEILUVA & EPSTEIN LLP
   200 Pringle Avenue, Suite 410
3  Walnut Creek, CA 94596
   Telephone: (925) 939-9880
4  Facsimile: (925) 939-9915

5  Attorneys for Plaintiffs
   Andrew Shalaby and Sonia Dunn-Ruiz
6

7

8                 UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10 ANDREW SHALABY and SONIA DUNN-        Case No. C 06-07026 EDL
   RUIZ,
11                                        **FIRST AMENDED COMPLAINT**
                Plaintiffs,               **(DEMAND FOR JURY TRIAL)**
12
13        vs.
14 IRWIN INDUSTRIAL TOOL COMPANY,
   INC., THE HOME DEPOT, INC., and DOES
15 2 through 100, inclusive
16             Defendants.

17        Plaintiffs Andrew Shalaby (hereinafter "Mr. Shalaby") and Sonia Dunn-Ruiz (hereinafter

18 "Ms. Dunn-Ruiz" – collectively "Plaintiffs"), by and through their  attorneys, allege for their

19 First Amended Complaint against defendants Irwin Industrial Tool Company, Inc., a wholly

20 owned subsidiary of Newell Rubbermaid, Inc. (hereinafter "Irwin"), and The Home Depot, Inc.

21 (collectively ("Defendants") as follows:

22                        **JURISDICTION AND VENUE**
23
24        1.      Plaintiffs are, and at all times were, residents of the City of El Cerrito, County of

25 Contra Costa, in the State of California.

26        2.      Defendant Irwin Industrial Tool Company, Inc. is and at all times relevant to this

27 action was, a corporation organized and existing under the laws of the State of Delaware, with its

28

                                                        EXHIBIT A

1  principal place of business in Huntersville, North Carolina, and is a wholly owned subsidiary of

2  Newell Rubbermaid, Inc.  Plaintiffs are informed and believe, and thereon allege, that Irwin

3  Industrial Tool Company manufactures and distributes hand tools, power tools and accessories,

4  including MAPP Gas torches and MAPP Gas cylinders under the "BernzOmatic" brand name.

5       3.     Plaintiffs are informed and believe, and thereon allege, that BernzOmatic is an

6  unincorporated division of Irwin Industrial Tool Company

7       4.     Defendant The Home Depot, Inc. is, and at all times relevant was, a corporation

8  organized and existing under the laws of the State of Delaware, with its principal place of

9  business in Atlanta, Georgia.  Plaintiffs are informed and believe, and thereon allege, that The

10  Home Depot, Inc. is a retail seller of hardware, appliances, building materials, gardening

11  materials, and other home improvement supplies, which operates stores throughout the United

12  States, including California, with stores in the cities of Emeryville (Alameda County) and El

13  Cerrito (Contra Costa County), California.  The Home Depot, Inc. sells, among other things,

14

15  BernzOmatic Brand MAPP Gas torches.

16       5.     Plaintiffs are ignorant of the true names and capacities of defendants sued herein

17  as DOES 2 through 100, inclusive, and therefore sues those defendants by such fictitious names.

18  Plaintiffs will amend this complaint to allege the true names and capacities of said defendants if

19  and when that information is ascertained.

20

21       6.     Plaintiffs are informed and believe that at all times mentioned herein, defendants

22  and each of them were the agents, servants, joint venturers, authorized representatives, delegates

23  and/or successors of the other defendants named herein, and were acting within the course and

24  scope of said agency, service, joint venture, representation, delegation and/or succession.

25

26       7.     The court has original jurisdiction of this action under 28 U.S.C. § 1332, based

27  upon the parties' complete diversity of citizenship, in that it is a civil action between citizens of

28

1    different states in which the amount in controversy exceeds the sum of $75,000, exclusive of

2    interest and costs.

3         8.    Venue is proper in the Northern District of California, pursuant to 28 U.S.C. §

4    1441(a), as well as Civil Local Rules 3-2 (c) and (d), on the grounds that this action was

5    commenced in the Superior Court of the State of California, in and for the County of Alameda,

6    and was subsequently removed to this Court by defendants pursuant to 28 U.S.C. § 1441(a).

7    **FACTUAL ALLEGATIONS**

8

9         9.    Sometime in early to mid 2005, Mr. Shalaby purchased a BernzOmatic brand

10   MAPP Gas torch kit from a Home Depot store near his home in El Cerrito, California. The torch

11   kit included the two components of a BernzOmatic MAPP Gas torch: a yellow colored MAPP

12   Gas canister, or cylinder, and a torch head assembly ("torch"), the tip of which emits a flame

13   when the torch is in use. The flame is intended to be used for soldering, welding, and other

14   purposes that are described on the cylinder labels, on BernzOmatic internet website:

15   http://www.bernzomatic.com, and in other product related instructions and promotional

16   materials.

17

18        10.   The BernzOmatic torch is designed and intended to be screwed on to a threaded

19   metal neck of the MAPP Gas cylinder. Once attached to the cylinder, the torch is designed and

20   intended to be ignited when the user activates a trigger switch that is a part of the torch assembly.

21        11.   Soon after Mr. Shalaby purchased the BernzOmatic torch kit from Home Depot,

22   he purchased several replacement BernzOmatic MAPP Gas cylinders from Home Depot and/or

23   Ace Hardware to use once the original cylinder that came with the torch kit was depleted of

24   MAPP Gas.

25

26        12.   Plaintiffs and their two children are avid campers. They own a recreational

27   vehicle which they use on a regular basis to tour and park for overnight stays at designated

28   campgrounds that accommodate recreational vehicles.

3

13.     While camping, Plaintiffs regularly light wood campfires in the evenings.  Up until April 21, 2006, Mr. Shalaby typically ignited the family's campfires by using his BernzOmatic MAPP Gas torch to ignite the firewood.  Mr. Shalaby stored the torch in a wooden box, along with the auxiliary MAPP Gas canisters, which Plaintiffs kept inside of their recreational vehicle.

14.     The MAPP Gas torch kit contained a written representation that, among other things, one of the intended and/or acceptable uses of the torch was for "lighting grills."  By making this representation, BernzOmatic intended for consumers to use its MAPP Gas torches to start cooking and/or recreational campfires, and knew or should have known that some consumers would use its torches in the manner that Mr. Shalaby used his torch at the time of the incident which is the subject of this lawsuit, as set forth in more detail herein below.

15.     Neither the torch nor the MAPP Gas cylinder contained a warning against using the torch to ignite a wood campfire.

16.     Defendants and each of them at all times herein mentioned knew and intended that the BernzOmatic Brand MAPP Gas torches that they designed, manufactured, marketed and sold would be purchased and used by consumers without the requisite knowledge of what constitutes material defects in the product, and thus without inspection for defects therein or in any of its component parts.

17.     The MAPP Gas torch and/or cylinder at issue in this case was, at the time Mr. Shalaby purchased it, defective and unsafe for its intended purposes in that the design, manufacture and/or workmanship of the torch or its component parts were such that, without any misuse of or abuse to the product on the part of the user, the contents of the cylinder allowed to discharge instantaneously and become ignited upon activation of the torch ignition switch.

18.     Between the date on which he purchased the MAPP Gas torch kit and April 21, 2006, Mr. Shalaby used the torch to ignite campfires on many occasions.

**A.    The Incident**

     19.    During the week of April 17, 2006, Plaintiffs were vacationing at the "Campland on the Bay" recreational vehicle resort, located at 2211 Pacific Beach Drive in San Diego, California.

     20.    On or about the evening of April 21, 2006, Mr. Shalaby was seriously injured when he activated the trigger switch on his BernzOmatic MAPP Gas torch in order to light a wood campfire in a designated campfire pit, located within the campsite at the Campland complex where Plaintiffs were staying.  Mr. Shalaby activated the trigger switch on the torch when the MAPP Gas cylinder suddenly, instantaneously, and without warning, exploded and/or discharged its contents, which caught fire.  The heated MAPP Gas and fire enveloped Mr. Shalaby, and caused severe burns to his face, limbs, and extremities.

**B.    Ms. Dunn-Ruiz Witnessed the Incident**

     21.    Ms. Dunn-Ruiz was less than ten feet away from Mr. Shalaby when the BernzOmatic cylinder exploded and/or instantaneously discharged its contents and enveloped Mr. Shalaby in heated MAPP Gas and fire.  While she had her back turned to her husband at the moment the explosion and/or gas discharge occurred, Ms. Dunn-Ruiz heard the noise from the explosion and/or gas discharged, and turned around within seconds to see her husband enveloped in flames.

**C.    Plaintiffs' Damages**

     22.    Mr. Shalaby was confined to a hospital for approximately three weeks after the incident of April 21, 2006 involving the BernzOmatic torch and MAPP Gas cylinder, receiving medical treatment for his injuries, including but not limited to painful skin grafts and surgeries, as well as treatments for infections and other medical complications that were proximately caused by the incident.  Mr. Shalaby was bedridden for several weeks thereafter.  During his time in the hospital, Mr. Shalaby incurred in excess of $300,000 in medical expenses, and he continues to incur medical substantial expenses in connection with ongoing medical treatment for his injuries.

