**EXHIBIT C**

JUN 1 9 2007

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COPY

| | |
|---|---|
| ANDREW SHALABY, an individual, and SONIA DUNN-RUIZ, an individual, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| NEWELL RUBBERMAID, INC., a Delaware Corporation; THE HOME DEPOT, INC., a Delaware Corporation, | ) Case No. C 06 7026 CW ) ) ) ) |
| Defendants. | ) ) ) |

DEPOSITION OF ROBERT KEVIN PRICE

San Diego, California

Wednesday, May 30, 2007

Reported by:
FRAUKE KUO

EXHIBIT C

5

```
 1        San Diego, California, Wednesday, May 30, 2007,
 2                   12:40 p.m. - 1:30 p.m.
 3
 4                   ROBERT KEVIN PRICE,
 5   having been first duly sworn, was examined and testified
 6   as follows:
 7
 8                      EXAMINATION
 9   BY MR. MOORHEAD:
10       Q.   Let's begin by having you give us your full name
11   for the record, please.
12       A.   Robert Kevin Price.
13       Q.   Mr. Price, as I understand it from conversations
14   before we went on the record, you prefer to go by Kevin,
15   because your dad is also Robert.
16       A.   That's what I go by.
17       Q.   So if I call you Kevin today, will that be okay?
18       A.   That's fine.
19       Q.   What is your business address?
20       A.   Business address?  Where I work, you mean?
21       Q.   Yes.
22       A.   I am not sure of the address.  It's the fire
23   station.
24       Q.   Station 21?
25       A.   No.  It's in Pala now.
```

6

1    Q.    Does it have a station number there?

2    A.    They just have one station.

3    Q.    And it's Pala?

4    A.    P-a-l-a.

5    Q.    Pala -- P-a-l-a.  Okay.

6         And is there a good phone number there to reach

7 you, Kevin?

8    A.    It would be 760 Area Code, 742-1632.

9    Q.    Okay.  How about either a home number or a cell

10 phone number where we can reach you if we have trouble

11 reaching you at that number.

12    A.    My home number is (760) 510-1169.  My cell phone

13 is (760) 705-5247.  I don't call it very often, so it's

14 hard to remember.

15    Q.    I understand.  By whom are you currently

16 employed?

17    A.    Mercy Ambulance.

18    Q.    And in Pala?

19    A.    Yes.

20    Q.    And that's up in north county someplace?

21    A.    Yeah.

22    Q.    And what's your position with Mercy Ambulance?

23    A.    Paramedic.

24    Q.    Okay.  By whom were you employed on April the

25 21st, 2006?

7

1    A.    I was a student with Palomar College.

2    Q.    And in addition to studying at Palomar, were you

3 part-time employed or --

4    A.    Full-time student.

5    Q.    Were you interning?

6    A.    Yes.

7    Q.    Okay.  And with whom?

8    A.    It was Station 21, and Joe Russo was my preceptor

9 with San Diego Rural Metro.

10    Q.    All right.  On April the 21st, 2006, Kevin, were

11 you among San Diego Fire Department personnel that

12 responded to a call for emergency assistance at Campland

13 on the Bay involving burn injuries to an adult male?

14    A.    Yes.

15    Q.    If you can recall, what Fire Department vehicles

16 were dispatched to the scene?

17    A.    I believe it was Medic 21 and Engine 21.

18    Q.    Okay.  Medic 21 would have been a paramedic

19 ambulance?

20    A.    Yes.

21    Q.    Is that what you traveled in?

22    A.    Yes.

23    Q.    And you would have traveled there with Joe Russo.

24 And let me see if I can get some of the other names.

25    A.    Donald Renshaw, he was the EMT driver.

9

1    Q.    Okay.  It looks like about seven Fire Department

2  personnel responded to this incident.  Does that sound

3  essentially correct, with your recollection?

4    A.    That sounds right.

5    Q.    Now, none of the people that responded to this

6  particular incident had to be involved in fire

7  suppression; did they?  You didn't have to put out any

8  fires?

9    A.    No.

10    Q.    Some of you were involved in caring for the fire

11  victim or victims; is that correct?

12    A.    Correct.

13    Q.    And who would that have been?  You and who else?

14    A.    It was me.  And I think you said his name was

15  Daniel, the EMT driver, and Joe Russo.  We were the

16  transporting -- We were the ones that transported.  And

17  the engine was also on scene, but it was mainly us who

18  transported.

19    Q.    Tell me specifically what you did at the scene,

20  Kevin.

21    A.    As far as from the beginning of the call to the

22  end?

23    Q.    Let's just take it from when you arrived at the

24  site of the incident.

25    A.    Okay.  When I arrived at the site of the

10

1   incident, I remember he was sitting -- I think it was near

2   a camp fire.  He didn't have any inhalation burns.  He was

3   breathing okay.  First off, I got lung sounds, T-Sat which

4   was good.  He was breathing good.  At that point, we put a

5   burn dressing on, trying to maintain his body temperature.

6          He was at the back of the ambulance, so we

7   brought the gurney up next to him, assisted him to the

8   gurney, and got him in the back of the ambulance.

9          Q.   And transported?

10         A.   And transported.

11         Q.   Let's slow our speed cadence down and take it

12  step by step.

13         A.   Okay.

14         Q.   You arrive at the scene.  He is sitting

15  especially, you can recall, near a camp fire?

16         A.   Yes.

17         Q.   Okay.  Your first concern was his breathing, and

18  so you went and checked to see what his expiration rate

19  was, heart rate?

20         A.   Yes.

21         Q.   And you checked to see if there was soot or

22  particulates around the mouth and nose?

23         A.   Correct.

24         Q.   You checked his oxygen saturation rate --

25         A.   Yes.

12

1    A.    Yes.

2    Q.    All right. So you assessed the burn injuries,

3  and you put -- What did you describe you put on it, some

4  kind of compress or something?

5    A.    It's just called a burn dressing.  It's just to

6  maintain his body temperature and try to keep moisture

7  inside.

8    Q.    Okay.  And would you have been obtaining

9  information from him, like his height, his weight, his

10  allergies and things like that?

11    A.    Yes.

12    Q.    Okay.  Now, we had Captain Spangler in here this

13  morning, and he kind of helped educate us as to how the

14  system worked at that time.

15         It's my understanding that the engine company

16  would have had a Palm Pilot, and the paramedic ambulance

17  would have maybe a couple of them.  And he said he would

18  have been inputting some of the information that ends up

19  on the report, and you guys would have been inputting

20  others.

21    A.    Right.

22    Q.    Okay.  If you look at the report -- And, by the

23  way, here is a copy of it if you don't have one with you.

24    A.    Okay.

25    Q.    Can you determine, from looking at it -- and take

13

1   your time looking at it, if you want -- what information

2   on there you inputted as opposed to him or someone else?

3       A.   Okay.   The vital signs -- The initial vital signs

4   were probably inputted by him.

5       Q.   Okay.   And that's on page 1.   You are talking

6   about his pulse, respiration, and blood pressure and

7   stuff?

8       A.   Right.

9       Q.   Okay.

10      A.   And on page 2, "History:  Allergies, Meds," that

11  could have been him or I.   I am not sure.   "Secondary"

12  could have been him or me, too, on page 2.

13      Q.   Okay.

14      A.   The "Intervention" was me.

15      Q.   Okay.   How about the "Special Questions

16  Narrative"?

17      A.   And the narrative, that was me.

18      Q.   Okay.   Then, below that, there is something we

19  determined means "Secondary Exam Narrative."   Is that

20  something you would have inputted, him, or someone else?

21      A.   That was me.

22      Q.   Okay.   And then, below that, there is an "I,"

23  which stands for --

24      A.   "Incident."

25      Q.   Okay.   So that's a brief description.

19

1      A.    Okay.

2      Q.    -- and we will mark it as Exhibit 8 to this depo

3   as well.

4            (Defendants' Exhibit No. 8 was marked for
             identification by the court reporter.)
5

6      MR. MOORHEAD:    Okay.

7   BY MR. MOORHEAD:

8      Q.    Now, the stuff that you input into the -- into

9   this report would have been done by a Palm Pilot?

10     A.    Correct.

11     Q.    Was that done at the scene, during transport,

12  after the call was over, or some combination of those?

13     A.    Combination.

14     Q.    Okay.  And when I look at the hard copy version

15  of this report, it appears that some of the print is in --

16  in bold.  Is that the stuff that's, basically, in the form

17  and you just fill in the blanks?

18     A.    I believe so.

19     Q.    Okay.  Do your best, if you can, Kevin, to read

20  for me what it was that you inputted under "History," just

21  so I am not guessing.  In other words, read it like you

22  were intending.  You don't have to use abbreviations.

23  What does it say?

24     A.    "Patient was kicking around a propane torch.  It

25  went into a fire and blew up and burned him.  Family

20

1  called 911."

2      Q.   Do you know -- and I realize it's been over a

3  year ago, and you have responded to many other things --

4  whether or not the information you gathered that goes into

5  the "History" section was obtained directly from

6  Mr. Shalaby, the patient, or from other sources?

7      A.   I --

8      Q.   Do you know whether that information was imparted

9  to you when you were at Mr. Shalaby's side?  In other

10  words, he could have heard somebody say how it happened

11  when that was communicated to you?

12      A.   Sorry.  I don't understand that question.

13      Q.   Okay.  I think you told us earlier you are not

14  sure whether what's in the "History" section was given to

15  you by Mr. Shalaby, by someone else at the scene, or

16  perhaps someone like Captain Spangler.

17      A.   Right.

18      Q.   What I am asking is:  Do you remember where you

19  received that information physically?  So I am asking

20  whether it was possible that Mr. Shalaby, if he wasn't the

21  reporting person -- whether he could have heard someone

22  else saying it, or is this told to you back at the

23  station, while you were en route, or by something where he

24  might not be able to hear?

25      A.   I am not sure, but I would think it would have

22

1  Fire Department that received -- that responded to the

2  scene that evening inspected it in any way?

3      A.    Not that I'm aware of.

4      Q.    Do you know if anyone photographed it in any way?

5      A.    Not that I'm aware of.

6      Q.    Do you know of any photographs that were taken at

7  the scene of the incident that day?

8      A.    No.

9      Q.    Do you have any idea, as you sit here today,

10 Kevin, what became of the propane torch that was mentioned

11 in the report?

12     A.    No.

13     Q.    Did you make any determination at the scene as to

14 whether the victim, at the time of the incident, was under

15 the influence of alcohol, medication, drugs, or anything

16 else?

17     A.    I do remember seeing beer bottles, I believe.  I

18 don't know if they were beer bottles, could have been

19 cans, but I don't remember whether or not he was under the

20 influence.  I didn't document it.

21     Q.    Okay.  I notice there is nothing in the report

22 about it.

23     A.    Right.

24     Q.    Do you have any independent recollection of --

25     A.    I do vaguely remember him being intoxicated, but

23

1   I am not sure.

2       Q.   Okay.  And if that -- if that is an accurate

3   recollection, what was the source of that information?  I

4   mean, did you smell it on his breath?

