JS 44 - CAND (Rev. 11/04)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO.)

E-Filing

**I.(a) PLAINTIFFS**
Andrew Shalaby, an individual, and Sonia Dunn-Ruiz, an individual

**DEFENDANTS**
Newell Rubbermaid, Inc., a Delaware corporation, Home Depot U.S.A., Inc., a Delaware corporation and Rubbermaid, Inc.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **Alameda**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Mark D. Epstein, Alborn, Veiluva & Epstein
200 Pringle Avenue, Suite 410
Walnut Creek CA 94596

ATTORNEYS (IF KNOWN)  415.705.0400
Joshua S. Goodman, Jenkins Goodman Neuman & Hamilton LLP, 417 Montgomery St., 10th Floor, San Francisco, CA 94104

CW ADR

BY FAX

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☑ 4 Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For diversity cases only)                                           AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☐ Original Proceeding
☑ Removed from State Court
☐ Remanded from Appellate Court
☐ Reinstated or Reopened
☐ Transferred from Another District (specify)
☐ Multidistrict Litigation
☐ Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 640 RR & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| | | | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus: | ☐ 791 Empl Ret Inc Security Act | ☐ 870 Taxes (US Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing | ☐ 535 Death Penalty | | | ☐ 890 Other Statutory Actions |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer w/disab - Empl | ☐ 555 Prison Condition | | | |
| | ☐ 446 Amer w/disab - Other | | | | |
| | ☐ 480 Consumer Credit | | | | |
| | ☐ 490 Cable/Satellite TV | | | | |

**VI. CAUSE OF ACTION** (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)
28 U.S.C. §1441

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____ CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY**   PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

**IX. DIVISIONAL ASSIGNMENT** (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)   ☒ SAN FRANCISCO/OAKLAND   ☐ SAN JOSE

DATE Nov. 9, 2006   SIGNATURE OF ATTORNEY OF RECORD   Pavan L. Rosati   Pavan L. Rosati

JS 44 Page 2
(Rev. 11/04)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44
### Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.   (a) Plaintiffs - Defendants. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.   Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a). F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.   Residence (citizenship) of Principal Parties. This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.   Origin. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

V.   Nature of Suit. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

VI.   Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause.

VII.   Requested in Complaint. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   Related Cases. This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases. Date and Attorney Signature.

Date and Attorney Signature.   Date and sign the civil cover sheet.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SHALABY ET AL                                        NO. CV 06-07026 MJJ

            Plaintiff,                               **CLERK'S NOTICE RE: FAILURE
                                                     TO FILE ELECTRONICALLY
    v.                                               AND/OR REGISTER AS AN E-
                                                     FILER**

NEWELL RUBBERMAID, INC. ET AL

            Defendant.
_____/

On 8/16/07, counsel for Thrid Party Defendant Worthington Industries Inc. filed an **Answer to Third Party Complaint, Corporate Disclosure Statement and Certification of Interested Entities or Persons, Motion to Transfer Venue, Declaration of Cathleen S. Huang, and  Request For Judicial Notice** manually, on paper. This case has been designated for electronic filing, pursuant to Local Rule 5-4 and General Order 45.


The above mentioned  paper document has been filed and docketed. However, General Order 45 provides at Section III  that cases assigned to judges who participate in the e-filing program "shall be presumptively designated" as e-filing cases. Therefore, counsel for Worthington Industries  should submit the above referenced documents, in PDF format within 10 days, as an attachment in an *e-mail* message directed to the judges chamber's "PDF" email box listed at http://ecf.cand.uscourts.gov. (Click on the **Judges** button and follow the procedure listed there).  Do *not* e-file a document which has been previously filed on paper, as is the case with the above mentioned filing. All subsequent papers should be e-filed.


Further, General Order 45 provides at Section IV (A) that "Each attorney of record is obligated to become an ECF User and be assigned a user ID and password for access to the system upon designation of the action as being subject to ECF." Counsel in this case who have not yet registered as ECF Users  must do so immediately.  Forms and instructions for registering can be found on the Court's Web site at ecf.cand.uscourts.gov.


Dated: August 23, 2007                          
                                                Sheila Rash
                                                Deputy Clerk

**United States District Court**
**For the Northern District of California**

1

2

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

3   Andrew Shalaby, et al.,

4

5                    Plaintiff(s),

6       v.

7   Newell Rubbermaid, Inc., et al.,

8                    Defendant(s),                              /

No. **C 06-7026 MJJ**

**Clerk's Notice**

9

10        (Plaintiff is required to serve, and file proof of service with the Court, any party involved not
11        listed on the attached proof of service.)

12   YOU ARE NOTIFIED THAT the Court has scheduled a  Case Management Conference for
13   **October 2, 2007** at **2:00 p.m.** before the Honorable Martin J. Jenkins.  The parties are instructed to
14   file a Joint Case Management Statement, pursuant to Civil L.R. 16-9, 10 days prior to the Case
     Management Conference.
15

16   Please report to courtroom 11, on the 19th floor, U.S. Courthouse, 450 Golden Gate Avenue, San
17   Francisco, CA 94102.

18

19   Dated:  August 24, 2007                                FOR THE COURT,

20                                                          Richard W. Wieking, Clerk

21                                                          By: *Lashanda Scott*
                                                               Lashanda Scott
22                                                             Courtroom Deputy

23

24

25   Please refer to Judge Jenkins' Standing Order located at www.cand.uscourts.gov for additional
     information. Pursuant to the Standing Order, the rescheduling of a hearing date for a motion does
26   not change the date on which an opposition brief or reply brief is due; any opposition brief remains
     due not less than 21 days prior to the date of the *originally noticed* hearing and any reply brief is due
27   not less than 14 days prior to the *originally noticed* hearing date.

28

MICHAEL J. VEILUVA (State Bar No. 100419)
MARK D. EPSTEIN (State Bar No. 168221)
ALBORG, VEILUVA & EPSTEIN LLP
200 Pringle Avenue, Suite 410
Walnut Creek, CA 94596
Tel:    (925) 939-9880
Fax:    (925) 939-9915

Attorneys for Plaintiffs
ANDREW SHALABY and SONIA DUNN-RUIZ

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ANDREW SHALABY, an individual, and SONIA DUNN-RUIZ, an individual,<br><br>      Plaintiffs,<br><br>  vs.<br><br>IRWIN INDUSTRIAL TOOL COMPANY, THE HOME DEPOT, INC., and DOES 2 through 100, inclusive,<br><br>      Defendants. | Case No. C 06-07026 MJJ<br><br>OPPOSITION TO THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE<br><br>Date:  September 25, 2007<br>Time:  9:30 a.m.<br>Ctrm:  11, 19th Floor<br>Judge: Hon. Martin J. Jenkins<br><br>Complaint filed: October 10, 2006<br>Case Removed:  November 9, 2006 |
| BERNZOMATIC,<br><br>      Third Party Plaintiff,<br><br>  vs.<br><br>WESTERN INDUSTRIES, INC., WORTHINGTON INDUSTRIES, and ROES 2 through 100, inclusive,<br><br>      Third Party Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

I. INTRODUCTION ............................................................................................................ 1

II. ISSUES TO BE ADDRESSED iN THIS MOTION ........................................................ 4

III. PERTINENT FACTS ..................................................................................................... 4

    A. The Product at Issue ...................................................................................... 4

    B. The Incident Underlying this Case ............................................................... 4

    C. Testimony of the Witnesses Who Responded to the Scene of the Incident ................ 5

        1. Warren L. Ratliff, Jr. ......................................................................... 5

        2. Randy Stephens ................................................................................. 7

        3. Deposition of Robert Kevin Price .................................................... 9

    D. Mr. Shalaby Was Hospitalized in San Francisco for Approximately Two Weeks ....... 9

IV. ARGUMENT ................................................................................................................ 10

    A. Worthington has Failed to Meet Its Burden ............................................... 10

    B. The Key Witnesses Reside in Northern California ..................................... 11

    C. The Witnesses in Southern California are Incidental at Best ..................... 13

        1. The Testimony About "Banging" the Cylinder Is Inadmissible ................. 13

        2. The Testimony That Mr. Shalaby "Kicked the Torch" into the Fire ............. 14

        3. Mr. Shalaby's Statement That He Was "Stupid" ........................... 15

        4. Mr. Shalaby Did Not Fully Connect the Torch and Used the Wrong Torch for
        the Cylinder .................................................................................... 15

    D. The Interests of Justice Demand That This Case Remain in the Northern District of
    California ..................................................................................................... 16

V. CONCLUSION .............................................................................................................. 17

1

## TABLE OF AUTHORITIES

2

3     **Cases**

4     *AJ Industries, Inc. v. United States District Court*, 503 F.2d 384 (9th Cir. 1974)....................... 10

5     *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270 (9th Cir. 1979)........................ 10

