**Transcribed Statement**

Of Andrew Shalaby
Claim No CKS 9984
Date: June 1, 2006 

It came off and is healing perfectly. Um, somehow or another my, my skin is doing well Uh, I'm making a, a good recovery, I think Very good recovery

Q: Okay. Um, in regards to going back to the, uh, the, the canister

A: Yes

Q: . . um, w-, um, had you used the canister before or, uh, or was it brand new or

A: Um, I'm pretty sure we used that one before. Yes. Because it had the tip on it. But we had, uh, we keep several inside the motor home Um, I'm certain I used that one before It had a tip on it The tip was on it.

Q: Okay And you didn't notice any problems with the prior use?

A: No It worked well

Q: _____[unintelligible].

A: It worked very well. Never - I've never had a problem with any of those canisters Never in my life. And I've used them throughout the years - many years.

Q: So this is the first time you've had any kind of a, of a, of a, of a crack or a leakage or, or anything .

A: Ever.

Q: accidental of that nature?

A: Yeah. Ever

Q: Um, okay. And the, the only witnesses that were with you at the time was your, your, your son and your daughter and you wife but they didn't actually see the - they saw you on fire but they didn't actually see the .

A: Nobody saw the fire as it happened They saw the glow of the fire but they, they were facing the other way Um, my son didn't see anything, he was in the motor home My daughter was asleep My wife was facing the other way walking towards the motor home and all of the campers that, uh, were in the area, we didn't get information on any of them.

Q: Yeah. And, uh, this was being used to light a log is my understanding for a camp fire?

**Transcribed Statement**

A Yeah. I think it was a log. It was either a log or a Duraflame. I don't remember.

Q: Okay And there was no flammable material _____[inaudible]?

A: Flammable Yeah

Q: Well, I guess in regards to .

A. Chemical - lighter fluid?

Q ...lighter fluid on them or that kind of chemicals.

A Nothing like that.

Q: Okay.

A I think it was just a log if I remember correctly.

Q. Okay. Um

A. We often used the torch to light the, uh, charcoal for the barbeque.

Q: With the BernzOmatic, uh...

A With the BernzOmatic It's MAPT M-A-P-T

Q Yeah

A: It's not propane.

Q: Yeah. I guess it's a MAPT gas. I guess it's a different .

A Yeah

Q. . combustible type of gas or fuel. Um, okay Is there anything that I left out or you can think of anything else that, uh, might _____[inaudible]

A: Okay

Q And then for, um, for identification purposes, can I have your date of birth?

A October 7, 1960

**Transcribed Statement**

Of Andrew Shalaby
Claim No.. CKS 9984
Date June 1, 2006 

Q: Okay. And could you, uh, spell your last name?

A: S-H-A-L-A-B-Y.

Q: Okay And, uh, I think we'll conclude the recording and, uh, again, the, the recording has been done with your full knowledge and consent?

A Yes, it has

Q And, uh, the, uh, your answers have been true and to the best of your abilities were accurate?

A. Yes. They were true and they're ac-, well, I don't know about accurate Um, um, as far as the actual incident, the day of the burn, I'm just going on my memory to the best of what I think is accurate but, uh, I will tell you this, after I got out of the hospital I was told that, uh, a lot of my information - probably _____[unintelligible] not accurate I was told that I told the doctor my appendix was removed.

Q. Oh.

A. But I was - I had no medications at the time of the injury Um, that's my memory to the best of my knowledge.

Q Okay The medications that I guess you're currently on right now while we're taking this recording would be?

A: The only medication I'm on right now if you could say I'm on anything is the Lunesta that I took last night for sleeping, um, and the Celebrex, which I took last night for pain So I don't think I have any medications in my system.

Q: Okay.

A: Um, I am having very mild withdrawals from the Xanax but I don't think it's affecting anything

Q: Okay.

A I think my memory is good now.

Q: Okay. Okay And, uh, again this is Joe Tancredy with St. Paul Travelers Insurance and we'll be concluding the, uh, uh, the recording. Okay.

A Okay

**Transcribed Statement**

Of. Andrew Shalaby
Claim No · CKS 9984
Date: June 1, 2006

[Tape off.]

JT/bpt/jaf/0727/RS0724E

MICHAEL J. VEILUVA (State Bar No. 100419)
MARK D. EPSTEIN (State Bar No. 168221)
ALBORG, VEILUVA & EPSTEIN LLP
200 Pringle Avenue, Suite 410
Walnut Creek, CA 94596
Telephone: (925) 939-9880
Facsimile: (925) 939-9915

Attorneys for Plaintiffs
Andrew Shalaby and Sonia Dunn-Ruiz

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW SHALABY and SONIA DUNN-RUIZ,<br><br>Plaintiffs,<br><br>vs.<br><br>IRWIN INDUSTRIAL TOOL COMPANY, INC., THE HOME DEPOT, INC., and DOES 2 through 100, inclusive<br><br>Defendants. | Case No. C 06-07026 MJJ<br><br>DECLARATION OF SONIA DUNN-RUIZ IN SUPPORT OF OPPOSITION TO THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE<br><br>Date: September 25, 2007<br>Time: 9:30 a.m.<br>Ctrm: 11, 19th Floor<br>Judge: Hon. Martin J. Jenkins<br><br>Complaint filed: October 10, 2006<br>Case Removed: November 9, 2006 |

I, Sonia Dunn-Ruiz, declare as follows:

1. I am one of the named plaintiffs in the action captioned above. I make the following statements, which are true and correct, based upon matters that are within my personal knowledge and observations, unless otherwise stated on information and belief. If called as a witness, I could and would testify truthfully and competently regarding the matters set forth below.

2. During the week of April 17, 2006, my family and I were vacating at Campland-on-the-Bay ("Campland"), a recreational vehicle resort located near the water in San Diego, California.

3. On the evening of April 21, 2006, during our stay at Campland, my husband Andrew Shalaby was severely injured when he attempted to light a wood campfire with his Bernzomatic MAPP Gas torch. As my husband went to ignite the fire with his torch, I heard a loud "whooshing" sound and looked over at my husband and saw that he was on fire, engulfed in flames. I immediately came to his aid.