1        23.    At all times mentioned herein, Mr. Shalaby was and remains a self-employed

2    attorney at law with an active litigation practice. During the time he was confined to the

3    hospital, Mr. Shalaby was unable to work and, as a result, lost a substantial amount of income.

4    Since being discharged from the hospital, Mr. Shalaby's ability to resume his law practice has

5    been limited due to the physical and emotional injuries he sustained as a result of the April 21,

6    2006 incident involving the BernzOmatic torch and MAPP Gas cylinder. Mr. Shalaby was

7    recently able to resume practicing law on a limited basis, but he continues to lose a substantial

8    amount of business and income due to his limited ability to practice law on a full time basis. Mr.

9    Shalaby will continue to lose income as a result of the injuries he sustained from the

10    BernzOmatic MAPP Gas torch for an indefinite period of time.

11        24.    Mr. Shalaby has suffered mental anguish and emotional injuries as a result of the

12    April 21, 2006 incident with the BernzOmatic torch and MAPP Gas cylinder, including but not

13    limited to Post Traumatic Stress Disorder, for which he has sough treatment. Mr. Shalaby has

14    incurred, and continues to incur, out-of-pocket expenses for the treatment of his emotional

15    injuries.

16        25.    Ms. Dunn-Ruiz has suffered mental anguish and emotional injuries as a result of

17    witnessing her husband burn as a result of the April 21, 2006 incident with the BernzOmatic

18    torch and MAPP Gas cylinder while standing in close proximity to her husband.

19

20        **FIRST CAUSE OF ACTION -- STRICT PRODUCTS LIABILITY**
21        ***(By Mr. Shalaby Against Irwin Industrial Tools and Home Depot)***

22        26.    Plaintiffs incorporate by this reference the allegations, and each of them,

23    contained in paragraphs 1 through 25 above, as though fully set forth herein.

24        27.    At all times mentioned in this complaint, the BernzOmatic Brand MAPP Gas

25    torch and/or cylinder that caused Mr. Shalaby's injuries and/or its component parts, were

26    defective as to design, manufacture, and warnings, which caused the torch, cylinder and/or their

27

28

component parts to be in a dangerous and defective condition and prone to failure, which made them unsafe for their intended use.

28.    Plaintiffs are informed and believe that the torch and/or cylinder contained one or more manufacturing defects when they left the possession of Irwin Industrial Tools, Home Depot and/or DOES 2 through 100 (collectively "Defendants") in that the torch and/or cylinder differed from the intended design and specifications, and/or from other typical units of the same product line.

29.    Plaintiffs are further informed and believe that the design of the BernzOmatic torch and/or MAPP Gas cylinder that caused Mr. Shalaby's injuries was defective because the torch and/or cylinder did not perform as safely as an ordinary consumer would have expected them to perform when used in the manner that Mr. Shalaby did at the time of the April 21, 2006 incident which is the subject of this case.

30.    Defendants, and each of them, designed, manufactured, distributed, marketed and/or sold the torch and cylinder, and the torch and/or cylinder contained one or more manufacturing and/or design defects when they left Defendants' possession.

31.    As a direct and proximate result of the defective and dangerous condition of torch, cylinder and/or their component parts as described above, Mr. Shalaby sustained the following serious injuries and damages from using the torch in an intended manner:

    a.    Deep burns over 22% of his body surface, including his face, hands, arms and legs, requiring surgical repair, skin grafts and continuing medical treatment;

    b.    physical pain and discomfort;

    c.    immobility;

    d.    disfigurement;

    e.    lost wages; and

f.  emotional trauma and mental anguish, including but not limited to Post

Traumatic Stress Disorder.

## SECOND CAUSE OF ACTION -- STRICT LIABILITY FOR FAILURE TO WARN
### (By Mr. Shalaby Against Irwin Industrial Tools and Home Depot)

32.  Plaintiffs incorporate by this reference the allegations, and each of them,

contained in paragraphs 1 through 31 above, as though fully set forth herein.

33.  The BernzOmatic torch and MAPP Gas cylinder that caused Mr. Shalaby's

injuries lacked sufficient instructions or warnings of the potential risk and danger that the

cylinder might suddenly and instantaneously discharge its contents and catch fire when used in

an intended and foreseeable manner.

34.  This danger and risk were known or should have been known to Defendants at the

time the torch and MAPP Gas cylinder were designed, manufactured, distributed, marketed and

sold.

35.  These risks presented a substantial danger to purchasers and users of the torch that

ordinary consumers would not have recognized or expected, particularly without an adequate

warning.

36.  Mr. Shalaby was injured when he used the torch in a manner that was intended

and foreseeable to Defendants.

37.  The lack of sufficient instructions or warnings was a substantial factor in causing

Mr. Shalaby's injuries.

## THIRD CAUSE OF ACTION – NEGLIGENCE
### (By Mr. Shalaby Against Irwin Industrial Tools)

38.  Plaintiffs incorporate by this reference the allegations, and each of them,

contained in paragraphs 1 through 37 above, as though fully set forth herein.

FIRST AMENDED COMPLAINT

39.    Irwin Industrial Tools, whose BernzOmatic division designed, manufactured, distributed, marketed and/or sold the BernzOmatic Brand torch and MAPP Gas cylinder that caused Mr. Shalaby's injuries.

40.    Irwin Industrial Tools was negligent in designing and/or manufacturing the torch and MAPP Gas cylinder in that they failed to use the amount of care in designing and/or manufacturing the torch and cylinder that a reasonably careful designer and manufacturer would use in similar circumstances to avoid exposing others to a foreseeable risk of harm.

41.    Mr. Shalaby was harmed as a proximate result of Irwin Industrial Tools' negligence when the BernzOmatic Brand MAPP Gas cylinder exploded and instantaneously discharged its contents upon Mr. Shalaby's activation of the torch trigger switch.

42.    The negligence of Industrial Tools' was a substantial factor in causing Mr. Shalaby's injuries.

### FOURTH CAUSE OF ACTION – NEGLIGENT FAILURE TO WARN
*(By Mr. Shalaby Against Irwin Industrial Tools and Home Depot)*

43.    Plaintiffs incorporate by this reference the allegations, and each of them, contained in paragraphs 1 through 42 above, as though fully set forth herein.

44.    Defendants, and each of them, were negligent by not using reasonable care to adequately warn or instruct consumer's about the dangerous condition(s) in the BernzOmatic Brand MAPP Gas torch's and/or cylinder that caused Mr. Shalaby's injuries, or about circumstances that are likely to make the consumer's use of the torch dangerous.

45.    Defendants, and each of them, knew or reasonably should have known that the torch presented an unreasonable danger of exploding, or was likely to explode, when used in a reasonably foreseeable manner.

900725.pld.USDC Pldgs.Amended Complaint (Final).doc
FIRST AMENDED COMPLAINT

46.    Defendants knew or reasonably should have known that users of the torch would not realize this danger, yet failed to adequately warn of the danger or instruct users on the safe use of the torch to prevent the type of injuries that Mr. Shalaby has sustained.

47.    A reasonable designer, manufacturer, marketer, distributor and seller would have warned of this danger, or instructed users on the safe use of the torch, to prevent that type of injuries that Mr. Shalaby has sustained.

### FIFTH CAUSE OF ACTION – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### *(By Mr. Shalaby Against Irwin Industrial Tools and Home Depot)*

48.    Plaintiffs incorporate by this reference the allegations, and each of them, contained in paragraphs 1 through 47 above, as though fully set forth herein.

49.    Mr. Shalaby was proximately harmed by the BernzOmatic Brand torch and MAPP Gas cylinder used in the April 21, 2006 incident because the torch and cylinder did not have the qualities, reliability and safety that a reasonable consumer would expect.

50.    At the time he purchased the torch, Defendants were in the business of selling BernzOmatic Brand torches and MAPP Gas cylinders.

51.    The BernzOmatic torch and MAPP Gas cylinder that caused Mr. Shalaby's injuries were not of the same quality as those generally acceptable in the industry, and were not fit for the ordinary purposes for which such products are used.

52.    The failure of the torch to have the expected quality that it should have had was a substantial factor in causing Mr. Shalaby's injuries.

### SIXTH CAUSE OF ACTION –
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
#### *(By Plaintiffs Against All Defendants)*

53.    Plaintiffs incorporate by this reference the allegations, and each of them, contained in paragraphs 1 through 52 above, as though fully set forth herein.

54.    Defendants, and each of them, were negligent in designing, manufacturing, distributing and selling the defective BernzOmatic Brand torch and MAPP Gas cylinder that caused Mr. Shalaby's injuries.

55.    Ms. Dunn-Ruiz was present at the scene of the April 21, 2006 incident involving the explosion and/or instantaneous discharge of the contents of the MAPP Gas cylinder in Mr. Shalaby's hands, when it occurred, and was aware at the time that her husband was sustaining severe and life threatening injuries.

56.    Both Mr. Shalaby and Ms. Dunn-Ruiz suffered serious emotional distress as a result of experiencing and observing the April 21, 2006 incident, respectively, including severe mental suffering, grief, anguish, anxiety, depression, worry, shock, and in the case of Mr. Shalaby, Post Traumatic Stress Disorder.