5       A.   I think that was just it.  It was just smelling

6   it on his breath.

7       Q.   You didn't take any blood tests to determine the

8   level of intoxication?

9       A.   We just checked his blood sugar.  We don't take

10  blood tests for that kind of thing.

11      MR. MOORHEAD:  I don't believe I have any other

12  questions for you at this time.  Mr. Epstein represents

13  the plaintiffs, and he may have some for you.

14

15                      EXAMINATION

16  BY MR. EPSTEIN:

17      Q.   Can I call you Kevin as well?

18      A.   Sure.

19      Q.   We met briefly off the record.  I am Mark

20  Epstein, for the record, and I represent the plaintiff,

21  Andy Shalaby, and his wife in this lawsuit.  I will do my

22  best to speak slower, realizing --

23      A.   Me too.

24      Q.   -- again, it would be good if we both did that.

25           Before I get to what I was going to ask you,

MAY 9 · 2007

1

1     UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3

4  ANDREW SHALABY, an    )
   individual, and SONIA   )
5  DUNN-RUIZ, an individual, )
              )
6       Plaintiffs,  )
              )
7  vs.         ) Case No. C 06 7065 CW
              )
8  NEWELL RUBBERMAID, INC., a )
   Delaware Corporation, THE )
9  HOME DEPOT, INC., a    )
   Delaware Corporation,   )
10              )
       Defendants. . )
11  _____ )

COPY

12

13

14       DEPOSITION OF:

15        JOE RUSSO

16    WEDNESDAY, APRIL 18, 2007

17

18

19

20

21

22 Reported by:  Sally D. Phelps
        CSR 3485

23

24

25

EXHIBIT D

10

1      Again if you were to say uh-huh Mr. Epstein and

2  I might say was that a yes, not because we're surprised

3  that you were saying uh-huh but because we want to make

4  sure when someone reads this later that they know that

5  that's what you were saying.

6      Like I told you before we got started I don't

7  expect this to last much more than an hour or so.  We're

8  going to try to get you out of here as soon as possible

9  but if you need to take break for whatever reason whether

10 it's work related or you just want to use the men's room

11 or whatever let us know.

12     Even though there is a light bulb hanging from

13 here I don't have a rubber hose.  I'm not going to try to

14 punish you in any way.  I'm going to get your best

15 testimony and get you on your way.

16     Do you have any questions about what we're going

17 to do before we get started?

18     A.  No.

19     Q.  If any come up please feel free to stop us and

20 ask us so we can clarify it for you. I should probably

21 get an address from you.  Do you have an address you can

22 give me?

23     A.  Home address or work address?  I'll give you

24 work address.

25     Q.  All right.  That's fine.

11

1    A.   Now, I know we said I can't look at them, but
2 can they tell me my work address?

3    Q.   If you don't remember it say I don't remember
4 what my work address is.

5    A.   I don't remember what it is right off the
6 moment.

7    Q.   Is it a station number?

8    A.   Well, let me give you this address here.  It's
9 1010 Second Avenue, suite No. 300, San Diego 92101.

10   Q.   Okay.  Is that probably the best address to try
11 to find you if we need you in the future on this case?

12   A.   For this case, yes.

13   Q.   What's your date of birth, Joe?

14   A.   6/24/70.

15   Q.   By whom are you currently employed?

16   A.   San Diego Medical Services Enterprise.  It's a
17 Rural/Metro Corporation.

18   Q.   That's their address on Second Avenue that you
19 gave me?

20   A.   That is our fire department headquarters where
21 all EMS is taken care of for the fire department and
22 Rural/Metro.

23   Q.   How long have you worked for San Diego Medical
24 Services Enterprise?

25   A.   Off and on now for approximately four years,

14

1    Q.  Depending on the information that came in?

2    A.  Depending on the information they retained.

3    Q.  The paramedic vehicle that you rode on was an

4 ambulance as well as the equipment?

5    A.  I was on the paramedic ambulance, not the

6 engine.

7    Q.  Right.  That one was truly an ambulance in the

8 sense you could transport people from the scene?

9    A.  Correct.  It was a paramedic ambulance.

10    Q.  Did any other, for the sake of example, private

11 company ambulances respond to that incident if you can

12 recall?

13    A.  No.

14    Q.  In all these questions, Joe, I'm just asking for

15 your best recollection.  So they may seem kind of

16 specific, but just give me your best recollection on some

17 of these things.

18        Upon your arrival do you know what your role was

19 on this particular call?

20    A.  Yes.  At that point I had an intern as I do now,

21 and it was my job to oversee the intern as he does

22 patient care.  And our job is strictly patient assessment

23 and care.

24    Q.  Was that intern Mr. Price?

25    A.  Correct.

22

1  thought may have occurred.

2      Q.  Did anybody assist you in that function?

3      A.  Bonnie may have and also Captain Spangler.

4      Q.  Captain Spangler may have or you're sure he did?

5      A.  May have.

6      Q.  As part of that function -- when I use that

7  function in the rest of these questions in that area I'm

8  talking about that information gathering function as

9  opposed to treatment.

10     A.  Okay.

11     Q.  In that function that you were performing did

12 you interview the victim at all?

13     A.  I did not but my intern did.

14     Q.  So now we're talking about Mr. Price?

15     A.  Robert Price, yes.

16     Q.  Were you present when that interview took place?

17     A.  Yes.

18     Q.  What information was gathered from the victim

19 concerning what had happened?  Again if there is

20 something there that will help you feel free to refer to

21 it, if there is not anything there --

22     A.  There is.  I have his initial of what he got,

23 and I stood over him and my best recollection was I

24 remember the patient stating that he kicked something.

25 He kicked the thing into the fire and it exploded.

23

1      Q.   Did he elaborate at that time on what he meant
2   by the thing?

3      A.   He did say it was a propane.

4      Q.   So you understood that he was telling you that
5   he had kicked some type of compressed gas cylinder into a
6   campfire basically?

7      A.   Yes.

8      Q.   All right.  Mr. Price would have been present
9   when he made that statement because he was the one that
10  was actually interviewing him.

11     A.   Yes.

12     Q.   Were there any more members of your fire
13  department team that would be able to confirm or disprove
14  that this is what he was saying that you know of?

15     A.   I don't know.  Maybe all of them, maybe none.  I
16  don't know.

17     Q.   But you're sure at least you and Mr. Price,
18  Robert Price?

19     A.   Correct.

20     Q.   Any other information, limiting it just now to
21  the victim, that was provided to you about what had
22  happened?  In other words, maybe he elaborated on why he
23  kicked it into the fire, how he kicked it into the fire,
24  or maybe it wasn't him that kicked it into the fire it
25  was somebody else in his presence, anything like that?

29

1  scene?  Do you know whether anybody from the fire

2  department, whether it be the engine company or the

3  paramedics with whom you were working took custody of it

4  at the scene?

5      A.  No, I don't know.

6      Q.  No, you don't know?

7      A.  No, I do not know.

8      Q.  If such a thing were to occur would that be

9  something typically the engine company would do?

10     A.  Ask me that one more time.

11     Q.  Sure.  If somebody from the fire department

12 decided that items at the scene needed to be taken into

13 custody as part of your overall investigation is that

14 something that would typically be done by the folks in

15 the engine company?

16     A.  Yes.

17     Q.  Does the fire department as a whole, I'm

18 including the paramedics, EMT's, engine companies, do

19 they in the typical instance like this one reach a final

20 consensus conclusion as to what happened or do they just

21 have you put out a report like that and that's the end of

22 the story?

23     A.  On my end this is what we do.  We put out a

24 report like this, and that's the end of the story.  On

25 their end I do not know.  We're one entity but we're

30

1  separate.

2      Q.  Let me show you what we were provided as a

3  report in connection with this.  Maybe you can compare

4  that with what you've got in front of you.  If there is

5  additional stuff we need to get from you we'll make

6  copies of that.

7      A.  This is exactly what I have.

8      Q.  Okay.  Nothing less, nothing more?

9      A.  Nothing less.  Only the top sheets of paper

10  about this whole meeting.

11          MR. MOORHEAD:  Okay.  We don't need those.

12  We're going to mark this as the next exhibit in order.

13  This will be Exhibit 8.

14          (Exhibit 8 marked for identification.)

15  BY MR. MOORHEAD:

16      Q.  You've had an occasion I guess because you knew

17  you were coming here to take a look at this so you're

18  familiar essentially with what's in it?

19      A.  I took a brief look, yes.  This came to me on

20  very short notice.

21      Q.  Because I'm not familiar with the process maybe

22  I'm going to go through it in more detail than is

23  necessary, but the first section of this looks like it's

24  called call information, and it looks like somebody has

25  recorded where the incident occurred, a phone number,

45

1  loaded miles would -- actually looking back that loaded

2  miles is the amount of miles it took to get from there to

3  the hospital.

4      Q.  From Campland to the hospital?

5      A.  Correct.

6      Q.  It looks like below is the list of responding

7  fire department personnel?

8      A.  Yes.

9      Q.  Your name is in bolder print.  Maybe you're more

10 important; is that right?

11     A.  Because I was the paramedic on record.  Not any

12 more important.

13     Q.  Then it looks like there is a place for the

14 patient to sign if he wants to?  Is that it?

15     A.  Correct.  That's actually would be our

16 signatures.

17     Q.  Okay.

18     A.  That would actually be.

19     Q.  This one that I have doesn't bear your

20 signature?

21     A.  Neither does this one.  Maybe only the original

22 does.

23     Q.  You would expect if we found the original it

24 would have your signature on it?