6     *Florens Container v. Cho Yang Shipping*, 245 F.Supp.2d 1086 (N.D. Cal. 2002)................ 10, 11

      *Heller Financial, Inc. v. Midwhey Powder Co.*, 883 F.2d 1286 (7th Cir. 1989) ........................ 11

7     *Hughes Tool Company v. Max Hinrichs Seed Company*, 112 Cal.App.3d 194 (1981) ............... 12

8     *In re National Presto Industries, Inc.*, 347 F.3d 662 (7th Cir. 2003)........................................... 10

9     *Los Angeles Memorial Coliseum Comm'n v. NFL*, 89 F.R.D. 497 (CD Cal. 1981) .................... 10

      *Palace Exploration Co. v. Petroleum Development Co.*, 316 F.3d 1110 (10 Cir. 2003) ............. 11

10    *Securities Investor Protection Corp. v. Vigman*, 764 F.2d 1309 (9th Cir. 1985) ................. 10, 13

11    *Sindell v. Abbott Laboratories*, 26 Cal.3d 588 (1980).................................................................. 12

12    **Statutes**

13    Federal Rules of Civil Procedure, Rule 602 ........................................................................... 15

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION TO TRANSFER VENUE

# I. **INTRODUCTION**

1

2          In asking the Court to transfer this action to the United States District Court for the

3    Southern District of California in San Diego, Third Party Defendant Worthington Industries, Inc.

4    ("Worthington") argues that the convenience of the "critical" witnesses in this case would be

5    served by transferring the case. At first blush, Worthington's argument may sound appealing.

6    After all, the incident involving the MAPP Gas torch at issue in this case occurred in San Diego,

7    and the only witnesses who have been deposed thus far are the individuals who first appeared on

8    the scene in the aftermath of the incident. However, when the carefully selected snippets of

9    testimony that Worthington proffers in support of its motion are viewed in context of further

10   testimony from the same witnesses that Worthington failed to include, and the testimony is

11   analyzed with reasonable scrutiny, it becomes clear that Worthington's contention that this

12   testimony is "critical" is specious.

13          Worthington gives short shrift to plaintiffs' choice of forum. However, a plaintiff's

14   choice of forum must be accorded *substantial* weight in deciding a motion to transfer; a case

15   generally should not be transferred unless the "convenience" and "justice" factors <u>strongly favor</u>

16   that the case be transferred elsewhere. The court should consider the convenience of all

17   witnesses, and in so doing examine who the witnesses are, the nature of what their testimony will

18   be and *why such testimony is relevant or necessary*.

19          Worthington has offered carefully selected self-serving portions of deposition testimony

20   in support of Worthington's motion that do not provide a complete or accurate representation of

21   the degree of knowledge that these witnesses have concerning the relevant facts, and which do

22   not give the reader a sense of how unfounded, speculative, uncertain, and in some instances

23   plainly inadmissible, the statements are that Worthington contends are critical to establish the

24   claims and/or defenses in this case. (*See, e.g.*, Worthington's moving papers at 9:16 – 9:22.) In

25   truth, the Southern California witnesses whose testimony Worthington proffers in support of its

26   motion do not have knowledge of critical facts. <u>**None**</u> of these individuals observed the incident

27   itself, but instead observed what transpired in the aftermath. At best, the testimony of these

28   witnesses is incidental to the core issues in the case, and ancillary to the testimony to be offered

---

1

900725.pld.Opp to Mtn to Transfer.mpa.doc

1   by the witnesses who reside in Northern California.

2       The park rangers employed by the Campland-on-the-Bay recreational facility where the

3   incident occurred, Randy Stephens and Warren Ratliff, were the first known witnesses to

4   respond to the scene but neither of them saw what occurred or how plaintiff Andrew Shalaby

5   sustained his injuries. As noted in Worthington's moving papers, Mr. Stephens testified that

6   when he arrived on the scene, he heard Mr. Shalaby state, "I'm an idiot. I can't believe I'm so

7   stupid" and, "This is all my fault." However, Mr. Stephens cannot elaborate on or explain these

8   statements, which by themselves have little probative value. Mr. Stephens did not see the

9   accident, nor did he interview any witnesses to the incident (if any such witnesses aside from Mr.

10   Shalaby and his wife, Sonia Dunn-Ruiz, exist). Mr. Ratliff testified that he canvassed the

11   neighboring campsites and spoke with some unidentified campers who told him that they *heard*

12   *sounds* coming from the direction of Mr. Shalaby's campsite which led them to believe that Mr.

13   Shalaby "became frustrated" and hit the torch against a concrete ring around the campfire pit.

14   This is textbook inadmissible hearsay.

15       Messrs. Stephens' and Ratliff's testimony regarding their observations of the MAPP Gas

16   cylinder itself probably have some probative value as both Messrs. Stephens and Ratliff have

17   backgrounds in welding and experience using MAPP Gas torches. However, the conclusions

18   they drew that Worthington asserts on page 9 of its moving papers are "critical" (i.e., (a) that the

19   torch was not fully connected to the cylinder and (b) that Mr. Shalaby used the "wrong type of

20   torch with the cylinder") are, when the testimony is analyzed in full context of the remaining

21   testimony on the issue, inherently speculative, untrustworthy and unreliable, if even admissible

22   in the first place.

23       The deposition testimony of the fire department and paramedic personnel who arrived at

24   the scene demonstrates that they too have no testimony to offer regarding the <u>cause</u> of the

25   incident. The *only* statement on this issue that Worthington would like to offer is paramedic

26   Robert Price's testimony that *someone* told him that Mr. Shalaby kicked around a "propane

27   torch" that "went into a fire and blew up." Mr. Price is uncertain about where he heard this

28   statement, whether it was made by Mr. Shalaby or someone else. Mr. Price did not examine the

1    torch itself, nor is there any other admissible evidence to corroborate this statement, the source of

2    which is unknown.  This too is classic inadmissible hearsay, and not "critical" testimony as

3    Worthington argues.  Otherwise, the paramedics merely tended to Mr. Shalaby at the scene,

4    provided first aid, and transported him to the hospital in San Diego.

5          Contrary to Worthington's assertion, the **key** witnesses in this case are located in the San

6    Francisco Bay Area, not San Diego.  Mr. Shalaby and Ms. Dunn-Ruiz reside in El Cerrito

7    (Contra Costa County).  The vast majority of the medical treatment that Mr. Shalaby received for

8    his injuries occurred at St. Francis Memorial Hospital in San Francisco, where Mr. Shalaby spent

9    approximately two weeks undergoing two major surgeries and continuous medical treatment for

10   his injuries.  There are numerous physicians and hospital staff who tended to Mr. Shalaby at St.

11   Francis Memorial Hospital, including the physician who was primarily in charge of treating Mr.

12   Shalaby, who are indeed critical witnesses in the case, whose testimony will go to establish the

13   degree and extent of Mr. Shalaby's injuries and explain why his injuries prevented Mr. Shalaby

14   from returning to work for a significant period of time.

15          In addition, Mr. Shalaby's longtime family physician, from whom he received and

16   continues to receive treatment for his injuries outside the hospital, is in Berkeley, as is Mr.

17   Shalaby's psychotherapist, who will testify regarding the psychological disorders that Mr.

18   Shalaby has as a result of the incident.  Furthermore, after Mr. Shalaby returned home from the

19   hospital, a report was taken by a claims investigator, Joe Tancredy, who works for

20   BernzOmatic's liability insurance carrier in Walnut Creek; Mr. Tancredy not only interviewed

21   Mr. Shalaby in detail regarding the incident, but took possession of two of Mr. Shalaby's extra

22   BernzOmatic MAPP Gas cylinders for inspection and evaluation: he will testify that both

23   cylinders had visible hairline cracks in the metal that emitted bubbling or "hissing" sounds.

24          Worthington cannot meet its burden of showing that the convenience of the parties and

25   witnesses, and that the interests of justice require that this case be transferred to the Southern

26   District of California.  When the nature, foundation, and reliability of the Southern California

27   witnesses is analyzed in context and compared to the testimony that will be offered by the

28   witnesses who are located in Northern California, where plaintiffs initiated this action, it is clear

1    that the Southern California witnesses whose testimony Worthington argues is "critical" is, in

2    truth, incidental and ancillary to the testimony that will be proffered by the Northern California

3    witnesses. Accordingly, this motion lacks merit and should be denied.

## II.    ISSUES TO BE ADDRESSED IN THIS MOTION

5        1.        Whether the testimony of the witnesses in Southern California is of sufficient

6    relative importance vis-à-vis the testimony of the witnesses in Northern California, and of

7    sufficient reliability, to justify overriding plaintiffs' choice of forum and transferring the case to

8    the Southern District of California.