4. At trial, I will testify regarding the details of my husband's and my experience in the aftermath of the incident, including the nature, extent and scope of Andy's physical injuries and emotional issues, the out-of-pocket expenses we have incurred as well as our loss of income as a result of the incident. I will also testify regarding the emotional and practical effects that the incident has had on our lives.

I declare under penalty of perjury of the laws of the State of California that the foregoing statements are true and correct, and if called to testify as a witness I can and will testify competently thereto.

Executed on September 1, 2007 at El Cerrito, California.

Sonia Dunn-Ruiz

SONIA DUNN-RUIZ



MICHAEL J. VEILUVA (State Bar No. 100419)
MARK D. EPSTEIN (State Bar No. 168221)
ALBORG, VEILUVA & EPSTEIN LLP
200 Pringle Avenue, Suite 410
Walnut Creek, CA 94596
Telephone: (925) 939-9880
Facsimile: (925) 939-9915

Attorneys for Plaintiffs
Andrew Shalaby and Sonia Dunn-Ruiz

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW SHALABY and SONIA DUNN-RUIZ,<br><br>Plaintiffs,<br><br>vs.<br><br>IRWIN INDUSTRIAL TOOL COMPANY, INC., THE HOME DEPOT, INC., and DOES 2 through 100, inclusive<br><br>Defendants. | Case No. C 06-07026 MJJ<br><br>DECLARATION OF MARK D. EPSTEIN IN SUPPORT OF OPPOSITION TO THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S MOTION TO TRANSFER VENUE<br><br>Date: September 25, 2007<br>Time: 9:30 a.m.<br>Ctrm: 11, 19th Floor<br>Judge: Hon. Martin J. Jenkins<br><br>Complaint filed: October 10, 2006<br>Case Removed: November 9, 2006 |

I, Mark D. Epstein, declare as follows:

1. I am an attorney at law, duly licensed to practice before the courts of the State of California, and am admitted to practice on this Court. I am a partner in the law firm of Alborg, Veiluva & Epstein, LLP, counsel of record for plaintiffs in this action. I make the following statements, which are true and correct, based upon matters that are within my personal knowledge and observations, unless otherwise stated on information and belief. If called as a witness, I could and would testify truthfully and competently regarding the matters set forth below.

1 900725.pld.Epstein Decl in Opp to Worthington Mtn to Transfer.doc
DECLARATION OF MARK D. EPSTEIN IN SUPPORT OF OPPOSITION TO MOTION TO TRANSFER

2. Attached hereto as Exhibit A are true and correct copies of select pages that were produced to me by counsel for Irwin Industrial Tool Company as part of its initial disclosures in this case, as well as select product description pages that I printed off of the BerznOmatic internet website, http://www.bernzomatic.com/bernzomatic/consumer/jhtml/index.jhtml, which describe the suitability of BernzOmatic MAPP Gas torches for use in lighting grills and pilot lights.

3. Attached hereto as Exhibit B are true and correct copies of select pages that were produced to me by counsel for Irwin Industrial Tool Company as part of its initial disclosures in this case which describe the suitability of BernzOmatic MAPP Gas torches for use in lighting campfires.

4. Attached hereto as Exhibit C is a true and correct copy of the transcript of the deposition of Warren Ratliff, at which I made a personal appearance and in which I participated.

5. Attached hereto as Exhibit D is a true and correct copy of the transcript of the deposition of Randy Stephens, at which I made a personal appearance and in which I participated.

6. Attached hereto as Exhibit E are true and correct copies of pages 20 and 21 of the transcript of the deposition of Robert Kevin Price, at which I made a personal appearance and in which I participated.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed on September 4, 2007 at Walnut Creek, California.

/s/

MARK D. EPSTEIN



Tool Finder Wizard :: Bernzomatic http://www.bernzomatic.com/bernzomatic/consumer/jhtml/toolFinder..

SEARCH FIND
Sign In Shopping Cart Order Status

BERNZOMATIC

CATALOG
TOOL FINDER WIZARD
EXPERT CENTER
SUPPORT & SERVICES
DOWNLOAD CENTRAL
WHERE TO BUY

## TOOL FINDER RESULTS

Below are the fuel types appropriate for your project. Click on the icons to view the products within each category.

BASIC
PROPANE
P

**Propane** fuel is a basic gas which is appropriate for the following projects:

- Soldering copper pipes up to 3/4"
- Thawing frozen pipes & locks
- Loosening rusted boldts
- Removing paint, caulk & putty
- Lighting pilot light & grills

MULTI-APPLICATION
MAPP

**MAPP** gas is a Multi-Application fuel appropriate for the following projects:

- Soldering copper pipes up to 3/4"
- Thawing frozen pipes & locks
- Loosening rusted bolts
- Removing paint, caulk & putty
- Lighting pilot light & grills

**PLUS**

- Soldering copper pipes over 3/4"
- Brazing copper pipes
- Brazing steel
- Hardening steel (+ Oxygen gas)
- Repairing garden tools (+ Oxygen gas)
- Light welding (+ Oxygen gas)
- Thin metal cutting (+ Oxygen gas)

LEGAL - PRIVACY - A NEWELL/RUBBERMAID COMPANY
CONTACT US - ABOUT US - SITE MAP

of 1
10/3/2006 5:34 PM



High Temperature Torch
Soplete de alta temperatura
Chalumeau à haute température
• Self-Igniting
• Auto-encendido
• Auto-allumage
BZO000102
MADE IN U.S.A.
U.S.A.
MULTI-APPLICATION
MAPP GAS

# MULTI-APPLICATION™

TS4000ZK

## High Temperature Torch
## Soplete de alta temperatura

## Chalumeau à haute température

Multi-Application MAPP® Torches are Ideal for:
- Soldering Copper Pipes from 1/8" up to 3"
- Thawing Frozen Pipes & Locks
- Brazing Steel
- Brazing Copper Pipes
- Loosening Rusted Bolts
- Removing Paint, Caulk & Putty
- Lighting Grills