57.    The negligence of Defendants in designing, manufacturing, distributing, marketing and selling the defective torch and/or MAPP Gas cylinder was a substantial factor in causing Plaintiffs' serious emotional distress.

Wherefore, Plaintiffs DEMAND A JURY TRIAL, and pray that a judgment be entered against Defendants, and each of them, as follows:

1.    For general damages, including but not limited to damages for emotional distress, pain and suffering, according to proof;

2.    For special damages, including but not limited to out of pocket medical expenses and incidental expenses related to Mr. Shalaby's injuries, and lost income, according to proof;

3.    For exemplary damages;

4.    For prejudgment interest according to law;

5.    For costs of suit incurred in this action; and

900725.pld.USDC Pldgs.Amended Complaint (Final).doc

6.     For any other and further relief that the court deems just and proper.

Dated:   June__, 2007                          ALBORG, VEILUVA & EPSTEIN LLP


                                               By:_____
                                                     MARK D. EPSTEIN
                                               Attorneys for Plaintiffs

900725.pld.USDC Pldgs.Amended Complaint (Final).doc
FIRST AMENDED COMPLAINT

1  MICHAEL J. VEILUVA (State Bar No. 100419)
   MARK D. EPSTEIN (State Bar No. 168221)
2  ALBORG, VEILUVA & EPSTEIN LLP
   200 Pringle Avenue, Suite 410
3  Walnut Creek, CA 94596
   Telephone: (925) 939-9880
4  Facsimile: (925) 939-9915

5  Attorneys for Plaintiffs
   Andrew Shalaby and Sonia Dunn-Ruiz
6
7  J. PHILLIP MOORHEAD (State Bar No. 99445)
   LESLIE M. PRICE, JR. (State Bar No. 102872)
   KELLER, PRICE & MOORHEAD
8  229 Avenue I, Second Floor
   Redondo Beach, CA 90277
9  Telephone: (310) 540-1332
   Facsimile: (310) 540-8480
10
11 Attorneys for Defendants Newell Rubbermaid, Inc.,
   Rubbermaid, Incorporated, and The Home Depot, Inc.
12
13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15 ANDREW SHALABY and SONIA DUNN-      Case No. C 06-07026 CW
   RUIZ,                              JOINT CASE MANAGEMENT
16                                    STATEMENT AND PROPOSED ORDER
                Plaintiffs,           /
17                                    Date:  February 16, 2007
        vs.                          Time:  1:30 p.m.
18                                    Dept.: Courtroom 2
   NEWELL RUBBERMAID, INC.,
19 RUBBERMAID, INCORPORATED, and
   THE HOME DEPOT, INC.,
20
                Defendants.
21

22        The parties to the above-entitled action jointly submit this Case Management Statement

23 and Proposed Order, and respectfully request that the Court adopt it as its Case Management

24 Order in this case.

25                        DESCRIPTION OF THE CASE

26        This case stems from an incident that occurred on April 21, 2006, in which plaintiff

27 Andrew Shalaby was injured while using a BernzOmatic brand MAPP Gas cylinder and torch.

28

                                         1                    900725.pld.USDC Pldgs.Joint CMC(final).doc
                  JOINT CASE MANAGEMENT STATEMENTfinal joint cmc statement
                                                              EXHIBIT B

1.     **Brief Description of the Events Underlying the Action**

    a.     **Description of the Product at Issue in the Case**

Plaintiff Andrew Shalaby purchased a BernzOmatic brand MAPP Gas kit consisting of a MAPP gas cylinder and torch from a local hardware store, near his home in El Cerrito, California in mid-2005. Sometime after he purchased the original BernzOmatic kit, Mr. Shalaby purchased two replacement BernzOmatic MAPP Gas cylinders to use when the original cylinder was depleted of fuel. MAPP gas is a mixture of liquefied petroleum and methylacetylene-propadiene. MAPP gas is typically used for welding or soldering applications due to its high combustion temperature of 5301 F (2927 C ).

The BernzOmatic product which is the subject of this case included two components: a yellow colored canister or "cylinder" which contained the MAPP gas that was the fuel, and a "torch" that emits a flame from the tip when the torch is in use. The torch attached to the cylinder by screwing on to a threaded metal neck at the top of the cylinder. When the torch is attached to the cylinder, the user ignites the torch by pulling a trigger switch that is a part of the torch assembly.

    b.     **The Incident Underlying This Case**

Mr. Shalaby and his family, his wife Sonia Dunn-Ruiz and their two children, are avid campers. The family owns a recreational vehicle which they use on a regular basis to tour the western United States and park for overnight stays at designated campgrounds that accommodate recreational vehicles. Prior to and including the evening of April 21, 2006, Mr. Shalaby regularly used his BernzOmatic MAPP Gas torch to ignite wood campfires.
During the week of April 17, 2006, plaintiffs were vacationing at the "Campland on the Bay" recreational vehicle resort, located at 2211 Pacific Beach Drive in San Diego, California.
On the evening of April 21, 2006, Mr. Shalaby was severely injured when he activated the trigger switch on his BernzOmatic torch. Upon activating the trigger, Mr. Shalaby was engulfed by heated MAPP Gas and flames that were emitted from the product, which caused severe burns to his face, limbs, and extremities.

1    After investigation at the campsite, the parties are informed and believe that the onsite

2    manager claims that he was instructed by fire department personnel who responded to the scene

3    to discard the product involved in the incident for safety reasons. Accordingly, the parties are

4    informed and believe that product was discarded shortly after the incident.

5        c.    **Plaintiffs Contend That The Incident Was a BLEVE**

6    Plaintiffs contend that Mr. Shalaby's injuries were caused by a phenomenon known in the

7    scientific community as a "BLEVE". The word BLEVE is an acronym that stands for "Boiling

8    Liquid Expanding Vapor Explosion." A BLEVE occurs when a tank containing pressurized

9    liquid fails suddenly and produces an explosive effect. During the occurrence of a BLEVE, the

10    liquid inside the tank absorbs energy from the surrounding fire and rapidly heats up, resulting in

11    an increased rate of vaporization that increases the ullage [??] pressure. When this pressure

12    exceeds a certain limit (characteristic of the material properties of the tank wall, wall thickness

13    and temperature), the tank fails and the liquid that is released from the tank boils rapidly and

14    expands. If the liquid inside the tank is flammable, it ignites and forms a fireball.

15    Defendants contend that there is a safety relief valve to prevent an explosion if pressure

16    builds inside the cylinder.

17        d.    **There is No Product for Defendants to Inspect for Alleged Defects.**

18    Defendants have not yet had an opportunity to investigate or conduct discovery regarding

19    the relevant facts and the nature of the incident. The parties are informed and believe that the

20    product is no longer available to inspect and examine. However, plaintiffs have produced

21    photographs of the product, as it existed shortly before the incident occurred.

22        e.    **Mr. Shalaby's Wife Witnessed the Incident**

23    Mr. Shalaby's wife, plaintiff Sonia Dunn-Ruiz, was less than ten feet away from

24    Mr. Shalaby when the product exploded. She initially had her back turned to her husband, but

25    upon hearing a loud noise, she turned around within seconds to witness her husband on fire.

26        2.    **The Principal Factual Issues Which the Parties Dispute**

27    As of the filing of this joint statement, counsel for the parties have discussed the facts of

28    the case, but no discovery has yet been conducted. While discovery may result in one or more

900726.pld.USDC Pldgs.Joint CMC(final).doc

JOINT CASE MANAGEMENT STATEMENTfinal joint cmc statement

1  disputed factual issues, as of the filing of this statement, the parties have no information with
2  which to dispute the facts of the case.

3      3.      **The Principal Legal Issues Which the Parties Dispute**

4          The parties reasonably anticipate that they may have one or more disputes regarding the
5  following legal issues:

6          a.      Whether or not the product at issue in this case contained a manufacturing
7  defect when it left defendants' possession.

8          b.      Whether or not Plaintiffs can make a prima facie showing of defect
9  without the actual product available for examination and inspection by all parties and experts.

10          c.      Whether or not the product at issue in this case, or any of its components,
11  contained one or more design defects.

12          d.      Whether or not Mr. Shalaby's injuries at issue in this case were
13  proximately caused, in whole or in part, by a defective or unsafe condition in the product.

14          e.      Whether or not Mr. Shalaby's injuries were proximately caused, in whole
15  or in part, by a misuse of the product.

16          f.      Whether or not Mr. Shalaby was using the product in a safe and/or
17  intended and foreseeable manner.

18          g.      Whether or not the product at issue in this case had adequate instructions
19  or warnings that addressed the potential risks and factors in using the product which plaintiffs
20  contend proximately caused Mr. Shalaby's injuries.

21          h.      Whether or not BernzOmatic's has any liability for plaintiffs' injuries and,
22  if so, whether BernzOmatic is jointly and severally liable in the event that one or more of the
23  product's components were manufactured by a supplier.

24          i.      Whether or not BernzOmatic or one of its vendors, suppliers and/or
25  subcontractors was negligent in manufacturing and/or designing the product or its component
26  parts.