25     A.  I hope so.

SDMSE Patient Report - FS06035953                                    Page 1 of 4

SAN DIEGO MEDICAL SERVICES ENTERPRISE - Billing Report - 04/21/2006 - M21

INC#: FS06035953 QA Net#: 2412526 TapChart ID: 8528936003228463569

**Call Information (From CAD)**

| Demographics | | Incident Times | |
|---|---|---|---|
| Address: | 2211 Pacific Beach Dr | TimeInQue: | 04/21/2006 22:09:23 |
| City: | SAN DIEGO | Assigned: | 04/21/2006 22:10:58 |
| Zip: | 92109 | | |
| Phone: | 949-340-5572 | Enroute: | 04/21/2006 22:12:34 |
| Notes: | 45m, burns to legs and hands | Staged: | |
| | | On Scene: | 04/21/2006 22:16:47 |
| Dispatch: | Burns / Explosion (L1) | Depart: | 04/21/2006 22:31:41 |
| Hospital: | UCSD Medical Center | Arrive Hosp: | 04/21/2006 22:45:22 |
| | | Clear: | 04/21/2006 23:21:12 |

**Patient Information (From TapChart)**
Name: Shalaby, Andrew W DOB: 10/07/1960
C/C: Moderate Status Burn - 45 Y/O M 180 lbs.
GCS: 15 RTS: 12

BRIM:
GCS: 15      B: Normal
E: 4         R: Oriented X 3
V: 5         I: Spont
M: 6         M: Obeys Cmds

VITALS:
Pulse: 62
Resp: 18
BP: 130/70
EKG: NSR No Ect No ST Ch
Eyes: R: 3 mm PERL L: 3 mm PERL
LOC: GCS: 15  E: 4  V: 5  M: 6
Lungs: R: Clear L: Clear
Sat: 96% a O2 - 100% p O2
Skins: Normal Normal Normal
Sugar: 102
Temp:

Δ π EXHIBIT 8
Deponent RUSSO
Date 4/16/07 Rptr: Phelp
WWW.DEPOBOOK.COM

P 0440

May 01 07 05:11p    William R. Phelps         8583147800          p.4

SDMSE Patient Report - FS06035953                                Page 2 of 4

| Date | Time | Pulse | BP | Resp | EKG |
|------|------|-------|-----|------|-----|
| 04/22/2006 | 21:22:29 | 62 | 130/70 | 18 | NSR - No Ect - No ST Ch |
| 04/22/2006 | 21:39:00 | 62 | 110/p | 18 | |
| 04/22/2006 | 21:39:00 | 62 | 110/p | 18 | |

**History:**      aniexty

**Allergies:**    PCN

**Medications:** zoloft, xanax

**SECONDARY:**

| | |
|---|---|
| **Head:** | Negative - Unremarkable |
| **Upper Extrem:** | Lt Rt Hand 2nd degree burn. |
| **Chest:** | Negative - Unremarkable |
| **Abdomen:** | Negative - Unremarkable |
| **Back:** | Negative - Unremarkable |
| **Pelvis:** | Negative - Unremarkable |
| **Lower Extrem:** | Lt Rt Lower leg 2nd degree burn. |

**INTERVENTION:**

04/22/2006 21:39:58 EKG Monitor - NSR
04/22/2006 21:40:20 Sat before O2 - 96%
04/22/2006 21:40:22 Sat with O2 - 100%
04/22/2006 21:42:00 NS 1000 ml 500 Fluid Bolus BHO - Robert Price (Intern)
04/22/2006 21:43:00 O2 4 LPM w/ Canula SO - Robert Price(Intern)
04/22/2006 21:43:00 MS 4 mg IVP SO - Robert Price(Intern)
04/22/2006 21:43:00 MS 4 mg IVP BHO - Robert Price(Intern)
04/22/2006 21:45:25 Blood Sugar - 102

**Special Questions Narrative:**
Burn caused by explosion. No cooling measures before EMS arrival. No associated SOB. Burn did not occur in a confined space.

**2' Exam Narrative:**
Total 1' burns: %. Total 2' burns: %. Total 3' burns: %. There are circumferential burns. Burns involve the feet. No soot in pt's airway. No singed nasal hair. No singed facial hair.

**I:**
45 Y/O male found in sitting position.
**C:**
Burn -

P 0441

SDMSE Patient Report - FS06035953                              Page 3 of 4

H:
pt was kicking around a proane torch it went into the fire and blew
up. and burned him. family called 911.
A:
pt a/ox4. vitals listed. secondary. no neck or back pain; no loc. pt
had 3rd degree burns to. outside of his left hand. and 2nd degree to
both calfes circumfrentially. approx 18% bsi.
R:
listed
T:
No change in patient while enroute hospital. Full report given to
receiving facility. IV(s) patent and flowing well.

burn center criteria.

Assigned Base:     30
Base Contacted:    35
Requested Hosp:    35
Nearest Hosp:      30
Destination:       UCSD Medical Center
Dest Reason:       Resource Issue
Resource Issue:    Burn
Loaded Mileage:    7
Transport Codes:   3 10


Robert Spangler P0311 E21-City of San Diego ALS

Alfred Allen III H9696 E21-City of San Diego ALS

Christopher Herse H9587 E21-City of San Diego ALS

Bonnie Martin P1253 E21-City of San Diego ALS

Daniel Nenow I11431 M21-City of San Diego ALS

Robert Price(Intern) I6904 M21-City of San Diego ALS

Joseph Russo P1748 M21-City of San Diego ALS


Patient Person Signature: _____


SDMSE - Billing

Patient Address:
7525 Leviston                                        P.0442

May 01 07 05:11p    William R. Phelps              8583147800                    p.6

SDMSE Patient Report – PSU6035953

Lecerrito CA 94530

Bastock List

# Code    Item

7 90009 Gloves, Latex Free pair
1 82110 Sheet, Fitted
1 82100 Sheet, Flat
1 82145 Pillow Case
1 85100 ECG Pads Adult
1 84663 Glucose Strips
1 91009 IV Solution- 1000 ml
1 21001 IV Tubing- Maxi
1 90011 IV Tubing- Select 3
1 22061 IV Cath 14-20 ga
3 87100 Alcohol Prep
1 25211 Tourniquet
1 73010 4X4 Non-sterile
1 25221 Veniguard
1 10500 Oxygen
1 52101 Nasal Canula
1 01055 MS

P 0443

1 │ RICHARD A. ERGO (# 110487)
   │ CATHLEEN S. HUANG (# 219554)
2 │ BOWLES & VERNA LLP
   │ 2121 N. California Boulevard, Suite 875
3 │ Walnut Creek, California  94596
   │ Telephone:  (925) 935-3300
4 │ Facsimile:  (925) 935-0371
   │ Email:  raergo@bowlesverna.com
5 │        chuang@bowlesverna.com

6 │ Attorneys for Third Party Defendant
   │ Worthington Industries, Inc.

7

**FILED**

**AUG 16 2007**

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8

9 │               UNITED STATES DISTRICT COURT

10 │             NORTHERN DISTRICT OF CALIFORNIA

11 │ ANDREW SHALABY, an individual, and SONIA │ Case No.:  C06-07026 MJJ
    │ DUNN-RUIZ an individual,
12 │                                          │ Judge Martin J. Jenkins
    │                Plaintiffs,
13 │                                          │ **THIRD PARTY DEFENDANT**
    │        vs.                              │ **WORTHINGTON INDUSTRIES, INC.'S**
14 │                                          │ **MOTION TO TRANSFER VENUE**
    │ IRWIN INDUSTRIAL TOOL COMPANY, THE
15 │ HOME DEPOT, INC., and DOES 2 through 100, │ Date:      September 25, 2007
    │ inclusive,                               │ Time:      9:30 a.m.
16 │                                          │ Ctrm:      11, 19th Floor
    │                Defendants.
17 │
    │
18 │ BERNZOMATIC,
19 │                Third Party Plaintiff,                        **BY FAX**
20 │        vs.
21 │ WESTERN INDUSTRIES, INC.,
    │ WORTHINGTON INDUSTRIES, AND ROES 2
22 │ through 100, inclusive,
23 │                Third Party Defendants.

24 │               **NOTICE OF MOTION**

25 │        PLEASE TAKE NOTICE that on September 25, 2007, at 9:30 a.m. in Courtroom 11 of the

26 │ above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California 94102, Third Party

27 │ Defendant Worthington Industries, Inc. ("Worthington") will move the Court for an order that the

28

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                    1
THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE

above-captioned case be transferred to the United States District Court for the Southern District of California in San Diego.

## STATEMENT OF RELIEF

Pursuant to 28 U.S.C. Section 1404(a), Worthington brings this motion to transfer this action to the Southern District in San Diego based on the interests of justice and convenience of the witnesses, as all key third party witnesses work and reside in Southern California. If the venue is transferred to the Southern District, the parties will be more likely to be able to offer the witnesses' testimony live and the witnesses will be the least inconvenienced.

This Motion is based on the documents and exhibits filed herewith, including this Notice of Motion, Memorandum of Points and Authorities, Request for Judicial Notice, the Declaration of Cathleen S. Huang, and such other evidence and argument as may be presented on the hearing of this Motion.

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                    2
THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE

1    RICHARD A. ERGO (# 110487)
     CATHLEEN S. HUANG (# 219554)
2    BOWLES & VERNA LLP
     2121 N. California Boulevard, Suite 875
3    Walnut Creek, California 94596
     Telephone: (925) 935-3300
4    Facsimile: (925) 935-0371
     Email: raergo@bowlesverna.com
5            chuang@bowlesverna.com

6    Attorneys for Third Party Defendant
     Worthington Industries, Inc.

7

8

9                **UNITED STATES DISTRICT COURT**

10              **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 11   ANDREW SHALABY, an individual, and SONIA DUNN-RUIZ an individual, | **Case No.: C06-07026 MJJ** |
| 12 | Judge Martin J. Jenkins |
| 13           Plaintiffs, | **THIRD PARTY DEFENDANT** |
| 14    vs. | **WORTHINGTON INDUSTRIES, INC.'S MEMORANDUM OF POINTS AND** |
| 15   IRWIN INDUSTRIAL TOOL COMPANY, THE HOME DEPOT, INC., and DOES 2 through 100, inclusive, | **AUTHORITIES IN SUPPORT OF MOTION TO TRANSFER VENUE** |
| 16           Defendants. | Date: September 25, 2007<br>Time: 9:30 a.m.<br>Ctrm: 11, 19th Floor |
| 17 | |
| 18 | |
| 19   BERNZOMATIC, | |
| 20           Third Party Plaintiff, | |
| 21    vs. | |
| 22   WESTERN INDUSTRIES, INC., WORTHINGTON INDUSTRIES, AND ROES 2 through 100, inclusive, | |
| 23 | |
| 24           Third Party Defendants. | |

25

26

27

28

CASE NO.: C06-07026 MJJ

THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## TABLE OF CONTENTS

3

4

I.    INTRODUCTION .............................................................................................1

5

II.   STATEMENT OF FACTS .................................................................................2

6

III.  LEGAL ARGUMENT ........................................................................................5

7

      A.    Pursuant to 28 U.S.C. Section 1404(a), Venue Should Be Transferred to the
           Southern District of California Because It Is The Most Convenient Forum

8
           For All Key Witnesses .........................................................................................5

9
           1.    The Southern District has Personal and Subject Matter Jurisdiction

10
                over the Parties and is a Proper Venue .....................................................6

11
           2.    The Most Important Factor – "Convenience of the Witnesses" –
                Weighs In Favor of a Transfer ...............................................................6

12

13
           3.    Whether Witnesses Can Testify Live Is Considered In A Motion to
                Transfer ...................................................................................................8

14

15
           4.    The Testimonies of the Key Third Party Witnesses Are Critical
                As They Help Establish the Cause of The Accident...............................9

16
           5.    Plaintiffs' Choice of Forum Has Little Connection to This Case...........9

17

IV.   CONCLUSION...................................................................................................10

18

19

20

21

22

23

24

25

26

27

28

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE

## TABLE OF AUTHORITIES

## CASES

*A. J. Industries, Inc. v. U. S.,* (9th Cir. 1974) 503 F.2d 384, 386-87 ..........................................7

*Amini Innovation Corp. v. JS Imps., Inc.,*
(C.D. Cal. 2007) 2007 U.S. Dist. LEXIS 43758, *43-46; ........................................................7