9        2.        Whether on balance the more critical witnesses in the case reside in Northern

10   California as opposed to Southern California.

## III.    PERTINENT FACTS

12   A.        **The Product at Issue**

13       BernzOmatic is an unincorporated division of Irwin Industrial Tool Company, Inc.,

14   which in turn is a wholly owned subsidiary of Newell Rubbermaid, Inc.  (Affidavit of John K.

15   Stipancich.)  While MAPP gas, a mixture of liquefied petroleum and methylacetylenepropadiene,

16   is typically used for welding or soldering applications, BernzOmatic's own product literature

17   states that the company's MAPP gas torches are also "appropriate" for other projects such as,

18   *inter alia*, "lighting pilot light & grills" and "starting campfires."  (Declaration of Mark D.

19   Epstein in Support of Opposition to Motion to Transfer ("Epstein Decl."), ¶2 and Exhibit A and

20   ¶3 and Exhibit B.)

21   B.        **The Incident Underlying this Case**

22       Mr. Shalaby, his wife, Sonia Dunn-Ruiz, and their two children are avid campers.  The

23   family owns a recreational vehicle which they use on a regular basis to tour the western United

24   States and park for overnight stays at designated campgrounds which accommodate such

25   vehicles.  Prior to and including the evening of April 21, 2006, Mr. Shalaby regularly used his

26   BernzOmatic MAPP Gas torch to ignite wood campfires, consistent with the types of use for

27   which the torch is intended and proscribed by BernzOmatic.  (Declaration of Andrew Shalaby

28   "Shalaby Decl.", ¶ 2.)

4    900725.pld.Opp to Mtn to Transfer.mpa.doc

1         During the week of April 17, 2006, plaintiffs were vacating at Campland-on-the-Bay, a

2    recreational vehicle resort located near the water in San Diego, California.  On the evening of

3    April 21, 2006, Mr. Shalaby was severely injured when he activated the trigger switch on his

4    BernzOmatic MAPP Gas torch.  (Shalaby Decl., ¶3; Declaration of Sonia Dunn-Ruiz ("Dunn-

5    Ruiz Decl."), ¶ 2.)  Upon activating the trigger, Mr. Shalaby was engulfed by heated MAPP gas

6    and flames that were instantaneously discharged from the product, and which caused severe

7    burns to his face, limbs and extremities.  (*Ibid.*)  The incident occurred in the presence of, and

8    was observed by, Ms. Dunn-Ruiz.  (Dunn Ruiz Decl., ¶ 3.)

9         There are <u>no other known witnesses to the incident itself</u>.  The evidence will show that

10    Mr. Shalaby never misused or abused the torch, and he exercised due caution and care in

11    operating the torch.

12    **C.**    **<u>Testimony of the Witnesses Who Responded to the Scene of the Incident</u>**

13         **1.**    **<u>Warren L. Ratliff, Jr.</u>**

14         Warren L. Ratliff, Jr. is employed as a park ranger supervisor at Campland-by-the-Bay in

15    San Diego.  (Epstein Decl., ¶ 4 and Exh. C [Ratliff Deposition Transcript] at p. 9.)  Mr. Ratliff

16    was on duty on April 21, 2006, when he was informed by a Campland guest that there was an

17    injury accident in which another guest had been burned.  (Epstein Decl., ¶ 4 and Exh. C [Ratliff

18    Deposition Transcript] at pp. 10-11.)  Mr. Ratliff dispatched Campland ranger Randy Stephens to

19    the scene of the incident and waited for the fire department and paramedics to arrive so that he

20    could escort them to the scene.  (Epstein Decl., ¶ 4 and Exh. C [Ratliff Deposition Transcript] at

21    pp. 15-16.)

22         Upon arriving at the scene of the incident, Mr. Ratliff made sure that the area was secured

23    and then set about looking for witnesses to interview.  (Epstein Decl., ¶ 4 and Exh. C [Ratliff

24    Deposition Transcript] at pp. 17-19.)  Mr. Ratliff first went to the adjacent campsite to the left of

25    plaintiffs' campsite and was told by an unidentified female who was staying at that site, that "the

26    guest" at plaintiffs' campsite (presumably Mr. Shalaby) was "trying to light the campfire with

27    the torch and it would not light, and was banging the torch on the side of the fire ring." (Epstein

28    Decl., ¶ 4 and Exh. C [Ratliff Deposition Transcript] at pp. 19-20.)  A male guest who was

1   staying at the same adjacent campsite to the left of plaintiffs told Mr. Ratliff that "he heard [Mr.

2   Shalaby] was frustrated at not being able...to light the campfire." (*Id.* at p. 20.) Mr. Ratliff

3   cannot recount any other statements from witnesses at that campsite. (*Ibid.*)

4         Mr. Ratliff then went to the adjacent campsite to the right of plaintiffs' campsite. (*Id.* at

5   p. 21.) The guests at that campsite hung a blanket partition between their site and plaintiffs'

6   campsite for privacy. (*Ibid.*) The unidentified guests at that site described hearing an explosion

7   and observing a "large ball of flame" at plaintiffs' campsite. (*Ibid.*) Mr. Ratliff cannot recount

8   any other statements from the witnesses at that campsite, (*Ibid.*) and does not recall speaking

9   with any other witnesses about the incident. (*Id.* at pp. 21-22.)

10        Mr. Ratliff described seeing the torch cylinder (which contained the MAPP Gas) lying in

11  the dirt, about four feet behind Mr. Shalaby who had been propped up in a chair. (*Id.* at p. 23.)

12  The cylinder and the torch were still attached. (*Ibid.*) Mr. Ratliff picked up the cylinder and

13  inspected it to make certain that it wasn't still in an explosive state, and then carried it to an

14  engineer with the fire department who was at the scene to ask if the fire department needed it.

15  (*Id.* at p. 24.) After asking his captain, the engineer returned five minutes later to tell Mr. Ratliff

16  that the fire department did not need the cylinder and that Mr. Ratliff could dispose of it. (*Id.* at

17  pp. 35-36.)

18        Mr. Ratliff is a former certified welder with the U.S. Navy (*id.* at 55-56), who has

19  experience using MAPP Gas torches. (*Id.* at pp. 58-59, 63.) Mr. Ratliff is familiar with

20  BernzOmatic brand MAPP Gas torches, having purchased and used them before. (*Id.* at p. 63

21  [BernzOmatic is misspelled in the transcript as "Burnzomatic"].) He identified the torch he

22  recovered from the scene of the incident as a BernzOmatic brand torch. (*Id.* at pp. 65-66.) Mr.

23  Ratliff described the torch cylinder as having a "split along the very bottom, the last thread of the

24  neck." (*Id.* at 26:24-26:25.) Mr. Ratliff observed that the torch was attached to the threads, and

25  that the base of the threads "bent" away at the top of the cylinder, where he believed the

26  explosion occurred. (*Id.* at p. 28.)

27        When asked at first whether he could determine what the cause of the crack was, and

28  specifically whether it was caused by Mr. Shalaby "banging it," Mr. Ratliff answered, "I made

1   my personal observation, and based on what witnesses said to me, it could have been a number

2   of things." (*Id.* at 28:16-29:3.)  Mr. Ratliff was then asked, "So you didn't come to a conclusion

3   as to what you thought it was?" to which Mr. Ratliff responded, "No, sir." (*Id.* at 29:4-29:6.)

4   Mr. Ratliff was asked if the condition of the torch was "inconsistent with the story that the

5   camper to the left of Mr. Shalaby had said, that it had been banged on the campfire ring," to

6   which Mr. Ratliff answered "no," and that it was a "possibility" that the torch had been "banged"

7   on the campfire ring. (*Id.* at 29:13-29:19.)  However, Mr. Ratliff went on to testify that he

8   thought, based on his personal experience with MAPP Gas torches, that the explosion may also

9   have been caused by the use of "faulty materials" in the manufacturing of the cylinder. (*Id.* at

10   29:20-30:6.)

11        Later in his deposition, Mr. Ratliff changed his testimony and testified that he thought the

12   crack in the cylinder might have been caused by "abuse." (*Id.* at 68:25-69:5.)  When asked to

13   elaborate, Mr. Ratliff testified that it appeared to him that the top of the nozzle was "banged"

14   against a hard surface, though he did not think the banging caused the crack in the cylinder, but

15   might have weakened the connection between the nozzle and cylinder. (*Id.* at 69:9-69:20.)

16        With regard to both opinions, that the crack in the cylinder was caused by faulty materials

17   and that the crack might have been caused or contributed to by "banging" the nozzle against a

18   hard surface, Mr. Ratliff was unable to give any specific grounds upon which he based his

19   opinions other than to testify that he reached these conclusions based on his past experience. (*Id.*

20   at 30:2-30:6; 69:9-69:24.)