Los sopletes MAPP® de aplicaciones múltiples son ideales para:
- Soldar tubos de cobre de 1/8" (3.18 mm) hasta 3" (76.2 mm)
- Decongelar tubos y cerraduras congeladas
- Soldar acero
- Soldar tubos de cobre
- Aflojar pernos oxidados
- Remover pintura, impermeabilizante y masilla
- ncender parrillas

Les chalumeaux MAPP® utilisés pour diverses applications sont idéaux pour:
- Souder des tuyaux en cuivre de 1/8 pouce à 3 pouces
- Dégeler les tuyaux et les serrures grippés
- Braser des pièces en acier
- Braser les tuyaux en cuivre
- Desserrer les boulons rouillés
- Enlever la peinture, les mastics de calfeutrage et le mastic de vitrerie
- Allumer des grils

0 70042 19042 7

©2004 BERNZOMATIC
Medina, NY 14103, USA
1-800-654-9011
www.bernzomatic.com
97303

WARNING: Contents extremely flammable and under pressure. DO NOT store at temperatures above 120°F / 49°C. Keep away from heat and flame. DO NOT store in living areas. Carefully read cautions on individual containers. KEEP OUT OF REACH OF CHILDREN.

ADVERTENCIA: El contenido es extremadamente inflamable y está bajo presión. NO almacenar a temperaturas superiores a los 49°C / 120°F. Mantener alejado del calor y del fuego. NO almacene este producto en áreas de vivienda. Leer cuidadosamente las precauciones indicadas en cada recipiente en particular. MANTENER ALEJADO DEL ALCANCE DE LOS NIÑOS.

AVERTISSEMENT : Contenu extrêmement inflammable et sous pression. NE PAS entreposer à des températures supérieures à 49°C (120°F). Garder loin de toute source de chaleur ou flamme. À NE PAS ranger dans des endroits habitables. Lire attentivement les mises en garde sur les contenants individuels. GARDER HORS DE PORTÉE DES ENFANTS.

WARNING: ALWAYS wear safety goggles, gloves and other appropriate safety items for protection.

ADVERTENCIA: SIEMPRE use gafas y guantes de seguridad y otros artículos adecuados para su protección.

AVERTISSEMENT: TOUJOURS porter des verres de sécurité, des gants et tout autre article de sécurité afin d'assurer votre protection.

G04085

BZO000103

## Thawing frozen pipes

Pipes can freeze if they are exposed to an outside wall during freezing weather. You can use a BernzOmatic torch to thaw them. But be careful. Thawing frozen pipes the wrong way can cause them to burst. Be sure to use an appropriate heat shield between the pipes to be thawed and nearby walls. Start at the faucet end of the frozen pipe. Open up the the faucet and begin heating there, working your way toward the water supply. If all is going well, water will start dripping out of the open faucet.

If you have pipes that are prone to freezing, it's a good idea to insulate them or leave the cabinet doors of the sink open so room heat can protect them.

## Removing floor tile

Occasionally it's necessary to remove a damaged floor tile and replace it, an ideal application for a BernzOmatic torch. Use the flame spreader attachment on the torch. Heat the tile, keeping the propane cylinder angled up, playing the flame over all areas of the tile until it feels uncomfortably warm to the touch. Score a line on all sides of the tile. Use a putty knife to lift one corner of the tile. Keep moving the putty knife along the edge of the tile so you can lift the entire edge. Keep applying heat and slowly work the putty knife underneath until the tile comes up.

After the tile has been lifted, keep applying heat to the floor surface being careful not to heat the adjoining tiles. Use the putty knife to scrape away *all* traces of tile cement. For final clean-up of the surface, use soap and warm water for water-soluble cement, or paint thinner. Be careful not to get the soapy water or paint thinner underneath adjoining tiles. Wipe the area dry and you're ready to apply the new cement and replacement tile.

This brochure provides a general overview of the many uses of BernzOmatic torches. If you want to learn more about metal working, consult your local library or consider training through your local vocational/technical school.

*MAPP™ is a registered trademark of Airco, Inc.

---

NEW FROM **BERNZOMATIC**

Model JT800 OUTDOOR TORCH and
JT850 TRIGGER START OUTDOOR TORCH

- Ideal for a variety of outdoor projects. *
- Eliminates the need for chemical use.
- Uses Propane or MAPP® gas.
- UL listed

For more information contact BernzOmatic at (800) 654-9011 or on the internet at http://www.bernzomatic.com

WEED REMOVAL

STARTING CAMPFIRES *

MELTING ICE

INSECT CONTROL

BZO000089



5

Ideal for:
Ideal para:
weed burning
quemando maleza
campfires
fogatas
chimeneas
chimeneas
BERNZOMATIC
Self-Igniting
Outdoor Torch
Soplete de auto encendido
para uso en el aire libre
36" Reach from grip to tip
Adjustable jumbo flame
Alcance 91.44cm desde la parte que se apréta a la punta
Llama ajustable
JT850
www.bernzOmatic.com

BZO000092

# BERNZOMATIC

**Self-Igniting Outdoor Torch**

Soplete de auto encendido para uso en el aire libre

**36" Reach from grip to tip**

**Adjustable jumbo flame**

Alcance 91.44 cm desde la parte que se apréta a la punta

Llama ajustable

©2006 BERNZOMATIC
Medina, NY 14103, USA
1-800-654-9011
www.bernzOmatic.com

94481

| ⚠ Warning ⚠ | ⚠ Advertencia ⚠ | ⚠ Advertissement ⚠ |
|---|---|---|
| FIRE & BURN HAZARD For outdoor use only. Never use near fuel, solvents, flammable liquids, wood, paper, or other combustible materials. Always have a bucket of water or an ABC-type fire extinguisher within reach when using torch. Failure to follow this warning can result in severe personal injury or death. | PELIGRO DE INCENDIOS Y QUEMADURAS Para uso en exteriores únicamente. Nunca utilice este producto cerca de combustible, solventes, liquidos inflamables, madera, papel o cualquier otro material combustible. Siempre tenga a la mano un balde de agua o un extinguidor de incendios tipo ABC cuando use un soplete. No obedecer esta advertencia puede dar como resultado graves lesiones personales o incluso la muerte. | RISQUE D'INCENDIE ET DE BRÛLURE Pour usage extérieur seulement. N'utilisez jamais à proximité de combustibles, solvants, liquides inflammables, bois, papiers ou autres matériaux combustibles. Ayez toujours à portée de la main proximité un seau d'eau ou un extincteur d'incendie de type ABC lors de l'utilisation du chalumeau. Le défaut de respecter cette mise en garde peut entraîner des blessures graves ou même la mort. |