27

28

4

900726.pld.USDC Pldgs.Joint CMC(final).doc

     j.     Whether or not the product performed as safely as an ordinary consumer would have expected it to perform when used in the manner that Mr. Shalaby used it at the time of the incident.

     k.     Whether or not Mr. Shalaby's claimed injuries and damages in this case, or some of them, were proximately caused by the incident.

     l.     Whether or not the product was of the quality that a reasonable buyer would expect, or was fit for the ordinary purposes for which similar or like-kind products are typically used.

     m.     Whether or not BernzOmatic can make a prima facie showing that the product conformed with generally accepted design, manufacturing, and safety standards and regulations in existence at the time of the incident, and if so, what the relevance and weight of that evidence is as to the issue of whether the product contained a design and/or manufacturing defect.

     n.     Whether Mr. Shalaby was negligent in his use of the product thereby barring or reducing his recovery, if any.

**4.     The Other Factual Issues (e.g. Service of Process, Personal Jurisdiction, Subject Matter Jurisdiction, or Venue) Which Remain Unresolved**

There remains an issue as to which business entities are the proper defendants in this case. Plaintiffs believe they have sued the proper entities. Defendants contend that Home Depot U.S.A. should be named as a defendant in lieu of Home Depot, Inc., and that Irwin Industrial Tools, Inc. should be named as defendant in lieu of Newell Rubbermaid, Inc. and Rubbermaid Inc. During their Rule 26 meet and confer telephone conference, counsel for plaintiffs and defendants agreed to resolve this issue by stipulation and a court order thereon. If the parties can agree on stipulation terms that are satisfactory to plaintiffs, said stipulation may result in a dismissal of Home Depot from the case without prejudice on the grounds that BernzOmatic is providing a defense and indemnity to Home Depot. Upon a proper evidentiary showing, or the execution of an acceptable stipulation by defendants, the appropriate "BernzOmatic" entity will

1  be substituted for Newell Rubbermaid, Inc. and Rubbermaid Inc., who will be dismissed without

2  prejudice

3      The parties wish to address this issue with the Court at the initial case management

4  conference, and expect to have a stipulation and proposed order on file with the Court within two

5  weeks thereafter.

6      **5.    The Parties Which Have Not Been Served and the Reasons**

7      All named defendants have been served.

8      **6.    The Additional Parties To Be Joined**

9      While BernzOmatic may have manufactured the torch at issue, BernzOmatic contends

10  that it did not manufacture the MAPP gas cylinder.  BernzOmatic contends that during the

11  relevant timeframe, BernzOmatic purchased MAPP gas cylinders for private labeling from one

12  of two manufacturers.  The serial number on the cylinder and/or purchase date of the cylinder

13  would identify the cylinder manufacturer.  One or both of the cylinder manufacturers are likely

14  to be added as defendants.

15                      **ALTERNATIVE DISPUTE RESOLUTION**

16      **7.    The Following Parties Consent to Assignment of this Case to a United States**
            **Magistrate Judge**
17

18  None.

19      **8.    ADR**

20      The parties have already agreed to submit the case to mediation before a private mediator

21  who has yet to be selected.  The parties have been ordered to complete mediation by April 19,

22  2007.

23                              **DISCLOSURES**

24      The parties certify that they have made the disclosures that are required of them by F.R.

25  Civ. P. 26(a)(1) and Civil L.R. 16-9 concurrently with the filing of this statement.

    DISCOVERY
26

27      The parties agree to the following discovery plan, exclusive of expert discovery:

28      a.      Interrogatories.  Each party may propound up to 35 interrogatories.

      b.     Requests for Documents and Things.  Each party may propound up to 35 requests for production of documents and things.

      c.     Depositions.  Each party may take up to 15 depositions of percipient witnesses and non-retained expert witnesses.

      d.     Third Party Subpoenas.  In addition to any deposition subpoenas, each party may serve up to 15 third party subpoenas for purposes of inspection and producing documents and things including, but not limited to, entry onto land to inspect the accident site.

The parties will need to complete some basic discovery prior to mediation, but do not anticipate that they will be able to complete all necessary discovery before mediation.  The parties anticipate that they will be able to complete their non-expert discovery by September 30, 2007, barring unforeseen difficulties.

## TRIAL SCHEDULE

The parties request a trial date in January 2008.  The parties estimate that the trial will last between five to seven court days.

## SIGNATURE AND CERTIFICATION BY LEAD TRIAL COUNSEL

Pursuant to Civil L.R. 16-12, each of the undersigned certifies that he or she has read the brochure  entitled "Dispute Resolution Procedures in the Northern District of California," discussed the available dispute resolution options provided by the court and private entities and has considered whether this case might benefit from any of the available dispute resolution options.

Dated: February 8, 2007          KELLER, PRICE & MOORHEAD

                              /S/

                    By: _____
                          LESLIE M. PRICE, JR.
                          Attorneys for Defendants

Date: February 8, 2007           ALBORG, VEILUVA & EPSTEIN LLP

                              /S/

                    By: _____
                          MARK D. EPSTEIN
                          Attorneys for Plaintiffs

1

**CASE MANAGEMENT ORDER**

2    The Case Management Statement and Proposed Order is hereby adopted by the Court as

3  the Case Management Order for the case and the parties are ordered to comply with this Order.

4  In addition, the Court orders:

5

6

7

8

9

10

11

12

13

14

15

Dated:

16                                                   _____

                                                     UNITED STATES DISTRICT COURT
17                                                   JUDGE

18

19

20

21

22

23

24

25

26

27

28

900725.pld.USDC Pldgs.Joint CMC(final).doc

JOINT CASE MANAGEMENT STATEMENT final joint cmc statement

**FILED**

**AUG 1 6 2007**

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1 | RICHARD A. ERGO (# 110487)
    CATHLEEN S. HUANG (# 219554)
2 | BOWLES & VERNA LLP
    2121 N. California Boulevard, Suite 875
3 | Walnut Creek, California 94596
    Telephone: (925) 935-3300
4 | Facsimile: (925) 935-0371
    Email: raergo@bowlesverna.com
5 |        chuang@bowlesverna.com

6 | Attorneys for Third Party Defendant
    Worthington Industries, Inc.

7

8

9

10

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

11 | ANDREW SHALABY, an individual, and SONIA
     DUNN-RUIZ an individual,
12 |
               Plaintiffs,
13 |
           vs.
14 |
     IRWIN INDUSTRIAL TOOL COMPANY, THE
15 | HOME DEPOT, INC., and DOES 2 through 100,
     inclusive,
16 |
               Defendants.
17 |
18 | ──────────────────────────────
     BERNZOMATIC,
19 |
               Third Party Plaintiff,
20 |
           vs.
21 |
     WESTERN INDUSTRIES, INC.,
22 | WORTHINGTON INDUSTRIES, AND ROES 2
     through 100, inclusive,
23 |
               Third Party Defendants.
24 |

Case No.: C06-07026 MJJ

Judge Martin J. Jenkins

**DECLARATION OF CATHLEEN S.
HUANG IN SUPPORT OF THIRD PARTY
DEFENDANT WORTHINGTON
INDUSTRIES, INC.'S MOTION TO
TRANSFER VENUE**

Date:     September 25, 2007
Time:     9:30 a.m.
Ctrm:    11, 19th Floor

**BY FAX**

25

26 | I, CATHLEEN S. HUANG, declare:

27 |     1.     I am an attorney at law duly admitted to practice before all the courts of the State of

28 | California and am an associate at the law firm of Bowles & Verna LLP, counsel for Third Party

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                    1
DEC. OF CATHLEEN S. HUANG IN SUPPORT OF WORTHINGTON'S MOTION TO TRANSFER VENUE

1  Defendant Worthington Industries, Inc. ("Worthington") herein.  If called as a witness, I could and

2  would competently testify to the facts stated herein.

3       1.       Attached hereto as **Exhibit A** is a true and correct copy of the relevant excerpts from the

4

5  deposition transcript of Randy Stephens.

6       2.       Attached hereto as **Exhibit B** is a true and correct copy of the relevant excerpts from the

7  deposition transcript of Warren Ratliff.

8       3.       Attached hereto as **Exhibit C** is a true and correct copy of the relevant excerpts from the

9  deposition transcript of Robert Price.

10      4.       Attached hereto as **Exhibit D** is a true and correct copy of the relevant excerpts from the

11  deposition transcript of Joe Russo.

12

13

14      I declare under penalty of perjury under the laws of the State of California that the foregoing is

15  true and correct.  Executed this _16_ day August, 2007, at Walnut Creek, California.