*Decter v. Gill* (ED. Cal. 2006) 2006 U.S. Dist. LEXIS 90415, *7 ..........................................7

*Hoffman v. Blaski,* (1960) 363 U.S. 335, 344; 28 U.S.C. § 1404, subd., (a) ..............................6

*Jones v. GNC Franchising, Inc.,* (9th Cir. 2000) 211 F.3d 495, 498..........................................7

*Pacific Car and Foundry Co. v. Pence* (9th Cir. 1968) 403 F.2d 949, 954 ...........................7, 10

*Polaroid Corp. v. Casselman,* (S.D.N.Y. 1962) 213 F. Supp. 379, 382......................7, 8, 9, 10

*Royal Queentex Enterprises, Inc. v. Sara Lee Corp.*
(N.D. Cal. 2000) 2000 U.S. Dist. LEXIS 10139, 8. .............................................................6, 7

*Van Dusen v. Barrack,* (1964) 376 U.S. 612, 616 .................................................................5

*Vivoli v. Vivoli's* (C.D. Cal. 1984) 606 F.Supp. 106, 108..........................................................7


## STATUTES

28 U.S.C. Section 1391(a)(2) ............................................................................................6

28 U.S.C. Section 1404(a) ........................................................................................1, 5, 7

Federal Rules of Civil Procedure Rule 45(b)(2)....................................................................7

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

# I. INTRODUCTION

Third Party Defendant Worthington Industries, Inc. ("Worthington"), contemporaneously with filing its Answer, brings this motion to transfer this action to the Southern District in San Diego based on the interests of justice and convenience of the witnesses. While Worthington was just brought into this products liability action, the case has been pending for some time. Worthington's counsel has had the opportunity to review the deposition transcripts of five third party witnesses, who have been deposed. These San Diego area witnesses are critical to the defense of Plaintiffs' claims of product defect.

On April 21, 2005, Plaintiff Andrew Shalaby suffered serious burn injuries from a fire while camping in San Diego, California. Shalaby and his wife allege that fire was caused by a defect in their MAPP gas torch and/or cylinder, which Shalaby claims he was using to attempt to light a campfire. However, various third party witnesses who reside and work in the San Diego area have offered contradictory testimony as to how the accident occurred. Specifically, their testimonies would establish that Shalaby's conduct (including banging the torch against a hard surface and kicking the torch into the camp fire), rather than the alleged defect, caused the incident.

Consistent with Shalaby banging the cylinder against a hard surface is the fact that there was a hole on the top of the cylinder observed after the accident by two of these San Diego witnesses. However, the cylinder and torch were discarded shortly after the accident. Consequently, the only evidence of the physical condition of the cylinder after the accident will be the testimony of two campground rangers who observed the crack in the cylinder and described its size, location and nature. Their testimony will serve as the factual foundation for the expert witnesses to opine on the cause of the accident.

Having the trial in Northern California will likely prevent the defendants from putting on live testimony of some or all of the critical witnesses. In lieu of live testimony, defendants will likely have to offer critical testimony into evidence by reading deposition transcripts. To the extent that defendants are able to convince or compel any of the third party witnesses to travel 500 miles to testify, such will be a substantial burden on and inconvenience to the witnesses.

Accordingly, pursuant to 28 U.S.C. Section 1404(a), the interests of justice and the convenience

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                                    1
THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE

of the witnesses demand that this action be transferred to the Southern District in San Diego where defendants will be able to offer the witnesses' testimony live and where the witnesses will be the least inconvenienced.

## II.    STATEMENT OF FACTS

In early to mid 2005, Shalaby allegedly purchased a Bernzomatic MAPP Gas torch kit from a Home Depot store located in El Cerrito, California. The kit allegedly included a torch and a yellow MAPP Gas cylinder filled with MAPP Gas. (Plaintiffs' First Amended Complaint ("FAC") attached as Exhibit A to Request for Judicial Notice ("RJN") at ¶ 9.) Shortly thereafter, Shalaby purchased several replacement cylinders. (FAC ¶ 11.) MAPP Gas is typically used for welding and soldering due to its high combustion temperature of 5301 degrees Fahrenheit (2927 degrees Celsius). (Joint Case Management Statement ("JCMS") RJN Exh. B at p. 2, § 1a.) In place of its conventional use, Shalaby regularly used his torch to light campfires. (JCMS, p. 2, § 1b.)

During the week of April 17, 2006, Shalaby, Plaintiff Dunn-Ruiz, and their two children were vacationing at a recreational vehicle park known as "Campland on the Bay" located in San Diego, California. (JCMS, p. 2, § 1b.) Shalaby took his torch and MAPP Gas cylinders with him on this trip. Shalaby claims that on April 21, 2006 when he attempted to light a campfire using his torch, the cylinder exploded and/or discharged its contents, causing Shalaby to suffer burn injuries. (FAC ¶¶ 20-22.)

Key third party witnesses including camp rangers, Randy Stephens and Warren Ratliff, and paramedics, Robert Price and Joe Russo, all work and reside in the Southern California area. (The deposition transcripts of Randy Stephens, Warren Ratliff, Robert Price, and Joe Russo are attached as Exhibits A to D to the Declaration of Cathleen S. Huang ("Huang Decl."). See Huang Decl. Exh. C, Price dep. 5:10-6:21; Huang Decl. Exh. A, Stephens dep. 9:1-22; Huang Decl. Exh. B, Ratliff dep. 8:5-9:4; Huang Decl. Exh. D, Russo dep. 10:19 – 11:9.) They offer the following testimony, which is highly probative on the issue of causation.

Ranger Randy Stephens was on duty at Campland on the day of the incident. (Huang Decl. Exh. A, Stephens dep. 11:7-10.) Fellow campers witnessed the incident and one camper reported it and

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                                    2
THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE

Ranger Stephens was radioed to go to the site of the incident. (Huang Decl. Exh. A, Stephens dep., 10:4-14; 11:7-19.) Stephens went to the accident scene and heard Shalaby repeating out loud: "I'm an idiot. I can't believe I'm so stupid." "This is all my fault." (Huang Decl. Exh. A, Stephens dep., 35:11-24.)

Stephens has experience with MAPP gas and torches. (Huang Decl. Exh. A, Stephens dep., 48:9-23.) Based on his observations, the torch being used was not a proper torch for a MAPP gas cylinder. (Huang Decl. Exh. A, Stephens dep., 49:8-50:18.)

Warren Ratliff is also a ranger at Campland. (Huang Decl. Exh. B, Ratliff dep., 9:8-22.) Ratliff went to the accident scene along with the fire department and paramedics. (Huang Decl. Exh. B, Ratliff dep., 17:23-18:7.) At the scene, Ratliff spoke to neighboring campers. (Huang Decl. Exh. B, Ratliff dep., 18:21-19:2.) Among other things, campers told him that Shalaby had attempted to light a campfire with his torch and when he was unsuccessful, he became "frustrated" and started banging the torch on the campfire ring. (Huang Decl. Exh. B, Ratliff dep., 19:7-20:23.)

Ratliff made an hour-long examination of the torch and cylinder after the incident. (Huang Decl. Exh. B, Ratliff dep., 66:20-23.) Based on his examination, Ratliff felt that the torch apparatus may have been improperly attached to the cylinder or not placed fully in the "on" position. (Huang Decl. Exh. B, Ratliff dep., 31:5-13.) Ratliff has extensive experience with MAPP gas torches, having used them to weld pipes together while he worked as a certified welder for the Navy, a plumber, and as a maintenance person. (Huang Decl. Exh. B, Ratliff dep., 56:5-7, 58:22-25, 59:6-12, and 62:21-65:10.)

During his examination, Ratliff made many observations of the torch and cylinder remnants as follows. Ratliff observed a crack in the cylinder that appeared to have been caused by banging the cylinder against a hard surface. (Huang Decl. Exh. B, Ratliff dep., 67:21-70:19.) Ratliff noted that the threaded neck of the cylinder just above the edge of the crack tilted away from the crack at a slight angle, which suggested to Ratliff that the torch may have been banged against something, thereby adjusting the threaded area of the cylinder. (Huang Decl. Exh. B, Ratliff dep., 70:10-19; 72:17-73:4) Ratliff said the crack was at the top of the cylinder at the point where the cylinder body tapered to the

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                    3
THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE

threaded neck and where the torch apparatus was attached. (Huang Decl. Exh. B, Ratliff dep., 67:21-25; 68:20-24.) The edges of the crack appeared to have been forced outward from the interior of the cylinder as if from an explosion. (Huang Decl. Exh. B, Ratliff dep., 68:1-10.) When Ratliff picked up the torch and cylinder, the torch apparatus was still attached, but it was loose and did not appear to be screwed on entirely. (Huang Decl. Exh. B, Ratliff dep., 73:5-10.)

Ranger Stephens made similar observations of the cylinder. (Huang Decl. Exh. A, Stephens dep. 42:14-43:1.) In particular, he observed a split approximately two-and-a-half inches long and a quarter inch wide at the neck of the cylinder. (Huang Decl. Exh. A, Stephens dep. 42:14-43:1.) He also saw that the cylinder had burst open just beyond the threads at the neck. (Huang Decl. Exh. A, Stephens dep. 42:1-7.)

Paramedic Robert Price responded to this accident as an intern for Station 21 of the San Diego Fire Department. (Huang Decl. Exh. C, Price dep., 6:15-7:14.) Price treated Shalaby at the scene. (Huang Decl. Exh. C, Price dep., 9:5-10:10.) Price saw beer bottles at the campsite and smelled alcohol on Shalaby's breath. (Huang Decl. Exh. C, Price dep., 22:13-23:6.)

Price was one of the persons that inputted information into what eventually became the fire department report. (Huang Decl. Exh. C, Price dep., 12:12-13:21) One of Price's entries into the report reflects:

"Patient was kicking around a propane torch. It went into a fire and blew up and burned him. Family called 911." (Huang Decl. Exh. C, Price dep., 19:19-20:1.)

Price wasn't sure whether this statement was made to him by Shalaby or someone else. (Huang Decl. Exh. C, Price dep., 20:13-17.) However, Price's supervisor, Joe Russo, was present when Price was interviewing Shalaby. (Huang Decl. Exh. D, Russo dep., 14:3-25; 22:6-17.) Russo heard Shalaby state that he had kicked a "propane" cylinder into the fire and that it exploded. (Huang Decl. Exh. D, Russo dep., 22:18-23:7.)

An unidentified engineer with fire department told Stephens and Ratliff that the fire department did not need to take possession of the torch or cylinder. (Huang Decl. Exh. A, Stephens dep., 61:22-62:4; Huang Decl. Exh. B, Ratliff dep., 35:5-36:7.) Stephens recalls that the engineer said that they did not need the evidence because:

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                          4
THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE

"...the gentleman in question, the patient, as they stated, had already told them, and that it was an accident." (Huang Decl. Exh. A, Stephens dep., 61:22-62:4.)

Including Price and Russo, seven persons from San Diego Fire Department Station 21 responded to this incident. (Huang Decl. Exh. D, Russo dep., 29:17-30:20; 45:6-8; Exhibit 8.)