21        **2.    Randy Stephens**

22        Randy Stephens is employed as a park ranger at Campland-by-the-Bay.  (Epstein Decl., ¶

23   5 and Exh. D [Transcript of the Deposition of Randy Stephens] at 10:9-10:14].)  On the night of

24   the incident at issue in this case, he was instructed by Warren Ratliff to check out a report of a

25   burn injury on the premises.  (Epstein Decl., ¶ 5 and Exh. D at pp. 10-11; 13:24-14:17.)  When

26   he arrived at the scene, Mr. Stephens observed Mr. Shalaby in a seated position, and made some

27   observations regarding the scene and Mr. Shalaby's condition.  (*Id.* at pp. 28-31.)  Mr. Stephens

28   tended to Mr. Shalaby briefly, told him to "relax" and learned that his name was Andy or

1    Andrew. (*Id.* at pp. 31:24-32:15.)

2        Mr. Stephens described Mr. Shalaby's wounds as "fresh," "oozing," and "quite graphic,"

3    like nothing he had ever seen before. (*Id.* at 32:16-32:24.) From his past experience as an

4    Emergency Medical Technician (EMT), Mr. Stephens knew that Mr. Shalaby was likely going

5    into shock from his injuries. (*Id.* at 32:1-32:9.) Mr. Stephens went on to testify that in this state,

6    Mr. Shalaby was "rocking back and forth," and said something to the effect of, "I'm an idiot. I

7    can't believe I'm so stupid." (*Id.* at 35:11-35:24.) However, Mr. Shalaby did not say anything

8    more specific to Mr. Stephens, or that he thought he had done anything wrong. (*Id.* at 36:3-

9    36:11.) The only other thing that Mr. Ratliff believes he heard Mr. Shalaby say was that he was

10   trying to light a campfire. (*Id.* at 36:23-37:15.)

11       Mr. Stephens did not interview any witnesses. (*Id.* at 37:25-38:18.) Mr. Stephens

12   believes he overheard a number of varying and conflicting statements made by other campers at

13   the scene, including that Mr. Shalaby was trying to light a water heater "on the pilot light," that

14   he was lighting a campfire, that he was "kicking around the cylinder," and that he was hitting the

15   torch on the ring and it burst. (*Id.* at 38:21-39:8; .) Mr. Stephens does not know who made

16   these various statements or which one of the statements, if any, is accurate. (*Id.* at 39:2-41:1.)

17   Mr. Stephens described these statements as "hearsay things that we heard in general." (*Id.* at

18   71:9-71:22.)

19       Like Warren Ratliff, Randy Stephens was also a welder in the Navy, who is experienced

20   in using MAPP Gas torches. (*Id.* at 48:15-48:23.) Mr. Stephens examined the tank with Mr.

21   Ratliff and saw that it was "burst open." (*Id.* at 41:9-41:18.) Like Warren Ratliff, Mr. Stephens

22   observed a crack in the MAPP Gas cylinder (*Id.* at 42:14-43:15), and noted that it was a

23   BernzOmatic brand cylinder. (*Id.* at 45:12-45:17.) According to Mr. Stephens, he did not see

24   "any damage to [the cylinder] consistent with [it] being banged on a hard surface." (*Id.* at 47:12-

25   47:16.) Nor did Mr. Stephens see any evidence consistent with the torch "being banged against a

26   hard surface." (*Id.* at 72:7-72:11.) Other than the crack or slit in the cylinder, the likes of which

27   Mr. Stephens had never seen before in a MAPP Gas cylinder (*Id.* at 76:2-76:18), Mr. Stephens

28   saw no other damage. (*Id.* at 47:12-47:19.)

1    Mr. Stephens has no opinion of his own as to what caused the cylinder to explode.  (*Id.* at

2    77:10-77:17.)

3    With regard to the statement in his written report that the torch tip attached to the cylinder

4    was intended to be used with a propane cylinder rather than a MAPP Gas cylinder, Mr. Stephens

5    acknowledged that he was uncertain whether that was the case.  (*Id.* at 74:16-75:8.)  He went on

6    to testify that he and Mr. Ratliff disagreed at the time as to whether or not the torch tip was

7    appropriate for the cylinder.  (*Id.* at 76:24-77:9.)

8    **3.    Deposition of Robert Kevin Price**

9    Robert Kevin Price was a paramedic intern for Station 21 of the San Diego Fire

10   Department who tended to Mr. Shalaby in the aftermath of the incident.  (Declaration of

11   Cathleen S. Huang in support of Worthington's Motion to Transfer Venue ("Huang Decl."), Exh.

12   C at 20:13-20:17.)  With regard to the entry in his incident report which states, "Patient was

13   kicking around a propane torch.  It went into a fire and blew up, and burned him.  Family called

14   911," Mr. Price was not sure from whom he might have heard that statement.  (Epstein Decl., ¶ 6

15   and Exh. E [pp. 20-21 of the transcript of the deposition of Robert Kevin Price].)

16   **D.    Mr. Shalaby Was Hospitalized in San Francisco for Approximately Two Weeks**

17   Mr. Shalaby spent approximately one week at the burn unit at U.C. San Diego Medical

18   Center following the incident, before he was transferred to St. Francis Memorial Hospital in San

19   Francisco on or about April 28, 2006.  (Shalaby Decl., ¶ 4.)  At St. Francis Memorial Hospital,

20   Mr. Shalaby underwent several surgeries, including skin grafts, and daily medical treatment for

21   his injuries.  (Shalaby Decl., ¶ 5.)  Mr. Shalaby was tended to by several physicians at St.

22   Francis, including doctors Thomas P. Harries, Gifford S. Leung, Guido J. Gores, Jr., and Bruce

23   M. Potenza, among others.  (Shalaby Decl., ¶ 6.)  After he was released from St. Francis

24   Memorial Hospital, Mr. Shalaby continued to receive medical treatment and consultation for his

25   injuries from his regular physician, Kenneth J. Gjeltema, in Berkeley, and he continues to receive

26   treatment from Dr. Gjeltema to this day.  In addition, Mr. Shalaby received psychotherapy for

27   psychological injuries he sustained as a result of the incident from Richard Bloom, PhD, in

28   Berkeley.  (Shalaby Decl., ¶ 7.)  Mr. Shalaby continues to receive psychotherapy from Dr.

1   Bloom to this day. (*Ibid.*)

2       On June 1, 2006, Joe Tancredy from St. Paul Travelers Insurance, a liability insurance

3   carrier for BernzOmatic, interviewed Mr. Shalaby at his residence in El Cerrito concerning the

4   incident and his injuries, and took a recorded statement from Mr. Shalaby that was transcribed.

5   (Shalaby Decl., ¶ 8 and Exh. A [transcript of recorded statement].)  Mr. Tancredy also inspected

6   Mr. Shalaby's two additional BernzOmatic MAPP Gas cylinders and observed that they both had

7   visible cracks immediately beneath the threaded cap at the top of the cylinder.  (Shalaby Decl., ¶

8   9.)  He noted that one of the tanks emitted an audible leak.  (Shalaby Decl., ¶ 9.)  Mr. Tancredy

9   was concerned enough about the cracks and the audible leak that he asked to take custody of the

10  cylinders so that they could be examined by the manufacturers.  (Shalaby Decl., ¶ 9.)

11  

### IV.  ARGUMENT

12  **A.    Worthington has Failed to Meet Its Burden**

13      Worthington has the burden of establishing that "the convenience of the parties and

14  witnesses, and that the interests of justice require that this case be transferred to the Southern

15  District of California. *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th

16  Cir. 1979); *Los Angeles Memorial Coliseum Comm'n v. NFL*, 89 F.R.D. 497, 499 (CD Cal.

17  1981).  While Worthington gives short shrift to the issue of plaintiffs' choice of forum in the

18  Northern District of California, at the tail end of its motion, a plaintiff's choice of forum is

19  accorded *substantial* weight in a motion to transfer, and courts generally do not order a transfer

20  unless the "convenience" and "justice" factors strongly favor that the case be transferred

21  elsewhere. *See, e.g., Securities Investor Protection Corp. v. Vigman*, 764 F.2d 1309, 1317 (9th

22  Cir. 1985); *Lewis v. ACB Business Services, Inc.*, 135 F.3d 389, 413 (6th Cir. 1998); *In re*

23  *National Presto Industries, Inc.*, 347 F.3d 662, 665 (7th Cir. 2003).

24      In analyzing whether a transfer of this case would serve the convenience of the witnesses,

25  the court must look at who the witnesses are, the nature of what their testimony will be and *why*

26  *such testimony is relevant or necessary. Florens Container v. Cho Yang Shipping*, 245

27  F.Supp.2d 1086, 1092-93 (N.D. Cal. 2002); *AJ Industries, Inc. v. United States District Court*,

28  503 F.2d 384, 389 (9th Cir. 1974); *Palace Exploration Co. v. Petroleum Development Co.*, 316

10

900725.pld.Opp to Mtn to Transfer.mpa.doc

1  F.3d 1110, 1121 (10 Cir. 2003). The party seeking a transfer cannot rely on vague

2  generalizations as to the convenience factors; the moving party is obligated to identify the key

3  witnesses to be called and to present a generalized statement of what their testimony would

4  include. *Florens Container v. Cho Yang Shipping*, 245 F.Supp.2d at 1093, *supra*, *citing Heller*

5  *Financial, Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1293 (7th Cir. 1989).