Made in the USA
Hecho en USA

0 70042 19425 8

**Ideal for:**
Ideal para:

campfires
fogatas

weed burning
quemando maleza

chimeneas
chimeneas

JT850

BZO000093



Case 3:06-cv-07026-MJJ Document 58-3 Filed 09/04/2007 Page 4 of 5

BERNZOMATIC

Self-Igniting Outdoor Utility Torch

Soplete de auto encendido para todo uso en exteriores

Chalumeau utilitaire extérieur à allumage automatique

JT850

## Ideal For Year Round Use:

- Lighting Chimineas
- Melting Ice and Snow
- Lighting Camp Fires 
- Burning Weeds

## Ideal para usarse todo el año:

- Para encender chimeneas
- Para derretir hielo y nieve
- Para encender fogotas
- Para quemar maleza

## Idéal pour être utilisé toute l'année:

- Allumage de cheminées
- Fusion de la glace et de la niege
- Allumage de feux de camp
- Désherbage par combustion

0 70042 19425 8

©2004 BERNZOMATIC
Medina, NY 14103, USA
1-800-654-9011
www.bernzOmatic.com

97325 G04080

| ⚠ Warning ⚠ | ⚠ Advertencia ⚠ | ⚠ Advertissement ⚠ |
| --- | --- | --- |
| **FIRE & BURN HAZARD** For outdoor use only. Never use near fuel, solvents, flammable liquids, wood, paper, or other combustible materials. Always have a bucket of water or an ABC-type fire extinguisher within reach when using torch. Failure to follow this warning can result in severe personal injury or death. | **PELIGRO DE INCENDIOS Y QUEMADURAS** Para uso en exteriores únicamente. Nunca utilice este producto cerca de combustible, solventes, líquidos inflamables, madera, papel o cualquier otro material combustible. Siempre tenga a la mano un balde de agua o un extinguidor de incendios tipo ABC cuando use un soplete. No obedecer esta advertencia puede dar como resultado graves lesiones personales o incluso la muerte. | **RISQUE D'INCENDIE ET DE BRÛLURE** Pour usage extérieur seulement. N'utilisez jamais à proximité de combustibles, solvants, liquides inflammables, bois, papiers ou autres matériaux combustibles. Ayez toujours à portée de la main proximité un seau d'eau ou un extincteur d'incendie de type ABC lors de l'utilisation du chalumeau. Le défaut de respecter cette mise en garde peut entraîner des blessures graves ou même la mort. |

BZO000106

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANDREW SHALABY and SONIA DUNN-RUIZ, )
)
Plaintiffs, )
)
vs. ) No. C06-07026CW
)
NEWELL RUBBERMAID, INC., RUBBERMAID, )
INCORPORATED, and THE HOME DEPOT, )
INC., )
)
Defendants. )
______________________________________)

DEPOSITION OF WARREN L. RATLIFF, JR.

Taken at San Diego, California

April 17, 2007

Reported by Catherine Gautereaux, CSR
Certificate No. 3122

Appearances:

For Plaintiffs:

Alborg, Veiluva & Epstein LLP
By: Mark D. Epstein
200 Pringle Avenue, Suite 410
Walnut Creek, California 94596-7380
(925) 939-9880 fax (925) 939-9915
mepstein@avelaw.com

For Defendants:

Keller, Price & Moorhead
By: J. Phillip Moorhead
229 Avenue I, Second Floor
Redondo Beach, California 90277
(310) 540-1332 fax (310) 540-8480
jpm@kpmlawyers.com

For Warren Ratliff:

Grimm Vranjes McCormick & Graham LLP
By: Gregory D. Stephan
550 West C Street, Suite 1100
San Diego, California 92101
(619) 231-8802 fax (619) 233-6039

DEPOSITION OF WARREN L. RATLIFF, JR., taken by the Defendants at the Doubletree Club, 1515 Hotel Circle South, San Diego, California, commencing on Tuesday, April 17, 2007, at 9:05 a.m., before Catherine A-M Gautereaux, Certified Shorthand Reporter in and for the State of California.

I N D E X

| EXAMINATION BY | PAGE |
|---|---|
| Mr. Moorhead | 4, 86 |
| Mr. Epstein | 55 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Andrew Shalaby's reservation information for Campland on the Bay; 3-page incident report, dated 4/21/06 | 40 |
| 2 | Subpoena for the appearance of Warren Ratliff | 46 |
| 3 | July 12, 2006, letter from Gary Gunther, adjuster, to Therese Kiel; facsimile cover sheet, dated 7/13/06 | 48 |

SAN DIEGO, CALIFORNIA; TUESDAY, APRIL 17, 2007

9:05 A.M.

WARREN L. RATLIFF, JR.,

having been first duly sworn,

testified as follows:

EXAMINATION

BY MR. MOORHEAD:

Q Okay. Mr. Ratliff, I introduced myself before, but I will do it again. My name is John Moorhead, and I represent the defendants in a lawsuit that has been filed on behalf of a gentleman by the name of Andrew Shalaby and his wife, and we're here today to take your deposition.

Now, let me ask, first of all: You ever had your deposition taken before?

A Yes.

Q Okay. So you're familiar, at least generally, with the procedure?

A Yes, sir.