16

17

18                                                    CATHLEEN S. HUANG

19

20

21

22

23

24

25

26

27

28

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                              2
DEC. OF CATHLEEN S. HUANG IN SUPPORT OF WORTHINGTON'S MOTION TO TRANSFER VENUE

**EXHIBIT A**

ORIGINAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


ANDREW SHALABY and SONIA DUNN-RUIZ,  )
                                     )
            Plaintiffs,              )
                                     )
vs.                                  ) No. C06-07026CW
                                     )
NEWELL RUBBERMAID, INC., RUBBERMAID, )
INCORPORATED, and THE HOME DEPOT,    )
INC.,                                )
                                     )
            Defendants.              )
_____)


DEPOSITION OF RANDY T. STEPHENS

Taken at San Diego, California

April 17, 2007


Reported by Catherine Gautereaux, CSR
Certificate No. 3122

EXHIBIT A

9

1      A      No.

2      Q      What's your business address?

3      A      2211 Pacific Beach Drive.

4      Q      That's in San Diego?

5      A      San Diego, California, yes, sir.

6      Q      And the ZIP code?

7      A      92109.

8      Q      And the business phone?

9      A      That would be Area Code (858) 581-4219.

10     Q      And your home address?

11     A      Let's see.  I just moved.  I can give you

12   where I live.

13     Q      Well, I'm only asking so if we need to get

14   ahold of you if you were to decide Campland is not

15   paying you enough and you were to move away.

16     A      I live in an RV park.  So my mailing address

17   is 42566 Escolacata -- this is a mouthful --

18   E-s-c-o-l-a-c-a-t-a, Drive, okay.  And that's in

19   Temecula.  That's my permanent address.

20     Q      What's the ZIP code up there in Temecula?

21     A      It is 92592.

22     Q      All right.  And your date of birth?

23     A      10/3/69.

24     Q      By whom are you currently employed?

25     A      Terra Vista Management; Campland on the Bay.

10

1      Q    So the company you work for is Terra Vista

2 Management?

3      A    Yes, sir.

4      Q    And the place you work at is Campland --

5      A    Yes, sir.

6      Q    -- on the Bay?  You're jumping in on me a

7 little bit.

8      A    Oh.  Sorry.

9      Q    She is going to scream at me pretty soon if we

10 don't stop.  How long have you worked at Campland on the

11 Bay, roughly?

12     A    Roughly, coming on three years.

13     Q    And your current position there?

14     A    I am a ranger.

15     Q    How long have you held that position?

16     A    The three years I've been there.

17     Q    Okay.  Who is your immediate supervisor at the

18 present time?

19     A    Darrin Sessler.  D-a-r-r-i-n, S-e-s-s-l-e-r.

20     Q    How long has Darrin been your immediate

21 supervisor, roughly?.

22     A    Roughly, I want to say a year, a year and a

23 half.  They changed over supervisors.

24     Q    Was Therese Kiel a supervisor of yours at one

25 time?

11

1    A    Yes, sir.

2    Q    Is that immediately prior to Darrin?

3    A    Yes.  She is Darrin's predecessor.

4    Q    Okay.  Do you know which of them was your

5    supervisor in April of 2006?

6    A    That would have been Therese Kiel.

7    Q    All right.  Were you on duty at Campland on

8    the Bay on the evening of April 21, 2006, when a camper

9    named Andrew Shalaby suffered burns at his campsite?

10    A    Yes, sir, I was.

11    Q    Do you recall that event, at least somewhat?

12    A    Yes, I do.  Yeah, to a decent degree of --

13    Q    Okay.  How did you personally become aware of

14    Mr. Shalaby's incident?

15    A    A woman came up to the ranger gate.  This is

16    what I was told.  I was radioed to go to, I believe it

17    was, site D19, regarding a personal injury of a man

18    severely burned at the site, at which time I -- we asked

19    that 911 be called from our gate.

20    Q    Let me stop you there.

21    A    Yeah.

22    Q    You didn't -- you weren't contacted by the

23    person who came to the gate; you were radioed in?

24    A    I was radioed by Warren.

25    Q    Mr. Ratliff?

35

1    A    Right.  In fact, I remember them actually

2  packaging -- well, Mr. Shalaby, pretty much, to my

3  knowledge, actually stepped and sat onto the gurney

4  because of his injuries.  And they were -- they had him

5  in a -- in a semi-prone thing and they were loading him

6  in and, I believe, probably doing the standard -- I

7  remember them giving him oxygen.  And I'm not sure if

8  they started an IV line or stuff like that.  And then

9  once they had him packaged and they were ready to go, I

10  guided them out with lights and sirens.

11    Q    Now, you made reference to trying to comfort

12  Mr. Shalaby, putting a coat and blankets on him, telling

13  him that 911 had been called, et cetera.  Did you have

14  any conversations directly with him about what had

15  happened?

16    A    Varying -- it wasn't so much a conversation as

17  to when he was rocking back and forth, he just kept

18  saying, "I'm an idiot.  I can't believe I'm so stupid,"

19  something regarding this.

20         And we were telling him, "Just calm down."

21  You know, "We got help on the way."  And, you know, it

22  was coherently, but yet he was -- you could tell -- you

23  know, he was rocking back and forth, "This is all my

24  fault."  You know, "I'm so stupid."

25         He felt bad, basically, I think, for --

42

1     Q    Okay.  You said it was burst open.  I assume

2 by that you mean the cylinder?

3     A    The cylinder itself, right where the -- I

4 don't know if you've ever seen a propane cylinder, but

5 right at the top, where it domes and then creates the

6 threads, it was burst just beyond the threads at the

7 neck.

8     Q    Anyway, the cylinder that you're talking about

9 is roughly the shape of like a two-liter bottle, right?

10    A    Yeah.  Yeah, but slightly slimmer and -- yeah.

11    Q    The sides essentially go straight up and then

12 taper like shoulders into a neck that's threaded?

13    A    Right.  Right.  Exactly.

14    Q    And the place that you saw -- are we talking

15 about a hole, a crack, or what did you see that had

16 burst?

17    A    Well, if I use this right here -- it's

18 glass -- but right at the -- if this is the neck of the

19 bottle right here, it was split approximately two and a

20 half inches long.

21    Q    That's the length?

22    A    Long.  And maybe a quarter-inch wide.

23    Q    Okay.  So we are talking basically about,

24 like, a slit or a crack as opposed to a round hole?

25    A    Yeah.  Like a split.  It was kind of

43

1   elliptical-shaped, I guess.

2        Q    Okay.  And that was near where the -- or at

3   the point where the shoulders of the cylinder become the

4   threaded neck?

5        A    Right.  It was right at the neck.  Right at

6   the base of the neck.

7        Q    All right.  In or below the threads?

8        A    Below the threads.

9        Q    And basically running in the same direction as

10  the threads, as opposed to perpendicular to them?

11       A    Right.  Right.

12       Q    Did you observe in any way, shape or form,

13  either by manipulating it or looking at it or in any

14  other fashion, whether the torch was all the way onto

15  the cylinder?

16       A    That, I don't know.

17       Q    Okay.  Did you observe any damage to the

18  torch, as opposed to the crack you've talked about in

19  the cylinder?

20       A    No, no.  It was -- I didn't want to touch it

21  too much because I thought it was still -- I don't know.

22  I didn't notice the crack.  I didn't notice if the torch

23  body was still on the torch tip.

24       Q    Did you make any observations, however

25  unscientific they may have been, as to whether it

48

1      A      Yes, sir.

2      Q      Other than the crack that you saw at the neck

3   of the cylinder, and I think you said something about

4   maybe part of the label had pulled away, do you remember

5   seeing any other damage to the cylinder?

6      A      Besides the crack?  No, I don't remember.

7      Q      Besides the crack and the label issue?

8      A      No, sir.

9      Q      Okay.  Had you ever seen torches and cylinders

10  of this nature before the date of this incident?

11     A      Yes, sir.

12     Q      And have you used them before?

13     A      Yes, sir.

14     Q      Have you ever actually used MAPP?

15     A      Yes, sir.

16     Q      What other types of compressed gases have you

17  used?

18     A      Propane, MAPP gas, larger tanks with

19  oxyacetylene cutting torches, that kind of stuff when I

20  was in the Navy.

21     Q      So you've used this type of equipment several

22  times before?

23     A      Yes, sir.

24     Q      And your conclusion that the cylinder involved

25  in this incident was filled -- or let me -- at least,

49

1  that one time, with MAPP gas, was that based solely upon

2  the fact that it was yellow, or did you see some

3  labeling that indicated that it was MAPP?

4      A    I think it was solely because I know that that

5  color is reserved for MAPP gas only.  Propane cylinders

6  come in a very variance of colors, but MAPP gas has to

7  be in a yellow -- yellow cylinder.

8      Q    Based upon your observations, did it appear

9  that the torch that was involved in this incident, the

10 one you saw at that location -- was it, in your opinion,

11 the appropriate torch for that cylinder?

12     A    See, that's -- that's where -- to my

13 recollection -- now, I've seen the pictures, but to my

14 recollection, he -- to my recollection, it was the wrong

15 torch tip on the wrong type of cylinder.  That's to my

16 recollection.

17     Q    Okay.

18     A    Once again, I did see it at a distance.  I

19 never actually touched it.

20     Q    So you've seen different types of torches used

21 for different types of gases; is that what you're

22 saying?

23     A    Yes, sir.

24     Q    What's the difference between the torches?

25 What might have been wrong with this one, that caught

50

1  your attention?