Ratliff took the cylinder and torch back to the ranger station where it remained for two or three days. (Huang Decl. Exh. B, Ratliff dep., 36:15-21.) Thereafter, Ratliff believes that another staff member at the campground threw the torch and cylinder away. (Huang Decl. Exh. B, Ratliff dep., 37:15-17.)

Plaintiffs originally filed this action in Alameda Superior Court naming Newell Rubbermaid, Inc. ("Newell") and The Home Depot, Inc. ("Home Depot") as defendants. The case was removed to the Northern District. Thereafter, plaintiffs filed an amended complaint in which Home Depot remains a defendant, but Irwin Industrial Tool Company, Inc. ("Irwin") was named in place of Newell. Bernzomatic, a division of Irwin, has sued Worthington and Western for indemnity in a third party complaint.

## III. LEGAL ARGUMENT

A.    **Pursuant to 28 U.S.C. Section 1404(a), Venue Should Be Transferred to the Southern District of California Because It Is The Most Convenient Forum For All Key Witnesses**

Motions to transfer venue are governed by 28 U.S.C. Section 1404(a), which provides:

> [f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where [the action] might have been brought.

The purpose of Section 1404(a) is: "to prevent the waste of 'time, energy and money' and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, (1964) 376 U.S. 612, 616. Since all of the key third party witnesses in this case live and work in the San Diego area, this case should be transferred to the Southern District for their convenience.

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                        5
THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE

### 1. The Southern District has Personal and Subject Matter Jurisdiction over the Parties and is a Proper Venue

As a threshold matter, the moving party of a motion to transfer venue must show that the forum to which they seek to transfer is a forum in which the action originally might have been brought. See *Hoffman v. Blaski*, (1960) 363 U.S. 335, 344; 28 U.S.C. § 1404, subd., (a). The California District Courts have interpreted this to mean that "[t]he transferee court must have had complete personal jurisdiction over defendants, subject matter jurisdiction over the defendants, and proper venue had the claim originally been brought in that court." *Royal Queentex Enterprises, Inc. v. Sara Lee Corp.* (N.D. Cal. 2000) 2000 U.S. Dist. LEXIS 10139, 8. (Referencing *Hoffman*, 363 U.S. at 343-344.)

Here, all three of these requirements are satisfied. None of the defendants or third party defendants contest personal jurisdiction. The court has proper subject matter jurisdiction because there is diversity of citizenship[1] and because the claim exceeds $75,000.[2] Venue in the Southern District is proper under 28 U.S.C. Section 1391(a)(2)[3] in that the accident giving rise to this action occurred within the Southern District.

### 2. The Most Important Factor – "Convenience of the Witnesses" – Weighs In Favor of a Transfer

Once a court has determined that an action could have originally been brought in a different

---

[1] There is complete diversity among the Plaintiffs, the Defendants, and Third Party Defendants. Plaintiffs are citizens of California. Defendant Irwin Industrial Tool Company, Inc. is a Delaware corporation, with its principal place of business in North Carolina. Defendant The Home Depot, Inc. is a Delaware corporation, with its principal place of business in Georgia. Worthington is incorporated in and has its principal place of business in Ohio. Third Party Defendant Western Industries, Inc., is incorporated in and has its principal place of business in Wisconsin.

[2] Shalaby's past medial specials alone exceed $300,000.

[3] 28 USCA Section 1391(a)(2) provides: "[a] civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                    6
THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE

district, it must then determine whether the transfer would further the "convenience of parties and witnesses" and "the interest of justice." *Royal Queentex, supra* at 7. The district court has discretion to adjudicate motions for transfer according to "an individualized, case-by-case consideration of convenience and fairness." *Jones v. GNC Franchising, Inc.*, (9th Cir. 2000) 211 F.3d 495, 498. The courts weigh eight factors to determine whether a transfer is appropriate in a particular case:

> (1)plaintiff's choice of forum, (2) convenience of the parties, (3) convenience of the witnesses, (4) ease of access to the evidence, (5) familiarity of each forum with the applicable law, (6) feasibility of consolidation of other claims, (7) any local interest in the controversy, and (8) the relative court congestion and time of trial in each forum.

*Royal Queentex, supra.* at 7-8. Among the eight factors, "convenience of the witnesses" is the most important. *Amini Innovation Corp. v. JS Imps., Inc.*, (C.D. Cal. 2007) 2007 U.S. Dist. LEXIS 43758, *43-46; *Accord Royal Queentex, supra* at 18; *Decter v. Gill* (ED. Cal. 2006) 2006 U.S. Dist. LEXIS 90415, *7; See also *A. J. Industries, Inc. v. U. S.*, (9th Cir. 1974) 503 F.2d 384, 386-87 (discussing the importance and history of the convenience of witnesses in a Section 1404(a) transfer).

Federal Rules of Civil Procedure Rule 45(b)(2) permits service of a trial subpoena anywhere in California based on the fact that California state court statutes allow for such. Regardless, the practical reality is that the defendants will be unable to arrange for most, let alone all, of the critical witnesses to travel from the San Diego area to Northern California to testify at trial. The witnesses may have compelling reasons not to travel and spend one or more nights away from their homes and work. The witnesses' cooperation may be thoroughly tainted by the inconvenience of being compelled to travel to Northern California. Or the witnesses may simply not come. In *Polaroid Corp. v. Casselman*, (S.D.N.Y. 1962) 213 F. Supp. 379, 382 (cited in *Pacific Car and Foundry Co. v. Pence* (9th Cir. 1968) 403 F.2d 949, 954 and in *Vivoli v. Vivoli's* (C.D. Cal. 1984) 606 F.Supp. 106, 108), the Court recognized that "even if the witnesses are willing to travel to [plaintiff's choice of forum] the parties would be subjected to expense, the witnesses to inconvenience, and the trial, in all likelihood, to

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                7
THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE

1 interruption and delay. All of this can be avoided by trial in [the more convenient forum.]" Thus, the

2 interests of justice cry out for this case being transferred to the Southern District.

3        If the trial were in San Diego, the witnesses could simply be on standby and appear at trial on

4 short notice. Further, if their testimony were not completed by the end of the court day, they would be

5 able to return to their homes that night. In contrast, if the case remains in the Northern District, the

6 witnesses will not have that luxury. Rather, they will have to travel 500 miles to San Francisco. They

7 will have to spend the night away from home the day before their *scheduled* testimony and spend

8 additional nights to the extent they are not called when scheduled or their testimony is not completed by

9 the end of the court day.

10        Perhaps keeping the case in the Northern District would be justified if it inconvenienced just one

11 witness. However, Worthington has cited critical testimony of four separate witnesses. Moreover,

12 there were five additional persons from the San Diego Fire Department at the scene who may also have

13 critical testimony. (To date, only one of those persons has been deposed.) Further, the neighboring

14 campers who witnessed Shalaby's actions leading up to the accident may be called as witnesses.

15 Finally, Shalaby's initial treatment was at a hospital in the San Diego area. Thus, there may be well in

16 excess of a dozen third party witnesses needed to testify at trial who live and work in the San Diego

17 area.

18        **3. Whether Witnesses Can Testify Live Is Considered In A Motion to Transfer**

19        In evaluating the effect of a transfer on the convenience of witnesses, courts consider the

20 availability of certain witnesses and their live testimony at trial. *Polaroid, supra,* at 382. There is no

21 question that Shalaby suffered serious burns and a jury will likely be sympathetic to his injuries.

22 Worthington anticipates that Shalaby will deny banging his cylinder on a hard surface, kicking his

23 cylinder into the fire or admitting fault for the accident. To counter Shalaby's testimony, it will be

24 critical to have the third party witnesses appear live at trial, as opposed to having to rely on reading

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                    8

THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE

1   their deposition transcripts.  Needless to say, reading the testimonies will greatly reduce their impact.

2   As the *Polaroid* Court aptly observed, presenting testimony by deposition does not have the same force

3   and effect as live testimony and must be considered in a motion to transfer:

5   > Depositions, deadening and one-sided, are a poor substitute for live testimony
>   especially where, as here, vital issues of fact may hinge on credibility.  In

6   > determining credibility, there is nothing like the impact of live *dramatis personae*
>   on the trier of the facts.  Thus, the transfer which defendant seeks will not only

7   > serve the convenience of the witnesses but, more importantly, the ends of justice.

8   *Polaroid, supra* at 382-383.

9           **4.  The Testimonies of the Key Third Party Witnesses Are Critical As They Help
            Establish the Cause of The Accident.**

11          The testimonies of the third party witnesses are pivotal in this case – as they will help the trier of

12  fact to determine how this accident occurred and whether any defective product caused, or contributed

13  to the cause of, the accident.  Based on the deposition testimonies cited above, it was Shalaby's

14  conduct, rather than an alleged defect, that caused the accident.  Specifically, the testimonies indicate

15  that:

17          1.  Shalaby became frustrated with his torch and banged the cylinder against a hard object.

18          2.  Shalaby kicked the torch and cylinder into a fire.

19          3.  Shalaby made admissions that he was "stupid" and at fault for the accident.

20          4.  Shalaby did not fully connect the torch to the cylinder.

21          5.  Shalaby used the wrong type of torch with the cylinder.

22          The testimonies of these lay witnesses are even more essential and valuable because the physical

23  evidence has been discarded.  Generally in product liability cases where physical evidence is available,

24  liability often turns on the opinions of experts given after careful examination and testing of the product

26  in question.  Here, through no fault of their own, defendants' experts will have no such opportunity.  To

27  be able to opine on causation, it will be extremely important to the experts to know the nature of the

28  damage to the cylinder, i.e. the location of the crack, the size of the crack, a description of the crack,

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                          9
THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE

etc. Hence, without the cylinder and the torch, the experts will have to rely on the two rangers' description of the physical damage, as the foundational facts to determine whether the potential theories of the accident offered are consistent with the physical damage.

### 5.    Plaintiffs' Choice of Forum Has Little Connection to This Case

Worthington acknowledges that Plaintiffs' choice of forum is accorded weight in the court's determination of the propriety of a transfer. However, if the Plaintiff's choice of forum has no real connection with the litigation and the movant has made a strong showing of inconvenience, a transfer should be granted. *See Pacific Car, supra* at *954; Polaroid, supra,* at 383. Indeed, "[p]laintiff's choice of forum, then, is not the final word." *Pacific Car, supra* at 954.

Besides being plaintiffs' domicile, this forum has tenuous nexus to the fundamental issue of this case: the cause of the accident. In contrast, being the forum where the incident occurred and where the key witnesses reside, the Southern District has a very significant connection. Worthington has clearly identified who the inconvenienced witnesses will be, and what their testimony will be and how that testimony will be relevant to this case. These witnesses will play critical roles in this case and a venue change will have a significant impact on their convenience. Therefore, the scale significantly tips in favor of a transfer.