6       While Worthington provides a limited description of the testimony to be offered by the

7  San Diego witnesses, it is selective, with snippets of testimony that are quoted out of context.

8  When these snippets are examined more fully, and in the context of other relevant testimony by

9  the same witnesses, it becomes clear that these witnesses, for whose convenience Worthington

10  purports to make this motion, have testimony that is generally incidental to the issues in this

11  case. On the other hand, the witnesses who will provide testimony that is truly critical to the

12  case, including plaintiffs themselves (the only known witnesses to the incident), reside in

13  Northern California.

14  **B.    The Key Witnesses Reside in Northern California**

15       Plaintiff Andrew Shalaby, of course, will testify about the details of what occurred in the

16  moments prior to, during, and after the incident. (Shalaby Decl., ¶¶ 2-4.) He will also testify

17  about his purchase the of torch at issue, and the identical replacement MAPP Gas cylinders that

18  will be proffered as evidence in this case, as well as his storage and use of the torch in the

19  months, weeks and days leading up to the incident. (Shalaby Decl., ¶ 5.) Mr. Shalaby's wife,

20  Sonia Dunn-Ruiz, was present when the torch cylinder exploded and Mr. Shalaby caught fire.

21  (Dunn-Ruiz Decl., ¶¶ 2-3.) Both Mr. Shalaby and Ms. Dunn-Ruiz will provide extensive

22  testimony regarding the aftermath of the incident, including the nature, extent and scope of Mr.

23  Shalaby's physical and psychological injuries, the out-of-pocket expenses they have incurred and

24  their loss of income as a result of the incident, as well as the other emotional and practical effects

25  that the incident has had on their lives. (Shalaby Decl., ¶ 8; Dunn-Ruiz Decl., ¶ 4.)

26       Mr. Shalaby spent approximately two weeks at St. Francis Memorial Hospital in San

27  Francisco where he received the vast majority of the medical treatment for his injuries. (Shalaby

28  Decl., ¶¶ 4-7; Dunn-Ruiz Decl., ¶ 5.) Obviously, the testimony of the physicians at St. Francis

1    Memorial Hospital, particularly the testimony of Dr. Thomas Harries, is going to be crucial to

2    establish the degree and severity of Mr. Shalaby's injuries.  In addition, unless defendants are

3    prepared to stipulate to the degree to which Mr. Shalaby's ability to function at work and in his

4    daily life was diminished as a result of his injuries, the testimony of Dr. Harries and others at St.

5    Francis Memorial Hospital will be crucial to corroborate and provide a foundation for Mr.

6    Shalaby's damage claims.

7         Since his treatment at St. Francis Memorial Hospital, Mr. Shalaby has also been receiving

8    medical treatment for his injuries from his regular physician, Dr. Kenneth J. Gjeltema, and

9    psychotherapy for his psychological injuries from Richard Bloom, PhD, both of whom are in

10   Berkeley.  (Shalaby Decl., ¶ 7.)  The testimony of both of these witnesses will also be crucial for

11   Mr. Shalaby to establish his damage claims.

12        Finally, Joe Tancredy of St. Paul's Travelers Insurance undertook an extensive

13   investigation of the incident and examination of Mr. Shalaby's extra BernzOmatic cylinders and

14   noted that *both* of those cylinders had visible cracks in the same location that Randy Stephens

15   and Warren Ratliff described in the actual cylinder that was involved in the incident.  (Shalaby

16   Decl., ¶ 9.)  This testimony is also critical in this case because the actual product that caused Mr.

17   Shalaby's injuries was discarded by the Campland employees.  California law specifically

18   provides that when the actual product at issue is lost or destroyed due to no fault on the part of

19   the plaintiff, a design defect may be proven by circumstantial evidence.  *Hughes Tool Company*

20   *v. Max Hinrichs Seed Company*, 112 Cal.App.3d 194, 200-201 (1981).  More specifically, the

21   defect can be established based on other products which are identical to the one that injured the

22   plaintiff.  *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 600-01 (1980).  Thus, Mr. Tancredy's

23   testimony regarding his observations is highly relevant to establishing the nature of the product

24   defect.

25        Worthington argues that it would inconvenience the witnesses who reside in Southern

26   California.  However, transferring this case to the Southern District of California would result in

27   an equal amount of inconvenience, difficulty and expense for the witnesses in Northern

28   California.  Transferring the case to the Southern District of California would entail, among other

1  things, forcing physicians who provide urgent medical treatment to individuals with burn injuries

2  to take time off of work to travel from San Francisco to San Diego.  It would also require Dr.

3  Gjeltema (a medical doctor) and Dr. Bloom (a psychotherapist) to take time off of work and

4  unable to tend to their respective patients.

5         Moreover, transferring the case to the Southern District of California would be inherently

6  unjust and unfair to Mr. Shalaby and Ms. Dunn-Ruiz, who also would have to shoulder the

7  substantial burden and expense of traveling to San Diego for trial.  Plaintiffs have filed this

8  action in a proper district.  Notwithstanding Worthington's arguments to the contrary, the

9  convenience of the witnesses and the interests of justice not only do not strongly favor that the

10 case be transferred to the Southern District of California, the standard which Worthington must

11 meet on this motion (*Securities Investor Protection Corp. v. Vigman*, 764 F.2d at 1317, *supra*,

12 these factors weigh heavily *against* transferring the case away from the Northern District of

13 California, which is the most convenient district to the most critical witnesses in this case.

14 **C.     The Witnesses in Southern California are Incidental at Best**

15        As set forth on pages 9-10 in its moving papers, Worthington considers the following

16 testimony to be the "critical" testimony that justifies transferring this case to the Southern

17 District of California:

18        1. Mr. Shalaby became frustrated with his torch and "banged" the cylinder against a hard

19 object;

20        2. Mr. Shalaby "kicked the torch and cylinder into a fire";

21        3. Mr. Shalaby "made admissions that he was 'stupid' and at fault for the incident";

22        4. Mr. Shalaby did not fully connect the torch to the cylinder; and

23        5. Mr. Shalaby used the wrong type of torch with the cylinder.

24 (Moving papers at 9:11-10:4.)  However, even a cursory examination of the testimony that

25 Worthington contends supports these conclusions belies the integrity of this testimony.

26        **1.     The Testimony About "Banging" the Cylinder Is Inadmissible**

27        The only testimony that Mr. Shalaby "banged" the cylinder against a hard object is pure

28 hearsay: Mr. Ratliff's vague and ambiguous testimony that he spoke with guests at a neighboring

13                                    900725.pld.Opp to Mtn to Transfer.mpa.doc

OPPOSITION TO MOTION TO TRANSFER VENUE

1  campsite, whom he could not identify, who told him that they believe Mr. Shalaby became

2  frustrated and hit the torch against the concrete fire pit ring.  (Epstein Decl., ¶ 4 and Exh. C

3  [Ratliff Deposition Transcript] at pp.19-20) is pure hearsay for which there is no exception.

4  Accordingly, this testimony is inadmissible under Rules 801 and 802 of the Federal Rules of

5  Evidence.

6         Mr. Ratliff's testimony about his own conclusion that the cylinder being struck against a

7  hard object are inadmissible because they are not based on matters that are within his own

8  personal knowledge or rationally based on his perceptions.  He testified that the damage to the

9  cylinder that he observed could have been caused by "a number of things" (Epstein Decl., ¶ 4

10 and Exh. C at 28:16-29:3), and upon being prompted by counsel for BernzOmatic, he could only

11 testify that the condition of the torch was not "inconsistent with the story that the camper to the

12 left of Mr. Shalaby had said, that it had been banged on the campfire ring."  (*Id.* at 29:13-29:19.)

13 Mr. Ratliff subsequently testified that he thought the top of the torch nozzle was "banged"

14 against a hard surface (*Id.* at 69:9-69:20), but he was unable to state any specific grounds upon

15 which he based this opinion, other than to testify that he reached this conclusion based on his

16 "past experience".  (*Id.* at 30:2-30:6; 69:9-69:24.)  Thus, Mr. Ratliff's testimony that the torch

17 was struck against a hard surface is inadmissible under Rules 602 and 701 of the Federal Rules

18 of Evidence.  Even if Mr. Ratliff's testimony on these issues was admissible in the first instance,

19 it is entirely unclear, speculative, and contradictory.