Q Okay. At the risk of telling you things that you already know or things that Mr. Stephan might have spoken with you about yesterday, let me make sure I go through the basic ground rules so that we are on the same page, so to speak, before we get into the

substantive testimony.

The court reporter, seated to your right, is taking down everything that we're saying in the room today, or at least trying to. And so it's important that we follow some ground rules to increase the likelihood that the transcript that she prepares is readable.

The first of those ground rules is to try to wait until I've completed my question before you give your answer, because if both of us are speaking at the same time, it's going to be difficult for her to make an accurate record. There is also the risk that the last few words of the question might change its meaning somewhat and, therefore, your answer wouldn't correspond if you jumped in too soon.

So I'll try to wait until you've completed your answer before I ask another question, and if you would, please try to fight the temptation to answer my question before it's done, even though you'll probably know what it is before I finish it.

Now, it's also necessary that you give verbal responses to each question. Although it's perfectly okay to shake your head or make gestures or whatever, she is not here to interpret those things, and the record won't be clear unless you actually speak up and

say "Yes" or "No" or "two feet," or whatever the case may be.

I have the bad habit, not so much in depositions but in other places, of using uh-huh and un-unh. I don't know if you have that same malady, but if you would, try to avoid using those sounds for responses because they won't be clear on the record whether it was a positive or a negative.

If you forget any of these things, it's likely that either myself or Mr. Epstein may ask you, "Was that a yes? Was that a no?" You know, "How far apart are your hands?" We just recognize, having dealt with a lot of these transcripts, that there is going to be a big void here unless we ask you to speak. So we're not trying to get you to change your answer or to elaborate. We just want to know whether this was a yes or a no.

At a later point in time, the transcript will be prepared and sent, I guess, based upon our previous conversation, to Campland, where you'll have an opportunity to look it over and make corrections, if necessary, in order to make it accurate. And then you'll be asked to sign it under penalty of perjury.

You are not a party in this case. Campland is not a party in this case. But it's always best to try to make sure that your best answers are given today and

that changes are not needed to be made later, because it could have an impact on your credibility if that ever comes up, and we don't want to see that happen, and I know you don't, either.

I may ask questions that call for estimates of things like time or distance or whatever. I recognize that you probably didn't have a stopwatch or a tape measure, and I don't expect that type of precision, but I am entitled to your best estimates of such measurements. If you don't have an estimate or no recollection whatsoever, it would be a guess, tell us that. It doesn't help any of us.

If you don't understand one of my questions -- and, unfortunately, that happens a lot because my questions are not always as artful as I'd like them to be -- please let me know and I will rephrase it until you do understand it.

As the proceedings go on, if I get tired, my voice may trail off a bit. If you don't hear my question, feel free to let me know. I'll repeat it or I'll ask this nice young lady to read it back to you. But if you give us an answer, we're going to assume that you heard my question and you understood my question and that you mean your answer to correspond to it. Fair enough?

A Yes, sir.

Q Any questions on what's going to happen before we get started?

A No, sir.

Q Okay. Let's get your full name for the record, please.

A It would be Warren L. Ratliff, Jr. Middle name, Lee.

Q And what's your business address, Mr. Ratliff?

A 2211 Pacific Beach Drive, San Diego, California 92109.

Q And what's the phone number there?

A To our --

Q Main number.

A The main number would be (858) 581-4200.

Q And if we were to call that number and ask for you, they could track you down? Or maybe not?

A Maybe not.

Q Do you have a better number?

A Yes.

Q What would that number be?

A (858) 581-4219.

Q Okay. What's your home address?

A Is 1666 Garnet Avenue, G-a-r-n-e-t, No. 116 -- or 119. I'm sorry.

Q San Diego?
A San Diego, California.
Q Same ZIP?
A 92109.
Q Okay. Just for reference purposes, what's your date of birth?
A June 11th, 1960.
Q Okay. By whom are you currently employed, Mr. Ratliff?
A Would be Terra Vista Management; Campland on the Bay.
Q Terra Vista Management is the employer, and the location is Campland on the Bay?
A Yes. It would be the property location.
Q And the official business address for Campland on the Bay is that 2211 Pacific Beach Drive?
A Yes.
Q Okay. How long have you worked at Campland on the Bay, roughly?
A Five years.
Q What's your current position with Campland?
A With Campland, park ranger supervisor.
Q So you supervise other park rangers?
A The whole staff, yes.
Q Okay. And how many rangers does that entail?

A Currently we have, I believe, ten, besides myself and the manager.

Q How long have you been park ranger supervisor?

A Three years.

Q So you were park ranger supervisor in April of 2006?

A Yes, sir.

Q And who was your immediate supervisor?

A At that --

Q Now. Today.

A Today?

Q Uh-huh.

A Is Darrin Sessler.

Q And who was it in April of 2006?

A Would be Therese Kiel.

Q How does Therese spell her first name, do you know?

A Do you mind if I look at --

Q No, absolutely not. Whatever you need to refer to is fine.

A T-h-e-r-e-s-e.

Q And the last name, K-i-e-l?

A Yes, sir.

Q Were you working at Campland on the Bay in April of 2006, when a fellow by the name of Andrew

Shalaby was injured there?
A Yes, sir.
Q You were on duty that evening?
A Yes, sir.
Q Do you have at least some recollection of that event?
A Yes, sir.
Q If you can recall, Mr. Ratliff, how did you personally become aware that the incident had happened?
A Originally was, other guests at Campland had came to the gate in a frantic state, yelling that they had called 911, that there was an individual that was burned.
Q Were you at the gate at the time?
A Yes, sir.
Q So they told you that someone had been burned and that they had called 911?
A That is correct.
Q And these were campers that came to you?
A Yes, sir.
Q Was there a process at that time, Mr. Ratliff, whereby you or someone employed by Campland would typically make some type of a log entry specifically about learning an event, like, "I got a phone call" or "I was approached by people at such and such a moment,"

and put it down in writing somewhere?
A No. That may be -- okay.
Q When you received word of this incident at the gate, were you at the gate alone as far as employees go?
A I don't recall.
Q Did you have access to any type of a vehicle there?
A Yes, sir.
Q What kind of a vehicle did you have?
A I have a ranger Toyota pickup truck, and golf carts.
Q You mentioned that you had or -- I guess, is the way the question was asked -- about ten other rangers that report to you?
A Yes.
Q Was that essentially the same back in April of 2006?
A Approximately, yes.
Q And they work over a 24-hour period, I assume, in, like, maybe three different shifts?
A Yes.
Q Typically, on a shift that would include the hours of, say, nine o'clock p.m. to midnight, how many of those ten or so rangers would be on duty at Campland?
A On that particular evening, I believe there

was two.