2      A    For some reason, I remember it to be the type

3  that only goes on propane bottles; the difference being

4  in the size, the type of fire being introduced, and the

5  igniting.  You know, there is an -- actually, a flame

6  arrester on a MAPP gas cylinder -- or, excuse me -- on a

7  torch body, not cylinder.

8      Q    But as you sit here today, you are not a

9  hundred percent sure?

10     A    I am not a hundred percent on that.

11     Q    Do you know why they use different types of

12  torches for propane versus MAPP?

13     A    Why they use different types of torch tips.  I

14  know it has something to do with the flame arrester,

15  because the smaller propane tip withstands so much heat

16  before it burns out and the larger one is -- the larger

17  MAPP gas tip can take a higher heat than a propane tip

18  can.

19     Q    Is it your understanding that MAPP burns at a

20  higher temperature than propane?

21     A    Extremely higher.

22     Q    Okay.  What -- if you know, from your

23  experience, what are MAPP gas cylinders used for,

24  normally?

25     A    Yes, I do know.  They're used for excessive

61

1  looking back a year later.

2      Q    Understood.

3      A    I don't know exactly why I worded it that way,

4  but I just know that it is worded that way.

5      Q    Was the San Diego Fire Department -- I think

6  you said it was Station 21 that responded?

7      A    Yes.  Yes, I know it was engine -- they call

8  it Engine Company 21.  So it would have been a fire

9  engine, not a --

10     Q    At some point in time that evening, did the

11 fire department take possession of the cylinder and

12 torch?

13     A    That, I don't know.  I don't believe so,

14 because I myself remember asking the engineer -- and I

15 believe Warren did, too.  I can't state for sure --

16 whether they needed to collect the torch and torch body

17 for evidence.

18     Q    Limiting it only to your conversation, so that

19 Warren can speak for himself -- you had a conversation

20 with someone from the fire department --

21     A    Yes.  I don't remember exactly who it was.

22     Q    You had a conversation with someone at the

23 fire department, asking them if they wanted you to

24 collect and provide them the torch and the cylinder?

25     A    Yes.

62

1    Q    And what was their response?

2    A    No.  That the gentleman in question, the

3 patient, as they stated, had already told them, and that

4 it was an accident.

5    Q    Okay.  Did you have any follow-up

6 conversations with anybody at the fire department, in

7 the days or weeks after this incident, making sure that

8 they didn't change their mind and want the torch or the

9 cylinder?

10    A    No, sir.

11    Q    Okay.  Do you know what became of the torch

12 and the cylinder after that evening?

13    A    I, myself, saw it the following day in the --

14 still in the truck bed.  Once again, I didn't touch it,

15 because I didn't exactly know why it was there.  And if

16 it's not yours, don't touch it, you know.  But after

17 that, I did not see it again.

18    Q    Okay.  By "truck bed," you're talking about

19 the Toyota?

20    A    The Toyota Tacoma ranger truck, yes.

21    Q    So you saw it -- did you say it was the

22 following day or the same day?

23    A    It would have been the following day, when I

24 came on the shift.

25    Q    So the last time you saw the torch or the

MAY 1 6 2007

# ORIGINAL

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

ANDREW SHALABY and SONIA DUNN-RUIZ, )
                                     )
             Plaintiffs,             )
                                     )
vs.                                  ) No. C06-07026CW
                                     )
NEWELL RUBBERMAID, INC., RUBBERMAID, )
INCORPORATED, and THE HOME DEPOT,    )
INC.,                                )
                                     )
             Defendants.             )
_____)

DEPOSITION OF WARREN L. RATLIFF, JR.

Taken at San Diego, California

April 17, 2007

Reported by Catherine Gautereaux, CSR
Certificate No. 3122

8

1      A      Yes, sir.

2      Q      Any questions on what's going to happen before

3  we get started?

4      A      No, sir.

5      Q      Okay.  Let's get your full name for the

6  record, please.

7      A      It would be Warren L. Ratliff, Jr.  Middle

8  name, Lee.

9      Q      And what's your business address, Mr. Ratliff?

10     A      2211 Pacific Beach Drive, San Diego,

11  California 92109.

12     Q      And what's the phone number there?

13     A      To our --

14     Q      Main number.

15     A      The main number would be (858) 581-4200.

16     Q      And if we were to call that number and ask for

17  you, they could track you down?  Or maybe not?

18     A      Maybe not.

19     Q      Do you have a better number?

20     A      Yes.

21     Q      What would that number be?

22     A      (858) 581-4219.

23     Q      Okay.  What's your home address?

24     A      Is 1666 Garnet Avenue, G-a-r-n-e-t, No. 116 --

25  or 119.  I'm sorry.

9

1     Q    San Diego?

2     A    San Diego, California.

3     Q    Same ZIP?

4     A    92109.

5     Q    Okay.  Just for reference purposes, what's

6 your date of birth?

7     A    June 11th, 1960.

8     Q    Okay.  By whom are you currently employed,

9 Mr. Ratliff?

10    A    Would be Terra Vista Management; Campland on

11 the Bay.

12    Q    Terra Vista Management is the employer, and

13 the location is Campland on the Bay?

14    A    Yes.  It would be the property location.

15    Q    And the official business address for Campland

16 on the Bay is that 2211 Pacific Beach Drive?

17    A    Yes.

18    Q    Okay.  How long have you worked at Campland on

19 the Bay, roughly?

20    A    Five years.

21    Q    What's your current position with Campland?

22    A    With Campland, park ranger supervisor.

23    Q    So you supervise other park rangers?

24    A    The whole staff, yes.

25    Q    Okay.  And how many rangers does that entail?

17

1  department personnel to arrive so that you could take

2  them to the incident scene?

3      A    Yes, sir.

4      Q    And did you ride with them?  Did you take one

5  of the golf cars or carts?  Did you take your Toyota?

6  How did you get to the incident scene?

7      A    The ranger truck.

8      Q    And you knew where the incident occurred

9  because the campers that reported it to you told you

10  what campsite they were at or what --

11      A    The campsite where they were at.

12      Q    Great.  Give me your best estimate in feet,

13  yards, miles, or whatever, how far it would have been

14  from the gate, where you were working, over to the

15  incident site by way of travel.  Not the way the crow

16  flies, but how far did you have to drive to get there,

17  roughly?

18      A    I would estimate anywhere from 300 to

19  400 yards.

20      Q    So it would have only taken you probably a

21  minute or less to get there?

22      A    Yes, sir.

23      Q    Mr. Ratliff, when you arrived at the campsite

24  where the incident had occurred, who else was already

25  there?

18

1    A    Several campers and guests that were in other

2    sites; my ranger staff, Randy; I believe, the

3    gentleman's wife or girlfriend -- I'm not sure of that.

4    I recall one child, and the fire truck with its crew,

5    and the paramedics and their crew.

6        Q    And they were basically traveling with you?

7        A    Yes.  They were behind me.

8        Q    While you were there at the campsite where the

9    incident had happened, did anyone else arrive?  And by

10   that I would include, did any police respond or

11   ambulance or anything else?

12       A    The ambulance did come behind the fire staff.

13       Q    Were they in the same --

14       A    Yes.

15       Q    -- caravan, basically?  Did any police

16   agencies respond at all?

17       A    No, sir.

18       Q    I realize there were a lot of different people

19   there doing a lot of different things, and right now

20   this question pertains to you specifically, Mr. Ratliff.

21            Did you make a list anywhere of the names of

22   the fellow campers that came to the site, that were

23   milling about, that might have information?

24       A    I did not make a list of names.

25       Q    Whether or not you know any of their names,

19

1   did you speak with any of them about what happened?

2       A    Yes, I did.

3       Q    Do you have any recollection, as you sit here

4   today, of what any of these people told you?

5       A    Well, I have different stories from each

6   individual.

7       Q    All right.  I know it would be difficult to

8   put a name with a story, but maybe you could do it

9   chronologically or in your mind, "This person that

10  looked like this said 'X'."  Can you kind of tell us the

11  various stories that you heard?

12           MR. STEPHAN:  I'll just object.  Vague as to

13  time.  I guess, talking about that night?

14           MR. MOORHEAD:  Yes.

15  BY MR. MOORHEAD:

16      Q    I'm just talking about there, at the site

17  things that were told to you.

18      A    Well, when I arrived on the site, I secured

19  the site, observed the individual.  We tried to help the

20  fire department take care of that individual, first.

21           At that time I had Randy continue to do --

22  stay with him and monitor him and the campsite itself.

23  I then went to the first campsite to the left of that

24  campsite -- those were the individuals that also made

25  the original call, I guess, for 911 -- and spoke to

20

1  them.

2              The one female in that group gave me a story

3  of -- that the guest in that site was trying to light

4  the campfire with the torch and it would not light, and

5  was banging the torch on the side of the fire ring.

6      Q    Okay.

7      A    Another guest --

8      Q    Now, I don't want to go further because I want

9  to make sure I understood the question.  A lady from the

10 campsite to the left of Mr. Shalaby's campsite --

11 Mr. Shalaby being the individual that was injured -- to

12 the left as you're facing --

13     A    Facing his campsite.

14     Q    His campsite.  A woman in that group told you

15 that she had observed him trying to light the campfire

16 unsuccessfully and banging the torch on -- what did you

17 say?  On the campfire ring?