### IV.  CONCLUSION

The interests of convenience and justice favor transferring this case to the Southern District. If the trial occurs in Northern California, witnesses critical to the defense of this matter will either not appear or will suffer major inconvenience. The testimony of these witnesses does not involve minor issues, but rather goes to the heart of how this accident occurred. Moreover, because the evidence has been discarded, the only evidence of the physical condition of the cylinder – which will be critical to expert analysis – will be the testimony of the two San Diego area witnesses. Because these witnesses will contradict plaintiffs' version of the accident, it is imperative that the jury be able to observe the live testimony rather than hear monotonous readings of deposition transcripts. Accordingly,

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                        10
THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE

1  Worthington respectfully requests that this Court grant its motion to transfer venue to the Southern
2  District.

3

4  Dated: August ___ 16___, 2007                    BOWLES & VERNA LLP

5

6
                                                    By: _____
7                                                        RICHARD A. ERGO
8                                                        Attorneys for Third Party Defendant
                                                        Worthington Industries, Inc.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                    11
THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE

1

**PROOF OF SERVICE**

**(Shalaby v. Irwin – USDC, Northern District of California, Case No:  C 06 7026 MJJ)**

2

I, the undersigned, declare as follows:

3

I am a citizen of the United States, over the age of 18 years, and not a party to, or interested in the within

4  entitled action.  I am an employee of BOWLES & VERNA LLP, and my business address is 2121 N. California Blvd., Suite 875, Walnut Creek, California 94596.

5

On August 16, 2007, I served the following document(s):

6

**THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE;**

7  **DECLARATION OF CATHLEEN S. HUANG; REQUEST TO TAKE JUDICIAL NOTICE; and [PROPOSED] ORDER**

8  on the following parties in this action addressed as follows:

9  | *Attorneys for Plaintiffs* | *Attorneys for Defendant and Third Party Plaintiff* |
|---|---|
| Mark D. Epstein | *Bernzomatic and Defendant The Home Depot* |
| Alborg, Veiluva & Epstein LLP | J. Phillip Moorhead |
| 200 Pringle Avenue, Suite 410 | Keller, Price & Moorhead |
| Walnut Creek, CA  94596 | 229 Avenue I, 2nd Floor |
| Tel:     (925) 939-9880 | Redondo Beach, CA  90277-5600 |
| Fax:     (925) 939-9915 | Tel:     (310) 540-1332 |

10

11

12

13  <u>XXXX</u>    *(BY MAIL) I caused each such envelope, with postage thereon fully paid, to be placed in the United States mail at*
14  *Walnut Creek, California.  I am readily familiar with the business practice for collection and processing of mail in this office.  That in the ordinary course of business said document(s) would be deposited with the U.S. Postal Service in*
15  *Walnut Creek on that same day.  I understand that service shall be presumed invalid upon motion of a party served if the postal cancellation date or postage meter date on the envelope is more than one day after the date of deposit for mailing contained on this affidavit.*

16  __    *(BY PERSONAL SERVICE) I delivered each such envelope by hand to each addressee above.*
       __    *(BY OVERNIGHT DELIVERY) I caused each envelope, with delivery fees provided for, to be deposited in a box*
17  *regularly maintained by UPS/FEDERAL EXPRESS.  I am readily familiar with Bowles & Verna's practice for collection and processing of correspondence for overnight delivery and know that in the ordinary course of Bowles & Verna's*
18  *business practice the document(s) described above will be deposited in a box or other facility regularly maintained by UPS/FEDERAL EXPRESS or delivered to an authorized courier or driver authorized by UPS/FEDERAL EXPRESS to*
19  *receive documents on the same date that it is placed at Bowles & Verna for collection.*
       __    *(BY FACSIMILE) By use of facsimile machine number (925) 935-0371 or (925) 256-1755, I served a copy of the*
20  *within document(s) on the above interested parties at the facsimile numbers listed above.  The transmission was reported as complete and without error.  The transmission report was properly issued by the transmitting facsimile*
21  *machine.*

22

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and
23  correct, and that I am employed in the office of a member of the Bar of this Court at whose direction the service was made. Executed on August 16, 2007, at Walnut Creek, California.

24

25  *Donna Withrow*
DONNA WITHROW

26

27

28

FILED

1  RICHARD A. ERGO (# 110487)
   CATHLEEN S. HUANG (#219554)
2  BOWLES & VERNA LLP
   2121 N. California Boulevard, Suite 875
3  Walnut Creek, California  94596
   Telephone: (925) 935-3300
4  Facsimile: (925) 935-0371
   Email:  raergo@bowlesverna.com
5           chuang@bowlesverna.com

6  Attorneys for Third Party Defendant
   Worthington Industries, Inc.

7

07 AUG 16  PM 3: 36

RICHARD W. WIEKING
CLERK. U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11

12  ANDREW SHALABY, an individual, and SONIA
    DUNN-RUIZ an individual,

13              Plaintiffs,

14      vs.

15  IRWIN INDUSTRIAL TOOL COMPANY, THE
    HOME DEPOT, INC., and DOES 2 through 100,
16  inclusive,

17              Defendants.

18

19  BERNZOMATIC,

              Third Party Plaintiff,

20

      vs.

21

22  WESTERN INDUSTRIES, INC.,
    WORTHINGTON INDUSTRIES, AND ROES 2
    through 100, inclusive,

23

              Third Party Defendants.

24

CASE NO.:  C06-07026 MJJ

Judge Martin J. Jenkins

**WORTHINGTON INDUSTRIES, INC.'S
CORPORATE DISCLOSURE
STATEMENT AND CERTIFICATION OF
INTERESTED ENTITIES OR PERSONS**

BY FAX

25      Pursuant to Federal Rules of Civil Procedure Rule 7.1(a), Third Party Defendant Worthington

26  Industries, Inc. ("Worthington") certifies that it does not have a parent corporation and that there is no

27  publicly-held corporation that owns 10% or more of Worthington's stocks.

28

CASE NO.:  C06-07026 MJJ                                1
WORTHINGTON INDUSTRIES INC.'S CORPORATE DISCLOSURE STATEMENT AND CERTIFICATION OF
INTERESTED ENTITIES OR PERSONS

1    Pursuant to the Northern District Court of California Civil Local Rules Rule 3-16, Worthington

2    certifies that the following listed persons, associations of persons, firms, partnerships, corporations

3    (including parent corporations) or other entities (i) have a financial interest in the subject matter in

4    controversy or in a party to the proceeding, or (ii) have a non-financial interest in that subject matter or

5    in a party that could be substantially affected by the outcome of this proceeding:

6

7    Worthington's liability carriers are Travelers, ACE, XL, Zurich, Ohio Casualty, and Chubb.

8

9

10   Dated: August ___, 2007                    BOWLES & VERNA LLP

11

12

13                                              By: _____

14                                                  Richard A. Ergo
                                                    Cathleen S. Huang
15                                                  Attorneys for Third Party Defendant
                                                    WORTHINGTON INDUSTRIES, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO.:  C06-07026 MJJ                         2
WORTHINGTON INDUSTRIES INC.'S CORPORATE DISCLOSURE STATEMENT AND CERTIFICATION OF
INTERESTED ENTITIES OR PERSONS

1

**PROOF OF SERVICE**
(Shalaby v. Irwin – USDC, Northern District of California, Case No: C 06 7026 MJJ)

2

I, the undersigned, declare as follows:

3

I am a citizen of the United States, over the age of 18 years, and not a party to, or interested in the within

4 entitled action. I am an employee of BOWLES & VERNA LLP, and my business address is 2121 N. California Blvd., Suite 875, Walnut Creek, California 94596.

5

On August 16, 2007, I served the following document(s):

6

7 **WORTHINGTON INDUSTRIES, INC.'S CORPORATE DISCLOSURE STATEMENT AND CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

8 on the following parties in this action addressed as follows:

9 *Attorneys for Plaintiffs*                              *Attorneys for Defendant and Third Party Plaintiff*
Mark D. Epstein                                          *Bernzomatic and Defendant The Home Depot*
10 Alborg, Veiluva & Epstein LLP                           J. Phillip Moorhead
200 Pringle Avenue, Suite 410                            Keller, Price & Moorhead
11 Walnut Creek, CA 94596                                  229 Avenue I, 2nd Floor
Tel:     (925) 939-9880                                  Redondo Beach, CA 90277-5600
12 Fax:    (925) 939-9915                                  Tel:     (310) 540-1332

13 <u>XXXX</u>    *(BY MAIL) I caused each such envelope, with postage thereon fully paid, to be placed in the United States mail at Walnut Creek, California. I am readily familiar with the business practice for collection and processing of mail in this*
14 *office. That in the ordinary course of business said document(s) would be deposited with the U.S. Postal Service in Walnut Creek on that same day. I understand that service shall be presumed invalid upon motion of a party served if*
15 *the postal cancellation date or postage meter date on the envelope is more than one day after the date of deposit for mailing contained on this affidavit.*
16 __    *(BY PERSONAL SERVICE) I delivered each such envelope by hand to each addressee above.*
__    *(BY OVERNIGHT DELIVERY) I caused each envelope, with delivery fees provided for, to be deposited in a box*
17 *regularly maintained by UPS/FEDERAL EXPRESS. I am readily familiar with Bowles & Verna's practice for collection and processing of correspondence for overnight delivery and know that in the ordinary course of Bowles & Verna's*
18 *business practice the document(s) described above will be deposited in a box or other facility regularly maintained by UPS/FEDERAL EXPRESS or delivered to an authorized courier or driver authorized by UPS/FEDERAL EXPRESS to*
19 *receive documents on the same date that it is placed at Bowles & Verna for collection.*
__    *(BY FACSIMILE) By use of facsimile machine number (925) 935-0371 or (925) 256-1755, I served a copy of the*
20 *within document(s) on the above interested parties at the facsimile numbers listed above. The transmission was reported as complete and without error. The transmission report was properly issued by the transmitting facsimile*
21 *machine.*

22

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.
23 Executed on August 16, 2007, at Walnut Creek, California.

24

25                                                 Donna Withrow
                                                  DONNA WITHROW

26

27

28

Bowles & Verna LLP
2121 N. California Blvd.
Suite 875
Walnut Creek 94596



FILED

AUG 1 6 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1 | RICHARD A. ERGO (# 110487)
CATHLEEN S. HUANG (#219554)
2 | BOWLES & VERNA LLP
2121 N. California Boulevard, Suite 875
3 | Walnut Creek, California 94596
Telephone: (925) 935-3300
4 | Facsimile: (925) 935-0371
Email: raergo@bowlesverna.com
5 |        chuang@bowlesverna.com

6 | Attorneys for Third Party Defendant
Worthington Industries, Inc.

7

8

9 | UNITED STATES DISTRICT COURT

10 | NORTHERN DISTRICT OF CALIFORNIA

11

12 | ANDREW SHALABY, an individual, and SONIA DUNN-RUIZ an individual,

13 | Plaintiffs,

14 | vs.

15 | IRWIN INDUSTRIAL TOOL COMPANY, THE HOME DEPOT, INC., and DOES 2 through 100,
16 | inclusive,

17 | Defendants.