20        **2.    The Testimony That Mr. Shalaby "Kicked the Torch" into the Fire**

21        The testimony to the effect that Mr. Shalaby kicked the torch into the fire is, likewise, not

22 based on the personal knowledge or observations of any witnesses.  The testimony by paramedic

23 Robert Price is that he wrote a statement to this effect in his report because he remembers

24 someone at the scene saying that is what occurred, though Mr. Price does not know who he heard

25 make that statement.   (Huang Decl., Exh. C at 20:13-20:17; Epstein Decl., ¶ 6 and Exh. E.)

26 Though Mr. Price's supervisor, Joe Russo, testified that he heard Mr. Shalaby make that

27 statement, as Worthington points out in its moving papers (moving papers at 4:21-4:25), Mr.

28 Russo did not personally observe the cylinder being kicked; he can only repeat what Mr. Shalaby

14

1    said.  Therefore, his testimony is far from critical; indeed, it is hardly necessary to their defense

2    as they can always introduce this very simple testimony through deposition transcripts, and

3    defendants are free to cross-examine Mr. Shalaby and Ms. Dunn-Ruiz about this alleged

4    statement.

5         **3.**     **Mr. Shalaby's Statement That He Was "Stupid"**

6        Worthington asserts that Mr. Shalaby made admissions that he was "stupid" and "at fault

7    for the incident." (Moving papers at 9:19.)  Putting aside for the moment that Mr. Shalaby had

8    just been badly burned over much of his body and, in the opinion of an ex-paramedic (Mr.

9    Stephens), had gone into shock or was about to go into shock (Epstein Decl., ¶ 5 and Exh. D

10    [Stephens Deposition] at 35:11-35:24), thus calling into question Mr. Shalaby's state of mind at

11    the time, the probative value of these statements is minimal at best.  These statements are vague,

12    ambiguous and uncertain, and once introduced into evidence (assuming they are admissible),

13    defendants can always examine Mr. Shalaby about them.

14        Mr. Stephens is only able to testify that Mr. Shalaby made these statements; he does not

15    have knowledge of any relevant facts to elaborate on or explain these statements.  Thus, Mr.

16    Stephens' live testimony regarding these statements is hardly important to defendants.

17        **4.**     **Mr. Shalaby Did Not Fully Connect the Torch and Used the Wrong Torch**

18            **for the Cylinder**

19        Mr. Ratliff and Mr. Stephens disagreed as to whether the "wrong" type of torch

20    was attached to the MAPP Gas cylinder.  (Epstein Decl., ¶ 5 and Exh. D at 76:24-77:9.)  At his

21    deposition, Mr. Stephens admitted that he was really uncertain as to whether the torch was not

22    the correct type of torch for the cylinder, and didn't know why he had come to that conclusion in

23    the past.  (Epstein Decl., ¶ 5 and Exh. D at 74:16-75:8.)  Fed. R. Civ. P. 602 provides, "A

24    witness may not testify to a matter unless evidence is introduced sufficient to support a finding

25    that the witness has personal knowledge of the matter."  Given the degree of Mr. Stephens'

26    uncertainty about whether or not the torch was the "wrong type," any testimony by Mr. Stephens

27    to this effect is irrelevant and should be excluded.  Even if it is admitted, it has little if any

28    probative value.

1    Mr. Ratliff's testimony that the torch was not fully connected is equally vague and

2 uncertain. The testimony that Worthington contends is so critical is:

3    "Q: Okay. Before we get too far away from it, back to the torch. In addition to this

4 bend, did you see anything else that appeared to be wrong with the torch?

5    A: Just that I thought it could have been put on wrong or not all the way in the on

6 position."

7 (Huang Decl., Exh. B at 31:5-31:10.) While probably admissible, this testimony is so vague and

8 uncertain that it is probative of virtually nothing.

9    **D.    The Interests of Justice Demand That This Case Remain in the Northern District of**
    **California**
10

11    In summary, there is no valid reason to abrogate plaintiffs' choice of forum, and to

12 transfer this case to the Southern District of California. Indeed, to do so would be

13 counterproductive and contrary to the interests of justice.

14    The actual product involved in the incident has been discarded. There is no other known

15 relevant evidence at the site of the incident, thus the fact that the incident occurred in San Diego

16 is of no moment. The Southern California witnesses may have some testimony that is relevant in

17 some respect, but none of it is critical. The testimony that is admissible (barring the inadmissible

18 hearsay and speculative conclusions that do not meet the basic standards of being based upon

19 matters that are within the witnesses' personal knowledge) is precarious and merely incidental to

20 the issues in this case.

21    The witnesses who are truly critical in this case, on the other hand, reside in Northern

22 California. The only known witnesses to the incident itself are Mr. Shalaby and Ms. Dunn-Ruiz.

23 The physicians who provided the substantial bulk of Mr. Shalaby's medical treatment are in San

24 Francisco, and Mr. Shalaby's psychotherapist from whom he receives treatment for his

25 psychological injuries is in Berkeley. Joe Tancredy of St. Paul's Travelers Insurance, who took

26 possession of Mr. Shalaby's extra MAPP Gas cylinders to examine the visible cracks and report

27 to them to the manufacturers, is in Walnut Creek.

28    Accordingly, the interests of justice mandate that this case remain in the Northern District

16    900725.pld.Opp to Mtn to Transfer.mpa.doc

1    of California.

2    **V.  CONCLUSION**

3    Plaintiffs filed this action in a jurisdiction that is proper, and Worthington has failed to

4    meet its burden on this motion.  The critical witnesses in this case, the ones who have personal

5    knowledge regarding the details of the incident at issue, the diagnosis and treatment of Mr.

6    Shalaby's injuries from the incident, plaintiffs' monetary damages, and the condition of the two

7    replacement MAPP Gas cylinders which bore visible cracks like the one in the tank involved in

8    the accident that was described by Warren Ratliff and Randy Stephens, are all in Northern

9    California.  Thought he incident occurred in San Diego, none of the witnesses there have

10    testimony that is central to this case.  Comparative to the testimony of the witnesses in Northern

11    California, the testimony of the Southern California witnesses is incidental and ancillary.

12    Accordingly, this motion should be denied and this case should remain in the Northern District

13    of California.

14

15

16    Dated: September 4, 2007                    ALBORG, VEILUVA & EPSTEIN LLP

17                                                              /s/
                                       By: _____
18                                            MARK D. EPSTEIN
                                              Attorneys for Plaintiffs
19

20

21

22

23

24

25

26

27

28

1   MICHAEL J. VEILUVA (State Bar No. 100419)
    MARK D. EPSTEIN (State Bar No. 168221)
2   ALBORG, VEILUVA & EPSTEIN LLP
    200 Pringle Avenue, Suite 410
3   Walnut Creek, CA 94596
    Telephone: (925) 939-9880
4   Facsimile: (925) 939-9915

5   Attorneys for Plaintiffs
    Andrew Shalaby and Sonia Dunn-Ruiz
6

7

8                         UNITED STATES DISTRICT COURT

9                       NORTHERN DISTRICT OF CALIFORNIA

10  ANDREW SHALABY and SONIA DUNN-          Case No. C 06-07026 MJJ
    RUIZ,
11                                          DECLARATION OF ANDREW SHALABY
                                            IN SUPPORT OF OPPOSITION TO THIRD
12              Plaintiffs,                  PARTY DEFENDANT WORTHINGTON
                                            INDUSTRIES, INC.'S MOTION TO
13      vs.                                 TRANSFER VENUE

14  IRWIN INDUSTRIAL TOOL COMPANY,
    INC., THE HOME DEPOT, INC., and DOES    Date:   September 25, 2007
15  2 through 100, inclusive                Time:   9:30 a.m.
                                            Ctrm:   11, 19th Floor
16              Defendants.                 Judge: Hon. Martin J. Jenkins

17                                          Complaint filed: October 10, 2006
                                            Case Removed: November 9, 2006
18

19

20          I, Andrew Shalaby, declare as follows:

21          1.      I am one of the named plaintiffs in the action captioned above.  I make the

22  following statements, which are true and correct, based upon matters that are within my personal

23  knowledge and observations, unless otherwise stated on information and belief.  If called as a

24  witness, I could and would testify truthfully and competently regarding the matters set forth

25  below.

26          2.      My family and I are avid recreational vehicle campers.  We travel regularly

27  through the western United States in our recreational vehicle, staying overnight at designated

28

                                            1    900725.pld.Shalaby Decl in Opp to Worthington Mtn to Transfer.doc

campgrounds which can accommodate our vehicle. Prior to, and including the evening of April 21, 2006, I regularly used my BernzOmatic brand MAPP Gas torch to ignite wood campfires.