Q And that's in addition to you, or including you?

A Including me.

Q Okay. What other ranger, if you can recall, was on duty that night?

A Would have been Randy Stephens.

Q Do you know how he spells his last name?

A S-t-e-p-h-e-n-s.

Q In addition to the security staff, which would have involved you and Mr. Stephens or "Steffen," or however he pronounces it, would there have been other Campland employees on duty at that time of night?

A I am not quite understanding you.

Q Your duties, as I understand it, as park ranger, would have been overall supervision of what was going on and anybody who would have been, for the sake of example, working at a snack bar, at a laundry facility, or anybody else that was employed by Campland at that time of night?

A Yes.

Q Okay. Who else would have been employed at that time of night?

A We do have janitorial staff.

Q Okay. Do you remember any of them that were

on duty that particular evening?

A No, sir, I do not.

Q Okay. Other than rangers and janitorial staff, any other Campland employees that likely would have been on duty at or about the time this incident was recorded?

A I don't recall, but there was a possibility.

Q If there was somebody else, what in your mind might have been their function for Campland?

A We do have a game room attendant, usually, till eleven o'clock.

Q Do you know who that would have been in April of 2006?

A No, sir.

Q Is there anybody that would perform the function, say, of dispatcher or clerk or something so that if you guys were out patrolling the Campland area and an event was recorded, they could get on the radio or a cell phone, or however you communicate, and say, "We need you over at Campsite G112" or whatever?

A That would have been myself.

Q That would have been you, okay. Once you learned about this incident from the campers who came to the gate, did you go to the incident site?

A I told my employee, Randy Stephens, to

dispatch himself immediately to the site.

Q And how was that done, Mr. Ratliff? By phone? By radio?

A I believe, by radio. And I could have called out. He might have been in the proximity where I was able to yell at him.

Q I went out there yesterday. It's not far from the guard shack to where what I call "the main building" is. Is it conceivable that he might have been in the main building? Is that what you mean by earshot?

A In or around that area.

Q In any event, you dispatched Randy to go to the incident site?

A Yes, sir.

Q Do you know how he traveled there? I mean by foot, in a car or --

A By golf cart. Or I should say a golf car.

Q In addition to dispatching Randy to the scene, did you do anything else at that point in connection with dealing with this incident? By that I would include maybe yourself calling 911, calling your supervisor or anything like that.

A At that particular moment I heard the sirens that was on their way. I then had the -- oh, may I back up a little bit?

Q Sure.

A Other staff that was working at that particular time would have been our registration. We had a registration staff there -- that was there.

Q Okay.

A So I did call him to come and relieve me at the gate and I proceeded to the incident myself by truck and waited as the fire personnel arrived on the scene. Then I escorted them, with them behind me, to the site.

Q So if we back up a little bit, in addition to the potential janitorial staff, the game room attendant, there would have been someone in charge of registering guests?

A He was normally off at that time, but he happened to be a little bit late that day.

Q Do you remember what his name was?

A I believe on that particular night it was Alexander, and I do not know the last name.

Q Would he have been normally located in what I called the main building, just beyond the guard shack?

A Yes.

Q Okay. So you asked Alexander to come over and relieve you at the gate?

A To monitor the gate for me, yes.

Q All right. And then you waited for the fire

department personnel to arrive so that you could take them to the incident scene?

A Yes, sir.

Q And did you ride with them? Did you take one of the golf cars or carts? Did you take your Toyota? How did you get to the incident scene?

A The ranger truck.

Q And you knew where the incident occurred because the campers that reported it to you told you what campsite they were at or what --

A The campsite where they were at.

Q Great. Give me your best estimate in feet, yards, miles, or whatever, how far it would have been from the gate, where you were working, over to the incident site by way of travel. Not the way the crow flies, but how far did you have to drive to get there, roughly?

A I would estimate anywhere from 300 to 400 yards.

Q So it would have only taken you probably a minute or less to get there?

A Yes, sir.

Q Mr. Ratliff, when you arrived at the campsite where the incident had occurred, who else was already there?

A Several campers and guests that were in other sites; my ranger staff, Randy; I believe, the gentleman's wife or girlfriend -- I'm not sure of that. I recall one child, and the fire truck with its crew, and the paramedics and their crew.

Q And they were basically traveling with you?

A Yes. They were behind me.

Q While you were there at the campsite where the incident had happened, did anyone else arrive? And by that I would include, did any police respond or ambulance or anything else?

A The ambulance did come behind the fire staff.

Q Were they in the same --

A Yes.

Q -- caravan, basically? Did any police agencies respond at all?

A No, sir.

Q I realize there were a lot of different people there doing a lot of different things, and right now this question pertains to you specifically, Mr. Ratliff.

Did you make a list anywhere of the names of the fellow campers that came to the site, that were milling about, that might have information?

A I did not make a list of names.

Q Whether or not you know any of their names,

did you speak with any of them about what happened?

A Yes, I did.

Q Do you have any recollection, as you sit here today, of what any of these people told you?

A Well, I have different stories from each individual.

Q All right. I know it would be difficult to put a name with a story, but maybe you could do it chronologically or in your mind, "This person that looked like this said 'X'." Can you kind of tell us the various stories that you heard?

MR. STEPHAN: I'll just object. Vague as to time. I guess, talking about that night?

MR. MOORHEAD: Yes.