18     A    On the campfire ring.

19     Q    Then, did somebody else give you a story?

20     A    Another individual in that same campsite said

21 that he heard the gentleman was frustrated at not being

22 able to fight -- or to light the campfire.  And that was

23 it in that group.

24     Q    Okay.  Before we move on, 'cause there may be

25 others, when you arrived, was there a campfire burning

31

1  all were.  And the only conversation that took place was

2  trying to initially get their address and name, all my

3  original statements.  And I couldn't get that out of

4  her.

5      Q    Okay.  Before we get too far away from it,

6  back to the torch:  In addition to this bend, did you

7  see anything else that appeared to be wrong with the

8  torch?

9      A    Just that I thought that it could have been

10  put on wrong or not all the way in the on position.

11      Q    Okay.  You mean when it was attached to the

12  cylinder, it might not have been attached all the way?

13      A    Right.

14      Q    Okay.  How about missing paint, scratches,

15  dents, anything like that?

16      A    It appeared to me to be normal wear and tear.

17      Q    I don't think I asked you this.  About what

18  time was it that you learned of this incident, roughly?

19      A    That I learned of the incident?

20      Q    Yes.

21      A    Approximate times were between 10:15 p.m. and

22  10:30.

23      Q    P.m.?

24      A    Yes, sir.

25      Q    Were you able to determine from any source at

35

1   combustion?

2          A     Any --

3          Q     Any soot?

4          A     No, sir.

5          Q     Okay.  All right.  Then, going back to

6   something you told us earlier, you gathered up the torch

7   and the cylinder and at some point in the process, I

8   believe, before you went back to the gate, you had a

9   first conversation with fire department personnel about

10  what to do with the cylinder and the torch?

11         A     Yes.

12         Q     And that was with an engineer?

13         A     Was the engineer that I talked to at the --

14  was the first person I brought it to his attention.

15         Q     Okay.  And he told you he would have to check

16  with his captain?

17         A     He said, "Let me check with my captain, and I

18  will get back to you."  He was making a report in the

19  ambulance with Mr. Shalaby at that time.

20         Q     Okay.  And then, at some later point in time,

21  did he answer your question as to whether you needed to

22  keep it or not?

23         A     Yes, sir.

24         Q     How much later was that answer?

25         A     I'd estimate four to five minutes.

36

1    Q    Okay.  So you were still at the incident

2 scene?

3    A    Yes, sir.

4    Q    Okay.  And at that point in time the engineer

5 came to you and said, "We don't need you to keep it"?

6    A    Yes, sir.  And he said to dispose of it

7 however we dispose of them.

8    Q    Did he say why he didn't want you to keep it?

9    A    No, sir.

10    Q    Did anybody connected with the fire

11 department -- captain, engineer, paramedics or anybody

12 else -- indicate to you what information they had

13 gathered about how the incident occurred?

14    A    No, sir.

15    Q    All right.  Then, after the engineer told you

16 he had checked with his captain and you didn't need to

17 keep the cylinder or the torch, what became of them?

18    A    Well, that's when I had made my initial -- or

19 my thorough investigation of the cylinder and then took

20 it to -- back to our ranger station, and it was to be in

21 our possession for about two to three days.

22    Q    That was the last time you saw it, anyway?

23    A    Yes, sir.

24    Q    Okay.  And by the "ranger station," are we

25 talking about that large building just beyond the guard

37

1  gate, or is there a different spot?

2       A    No.  The ranger gate itself.

3       Q    Were you the one who transported the equipment

4  from the incident site to the gate shack?

5       A    Yes, sir.

6            MR. EPSTEIN:  I don't mean to interrupt you.

7  We have about five minutes before we need to call in.

8            MR. MOORHEAD:  Aren't they supposed to call

9  us?

10           MR. EPSTEIN:  Oh, I apologize.

11           MR. MOORHEAD:  We can go off the record for a

12 second.

13           (Discussion off record.)

14 BY MR. MOORHEAD:

15      Q    Did you personally dispose of the cylinder and

16 torch, or did somebody else do that?

17      A    I believe another staff did during the day.

18      Q    Did you submit the torch or the cylinder to

19 anyone else for examination, evaluation, and testing

20 before telling somebody else to get rid of it?

21      A    No, sir.

22      Q    So as far as you know, you're the only one who

23 took a look at it?

24      A    Yes, sir.  I believe Randy was also there with

25 me at the time, and we were discussing it.

56

1   it sounded like you have some experience with welding or

2   torches, some background that precedes your work at

3   Campland; is that correct?

4        A    That is correct, yes.

5        Q    Can you tell me:  What is the nature of your

6   prior experience with welding?

7        A    I was a certified welder for the Navy.

8        Q    Okay.

9        A    And in the civil service -- or civil world.

10       Q    Is that part of the Navy, or you were a

11  welder --

12       A    I was a Seabee, which is steelworker.

13       Q    When did you join the Navy?

14       A    That was 1979.

15       Q    Other than the Navy, is the Seabee -- is that

16  part of the Navy?

17       A    Yes.

18       Q    Have you served in any other branch of the

19  service?

20       A    No.

21       Q    And were you stationed here in San Diego?

22       A    No.

23       Q    Where were you stationed?

24       A    Gulfport, Mississippi.

25       Q    How long were you in the Navy before you --

58

1  program.

2  BY MR. EPSTEIN:

3      Q    While you were in the Navy, what applications

4  did you apply your welding skills to?

5      A    Oxyacetylene weld, mig weld, tig weld, arc

6  weld, brazing.

7      Q    Can you describe the types of projects you

8  worked on, or did you work on ships in dry dock repair?

9      A    Mainly, heavy structural steel.

10      Q    While you were a member of the Seabees, where

11  were you stationed then?

12      A    Gulfport, Mississippi.

13      Q    And did you work on projects, for example,

14  with the US -- the Army Corps of Engineers?

15      A    I'm not for sure.  I know there was Navy --

16  Army Corps of Engineer projects for girl scouts,

17  national forests, you know, that kind of stuff.

18      Q    You mentioned various types of -- it sounds

19  like welding gases or fuels you used.  Acetylene was one

20  of them?

21      A    Yes.

22      Q    Are you familiar with MAPP gas?

23      A    Yes, I am.

24      Q    While you were in the Navy, did you have

25  occasion to use MAPP gas torches?

59

1    A    Yes.

2    Q    Can you tell me what -- to the best of your

3  knowledge, what MAPP gas is, what its components are?

4    A    Well, no, not actually, I guess, but -- I know

5  about it, but --

6    Q    All right.  In your experience, what did you

7  use MAPP gas torches for?

8    A    Mainly for plumbing projects, when a lot of

9  condensation in the water was present.

10    Q    To your knowledge, is MAPP gas typically used

11  in the plumbing industry?

12    A    Yes.

13    Q    After you were discharged or got out of the

14  Navy, what was the next job you took?

15    A    I don't remember the place.  It was --

16    Q    What type of work?

17    A    It was a contractor doing water tanks for the

18  fire engines -- for fire trucks.

19    Q    Fabricating them or --

20    A    Fabricating them, yes.  Welding.

21    Q    So if I understand correctly, you were -- you

22  worked for a company that fabricated water tanks for

23  fire trucks?

24    A    Yes.

25    Q    And you would help weld the tanks together?

62

1     A     Yes.

2     Q     Between the time you left Mercer County

3 Sheriff' Department and came to work in Campland, did

4 you have any jobs where part of your official duties was

5 to weld?

6     A     Yes.

7     Q     Okay.  Where else would that have been?

8     A     I worked for myself.

9     Q     In what capacity?

10    A     Plumbing, electrical construction.

11    Q     Basically, self-employed contractor?

12    A     Yes.  Yeah.

13    Q     And where did you -- was that here in

14 California?

15    A     Yes.

16    Q     Approximately how many years did you do that?

17 Were you in business for yourself?

18    A     Probably two or three years, I think it was.

19    Q     Is this before you came to Campland?

20    A     Yes.

21    Q.    And you did some plumbing during that time?

22    A     Yes.

23    Q     And while you did the plumbing work, did you

24 have occasion to weld or solder pipes together?

25    A     Yes.

63

1      Q      And when you did that, did you ever use MAPP

2  gas torches?

3      A      Yes, all the time.

4      Q      All right.  Do you remember the brand name of

5  the MAPP gas torches you used, that you tended to use?

6      A      Mainly, Benzomatic (sic).

7      Q      Does Burnzomatic sound right?

8      A      Burnzomatic.

9      Q      Is that the one with the yellow tank?

10     A      Yes.  Home Depot.

11     Q      You would buy it at Home Depot or other

12  hardware stores?

13     A      Yes.

14     Q      Is it accurate to say that you have some

15  working knowledge and familiarity with MAPP gas torches?

16     A      Yes.

17     Q      And with the Burnzomatic brand in particular?

18     A      Yes.

19     Q      Have you ever been able to -- strike that.

20  While you were self-employed as a plumber/fix-it guy --

21     A      Yeah, here you go.

22     Q      -- did you ever have occasion to purchase or

23  come upon MAPP gas torches manufactured by another

24  company other than -- strike that.