18

19 | BERNZOMATIC,

20 | Third Party Plaintiff,

21 | vs.

22 | WESTERN INDUSTRIES, INC., WORTHINGTON INDUSTRIES, AND ROES 2 through 100, inclusive,

23

24 | Third Party Defendants.

**CASE NO.: C06-07026 MJJ**

Judge Martin J. Jenkins

**WORTHINGTON INDUSTRIES, INC.'S ANSWER TO BERNZOMATIC'S THIRD PARTY COMPLAINT**



25 | Third Party Defendant Worthington Industries, Inc. ("Worthington") responds to Third Party

26 | Plaintiff Bernzomatic's Third Party Complaint as follows:

27

28

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                              1
WORTHINGTON INDUSTRIES, INC.'S ANSWER TO BERNZOMATIC'S THIRD PARTY COMPLAINT

## THE PARTIES

1.     Defendant/ Third Party Plaintiff, Bernzomatic, is a Delaware corporation, with its principal place of business in North Carolina.

**RESPONSE:** Worthington is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1 and on that basis denies each and every allegation contained therein.

2.     Third Party Defendant, Western Industries, Inc., is a closely-held corporation with its principal place of business in Wisconsin.

**RESPONSE:** Worthington is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2 and on that basis denies each and every allegation contained therein.

3.     Third Party Defendant, Worthington Industries, Inc., is an Ohio corporation with its principal place of business in Ohio.

**RESPONSE:** Worthington admits the allegations in Paragraph 3.

4.     At various times, both Western and Worthington manufactured and sold Bernzomatic-branded MAPP gas cylinders.

**RESPONSE:** Worthington admits that Worthington Cylinders Wisconsin, LLC and Western at various times manufactured and sold Bernzomatic-branded MAPP gas cylinders. Worthington denies the remaining allegations in Paragraph 4.

5.     Worthington purchased Western's cylinder business in September 2004.

**RESPONSE:** Worthington admits that Worthington Cylinder Acquisition, LLC purchased certain assets from Western in September 2004. Worthington denies the remaining allegations in Paragraph 5.

//

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                    2

WORTHINGTON INDUSTRIES, INC.'S ANSWER TO BERNZOMATIC'S THIRD PARTY COMPLAINT

**JURIDICTION AND VENUE**

6.     Subject matter jurisdiction is proper in this Court because federal district courts in California recognize the rights of Third Party Complainant to Declarations of Rights, Breach of Contract Claims, Contractual Indemnity, Common Law Indemnity and Punitive Damages.  This Court has Personal Jurisdiction over the Third Party Defendants under the California long-arm statute as the actions or failures to act by the Third Party Defendants caused damage to the Defendant/Third Party Plaintiff and gave rise to claims in California.

**RESPONSE:**  Worthington denies that its actions or failures to act caused damage to Bernzomatic.  Worthington is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 6 and on that basis denies each and every remaining allegation contained therein.

7.     Venue is proper in this Court because all of the Plaintiffs' litigation claims arose in this jurisdiction, and all of the Third Party Complaint claims are derivative of those litigation claims.

**RESPONSE:**  Worthington is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7 and on that basis denies each and every allegation contained therein.

**FACTUAL ALLEGATIONS**

8.     Defendant/ Third Party Plaintiff, Bernzomatic, has been named as a Defendant in the above-captioned lawsuit (the "Shalaby litigation".)  Plaintiffs filed suit on October 10, 2006 and recently amended their Complaint on June 11, 2007.

**RESPONSE:**  Worthington admits that Plaintiffs filed suit in or about October 10, 2006 and amended their complaint on or about June 11, 2007 and that such complaints speak for themselves. Worthington is without knowledge or information sufficient to form a belief as to the truth of the

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                         3
WORTHINGTON INDUSTRIES, INC.'S ANSWER TO BERNZOMATIC'S THIRD PARTY COMPLAINT

1    remaining allegations in Paragraph 8 and on that basis denies each and every remaining allegation

2    contained therein.

3        9.      The Joint Case Management Statement and Order entered on February 20, 2007 alleges

4    that Plaintiff, Andrew Shalaby, suffered burns to his face and extremities due to an accident involving a

5    Bernzomatic-branded MAPP gas cylinder that he used to light a campfire.  It further alleges that liquid

6    MAPP gas inside the pressurized cylinder absorbed energy from the surrounding fire and heated up

7    such that it vaporized causing the cylinder to produce "an explosive effect."

8

9        **RESPONSE:**  Worthington admits that the February 20, 2007 Joint Case Management

10   Statement and Order speaks for itself.  Worthington is without knowledge or information sufficient to

11   form a belief as to the truth of the remaining allegations in Paragraph 9 and on that basis denies each

12   and every remaining allegation contained therein.

13

14       10.     The Joint Case Management Statement and Order entered on February 20, 2007 states

15   that fire department personnel who responded during the incident instructed the onsite manager to

16   discard the product.  Depositions of fire department and onsite personnel were taken on April 17, 2007

17   confirming that the product had been discarded.

18       **RESPONSE:**  Worthington admits that the February 20, 2007 Joint Case Management

19   Statement and Order speaks for itself and that certain depositions of fire department and campground

20   personnel have been taken.  Worthington is without knowledge or information sufficient to form a

21   belief as to the truth of the remaining allegations in Paragraph 10 and on that basis denies each and

22   every remaining allegation contained therein.

23

24       11.     Third Party Defendants, Western and Worthington, manufactured MAPP gas cylinders,

25   such as the one allegedly involved in this action.

26       **RESPONSE:**  Worthington admits that Western and Worthington Cylinders Wisconsin, LLC

27   manufactured MAPP gas cylinders.  Worthington denies the remaining allegations in Paragraph 11 that

28

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                        4
WORTHINGTON INDUSTRIES, INC.'S ANSWER TO BERNZOMATIC'S THIRD PARTY COMPLAINT

are directed at Worthington.  Worthington is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 11 and on that basis denies each and every remaining allegation contained therein.

12.    Defendant/Third Party Plaintiff purchased MAPP gas cylinders exclusively from Western and Worthington during the time periods relevant to this action.

**RESPONSE:** Worthington is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12 and on that basis denies each and every allegation contained therein.

13.    To the extent that a Bernzomatic-branded MAPP gas cylinder was involved in the accident which forms the basis of Plaintiffs' Complaint against Bernzomatic and Home Depot, said MAPP gas cylinder was manufactured by either Western or Worthington.

**RESPONSE:** Worthington is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13 and on that basis denies each and every allegation contained therein.

14.    Defendant/ Third Party Plaintiff cannot determine whether Western or Worthington manufactured the MAPP gas cylinder involved because the fire department personnel who responded during the incident instructed the onsite manager to discard the product and it cannot be recovered.

**RESPONSE:** Worthington is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14 and on that basis denies each and every allegation contained therein.

15.    Upon information and belief, the written contract between Worthington and Western regarding the sale of the cylinder business in September 2004 contains an express provision setting forth a method to facilitate identification of a cylinder's manufacturer if it cannot be determined by a serial number or other reliable information.

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                              5
WORTHINGTON INDUSTRIES, INC.'S ANSWER TO BERNZOMATIC'S THIRD PARTY COMPLAINT

**RESPONSE:** Worthington admits that there is a written contract between Worthington Cylinder Acquisition, LLC and Western regarding the sale of certain assets and that the contract speaks for itself. Worthington denies the remaining allegations in Paragraph 15.

### FIRST CLAIM – DECLARATION OF RIGHTS

16.    Defendant/ Third Party Plaintiff incorporates by reference the allegations in Paragraphs 1 through 15 of this Third Party Complaint as if fully rewritten herein.

**RESPONSE:** Worthington refers to Paragraphs 1 through 15 of this Answer to Bernzomatic's Third Party Complaint and by this reference incorporates the same herein as though fully set forth.

17.    Exclusive Supply Agreements between Newell Operating Company (a predecessor to Industrial Tool Company, dba Bernzomatic) and Western in 2001, as well as between Irwin Industrial Tool Company, dba Bernzomatic, and Worthington in 2006 for Western's and Worthington's MAPP gas cylinders included indemnification provisions. In September 2004, Worthington assumed the rights and obligations of Western under the 2001 Supply Agreement resulting from Worthington's purchase of Western's cylinder business at that time.

**RESPONSE:** Worthington admits that supply agreements between Western and Newell Operating Company and between Irwin Industrial Tool Company and Worthington Cylinders Wisconsin, LLC were entered into and speak for themselves. Worthington denies the remaining allegations in Paragraph 17 that are directed at Worthington. Worthington is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 17 and on that basis denies each and every remaining allegation contained therein.

18.    The indemnification provision at page 10 of the Agreement between Newell (Bernzomatic) and Western states, in pertinent part:

"Western assumes and agrees to indemnify, defend and hold harmless Newell and its affiliates, directors, officers, employees and agents for all claims against Newell for personal injury or

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                        6
WORTHINGTON INDUSTRIES, INC.'S ANSWER TO BERNZOMATIC'S THIRD PARTY COMPLAINT

property damage to the extent such injury or damage is alleged to be caused by or is caused by

the sale or distribution of Covered Cylinders supplied under this Agreement that were not

suitable for sale, distribution or use due to the design, manufacture, labeling or failure to label,

or storage prior to delivery to Newell of such Covered Cylinders. Western further agrees to

indemnify, defend and hold harmless Newell and its affiliates, directors, officers, employees and

agents for all claims against Newell resulting from the failure to manufacture products in

accordance with applicable laws including environmental and labor laws."

**RESPONSE:**   Worthington admits that the supply agreement between Western and Newell Operating Company speaks for itself. Worthington is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 18 and on that basis denies each and every remaining allegation contained therein.

19.     The indemnification provision at page 8 of the Agreement between Irwin Industrial Tool Company (Bernzomatic) and Worthington states, in pertinent part;

"WCW (Worthington) assumes and agrees to indemnify, defend and hold harmless Bernzomatic

and its customers, affiliates, directors, officers, employees and agents for all claims against

Bernzomatic for personal injury or property damage to the extent such injury or damage is

alleged to be cause(d) by or is caused by in whole or in part the sale or distribution of Covered

Cylinders supplied under this Agreement that were not suitable for sale, distribution or use due

to the design, manufacture, labeling or failure to label (except as provided in Section 4.4), or

storage prior to delivery to Bernzomatic of such Covered Cylinders. WCW further agrees to

indemnify, defend and hold harmless Bernzomatic and its affiliates, directors, officers,

employees and agents for all claims against Bernzomatic resulting from the failure to

manufacture products in accordance with applicable laws."

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                              7
WORTHINGTON INDUSTRIES, INC.'S ANSWER TO BERNZOMATIC'S THIRD PARTY COMPLAINT

1  **RESPONSE:**  Worthington admits that the supply agreement between Bernzomatic and

2  Worthington Cylinders Wisconsin, LLC speaks for itself.  Worthington denies the remaining allegations

3  in Paragraph 19 that are directed at Worthington.  Worthington is without knowledge or information

4
5  sufficient to form a belief as to the truth of the remaining allegations in Paragraph 19 and on that basis

6  denies each and every remaining allegation contained therein.