3.    During the week of April 17, 2006, my family and I were vacationing at Campland-on-the-Bay ("Campland"), a recreational vehicle resort located near the water in San Diego. During our stay at Campland, on the evening of April 21, 2006, I was severely injured when I activated the trigger switch on my MAPP Gas torch while attempting to ignite a wood campfire. Upon activating the trigger, or perhaps within seconds thereafter, the MAPP Gas torch assembly exploded (instantly discharged all of the pressurized gas) and I was suddenly engulfed in heated MAPP gas and fire. Among other injuries, I suffered severe burns to my face, limbs and extremities. My wife was present at the scene of the accident as well, and came to my immediate aid while I was still on fire.

4.    Following the incident described in the preceding paragraph, I was taken by ambulance to the burn unit at U.C. San Diego Medical Center. Approximately one week later, on or about April 26, 2006, I was transferred to the burn unit at St. Francis Memorial Hospital in San Francisco, which is closer to my home in El Cerrito.

5.    At St. Francis Memorial Hospital, I underwent two surgeries, including skin grafts, as well as extensive daily medical treatments for my injuries.

6.    I spent approximately two weeks at St. Francis Memorial Hospital where I was tended to by several physicians including Thomas P. Harries, M.D., the primary doctor in charge of my treatment, as well as Gifford S. Leung, M.D., Guido J. Gores, Jr., M.D., and Bruce M. Potenza, M.D., among others.

7.    After I was released from St. Francis Memorial Hospital, I continued to receive medical treatment and consultation for my injuries from the doctor who has been my regular physician for a number of years, Kenneth J. Gjeltema, M.D. in Berkeley. Though my condition has been improving over the past year, Dr. Harris and Dr. Gjeltema continue to provide medical

DECLARATION OF ANDREW SHALABY IN SUPPORT OF OPPOSITION TO MOTION TO TRANSFER

treatment and consultation for the injuries that stem from the April 21, 2006 incident involving the MAPP Gas torch. In addition, I received psychotherapy from Richard Blume, PhD, as well as from another psychologist specializing in sleep disorder, Dr. Carl Shames, both located in Berkeley and El Cerrito, California, for issues related to the April 21, 2006 incident. My treatment is ongoing at this time.

8. At trial, I will testify regarding the details of my experiences in the aftermath of the incident, including the nature, extent and scope of my physical injuries and emotional issues, the out-of-pocket expenses we have incurred as well as our loss of income as a result of the incident. I will also testify regarding the emotional and practical effects that the incident has had on our lives.

9. Soon after I returned home from St. Francis Memorial Hospital, I made a report of the April 21, 2006 incident to BernzOmatic on the company's internet website. Very soon thereafter, I was contacted by Joe Tancredy who advised me that he worked for St. Paul's Travelers Insurance, the liability insurance carrier for BernzOmatic. Mr. Tancredy came over to my house, and brought along a male photographer whose name I do not recall, on or about June 1, 2006, and interviewed me about the incident and the injuries I sustained. Mr. Tancredy recorded the interview and prepared a transcript. A true and correct copy of the interview transcript that I received from Mr. Tancredy is attached hereto as Exhibit A. While at my house, Mr. Tancredy, his photographer, and I inspected two additional BernzOmatic MAPP Gas cylinders that I had previously purchased approximately at the same time I purchased the one that caused my injuries. As we examined the cylinders, Mr. Tancredy, his photographer, and I noted that both of them had visible cracks immediately beneath the threaded cap at the top of the cylinder. Mr. Tancredy pointed out that one of the two tanks emitted an audible leak from the crack when one put it up close to the ear. I picked up the tank and put the crack close to my ear and heard a quiet, high pitched bubbling sound. Mr. Tancredy's photographer also observed

these defects.  Mr. Tancredy expressed concern about the cracks and the audible leak, and asked if he could take custody of the cylinders so that they could be examined by BernzOmatic.  I allowed Mr. Tancredy to take the two cylinders with him when he left.

I declare under penalty of perjury of the laws of the State of California that the foregoing statements are true and correct, and if called to testify I can and will testify competently thereto.

Executed on September 1, 2007 at El Cerrito, California.


ANDREW SHALABY

**Transcribed Statement**

| | |
|---|---|
| Of | Andrew Shalaby |
| Claim No | CKS 9984 |
| Date | June 1, 2006 |

Q·   Um, this is Joe Tancredy speaking with St. Paul Travelers Insurance. I'm speaking with Andrew Shal-, Shalaby.

A    Shalaby

Q·   Shalaby. And today's date is June 1, 2006 and we're discussing an accident that occurred on April 21, 2006   And, uh, Andrew, do I have your permission to record your statement?

A    Yes, you have my permission to record my statement.

Q    Okay   And going back to, um, April 21, 2006, um, my understanding is that you were in San Diego camping

A:   Yes.

Q    Okay   Could you explain a little bit in regards to the, uh, what led up to the accident?

A    Uh, I was camping with - we have a motor home. We were camping at, um, an RV park in San Diego. Um, it was 9:30-ish at nighttime. Um, my son wanted to light a camp fire   Uh, we usually use a, uh, BernzOmatic, uh, cylinder to light camp fires

Q·   Um, do you recall where you purchased the BernzOmatic?

A.   Yes   I purchased it at Home Depot, I'm quite sure.

Q    Do you know how old - how long ago it might have been?

A    Within the past five years

Q:   Okay   And then going on.

A:   Um, my son has used it before to light fires but on this particular occasion - my son is nine years old. My wife didn't want him to use it, um, so I later went out to use it light the, uh, fire and I, um, pushed the button. I don't have a very vivid recollection but I - I know the gas instantly discharged out of the canister   Uh, I wouldn't call it an explosion. I don't know what to call it but it, um, made a very loud hissing sound and, uh, some people heard a mild boom sound   My recollection was that, uh, there was a huge and instant flame, very strong, as strong as possible, that came out of the side of the canister   Um, if my recollection is correct, it was right at the area where the torch tip attaches to the canister   Um, I recall turning my head   I don't recall at all what happened after that for a few seconds, uh, but my next recollection was that I was 10 or 15 feet away from the, uh, fireplace   Um, I had looked down on my legs and they were on fire and my

## Transcribed Statement

Of:            Andrew Shalaby
Claim No·  CKS 9984
Date.        June 1, 2006                                                    Page 3 of 11

hands were on fire and the canister was still in my right hand, if I remember correctly
Um, as soon as I realized what was going on I recall throwing the canister and I recall the
flame going out, in my recollection, instantly on my legs and on my hands and
everything   Uh, I was wearing, um, socks and jean pants that went down to my knees
Um, from what I'm told from my wife and my brother who later retrieved my clothing
there were no singe marks whatsoever, no burn marks, no browning, no indication that
flame had touched the fabric at all.   Um, I recall, uh, hearing, uh, ambulance -
ambulances - and I think either a helicopter or an airplane or something and I recall, uh,
being loaded into the ambulance and my son crying and shaking.

Q       Do you recall what treatment the, uh, did paramedics give you treatment at the scene?

A       I have a recollection of the paramedics, um, saying I was going into shock and saying my
blood pressure, which I remember the numbers were - if I remember correctly - 94/35 or
something and I remember them giving me an IV which have been epinephrine, if I
remember correctly   I remember them, uh, saying that I was holding together and not
going into - in other words, not going under - not going into shock and that I was holding
together very well

Q·      But you did lose consciousness?

A:      I never did

Q:      Oh, okay.

A:      To the best of my knowledge.  I was headed in that direction but the epinephrine or
whatever they did seemed to do a very good job at keeping me fresh   Um, I remember
them taking me to the hospital   I was put in the ICU but I have pretty much a very strong
blank of memory on and off from that point forward.

Q       And now this was UCC San Diego Hospital?

A       Burn - Burn Center, yes

Q.      Burn Center?  Okay   _____[inaudible] in the Burn Center for approximately five days?

A       I was there for five days

Q:      Okay.  And what treatment did they perform there?