BY MR. MOORHEAD:

Q I'm just talking about there, at the site things that were told to you.

A Well, when I arrived on the site, I secured the site, observed the individual. We tried to help the fire department take care of that individual, first.

At that time I had Randy continue to do -- stay with him and monitor him and the campsite itself. I then went to the first campsite to the left of that campsite -- those were the individuals that also made the original call, I guess, for 911 -- and spoke to

Case 3:06-cv-02026-WBL Document 3-42 Filed 09/04/2007 Page 20 of 19



them.

The one female in that group gave me a story of -- that the guest in that site was trying to light the campfire with the torch and it would not light, and was banging the torch on the side of the fire ring.

Q Okay.

A Another guest --

Q Now, I don't want to go further because I want to make sure I understood the question. A lady from the campsite to the left of Mr. Shalaby's campsite -- Mr. Shalaby being the individual that was injured -- to the left as you're facing --

A Facing his campsite.

Q His campsite. A woman in that group told you that she had observed him trying to light the campfire unsuccessfully and banging the torch on -- what did you say? On the campfire ring?

A On the campfire ring.

Q Then, did somebody else give you a story?

A Another individual in that same campsite said that he heard the gentleman was frustrated at not being able to fight -- or to light the campfire. And that was it in that group.

Q Okay. Before we move on, 'cause there may be others, when you arrived, was there a campfire burning

in Mr. Shalaby's fire ring?

A There was a small campfire that was -- that was lit.

Q All right. We talked about the group that was in the campsite immediately to the left of the Shalaby campsite. Did you speak with any other individual?

A I spoke with the other campsite to the right of them.

Q Okay.

A They had a blanket partition, a man-made blanket partition between them.

Q Sort of a privacy thing?

A Right. Yes, sir.

Q Okay.

A Then the individual there said they heard a explosion, a large flame. Actually, all of them explained that to me. So there was a large ball of flame and explosion. And that was pretty much it from them.

Q Okay. Was that a male or female that gave you that story, if you remember?

A I believe it was a male and -- a husband and wife.

Q All right. That's all from the campsite immediately to the right of the Shalaby campsite. Did

you talk to any other campers?

A No. I cannot recall.

Q Okay. When you arrived at the campsite where the incident happened, was Mr. Shalaby still there?

A Yes.

Q Where, physically, was he located in relationship to the physical items that were there?

A As I arrived, he was placed, I believe, by other campers in a lounge chair and his feet placed in another lounge chair within three feet from the campfire ring.

Q To prop his feet up, you mean?

A Yes.

Q And, I assume, someplace away from the fire ring?

A He was about three feet.

Q Okay. All right. What about his girlfriend, or wife? Where was she when you arrived, if you remember?

A I don't recall.

Q Okay. You made reference to a child. Where was that child located, if you remember?

A I believe the child was standing in the wind break. We have a wind break there in the corner, kind of out of the way.

Q And by "wind break," you're talking about, like, a wooden fence?

A Yes.

Q Do you remember whether the child was male or female?

A No, I do not.

Q Okay. When you arrived at the scene, what is your best recollection of where the cylinder and/or torch were located?

A From where Mr. Shalaby was sitting in the chair, where he was placed by other guests, after that, the cylinder was to his rear, facing the campsite. Mr. Shalaby would be to the right, in the chair. The cylinder was behind Mr. Shalaby, in the dirt, approximately four feet.

Q Four feet from him. How far from the fire ring?

A Circular, three feet, probably. The same distance as he was.

Q Okay. At that time, when you first noticed the cylinder and the torch, were they attached to each other?

A They were still attached.

Q Was there any flame coming from the cylinder and torch at that point?

Case 3:07-cv-02702-W-BLM Document 3-2 Filed 10/30/2007 Page 40 of 49

A No, sir.

Q As part of your duties that evening, did you do anything specifically to inspect that equipment?

A Yes, sir.

Q What is it that you did, that you can recall?

A First of all, I secured the site, picked the cylinder up -- well, I inspected the cylinder to make sure that it wasn't still in the explosive state, then picked it up to remove it from being a potential hazard from anybody else, held it in my possession the entire time, and went to the fire department's engineer, who was standing there, asked him if they needed this for anything.

His reply to me was, he was going to speak to his captain -- he was making a report in the ambulance -- and he would get back to me.

Q We'll get to that conversation in a minute. Back to your observations: What observations can you recall making about the cylinder and the torch when you first came into contact with them?

A At that particular moment, the only observation that I observed, that it was MAPP; MAPP gas.

Q So you're familiar with the type of gas that was in the cylinder?

A Yes, sir.

Q Okay. When you first came in contact with the cylinder and the torch, were they still hot?

A I picked the cylinder up, and it was not hot at that time.

Q Okay. How about the torch? Was it hot?

A I did not -- I don't recall, myself, touching the torch end of it.

Q Okay. Did you observe any signs as if the cylinder had exploded; by that I mean any holes in it, any cracks, any fissures, anything like that, in the sidewall or bottom or neck or anything else on the cylinder?

A At that particular time, the cylinder was not an issue. I did all my observation after the -- Mr. Shalaby was taken care of.

Q Okay. Well, let's move on in time, then, to that point in time when you made your observations. At that point, after he had been taken care of, what observations do you recall making about the cylinder or torch at that point in time?

A As I took the cylinder back to the gate, I observed the cylinder had a right-angle bend to it at the torch, where the connection to the cylinder is, and appeared to be a crack in the cylinder at the bottom thread level of the cylinder.

Q Okay. If we -- you're familiar with what they look like when they are disassembled, the torch from the --

A Yes, sir.

Q All right. If you were to look at a MAPP gas cylinder from the store before it goes through any type of event like this one may have, it's shaped somewhat like my soda bottle, maybe not as tapered, but it comes basically straight up and then it tapers, and then it's got a neck on the top, that's threaded, right?

A Yes, sir.

Q Okay. And what color is it?

A It is yellow.

Q A MAPP gas cylinder is always yellow, right?