25          Let me rephrase my question.  Did you ever

64

1   have occasion to purchase another brand of torch, other

2   than Burnzomatic?

3       A    I don't recall.

4       Q    All right.  And I believe you mentioned

5   earlier that you've done some welding while you've been

6   at Campland?

7       A    Yes.  Soldering with MAPP gas, yes.

8       Q    Is part of your duties there to help maintain

9   the place?

10      A    That was my previous job before the park

11  ranger position I hold now.

12      Q    You were hired as a maintenance person?

13      A    Yes.

14      Q    And part of what you did at that time was to

15  fix -- or repair the plumbing?

16      A    Yes.

17      Q    And part of -- when you did plumbing work

18  there, part of what you did was to weld or solder pipes?

19      A    Yes.

20      Q    Do you still have occasion to do that at

21  Campland?

22      A    Not at Campland, no.

23      Q    I imagine you probably fix some things around

24  your home?

25      A    And other people's homes.

65

1    Q    Okay.  Do you happen to own -- at the present,

2  do you own a MAPP gas torch?

3    A    I just ran out and threw it away the other

4  day.

5    Q    Is there a reason that you did that?

6    A    I was done with it.  I was going to go buy a

7  new one.

8    Q    So is it accurate to say to this day you still

9  have occasion to use MAPP gas torches from time to time?

10   A    Yes.

11   Q    Can you give me an estimate of how many times

12  a year you might use one?

13   A    Whenever my friends call or somebody needs a

14  plumber.

15   Q    It's usually the most inopportune time?

16   A    Yes.

17   Q    So on the -- going back, then, for a moment to

18  the night of the incident in April of 2006, involving

19  Mr. Shalaby, when you -- I believe you testified that

20  you -- when you came upon the scene and did a survey,

21  you saw the torch on the ground some three feet behind

22  Mr. Shalaby; is that correct?

23   A    Yes.

24   Q    And at some point after you saw it, you went

25  and picked it up?

66

1    A    Yes.

2    Q    Okay.  When you did that, were you familiar

3  with the torch that you saw?

4    A    Yes.

5    Q    Was that the same type of torch that you had

6  used in the past?

7    A    Yes.

8    Q    And was there any -- was there any doubt in

9  your mind that it was a Burnzomatic brand torch?

10    A    No, I don't believe so.

11    Q    When you -- skipping a little bit ahead in

12  your testimony, when you spent some time observing the

13  torch, I believe you testified that that was after you

14  had spoken with the fire department personnel about

15  whether or not they wanted you to keep it or not?

16    A    Yes.  I secured the -- pretty much secured the

17  torch; in the meantime, was worried about Mr. Shalaby's

18  well-being, first.  I just did not want the torch to end

19  up in the wrong hands.

20    Q    Okay.  And when you -- can you tell me

21  approximately how long you spent examining the torch?

22    A    Oh, probably, I'd say an hour.  During my

23  entire report writing.

24    Q    And was that back at the -- I forget what you

25  call that -- the front gate?  Was that back at the

67

1    station?

2          A      In my -- in the office.  In my office.

3          Q      You call it the ranger station?

4          A      Well, the ranger station and my office are two

5    different places.

6          Q      Are they in the same general vicinity?

7          A      It's the next building behind it.

8          Q      I actually haven't had the benefit of seeing

9    the location.  But, basically, you spent an hour or so

10   examining the torch back at your office?

11         A      Yes.

12         Q      And I believe you testified that the labels

13   had not been destroyed on the torch, they had not been

14   burned off?

15         A      No, sir.  It appeared normal wear and tear to

16   me.

17         Q      To the best of your recollection, did the

18   front label say "Burnzomatic" on it?

19         A      I don't recall the -- the "MAPP" is what

20   catches -- caught my eye.

21         Q      Getting back to the breach or the hole you

22   described at the point where the nipple or the thread

23   joins the neck of the bottle, is that about roughly the

24   area of the tank where you saw the hole?

25         A      Yes.

68

1  Q Was it, in fact, a hole that you saw, and was

2 there --

3  A It appeared to be a crack forced open,

4 outward.

5  Q It was forced open, outward?

6  A Like an explosion outward.

7  Q From inside the bottle towards the outside?

8  A From inside the container, yes.  It was a

9 crack, and just one side of the crack appeared to be a

10 U-shape form.

11  Q I apologize to the court reporter.  I think I

12 was jumping in and speaking over you, which is something

13 I always tell the witness not to do.  But in this case,

14 I was doing it, so --

15   And just so the record is clear, because I do

16 think I was speaking over you, you were saying that the

17 crack appeared to have been forced outward from inside

18 the neck of the tank?

19  A Yes.

20  Q And you believe that it was roughly a U-shaped

21 crack or hole?

22  A No.  It appeared to be a straight line.  Just

23 the one side of the crack appeared to be more outward

24 than the other side of the crack.

25  Q Okay.  Based on your experience working with

69

1  torches and the like, what did that indicate to you,

2  that hole, if anything?

3       A    Personally?

4       Q    Yes.

5       A    Abuse.

6       Q    In what -- why did it indicate abuse?

7       A    Appeared to me that the container was used

8  other than what it was for.

9       Q    Can you be any more specific?  In other words,

10  did it strike you that there had been some sort of force

11  applied, or what is it you're describing?

12       A    Just my personal opinion, you're asking me,

13  or --

14       Q    Yes.  That's all I can ask for.

15       A    Okay.  It appears to me that it was banged

16  against -- the top of the nozzle was banged against

17  something of a hard surface and not created the crack,

18  but maybe, in my experience, that weakened the

19  connection between the torch nozzle and the cylinder

20  itself.

21            I have experienced other employees, when

22  they -- in my presence, when they were not able to light

23  that torch, do several other abusive things to get it to

24  light.

25       Q    Have you ever -- in your experience, have you

70

1  seen a crack like that before?

2      A    Not that particular type of crack, no.

3      Q    Did the -- getting back to your testimony, you

4  described -- I'm going to roughly paraphrase it -- but

5  the crack appeared to have been forced outward.  Did

6  that give any indication to you of what had transpired

7  or caused the crack?

8      A    I was under the impression that was from the

9  explosion.

10     Q    Was there anything in particular about the

11 crack or otherwise about the tank you saw that suggested

12 to you that it had been -- may have been banged on a

13 hard surface?

14     A    It appeared to me that the torch was -- might

15 have been banged against something that might have

16 adjusted the thread area of where the torch nozzle and

17 the canister would connect and had -- may have weakened

18 that area in the process of being banged, I guess you

19 would say.

20     Q    Okay.  But was there anything -- other than

21 the existence of the hole or the crack itself, was there

22 anything else; for example, scratches in the paint,

23 blunt --

24     A    Oh, the threaded part was this -- from the

25 crack itself, was forced at a right angle of the

72

1      Q      It comes to a neck, kind of like

2   Mr. Moorhead's bottle here?

3              MR. MOORHEAD:  They call this portion

4   "threaded," which attaches to the top of the neck.  That

5   will help in the terminology when you are discussing it.

6              MR. EPSTEIN:  Sure.

7   BY MR. EPSTEIN:

8      Q      At the neck of this tank there is, then, a

9   threaded tip, if you want -- maybe made of copper.  Or

10  can you tell me what the metal is at the top?

11     A      I would assume, aluminum.

12     Q      Aluminum?

13     A      Aluminum.  Pressed aluminum.

14     Q      But, in any event, it's not painted yellow,

15  right, the part with the threads?

16     A      I don't recall.

17     Q      But at the point where the threaded metal

18  meets the neck of the tank that is not threaded, it

19  becomes bent?  If I understand you correctly, you saw

20  that bend, that right-angle bend you were talking about,

21  start at that point, where the threaded portion of the

22  bottle meets the neck?

23     A      Yeah.  At the end, the bottom of the last

24  thread, between the last thread and the cylinder itself

25  is where the bend took place, and the explosion -- or

73

1    the crack was in that same area.

2        Q     Got it.  Was it an actual 90-degree angle that

3    you saw?

4        A     No.  It was a slight-angle bend.

5        Q     Slight angle.  And the torch tip was still

6    attached to the threads?  It was still screwed on when

7    you picked it up?

8        A     When I picked it up, it was -- appeared to be

9    loose at the -- it didn't appear to be all the way

10   attached, or all the way screwed on.

11       Q     Got it.  And could you tell at that time

12   whether that was because -- and when I say that, I mean

13   the fact that the torch tip was not screwed all the way

14   on -- because it was not screwed all the way on

15   initially, or the force of whatever had happened had

16   forced --

17       A     I would not be able to tell you.  I don't have

18   that knowledge to answer that.

19       Q     Just bear with me.  I'm going to scan through

20   my notes.  I think Mr. Moorhead covered most of what I

21   was going to ask you, so I'm just going to condense

22   whatever remaining questions I do have.

23             Other than the one crack -- I'm going to use

24   the term "crack" -- you described up on the neck of the

25   bottle, did you see any other breaches in the metal