7  20.    The allegations in the Shalaby litigation are for personal injury caused by the sale or

8  distribution of covered cylinders – (a Bernzomatic-branded MAPP gas cylinder) – manufactured and

9  sold by Western and Worthington pursuant to the Supply Agreements, which contained the above-cited

10  indemnification provisions.

11  **RESPONSE:**  The allegations in the Shalaby litigation speak for themselves. Worthington

12
13  denies the remaining allegations in Paragraph 20 that are directed at Worthington.  Worthington is

14  without knowledge or information sufficient to form a belief as to the truth of the remaining allegations

15  in Paragraph 20 and on that basis denies each and every remaining allegation contained therein.

16  21.    Pursuant to the indemnification provisions, Bernzomatic tendered its defense and

17  indemnification to Western on June 19, 2006, and to Worthington on January 24, 2007.

18  **RESPONSE:**  Worthington admits that Bernzomatic tendered the defense of the Shalaby matter

19  to Worthington.  Worthington is without knowledge or information sufficient to form a belief as to the

20
21  truth of the remaining allegations in Paragraph 21 and on that basis denies each and every remaining

22  allegation contained therein.

23  22.    To date, Western has neither defended nor indemnified Bernzomatic, which is a breach

24  of the indemnification provision in the Supply Agreement.

25  **RESPONSE:**  Worthington is without knowledge or information sufficient to form a belief as to

26  the truth of the allegations in Paragraph 22 and on that basis denies each and every allegation contained

27  therein.

28

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                    8
WORTHINGTON INDUSTRIES, INC.'S ANSWER TO BERNZOMATIC'S THIRD PARTY COMPLAINT

23.    To date, Worthington, has neither defended nor indemnified Bernzomatic, which is a breach of the indemnification provision in the Supply Agreement.

**RESPONSE:**  Worthington admits that it has not defended nor indemnified Bernzomatic. Worthington denies the remaining allegations in Paragraph 23.

24.    An actual dispute exists between Defendant/Third Party Plaintiff and Plaintiffs, Andrew Shalaby and Sonia Dunn-Ruiz.

**RESPONSE:**  Worthington admits that a dispute exists between Plaintiffs and Irwin Industrial Tool Company.  Worthington is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 24 and on that basis denies each and every remaining allegation contained therein.

25.    Bernzomatic is entitled to a declaration of rights under the contracts against Western and Worthington and the obligations under the indemnification provisions of the Supply Agreement as follows:

a.    Western is obligated under the indemnification provisions of the Supply Agreement and by virtue of its breach of its duty to defendant Bernzomatic in the <u>Shalaby</u> litigation, to indemnify Bernzomatic with respect to the full amount of all defense costs and any liability or settlement in the <u>Shalaby</u> litigation without any cost sharing, apportionment between particular claims or allegations, or limitation on amount.

**RESPONSE:**  Worthington is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25(a) and on that basis denies each and every allegation contained therein.

b.    Worthington is obligated under the indemnification provisions of the Supply Agreement and by virtue of its breach of its duty to defendant Bernzomatic in the <u>Shalaby</u> litigation, to indemnify Bernzomatic with respect to the full amount of all defense costs and any liability or

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                    9
WORTHINGTON INDUSTRIES, INC.'S ANSWER TO BERNZOMATIC'S THIRD PARTY COMPLAINT

1  settlement in the <u>Shalaby</u> litigation without any cost sharing, apportionment between particular claims

2  or allegations, or limitation on amount.

3      **RESPONSE:** Worthington denies the allegations in Paragraph 25(b).

4  ## SECOND CLAIM – BREACH OF CONTRACT/CONTRACTUAL INDEMNIFICATION

5

6      26.    Defendant/Third Party Plaintiff incorporates by reference the allegations in Paragraphs 1

7  through 25 of this Complaint as if fully rewritten herein.

8      **RESPONSE:** Worthington refers to Paragraphs 1 through 25 of this Answer to Bernzomatic's

9  Third Party Complaint and by this reference incorporates the same herein as though fully set forth.

10     27.    Western has breached its express and implied obligations under the Supply Agreement

11  because it has failed to defend and indemnify Defendant/Third Party Plaintiff and hold it harmless with

12
   respect to any of the amounts Defendant/Third Party Plaintiff has incurred and will incur in the future

13
   because of the <u>Shalaby</u> litigation.

14

15     **RESPONSE:** Worthington is without knowledge or information sufficient to form a belief as to

16  the truth of the allegations in Paragraph 27 and on that basis denies each and every allegation contained

17  therein.

18     28.    Such breach of contract by Western has directly and proximately caused injury to

19  Defendant/Third Party Plaintiff, including, but not limited to, the payment of the entire cost of the

20
   <u>Shalaby</u> litigation and the payment of fees and expenses in defending the <u>Shalaby</u> litigation.

21

22     **RESPONSE:** Worthington is without knowledge or information sufficient to form a belief as to

23  the truth of the allegations in Paragraph 28 and on that basis denies each and every allegation contained

24  therein.

25     29.    Worthington has breached its express and implied obligations under the Supply

26  Agreement because it has failed to defend and indemnify Defendant/Third Party Plaintiff and hold it

27

28

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                    10
WORTHINGTON INDUSTRIES, INC.'S ANSWER TO BERNZOMATIC'S THIRD PARTY COMPLAINT

harmless with respect to any of the amounts Defendant/Third Party Plaintiff has incurred and will incur in the future because of the <u>Shalaby</u> litigation.

**RESPONSE:** Worthington denies the allegations in Paragraph 29.

30.    Such breach of contract by Worthington has directly and proximately caused injury to Defendant/Third Party Plaintiff, including, but not limited to, the payment of the entire cost of the <u>Shalaby</u> litigation and the payment of fees and expenses in defending the <u>Shalaby</u> litigation.

**RESPONSE:** Worthington denies the allegations in Paragraph 30.

### THIRD CLAIM – EQUITABLE INDEMNIFICATION

31.    Defendant/Third Party Plaintiff incorporates by reference the allegations in Paragraphs 1 through 30 of this Complaint as if fully rewritten herein.

**RESPONSE:** Worthington refers to Paragraphs 1 through 30 of this Answer to Bernzomatic's Third Party Complaint and by this reference incorporates the same herein as though fully set forth.

32.    Third Party Defendants, Western and Worthington, manufactured Bernzomatic-branded MAPP gas cylinders and introduced those cylinders into the stream of commerce by selling them to Defendant/Third Party Plaintiff.

**RESPONSE:** Worthington admits that Western and Worthington Cylinders Wisconsin, LLC manufactured Bernzomatic-branded MAPP gas cylinders. Worthington admits that Worthington Cylinders Wisconsin, LLC sold such cylinders to Irwin Industrial Tool Company. Worthington admits that Western sold such cylinders to Newell Operating Company. Worthington denies the remaining allegations in Paragraph 32 that are directed at Worthington. Worthington is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 32 and on that basis denies each and every remaining allegation contained therein.

33.    To the extent that the MAPP gas cylinder at issue is held to be defective, which Defendant/Third Party Plaintiff expressly denies, one of the Third Party Defendants, Western and/or

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                11
WORTHINGTON INDUSTRIES, INC.'S ANSWER TO BERNZOMATIC'S THIRD PARTY COMPLAINT

1  Worthington, introduced that defect by manufacturing and selling MAPP gas cylinders to

2  Defendant/Third Party Plaintiff for further distribution and resale to the Plaintiffs.

3  **RESPONSE:** Worthington is without knowledge or information sufficient to form a belief as to

4  the truth of the allegations in Paragraph 33 and on that basis denies each and every allegation contained

5

6  therein.

7  34.    To the extent that the MAPP gas cylinder at issue is held to have caused injuries and

8  damages to Andrew Shalaby and Sonia Dunn-Ruiz, which Defendant/Third Party Plaintiff expressly

9  denies, Third Party Defendants, Western and Worthington, are liable for those injuries as a result of the

10  manufacture and sale of those MAPP gas cylinders to Defendant/Third Party Plaintiff for further

11  distribution and resale.

12  **RESPONSE:** Worthington denies the allegations in Paragraph 34 that are directed at

13

14  Worthington.  Worthington is without knowledge or information sufficient to form a belief as to the

15  truth of the remaining allegations in Paragraph 34 and on that basis denies each and every remaining

16  allegation contained therein.

17  35.    Because the cylinder product was discarded well before any lawsuit or involvement of

18  the Defendant/Third Party Plaintiff, there is no way to discover whether Western or Worthington

19  manufactured the cylinder at issue.

20

21  **RESPONSE:** Worthington denies the allegations in Paragraph 35.

22  36.    Because it is certain that the manufacturer of the cylinder at issue was either Western or

23  Worthington, both Western and Worthington owe indemnity to the Defendant/Third Party Plaintiff for

24  any alleged harm caused by the cylinder.

25  **RESPONSE:**    Worthington denies the allegations in Paragraph 36 that are directed at

26  Worthington.  Worthington is without knowledge or information sufficient to form a belief as to the

27

28

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                         12

WORTHINGTON INDUSTRIES, INC.'S ANSWER TO BERNZOMATIC'S THIRD PARTY COMPLAINT

1  truth of the remaining allegations in Paragraph 36 and on that basis denies each and every remaining

2  allegation contained therein.

3      37.    Thus, as a result of their actions, Third Party Defendants, Western and Worthington, owe

4  a complete common law duty of indemnification to Defendant/Third Party Plaintiff for all damages,

5  costs, expenses and fees associated with the <u>Shalaby</u> litigation.

6

7  **RESPONSE:**  Worthington denies the allegations in Paragraph 37 that are directed at

8  Worthington.  Worthington is without knowledge or information sufficient to form a belief as to the

9  truth of the remaining allegations in Paragraph 37 and on that basis denies each and every remaining

10  allegation contained therein.

11

### FOURTH CLAIM- THIRD PARTY BENEFICIARY

12

13      38.    Defendant/Third Party Plaintiff incorporates by reference the allegations in Paragraphs 1

14  through 37 of this Complaint as if fully rewritten herein.

15  **RESPONSE:**  Worthington refers to Paragraphs 1 through 37 of this Answer to Third Party

16  Plaintiff's Third Party Complaint and by this reference incorporates the same herein as though fully set

17  forth.

18      39.    Defendant/Third Party Plaintiff is an intended third party beneficiary of the contract

19  between Western and Worthington for the sale of the cylinder business in September 2004, wherein an

20  express method was provided for determining which manufacturer is responsible for a cylinder when it

21

22  cannot be determined by serial number or other reliable information.

23  **RESPONSE:**  Worthington admits that the contract between Western and Worthington

24  Cylinder Acquisition, LLC speaks for itself.  Worthington denies the remaining allegations in Paragraph

25  39.

26  //

27  //

28

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                    13
WORTHINGTON INDUSTRIES, INC.'S ANSWER TO BERNZOMATIC'S THIRD PARTY COMPLAINT