A·      Um, in the ICU there were a number of IVs and there was some cleaning of the burn
areas.  Um, I do remember at one point talking the first day or the second day to a doctor.
That's the only time I remember ever talking to a doctor during those five days   And I

## Transcribed Statement

| | |
|---|---|
| Of | Andrew Shalaby |
| Claim No . | CKS 9984 |
| Date. | June 1, 2006 |

Page 4 of 11

think he said - I don't remember who the doctor was but I think he said they don't know the degree of the burns as of yet. They have to debridge them and wait a few days to see what the degree of burns they were but it appeared to them that my face was a light second degree. My, uh, right hand was a second degree that did not require surgery. My left hand, in their assessment, was more than likely a deep second degree that required a skin graft on the backside of the hand. The front side of both hands they said were light second. They were blistered. And they said that the area on both calves from my knees down to my sock lines were rather definite to be, uh, deep second and third degree burns Both areas the skin right after the fire, as I recall, was actually hanging off the legs and the skin - what was left there was a very waxy white thing, whatever it is, um, whatever material left on my legs was waxy and white and, uh, no sensation on both legs  Um, they said that it was a 95 percent likelihood that the legs needed to have full grafting which had to occur within five to 10 days and, um, that's all I remember is to that second day    That might have been on that Saturday, April 22nd, that all that happened  My brother was present and my wife was present at that point. Um, from that point forward I recall asking to speak to physicians every day and never being given one to speak to. They told me they'd give me a resident to speak to but I don't recall ever having been given one.  I do recall that during those days I was on morphine and Delodid and Oxycodone regularly and I, um, had this great fear of muscle atrophy and every day I would get up, walk down the hallway and either walk or run up and down five flights of stairs, um, at least three times a day  Get out of the hospital and walk just up and down the block, get back in, get back in my bed. Um, at no point did anyone ever say anything about that, whether I should or shouldn't do it. I'm not sure why, um, but in my mind it seemed like that was a - at the time it seemed like that was necessary to keep the muscles alive.  Um, what I learned later on was - around the fifth - fourth or fifth day that I was developing infections, um, you know, my legs and that I was reaching a level of dehydration that was, uh, really, really bad. And, um, I recall, uh, having a conversation with my wife about a good friend of ours who's a surgeon in Berkeley by the name of Frederick Wright and asking her to call him and discuss all of this with him and see if there's some way I could be transferred up to Northern California primarily because I was concerned about the treatment in San Diego. And she did manage to reach him and he happened to have a connection in San Francisco, some plastic surgeon by the name of Clyde something, uh, that got me in touch with a, uh, Dr. Thomas Harry and they indicated that there was only one burn unit remaining up there with the exception of perhaps Sacramento, which was closing down. Um, I remember Dr. Harry calling me at the hospital in San Diego and telling me that, um, Mr Wright - Dr Wright had, uh, managed to somehow secure a bed for me in the facility at St. Francis Hospital which is at 900 Hyde Street in San Francisco  But that I had to be there the very following morning at 9·00 and if I was late at all they would have to send me back to San Diego Burn Center because they didn't have enough beds in the facility or something like that  And my wife immediately got down to San Diego and got me up and on a plane

**Transcribed Statement**

Of:         Andrew Shalaby
Claim No :  CKS 9984
Date:       June 1, 2006                                          Page 5 of 11

Q:    Okay. And then, uh, when you arrived at St. Francis you were, uh, um, they performed skin grafts there is my understanding?

A:    Yes. I arrived at St Francis on time and they did the surgeries

Q.    How soon after you had gotten to St. Francis did they do those?

A     They had to stabilize me from whatever day I got up there. The first surgery was April 28th There was a transfusion that day - there were two blood transfusions The second surgery was May 1st.

Q:    When were you discharged from .

A·    May 12th

Q:    Okay. And you're now currently under the care of which doctor? Doctor…

A.    Two doctors. Um, the surgeon, which is Dr Thomas Harry in San Francisco I have his phone number and information if you want that

Q     Okay.

A:    And, um, my primary care physician that I've had for years, his name is Ken Gjeltema, G-J-E-L-T-E-M-A, whom I saw last night. Uh, he's down here in El Cerrito. And, uh, I am going to be seeing a third plastic surgeon now, um, June 7th at 12.00, um, I think it's a Dr. Javahari in Berkeley at, uh, 2999 Regent Street. So those are the physicians that I'm being treated with and I am, uh, being set up for, uh, some psycho therapy treatment for - they think I might have posttraumatic stress disorder, which I don't know if I do or don't have it. I kind of fought that one because I don't - I don't think I have it but they seem to think I do.

Q:    Sometimes, yeah, it's hard to be a self-evaluator when other people are telling you.

A:    I mean, I had moments and I cried every day for - every hour on the hour for three weeks but it diminished dramatically as time went on, you know, down to like an hour a day, down to once every two days and so forth So to me that's just a normal part of the process but they seem to think I have - I have other things going on.

Q.    And now your current treatment is -- are you taking any medication currently or…

A     I, um, was given Oxycodone and Vicodin and perhaps other medications on May 12th, uh, and I had a Fentanyl patch on until May 14th but I quit cold turkey I, I literally threw the medications away, um, because I felt that the opiates were, uh, making it so my brain was

## Transcribed Statement

| | |
|---|---|
| Of | Andrew Shalaby |
| Claim No.: | CKS 9984 |
| Date | June 1, 2006 |

Page 6 of 11

not functioning at all and I needed my brain and my mind to focus on what I needed to do to heal  I didn't want to leave it at just, just leave it.  I wanted to actually participate in the decision making as to what, what was going on  I did have 10 days of horrible withdrawal from that and, uh, as far as ongoing medications, uh, yeah, there is a very light dosage of an antidepressant called Zoloft  Uh, the dosage is 25 milligrams and the minimum doctor-recommended dosage is 50 but I'm just on 25 and I'm supposed to stay on that for three months.  They gave me an anti-anxiety called Xanax but I, uh, didn't want to be on that either so I stopped taking that.  They gave me that in the hospital every day  I stopped taking that as of about a week ago and I have had, uh, some withdrawal from that but I'm not gonna go back to it because I don't feel healthy.  I, I feel it's, uh, tranquilizing.  I don't want to be tranquilized  Um, the other medications - yesterday the doctor gave me Lunesta to help me sleep because I don't sleep at night, um, and it worked, although I hope to get to the point where I don't need it to.  Um, he also gave me Celebrex for the pain because I don't want to take the opiates and it worked last night  I took one last night for the first time.  I was able to sleep so it seemed that that worked

Q:    And I guess they have you wearing special garments in order to, uh, uh, for the skin to heal?

A     Um, they, uh, fitted me with, um, Jobse, J-O-B-S-E, compressing garments which I have to wear until May 26th of next year - one year  They, um, are like pantyhose  They go just up to here - up to my thighs - and they, uh, cover the donor areas and the graft areas  They are supposed to prevent contraction, uh, minimize, reduce or eliminate, uh, scarring, hypotrophic scarring which is the raised parts of the scars  Um, prevent or minimize purpling and, and, uh, redness.  And they seem to work well so far from what I can tell  They're much more comfortable than the ACE bandages that they gave me initially.  I used to have to wrap my leg in ACE bandages  They're very difficult  I have to wear them 24 - 23 hours a day and I do have blister formations, uh, with liquid under them that's supposed to occur for six months to a year.  It's just part of the normal healing process as the skin is regenerating  So it's time-consuming to put them on to, uh, cover the blisters and put them on but once they're on they're pretty comfortable.

Q.    Um-hmm.  Is it painful putting them on or..

A     It's not that painful  It's just, uh, you just have to sit and cut little patches of gauze and put them over the blisters as you pull it up.  Um, it's not painful to put them on and they feel very good.  Um, there are times when I don't feel them, you know, I could - I could actually walk a mile now

Q:    Um-hmm.

A·    And, um, I feel like I'm doing pretty well.

## Transcribed Statement

| | |
|---|---|
| Of | Andrew Shalaby |
| Claim No · | CKS 9984 |
| Date | June 1, 2006 |

[Tape off - Tape on.]

A:     Still going?

Q:     Yeah. So in regards to your physical activity, you can walk, uh, without any problem and you just have to be careful of having any contact with your, your legs on the burned areas or

A     Yes   I can walk. Uh, I have walked a mile several times now.  I can probably push it beyond that. Um, I can run   I did run the other day.  I ran a block or half a block ,

Q     You can drive?

A.     I could drive   The problems are if my knees in a bent position for 10 minutes or longer, whether it's driving a car or, or sitting down, when I stretch my knees, um, the skin on the backside of the knees shrinks and tightens up really badly and it hurts a lot.  But once they're stretched for about five or 10 minutes it's okay

Q:     Um-hmm.  And now we're talking you might need further surgeries in regards to the areas behind the legs?

A:     In particular.

Q·     Uh-huh.

A     Um, there's a couple of areas but in particular behind the knees they, uh, were over cautiously - over grafted behind the knee area.  The graft there - a lot of the grafts fell off and my regular skin came back but the grafts that didn't have left these thick, uh, skin areas that really hurt when my leg stretches.  I think it's because of the contraction.  And I believe, and so does Dr Gjeltema, that probably those remaining portions of skin grafts behind the knee may have to be just removed or dermabraded or something like that so that, that problem's eliminated   And we both believe that my skin underneath it is healthy and in very good condition

Q·     Um-hmm.

A     It would just be fine   Uh, I'm gonna be seeing the plastic surgeon on that June 7th.  Then there's the back of my hand which was grafted substantially and more than 50 percent of the graft has come off and my regular skin had regenerated quite well.  The hair growth, uh, sensation, the color's coming back to normal from what I can tell   Just a very small area left of the skin graft on the back of the hand and it seems to me that parts of that are coming off, too.  I lost another piece here and here and my regular skin is just coming up really nicely, actually   There's another big piece here that came off and it looks perfect