A Yes, sir.

Q And what you've just described for me is that the neck of the cylinder that you observed at the gate following taking care of Mr. Shalaby, was bent?

A Not the neck.

Q Okay. What part was bent?

A Well, I don't know if the neck -- 'cause I never did disconnect the torch head from the cylinder.

Q Then, I misunderstood you.

A It just appeared to be a split along the very bottom, the last thread of the neck.

Q The lowest thread --
A The lowest thread.
Q -- as it's sitting on its bottom?
A The main cylinder -- body of the cylinder, to the first thread up on the neck.
Q Now, this crack, or whatever you're describing, is that going -- if the cylinder is sitting on its bottom, is the crack going vertically or horizontally, that you saw?
A I believe it was kind of in both directions.
Q And then you said something about something being bent. Maybe I misunderstood you.
A The top torch nozzle itself was at a right angle from that position, from the crack itself.
Q Okay. So let's stop a minute. The torch -- you've seen these torches as they come from the store?
A Yes, sir.
Q And they have a bend in them when they're in their correct format, right? They just don't go straight up?
A Yes. The nozzle itself has a normal operating bend.
Q You're talking about a bend different than the one that would normally be there?
A Yes.

Q And where, along the course of the torch from where it screws onto the neck of the cylinder to the tip, where the fire comes out -- where did you observe the bend that you're talking about, that didn't belong there, so to speak?

A Observed the bend pretty much at the base of the nozzle and the torch -- the cylinder itself.

Q Okay. So --

A At the explosion part, or whatever the break in the cylinder was, is where it was actually bent.

Q So what you are describing for me, if I understand it -- and correct me if I'm wrong -- is that the unusual bend that you saw was at or near the place that the torch attaches to the cylinder?

A That is correct, yes.

Q Okay. And did you make any observations of the torch to determine -- and I don't know if you have the expertise to do this or not, but, if you do, let us know -- whether that appeared to be something that was caused by the event or, for the sake of example, one of those people said that Mr. Shalaby was banging it.

In other words, did it look more like damage that somebody did to it before the event, or was it melted and bent as a result of the event? What did you see?

A I made my personal observation, and based on what witnesses said to me, it could have been a number of things.

Q So you didn't come to a conclusion as to what you thought it was?

A No, sir.

Q Was it inconsistent with having been melted into that position from the fire ball you described?

MR. EPSTEIN: Objection. Vague and ambiguous. Go ahead.

THE WITNESS: Yes, it was inconsistent.

BY MR. MOORHEAD:

Q Was it inconsistent with the story that the camper to the left of Mr. Shalaby had said, that it had been banged on the campfire ring?

A No.

Q So that was one possibility that was in your mind?

A Yes, sir.

Q Can you remember any other thoughts that came to your mind as to what might have caused the bend that you saw in the torch?

A Just the natural explosion itself could have -- or a faulty -- you know, my personal experience with these cylinders is faulty materials, manufactured

materials.

Q Okay. What observations did you make that made you believe that it might be that as opposed to any of the other things?

A Just my past experience from other previous places working with the stuff.

Q So you did not do any type of a qualitative analysis of the metals involved or anything like that to determine if it was --

A Negative. No, sir.

Q Okay. Did you have discussions with Mr. Shalaby at the scene?

A No, sir.

Q Did you overhear any discussions Mr. Shalaby had at the scene with other people?

A No, sir.

Q Did you have -- if I already asked you this, I apologize. Did you have any conversations with his wife or his girlfriend?

A Yes, sir.

Q Okay. And what, if anything, did you learn from her?

A She was very frantic. I couldn't get pretty much any statements from her per se, as she was more worried about his -- his well-being and that, which we

all were. And the only conversation that took place was trying to initially get their address and name, all my original statements. And I couldn't get that out of her.

Q Okay. Before we get too far away from it, back to the torch: In addition to this bend, did you see anything else that appeared to be wrong with the torch?

A Just that I thought that it could have been put on wrong or not all the way in the on position.

Q Okay. You mean when it was attached to the cylinder, it might not have been attached all the way?

A Right.

Q Okay. How about missing paint, scratches, dents, anything like that?

A It appeared to me to be normal wear and tear.

Q I don't think I asked you this. About what time was it that you learned of this incident, roughly?

A That I learned of the incident?

Q Yes.

A Approximate times were between 10:15 p.m. and 10:30.

Q P.m.?

A Yes, sir.

Q Were you able to determine from any source at

the scene of the incident how long before you learned of it, it had happened?

A I did not understand that question.

Q Sure. You learned of it, you said, somewhere around 10:15 to 10:30, by your conversations with Ms. Ruiz, the wife/girlfriend of Mr. Shalaby, and the other campers.

Do you know how long, before that 10:15 or 10:30 time frame that you learned of it, that it had actually happened? Like a minute before or ten minutes before or --

A I do not know.

Q Okay. But, in any event, when they reported it to you, they told you that they had called 911 and --

A And it had already happened, yes.

Q -- and the sirens were on their way?

A Yes, sir.

Q You indicated that when you arrived at the scene, Mr. Shalaby was still there. Was he conscious?

A Yes, sir.

Q Whether or not you heard anything he said, did you observe that he was having conversations with paramedics and ambulance personnel?

A Yes.

Q Did you observe that he had suffered burns?

A Yes, sir.

Q Where do you remember on his body seeing burns?

A I remember his legs, from his ankles up his -- would be above his knees, his hands and arms.

Q How about his face?

A I did not recall any on his face.

Q How about his clothing? Was it burned?

A I don't recall the clothing to be burned.

Q Did you take any photographs of the incident scene, the victim, the equipment that we talked about or anything else?

A No, sir.

Q Did you direct Randy to?

A No, sir.

Q So as far as you know, Campland on the Bay has never had any photographs relevant to this incident?

A No, sir.

Q The cylinder that you observed when you got to the scene, was it in a condition where it still had its labels?

A Yes, sir.

Q Okay. Do you remember whether the label was damaged in any way, either burned or scratched off or anything like that?