34

1   A    Appeared to be normal wear and tear.

2   Q    Did you make any observations, during the time

3  that the cylinder was in your care, custody, and

4  control, as to whether it still contained any gas?

5   A    No, sir, no more gas.

6   Q    It was all gone?

7   A    It was empty.

8   Q    Did you make any determinations, either

9  through your visual observations or the discussions you

10  had, as to whether there were any additional cylinders

11  on site?

12   A    No, sir.

13   Q    Did you make any determinations as to whether

14  there were any additional torches on site?

15   A    No, sir.

16   Q    Was there any soot or burn residue anywhere on

17  the exterior of the cylinder?

18   A    No, sir.

19   Q    You didn't see any anywhere?

20   A    No, sir, meaning soot.  There was some dust

21  from the ground, if that's what you are referring to.

22  That type of soot.

23   Q    I was specifically asking about -- let me

24  rephrase the question so we make sure we are

25  communicating -- any what I would call by-products of

1   combustion?

2       A    Any --

3       Q    Any soot?

4       A    No, sir.

5       Q    Okay.  All right.  Then, going back to

6   something you told us earlier, you gathered up the torch

7   and the cylinder and at some point in the process, I

8   believe, before you went back to the gate, you had a

9   first conversation with fire department personnel about

10  what to do with the cylinder and the torch?

11      A    Yes.

12      Q    And that was with an engineer?

13      A    Was the engineer that I talked to at the --

14  was the first person I brought it to his attention.

15      Q    Okay.  And he told you he would have to check

16  with his captain?

17      A    He said, "Let me check with my captain, and I

18  will get back to you."  He was making a report in the

19  ambulance with Mr. Shalaby at that time.

20      Q    Okay.  And then, at some later point in time,

21  did he answer your question as to whether you needed to

22  keep it or not?

23      A    Yes, sir.

24      Q    How much later was that answer?

25      A    I'd estimate four to five minutes.

36

1     Q     Okay.  So you were still at the incident

2   scene?

3     A     Yes, sir.

4     Q     Okay.  And at that point in time the engineer

5   came to you and said, "We don't need you to keep it"?

6     A     Yes, sir.  And he said to dispose of it

7   however we dispose of them.

8     Q     Did he say why he didn't want you to keep it?

9     A     No, sir.

10    Q     Did anybody connected with the fire

11  department -- captain, engineer, paramedics or anybody

12  else -- indicate to you what information they had

13  gathered about how the incident occurred?

14    A     No, sir.

15    Q     All right.  Then, after the engineer told you

16  he had checked with his captain and you didn't need to

17  keep the cylinder or the torch, what became of them?

18    A     Well, that's when I had made my initial -- or

19  my thorough investigation of the cylinder and then took

20  it to -- back to our ranger station, and it was to be in

21  our possession for about two to three days.

22    Q     That was the last time you saw it, anyway?

23    A     Yes, sir.

24    Q     Okay.  And by the "ranger station," are we

25  talking about that large building just beyond the guard

1 gate, or is there a different spot?

2      A     No. The ranger gate itself.

3      Q     Were you the one who transported the equipment

4 from the incident site to the gate shack?

5      A     Yes, sir.

6      MR. EPSTEIN: I don't mean to interrupt you.

7 We have about five minutes before we need to call in.

8      MR. MOORHEAD: Aren't they supposed to call

9 us?

10      MR. EPSTEIN: Oh, I apologize.

11      MR. MOORHEAD: We can go off the record for a

12 second.

13      (Discussion off record.)

14 BY MR. MOORHEAD:

15      Q     Did you personally dispose of the cylinder and

16 torch, or did somebody else do that?

17      A     I believe another staff did during the day.

18      Q     Did you submit the torch or the cylinder to

19 anyone else for examination, evaluation, and testing

20 before telling somebody else to get rid of it?

21      A     No, sir.

22      Q     So as far as you know, you're the only one who

23 took a look at it?

24      A     Yes, sir. I believe Randy was also there with

25 me at the time, and we were discussing it.

38

1     Q     Based upon anything that was told to you or

2   anything you observed while you were at the scene, did

3   any of the adjacent campers take any photographs?

4     A     I'm not aware of that.

5     Q     As far as you are aware from what you observed

6   or what you were told, did the fire department take any

7   photographs?

8     A     No, sir, I'm not aware.

9     Q     Give me your best estimate of the total number

10  of fire department personnel that showed up.  More or

11  less than ten, maybe, start with.

12    A     Approximately eight to ten.

13    Q     And they were all from the San Diego Fire

14  Department?

15    A     Yes, sir.

16    Q     Did they interview you at all?

17    A     No, sir.

18    Q     Whether it be the evening of the incident or

19  on subsequent occasions, did the fire department ever

20  tell you that they had determined the cause of the

21  incident?

22    A     No, sir.

23    Q     Were you present when any fire department

24  personnel interviewed or spoke with anyone else at the

25  campsite?

39

1     A    I was present, yes.

2     Q    Okay.  Did you hear any additional stories

3 above and beyond the ones you've told us that were

4 related to you by the campers on both sites?

5     A    I've heard additional stories from my staff

6 Randy and -- it was very vague, because I could hear

7 Mr. Shalaby having conversation with the fire personnel.

8 And I do not recall everything that was said.

9     Q    So you don't have any recollection of what

10 Mr. Shalaby said to the fire department?

11     A    Right.  Correct.  Yes.

12     Q    Do you have any recollection of any stories

13 given by anyone at the scene to fire department

14 personnel, other than the stories that you've told us

15 about that they told you; in other words, a new or

16 different story than the two that you told us about?

17     A    No.

18     Q    Okay.  Did you overhear, while you were at the

19 scene, anybody, whether it be Mr. Shalaby or the people

20 in his group, or adjacent campers, fire department

21 personnel or anyone, say anything about the incident

22 occurring as a result of the cylinder being kicked or

23 dropped into the campfire?

24     A    No.

25     Q    As a result of this incident, were any reports

40

1  prepared by Campland personnel?

2      A    One by myself, and one by my ranger, Randy

3  Stephens.

4          MR. MOORHEAD:  All right.  The crack staff

5  here at the hotel, that made copies for me, shorted me

6  on staples.  So I just kind of dog-eared them.  We'll

7  mark that as "1."  We'll mark this as Exhibit 1.  And

8  even though I understand that you may have the original

9  with you, I think this is an accurate photocopy.  So we

10 can work off of it until you find something in here

11 that's visibly unclear.

12         And I will represent to you that what I've got

13 here appears to be the sum and substance of the

14 information that would have been prepared at or about

15 the time of this incident.  And I'll go through it.  It

16 may not actually be one exhibit, but we're kind of

17 turning it into one --

18         MR. EPSTEIN:  A group exhibit?

19         MR. MOORHEAD:  -- a group exhibit.

20         (Exhibit 1 marked.)

21 BY MR. MOORHEAD:

22     Q    The first page is all typewritten, and on the

23 top it says "Inquire on Non-Active History."  Do you see

24 that, Mr. Ratliff?

25     A    Yes, sir.

41

1    Q    That's part of the documentation that Campland

2    has in connection with this incident?

3    A    Yes.

4    Q    Tell me what this is, how this would have been

5    generated, where it would be kept, things like that.

6    A    This was generated after the incident, to

7    receive information on the guest as far as address,

8    personal information that we needed to complete the

9    reports.

10    Q    Okay.  I am looking near the top.  I see "Room

11    D19."  Is that the space number where it happened?

12    A    Yes, sir.

13    Q    What does "Type L" mean to the right of that?

14    A    Would be, I believe, left-hand hookups in

15    our -- what they would call site category, so that they

16    know which way the RV is to be going into the campsite.

17    Q    Which way it should be oriented?

18    A    Yes.

19    Q    And then it looks like they've identified

20    Mr. Shalaby here with last name and first name.  They

21    indicate that in his group there were the two adults,

22    two children and a dog, basically?

23    A    I believe, no dogs.

24    Q    It looks like -- well, maybe I'm reading this

25    wrong.  It looks like adults, 2; 2 tots; dogs 01.

42

1      A     Well, it could be on the reservation form.   I

2   don't recall a dog.

3      Q     And then this address on Leviston Avenue is

4   Mr. Shalaby's address, as you understand it?

5      A     The address that he registered under.

6      Q     Okay.  All right.  Then, going to what is the

7   second page of what is -- has been marked as group

8   Exhibit 1 to this deposition, there is something with

9   the heading "Incident Report" at the top, and in

10  handwriting -- in typewriting it says "Report Taken By:"

11  and in handwriting it says "#3 R. Stephens."

12          That's Randy Stephens we've been talking

13  about?

14     A     That is correct.

15     Q     So this would have been something he prepared?

16     A     Yes, sir.

17     Q     All right.  Then, going to -- going to Page --

18  I'm going to say 3 and 4, because at the bottom of those

19  last two pages it says "Page 1 of 2" and "Page 2 or

20  2" -- this has "WL Ratliff" as the report taken by.  So

21  this would have been something you prepared?

22     A     Yes, sir.

23     Q     And that's your handwriting?

24     A     That is correct.

25     Q     Give me your best estimate of when this

43

1 document was prepared.

2     A     This particular document was rewritten on

3 7- -- July 12, 2006.

4     Q     That's what it indicates at the bottom of the

5 second of two pages?

6     A     Yes, sir.

7     Q     Okay.  Do you know why it was rewritten at

8 that time?

9     A     The original statement that I turned in for

10 this was not found.

11     Q     Okay.  So this was your account of what

12 happened as you recalled it on July 12, 2006?

13     A     Yes.  I always kept my own personal

14 documentation of incidents.

15     Q     Okay.  So let's back up.  You prepared one at

16 or about the time of the incident?

17     A     Yes, sir.

18     Q     And they couldn't find that one?

19     A     It was, yes, misplaced.

20     Q     Okay.  Did you have a duplicate of the one

21 that you prepared at or about the time of the incident?

22     A     Not a duplicate, but my notes as per se.

23     Q     Do you still have those notes?

24     A     I don't believe so.

25     Q     Okay.

44

1    A    I hand everything at the end of every year,
2    and then it is put in a file.
3    Q    So you prepared a handwritten report at or
4    about the time of the incident, and you had some
5    personal notes that you kept?
6    A    Yes.
7    Q    You found out from some source that the
8    incident report that you had submitted to Campland
9    couldn't be found, so you created Pages 3 and 4 of
10   Exhibit 1 from those notes?
11   A    Yes, sir.
12   Q    Did you write down verbatim what was in your
13   notes?
14   A    Yes, word for word.
15   Q    Okay.  So if we could find your old notes,
16   they would say just what I'm looking at?
17   A    Exactly.  Yes, sir.
18   Q    All right.  Then, looking down near the bottom
19   of Page 1 of your handwritten statement, it makes
20   reference to what you told us about speaking with the
21   fire department about keeping the stuff and they told
22   you that you didn't need to.  Is that basically correct?
23   A    That is correct.
24   Q    But they never told you why they did not want
25   you to keep it?

45

1  A    No, sir.

2  Q    Do you know from any source when Randy

3  Stephens' handwritten account was prepared?

4  A    The same evening.

5  Q    Okay.  So this is not another incident where

6  he had to duplicate his later on?

7  A    No, sir.

8  Q    Looking over the portion of Exhibit 1 that's

9  in your handwriting, do you see anything in it that, as

10 you sit here today, Mr. Ratliff, now looks to be

11 inaccurate?  Take a few moments to look at it if you

12 want.

13 A    I didn't understand you.  Inaccurate in which

14 way?

15 Q    Well, maybe you learned things since the day

16 of the incident that, when you look back on it, you say,

17 "Oh, that's what I thought at that time, but, in fact,

18 it was snowing that day," or whatever the case may be.

19      Is there anything in there that, as you look

20 at it now, you say, "I was wrong.  That's not what

21 happened"?

22 A    No, sir.

23      MR. MOORHEAD:  Okay.  We are going to mark

24 this as Exhibit 2.  But before I give it to the court

25 reporter, I'm going to give it to you.  I don't think I

46

1  have any extras, but it's just the deposition subpoena.

2  It's the subpoena for you to be here today, probably

3  ruining your Tuesday.

4          (Exhibit 2 marked.)

5  BY MR. MOORHEAD:

6      Q    If you would, turn to the second page of that

7  document.  And there is a list there of what we asked be

8  brought along.  All right.  Do you see that?

9      A    Yes, sir.

10     Q    All right.  And for the record, could you read

11 what the first category was.

12     A    "All reports and witness statements taken in

13 connection with the incident involving Andrew Shalaby on

14 April 21, 2007 at Campland."

15     Q    Is Exhibit 1 everything that would meet that

16 description?

17     A    I believe, yes, sir.

18     Q    Okay.  What's the second category?

19     A    "All correspondence generated and received in

20 connection with the incident involving Andrew Shalaby on

21 April 21, 2007 at Campland."

22     Q    Do you have anything that meets that

23 description at Campland, any letters to anybody, any

24 letters from the fire department, things like that?

25     A    I have the one letter.

1        Q      Okay.  You are holding up something?

2        A      I don't -- I never really reviewed it, myself.

3               MR. MOORHEAD:  Okay.  For the record, what

4    Mr. Ratliff has handed to us -- and I have additional

5    copies of this we can mark as the next exhibit -- is a

6    July 12, 2006, letter from Gary Gunther, adjuster for

7    Crawford, to Therese Kiel at Campland.  All right.

8               And it indicates that Mr. Gunther is

9    associated with Crawford & Company and that they were

10   assigned to look into this by Lexington Insurance

11   Company, "which insures BG Western/Western Industries,

12   the manufacturers of gas cylinders."

13   BY MR. MOORHEAD:

14       Q      This was something that was in Campland's file

15   when you went to look to find out what documents they

16   have?

17       A      Yes, sir.  It's from -- my manager at the time

18   received that.

19              MR. MOORHEAD:  I'm sure I've got extra copies

20   of this someplace.  Let me hand this back to you.  We'll

21   mark this as Exhibit 3.

22              (Discussion off record.)

23   BY MR. MOORHEAD:

24       Q      Other than this letter dated July 12 from Gary

25   Gunther, at Crawford & Company, to Therese Kiel, who, I

48

1  understand, was your supervisor at the time this

2  incident happened, any other correspondence that you are

3  aware of that Campland has in connection with this

4  incident?

5       A    Just the fax cover sheet that was with this,

6  to our company risk manager at the home office.

7       Q    Okay.  So this facsimile cover sheet would

8  have transmitted what we've marked as Exhibit 3 to

9  your -- who did you say Mr. Yu was?

10      A    Is the company risk manager.

11      Q    Okay.  So these would have come together?

12      A    I believe so.

13           MR. MOORHEAD:  Well, let's mark it as a

14  two-page exhibit, then; that being the July 12 letter

15  from Mr. Gunther and the facsimile cover sheet, which

16  bears the date "7-13-06" and the subject "4/21/06 Fire

17  Accident."

18           (Exhibit 3 marked.)

19  BY MR. MOORHEAD:

20      Q    Other than that, does Campland have anything,

21  in the form of correspondence or otherwise, that would

22  be responsive to category No. 2 there?

23      A    (Witness shakes head.)

24      Q    All right.  What's category No. 3?

25      A    Category No. 3.  "All photographs taken in

49

1    connection with the incident involving Andrew Shalaby on

2    April 21st, 2007 at Campland."

3         Q    I believe, based upon your previous testimony,

4    your testimony now would be that you don't have any

5    photographs?

6         A    Yes, that is correct.

7         Q    All right.  Category 4?

8         A    "The canister" or canisters "recovered in the

9    incident involving Andrew Shalaby on April 21, 2007 at

10   Campland."

11        Q    And do you still have that?

12        A    No, sir.

13        Q    All right.  Category No. 5?

14        A    "The torch recovered in the incident involving

15   Andrew Shalaby on April 21, 2007 at Campland."

16        Q    Do you still have that?

17        A    No, sir.

18        Q    As far as you are aware, does anybody know

19   where either the canister -- or the cylinder, I call

20   it -- or the torch are at this time?

21        A    No, sir.

22        Q    Other than meeting with us here today to talk

23   about this and meeting with your attorney, have you met

24   with anybody else in connection with this incident,

25   since the date it happened, in the months that have

50

1  intervened?

2      A    I don't understand that question.  What do you

3  mean by meeting?

4      Q    Well, has anyone approached you -- I guess I

5  should make it broader -- has anyone called you, come to

6  Campland, called you to their office or anything else to

7  talk to you about this incident, the facts of this

8  incident, since everybody parted ways on April 21 of

9  2006?

10     A    Yes.

11     Q    How many times has that occurred?

12     A    One time.

13     Q    Okay.  And how long ago was that?

14     A    Six, eight months ago.

15     Q    If you know, is that Mr. Gunther?

16     A    I don't know.

17     Q    Was that something that was done by a

18  telephone, face-to-face, or what?

19     A    First, by telephone correspondence.  Then, in

20  person.

21     Q    Okay.  Telephone call, written correspondence,

22  and then face-to-face?

23     A    I'm not aware of any written correspondence.

24     Q    Telephone call, then face-to-face?

25     A    Yes, sir.

51

```
1      Q      Where did the face-to-face meeting take place?

2      A      At Campland.

3      Q      Let's back up to the telephone call.  Someone

4  called you, six to eight months ago, to talk about this

5  incident?

6      A      They were -- yes.  Initially talked about the

7  incident, then wanted to have a meeting face-to-face to

8  review our records.

9      Q      Okay.  But you don't know the identity of this

10 individual?

11     A      No, not -- I don't recall, let's put it that

12 way.

13     Q      Okay.  And in the telephone conversation they

14 asked you some questions about the incident itself?

15     A      Yes.

16     Q      Do you remember anything that was talked about

17 in that telephone conversation, separate or different

18 from what we've talked about here today?

19     A      No, sir.

20     Q      And then in the course of that conversation,

21 he requested that he have an opportunity to meet with

22 you?

23     A      Yes.

24     Q      And that was at Campland?

25     A      Yes.
```

52

1    Q    And the stated reason for meeting with you was

2  to look at whatever documents you had?

3    A    Right.

4    Q    Okay.  And did that person come out?

5    A    Yes, he did.

6    Q    And it was a male?

7    A    Yes.

8    Q    Did that --

9    A    He identified himself as an investigator for,

10  I believe, the insurance company.

11    Q    So somebody that would not have been

12  inconsistent with Mr. Gunther, as far as same sort of

13  thing, investigating this incident, and a male?

14    A    Well, I do have his business card.  I just

15  don't have it with me.  And I believe my general manager

16  has -- I think it was left on his desk, but -- at the

17  time.

18    Q    Okay.  So there might be a way for us to find

19  out who it was that came out and talked to you?

20    A    Yes, sir.

21    Q    Okay.  In any event, when he came out, did he

22  ask you more questions about the incident, separate and

23  different from the ones that he had talked to you about

24  over the phone?

25    A    No, sir.

53

| | | |
|---|---|---|
| 1 | Q | Did he look at what we've marked as Exhibit 1? |
| 2 | A | No, sir. |
| 3 | Q | Did he look at any document? |
| 4 | A | No, sir. |
| 5 | Q | What, if anything, did he do when he came out? |
| 6 | A | Interviewed me. |
| 7 | Q | Okay.  So he asked more questions? |
| 8 | A | Yes. |
| 9 | Q | Were they the same questions he had asked over |
| 10 | | the phone, essentially? |
| 11 | A | Basically, yes. |
| 12 | Q | Was he recording that interview in any way? |
| 13 | A | Not to my knowledge at all. |
| 14 | Q | So he wasn't writing anything down? |
| 15 | A | Yes, he was. |
| 16 | Q | As far as you know, he wasn't tape-recording |
| 17 | | it? |
| 18 | A | As far as I know, he was not tape-recording. |
| 19 | Q | But he was taking notes during the |
| 20 | | conversation? |
| 21 | A | Yes. |
| 22 | Q | Did he ever give you a copy of whatever notes |
| 23 | | he took? |
| 24 | A | No, sir. |
| 25 | Q | Okay.  Did he ever tell you that he was going |

54

1  to get back in touch with you and send you a copy of

2  those notes?

3      A    I don't recall the note aspect, but I do

4  recall he was probably going to be in future contact

5  with us.

6      Q    Did he ever get in contact with you again?

7      A    I don't believe so.  I believe it was somebody

8  else at that time.

9      Q    Do you think you got in touch with somebody

10  else?

11      A    Yes.  I was under the impression that he was

12  an investigator for the company and he was referring

13  information to them, so --

14      Q    Okay.

15      A    Then, they were going to correspond with us.

16      Q    Did your superiors ask you to come in so that

17  they could interview you about what had happened?

18      A    No, sir.

19      Q    Other than Mr. Gunther and the guy we've

20  talked about, who spoke with you over the phone and then

21  came out and asked you some questions, have you spoken

22  with anybody, for the sake of example, that they said

23  that they were with an insurance company investigating

24  the incident?  Any people other than what we've talked

25  about?

55

```
 1      A    No.
 2      Q    Not over the phone?  Not in person?  Not in
 3 writing?
 4      A    No, sir.
 5      Q    Great.  I don't believe I have --
 6      A    I believe, a Debbie.  But who is Debbie?  I
 7 think she is with you guys.
 8      Q    Oh.  Deirdre?
 9      A    Deirdre.
10      Q    To set up the deposition?
11      A    That's it.
12      Q    Other than the conversation setting up today's
13 deposition --
14      A    That's it.
15           MR. MOORHEAD:  All right.  I don't think I
16 have any more questions.  Mr. Epstein probably does.
17           (Recess.)
18           MR. EPSTEIN:  Back on.
19
20                     EXAMINATION
21 BY MR. EPSTEIN:
22      Q    Mr. Ratliff, we met off the record.  I'm Mark
23 Epstein.  I represent plaintiffs in this case,
24 Mr. Shalaby and his wife.
25           You testified a little earlier about your --
```

56

1    it sounded like you have some experience with welding or

2    torches, some background that precedes your work at

3    Campland; is that correct?

4         A    That is correct, yes.

5         Q    Can you tell me:  What is the nature of your

6    prior experience with welding?

7         A    I was a certified welder for the Navy.

8         Q    Okay.

9         A    And in the civil service -- or civil world.

10        Q    Is that part of the Navy, or you were a

11   welder --

12        A    I was a Seabee, which is steelworker.

13        Q    When did you join the Navy?

14        A    That was 1979.

15        Q    Other than the Navy, is the Seabee -- is that

16   part of the Navy?

17        A    Yes.

18        Q    Have you served in any other branch of the

19   service?

20        A    No.

21        Q    And were you stationed here in San Diego?

22        A    No.

23        Q    Where were you stationed?

24        A    Gulfport, Mississippi.

25        Q    How long were you in the Navy before you --

57

1    did you start some sort of apprentice welding program

2    while you were --

3         A    Yes.

4         Q    How long had you been in the Navy when you

5    started that?

6         A    I was in the reserve program, so I was --

7    like, a year, a year and a half, something like that.

8         Q    And then you became involved in a welding

9    certification program?

10        A    Yes.

11        Q    And how long did that program last; the

12   certification?

13        A    Nine months, I think it was.

14        Q    And was there a name to the -- or a title to

15   the certification you received at the end of that?

16        A    Welding certification.

17        Q    It came in a nice little plaque?

18        A    Oh, yeah.  Yes.

19        Q    How long did you remain in the Navy?

20        A    Till March 23rd, 1982 -- '83.  I don't

21   remember.

22        Q    Early eighties sometime?

23        A    Yes.

24             MR. MOORHEAD:  Four-year tour?

25             THE WITNESS:  Well, I was in the reserve

58

1  program.

2  BY MR. EPSTEIN:

3      Q    While you were in the Navy, what applications

4  did you apply your welding skills to?

5      A    Oxyacetylene weld, mig weld, tig weld, arc

6  weld, brazing.

7      Q    Can you describe the types of projects you

8  worked on, or did you work on ships in dry dock repair?

9      A    Mainly, heavy structural steel.

10      Q    While you were a member of the Seabees, where

11  were you stationed then?

12      A    Gulfport, Mississippi.

13      Q    And did you work on projects, for example,

14  with the US -- the Army Corps of Engineers?

15      A    I'm not for sure.  I know there was Navy --

16  Army Corps of Engineer projects for girl scouts,

17  national forests, you know, that kind of stuff.

18      Q    You mentioned various types of -- it sounds

19  like welding gases or fuels you used.  Acetylene was one

20  of them?

21      A    Yes.

22      Q    Are you familiar with MAPP gas?

23      A    Yes, I am.

24      Q    While you were in the Navy, did you have

25  occasion to use MAPP gas torches?

59

1    A    Yes.

2    Q    Can you tell me what -- to the best of your

3  knowledge, what MAPP gas is, what its components are?

4    A    Well, no, not actually, I guess, but -- I know

5  about it, but --

6    Q    All right.  In your experience, what did you

7  use MAPP gas torches for?

8    A    Mainly for plumbing projects, when a lot of

9  condensation in the water was present.

10    Q    To your knowledge, is MAPP gas typically used

11  in the plumbing industry?

12    A    Yes.

13    Q    After you were discharged or got out of the

14  Navy, what was the next job you took?

15    A    I don't remember the place.  It was --

16    Q    What type of work?

17    A    It was a contractor doing water tanks for the

18  fire engines -- for fire trucks.

19    Q    Fabricating them or --

20    A    Fabricating them, yes.  Welding.

21    Q    So if I understand correctly, you were -- you

22  worked for a company that fabricated water tanks for

23  fire trucks?

24    A    Yes.

25    Q    And you would help weld the tanks together?

60

1  A  Yes.  Pressure-weld the tanks, yes.

2  Q  And that was part of the manufacturing

3 process?

4  A  Yes.

5  Q  Where was the -- where was your employer at

6 that time?

7  A  Rock Island, Illinois.

8  Q  What type of welding gas did you typically use

9 at that job?

10  A  It was -- it would have been acetylene.

11  Q  Acetylene?

12  A  Yes.  And oxygen.

13  Q  Can you tell me approximately how long you

14 remained at that job.

15  A  I think the contract ended, like, two years --

16 or it lasted two years.

17  Q  Sometime in the mid 1980's?

18  A  Yeah.  I think it was '80- -- I was still in

19 the Navy at the time.  I was in the reserve program.  So

20 it was around '81, '82.

21  Q  And you don't remember the name of that -- the

22 company you worked for?

23  A  No.

24  Q  I don't remember what I did yesterday, so it's

25 okay.

61

1    A    I know where it's at.

2    Q    After you left that job, where did you go to

3  work next?

4    A    I went into law enforcement.

5    Q    Okay.  Police?

6    A    Police, yes.

7    Q    Where?

8    A    Mercer County Sheriff's Department.

9    Q    In which state is that?

10   A    Illinois.

11   Q    Approximately how long were you with the

12  Mercer County Sheriff's Department?

13   A    Till election.  It was about two years.

14   Q    And were you a sheriff's deputy?

15   A    Yes.

16   Q    Did you have an occasion to do any welding on

17  the job?

18   A    No, sir.

19   Q    All right.  Any more jobs after you left --

20  after the Mercer County Sheriff's Department, did you

21  have any other jobs where you served as a welder?

22   A    Campland, right here.

23   Q    Okay.  All right.  Skipping forward in -- I

24  believe you said you've been in Campland for about five

25  years?

62

1     A    Yes.

2     Q    Between the time you left Mercer County

3 Sheriff' Department and came to work in Campland, did

4 you have any jobs where part of your official duties was

5 to weld?

6     A    Yes.

7     Q    Okay.  Where else would that have been?

8     A    I worked for myself.

9     Q    In what capacity?

10     A    Plumbing, electrical construction.

11     Q    Basically, self-employed contractor?

12     A    Yes.  Yeah.

13     Q    And where did you -- was that here in

14 California?

15     A    Yes.

16     Q    Approximately how many years did you do that?

17 Were you in business for yourself?

18     A    Probably two or three years, I think it was.

19     Q    Is this before you came to Campland?

20     A    Yes.

21     Q    And you did some plumbing during that time?

22     A    Yes.

23     Q    And while you did the plumbing work, did you

24 have occasion to weld or solder pipes together?

25     A    Yes.

63

1      Q      And when you did that, did you ever use MAPP
2  gas torches?
3      A      Yes, all the time.
4      Q      All right.  Do you remember the brand name of
5  the MAPP gas torches you used, that you tended to use?
6      A      Mainly, Benzomatic (sic).
7      Q      Does Burnzomatic sound right?
8      A      Burnzomatic.
9      Q      Is that the one with the yellow tank?
10     A      Yes.  Home Depot.
11     Q      You would buy it at Home Depot or other
12  hardware stores?
13     A      Yes.
14     Q      Is it accurate to say that you have some
15  working knowledge and familiarity with MAPP gas torches?
16     A      Yes.
17     Q      And with the Burnzomatic brand in particular?
18     A      Yes.
19     Q      Have you ever been able to -- strike that.
20  While you were self-employed as a plumber/fix-it guy --
21     A      Yeah, here you go.
22     Q      -- did you ever have occasion to purchase or
23  come upon MAPP gas torches manufactured by another
24  company other than -- strike that.
25            Let me rephrase my question.  Did you ever

1 have occasion to purchase another brand of torch, other

2 than Burnzomatic?

3      A      I don't recall.

4      Q      All right.  And I believe you mentioned

5 earlier that you've done some welding while you've been

6 at Campland?

7      A      Yes.  Soldering with MAPP gas, yes.

8      Q      Is part of your duties there to help maintain

9 the place?

10      A      That was my previous job before the park

11 ranger position I hold now.

12      Q      You were hired as a maintenance person?

13      A      Yes.

14      Q      And part of what you did at that time was to

15 fix -- or repair the plumbing?

16      A      Yes.

17      Q      And part of -- when you did plumbing work

18 there, part of what you did was to weld or solder pipes?

19      A      Yes.

20      Q      Do you still have occasion to do that at

21 Campland?

22      A      Not at Campland, no.

23      Q      I imagine you probably fix some things around

24 your home?

25      A      And other people's homes.

1      Q      Okay.  Do you happen to own -- at the present,

2  do you own a MAPP gas torch?

3      A      I just ran out and threw it away the other

4  day.

5      Q      Is there a reason that you did that?

6      A      I was done with it.  I was going to go buy a

7  new one.

8      Q      So is it accurate to say to this day you still

9  have occasion to use MAPP gas torches from time to time?

10     A      Yes.

11     Q      Can you give me an estimate of how many times

12  a year you might use one?

13     A      Whenever my friends call or somebody needs a

14  plumber.

15     Q      It's usually the most inopportune time?

16     A      Yes.

17     Q      So on the -- going back, then, for a moment to

18  the night of the incident in April of 2006, involving

19  Mr. Shalaby, when you -- I believe you testified that

20  you -- when you came upon the scene and did a survey,

21  you saw the torch on the ground some three feet behind

22  Mr. Shalaby; is that correct?

23     A      Yes.

24     Q      And at some point after you saw it, you went

25  and picked it up?

1      A      Yes.

2      Q      Okay.  When you did that, were you familiar

3   with the torch that you saw?

4      A      Yes.

5      Q      Was that the same type of torch that you had

6   used in the past?

7      A      Yes.

8      Q      And was there any -- was there any doubt in

9   your mind that it was a Burnzomatic brand torch?

10     A      No, I don't believe so.

11     Q      When you -- skipping a little bit ahead in

12  your testimony, when you spent some time observing the

13  torch, I believe you testified that that was after you

14  had spoken with the fire department personnel about

15  whether or not they wanted you to keep it or not?

16     A      Yes.  I secured the -- pretty much secured the

17  torch; in the meantime, was worried about Mr. Shalaby's

18  well-being, first.  I just did not want the torch to end

19  up in the wrong hands.

20     Q      Okay.  And when you -- can you tell me

21  approximately how long you spent examining the torch?

22     A      Oh, probably, I'd say an hour.  During my

23  entire report writing.

24     Q      And was that back at the -- I forget what you

25  call that -- the front gate?  Was that back at the

67

1  station?

2       A   In my -- in the office.  In my office.

3       Q   You call it the ranger station?

4       A   Well, the ranger station and my office are two

5  different places.

6       Q   Are they in the same general vicinity?

7       A   It's the next building behind it.

8       Q   I actually haven't had the benefit of seeing

9  the location.  But, basically, you spent an hour or so

10 examining the torch back at your office?

11      A   Yes.

12      Q   And I believe you testified that the labels

13 had not been destroyed on the torch, they had not been

14 burned off?

15      A   No, sir.  It appeared normal wear and tear to

16 me.

17      Q   To the best of your recollection, did the

18 front label say "Burnzomatic" on it?

19      A   I don't recall the -- the "MAPP" is what

20 catches -- caught my eye.

21      Q   Getting back to the breach or the hole you

22 described at the point where the nipple or the thread

23 joins the neck of the bottle, is that about roughly the

24 area of the tank where you saw the hole?

25      A   Yes.

68

1      Q     Was it, in fact, a hole that you saw, and was

2 there --

3      A     It appeared to be a crack forced open,

4 outward.

5      Q     It was forced open, outward?

6      A     Like an explosion outward.

7      Q     From inside the bottle towards the outside?

8      A     From inside the container, yes.  It was a

9 crack, and just one side of the crack appeared to be a

10 U-shape form.

11      Q     I apologize to the court reporter.  I think I

12 was jumping in and speaking over you, which is something

13 I always tell the witness not to do.  But in this case,

14 I was doing it, so --

15           And just so the record is clear, because I do

16 think I was speaking over you, you were saying that the

17 crack appeared to have been forced outward from inside

18 the neck of the tank?

19      A     Yes.

20      Q     And you believe that it was roughly a U-shaped

21 crack or hole?

22      A     No.  It appeared to be a straight line.  Just

23 the one side of the crack appeared to be more outward

24 than the other side of the crack.

25      Q     Okay.  Based on your experience working with

69

1  torches and the like, what did that indicate to you,

2  that hole, if anything?

3         A    Personally?

4         Q    Yes.

5         A    Abuse.

6         Q    In what -- why did it indicate abuse?

7         A    Appeared to me that the container was used

8  other than what it was for.

9         Q    Can you be any more specific?  In other words,

10  did it strike you that there had been some sort of force

11  applied, or what is it you're describing?

12         A    Just my personal opinion, you're asking me,

13  or --

14         Q    Yes.  That's all I can ask for.

15         A    Okay.  It appears to me that it was banged

16  against -- the top of the nozzle was banged against

17  something of a hard surface and not created the crack,

18  but maybe, in my experience, that weakened the

19  connection between the torch nozzle and the cylinder

20  itself.

21              I have experienced other employees, when

22  they -- in my presence, when they were not able to light

23  that torch, do several other abusive things to get it to

24  light.

25         Q    Have you ever -- in your experience, have you

70

1  seen a crack like that before?

2        A     Not that particular type of crack, no.

3        Q     Did the -- getting back to your testimony, you

4  described -- I'm going to roughly paraphrase it -- but

5  the crack appeared to have been forced outward.  Did

6  that give any indication to you of what had transpired

7  or caused the crack?

8        A     I was under the impression that was from the

9  explosion.

10       Q     Was there anything in particular about the

11 crack or otherwise about the tank you saw that suggested

12 to you that it had been -- may have been banged on a

13 hard surface?

14       A     It appeared to me that the torch was -- might

15 have been banged against something that might have

16 adjusted the thread area of where the torch nozzle and

17 the canister would connect and had -- may have weakened

18 that area in the process of being banged, I guess you

19 would say.

20       Q     Okay.  But was there anything -- other than

21 the existence of the hole or the crack itself, was there

22 anything else; for example, scratches in the paint,

23 blunt --

24       A     Oh, the threaded part was this -- from the

25 crack itself, was forced at a right angle of the

1  cylinder itself.

2      Q    Is that what you were testifying about

3  earlier, that right angle?

4      A    Yes, the right angle.  Not the torch nozzle,

5  but the cylinder and the torch nozzle.  The cylinder is

6  here.  The torch nozzle is on top, straight, and there

7  is a natural bend by manufacture at the connection of

8  the threaded area and the torch nozzle itself, at a

9  right angle.  And on the right side or the side that

10  was -- I don't know how to say this -- on the --

11          MR. STEPHAN:  Opposite.

12          THE WITNESS:  Opposite of the bend of the

13  side -- on the side of where the crack was, the angle

14  went to the right; right-side angle of that crack.

15  BY MR. EPSTEIN:

16      Q    When you say, "The angle went to the right," I

17  understand, or at least I think I do, that the torch

18  nozzle you saw, or the torch tip, was at a bend.  But

19  are you saying that the actual threaded portion of the

20  cylinder was bent off from the yellow painted --

21      A    The base of the threads.

22      Q    Right.  In other words, if I'm describing

23  correctly, you've got your yellow painted cylinder, if

24  you will?

25      A    Cylinder, yes, sir.

72

1      Q    It comes to a neck, kind of like
2  Mr. Moorhead's bottle here?
3          MR. MOORHEAD:  They call this portion
4  "threaded," which attaches to the top of the neck.  That
5  will help in the terminology when you are discussing it.
6          MR. EPSTEIN:  Sure.
7  BY MR. EPSTEIN:
8      Q    At the neck of this tank there is, then, a
9  threaded tip, if you want -- maybe made of copper.  Or
10 can you tell me what the metal is at the top?
11     A    I would assume, aluminum.
12     Q    Aluminum?
13     A    Aluminum.  Pressed aluminum.
14     Q    But, in any event, it's not painted yellow,
15 right, the part with the threads?
16     A    I don't recall.
17     Q    But at the point where the threaded metal
18 meets the neck of the tank that is not threaded, it
19 becomes bent?  If I understand you correctly, you saw
20 that bend, that right-angle bend you were talking about,
21 start at that point, where the threaded portion of the
22 bottle meets the neck?
23     A    Yeah.  At the end, the bottom of the last
24 thread, between the last thread and the cylinder itself
25 is where the bend took place, and the explosion -- or

1 the crack was in that same area.

2    Q    Got it.  Was it an actual 90-degree angle that

3 you saw?

4    A    No.  It was a slight-angle bend.

5    Q    Slight angle.  And the torch tip was still

6 attached to the threads?  It was still screwed on when

7 you picked it up?

8    A    When I picked it up, it was -- appeared to be

9 loose at the -- it didn't appear to be all the way

10 attached, or all the way screwed on.

11    Q    Got it.  And could you tell at that time

12 whether that was because -- and when I say that, I mean

13 the fact that the torch tip was not screwed all the way

14 on -- because it was not screwed all the way on

15 initially, or the force of whatever had happened had

16 forced --

17    A    I would not be able to tell you.  I don't have

18 that knowledge to answer that.

19    Q    Just bear with me.  I'm going to scan through

20 my notes.  I think Mr. Moorhead covered most of what I

21 was going to ask you, so I'm just going to condense

22 whatever remaining questions I do have.

23        Other than the one crack -- I'm going to use

24 the term "crack" -- you described up on the neck of the

25 bottle, did you see any other breaches in the metal

74

1  bottle of the cylinder or anywhere else?

2      A    No, sir.

3      Q    I believe you testified, in response to

4  Mr. Moorhead's question, you did not see any signs of

5  combustion residue anywhere on the bottle.

6      A    No, sir.

7          (Discussion off record.)

8  BY MR. EPSTEIN:

9      Q    As I am going down my list, I know you

10 answered most of these.  And did you -- was it your

11 testimony that Mr. Stephens or -- yes, Mr. Stephens, was

12 present with you at least for part of the time when you

13 examined the torch?

14     A    Pretty much all the time, I believe.

15     Q    All the time?

16     A    Yes.

17     Q    As you sit here now, can you remember --

18 strike that.  Let me back up.  To your knowledge, does

19 Mr. Stephens have any experience with welding?

20     A    He says he does.  I don't have any knowledge

21 that he does.

22     Q    We'll have the opportunity to ask him, of

23 course.  Do you remember him making any comments about

24 the torch, his observations, while you were examining

25 it?

75

1      A      We had had a discussion.  Experience versus

2 experience.

3      Q      I see.  All right.  Can you describe for me

4 what the nature of that -- was it a disagreement?

5      A      Yes.

6      Q      What was the nature of your disagreement with

7 him?

8      A      I disagreed with some of his observations

9 and -- and his idea of the torch.

10     Q      And this is not meant to compare you to him.

11 I just sort of would like to find out what it was

12 that -- not who was right and who was wrong, but what

13 was it that you guys disagreed about?

14            MR. MOORHEAD:  Could we get a time frame as to

15 when this happened?

16            MR. EPSTEIN:  Yes.  Sure.

17 BY MR. EPSTEIN:

18     Q      Let me back up.  I assume the discussion

19 you're talking about, with Mr. Stephens, where you had a

20 heated discussion, as you put it -- did this take place

21 during the roughly hour or so that you examined the

22 torch the evening of the incident?

23     A      Yes.  It was after the incident.

24     Q      I'm sorry, after the incident but after the

25 fire department --

76

1    A    Yes.

2    Q    And this was back at your office?

3    A    Yes.  And the following day, I believe.

4    Q    So later that evening of the incident and/or

5    sometime the following day, can you tell me to the best

6    of your recollection what it was that you and

7    Mr. Stephens had a disagreement about or the things you

8    disagreed about with regard to the torch?

9    A    He made the statement to me that he thought

10   that it was the wrong nozzle that was placed on the

11   cylinder itself.  And I disagreed with that.

12   Q    When you say "the wrong nozzle," you mean the

13   wrong type of torch tip?

14   A    Yes.  The torch nozzle.

15   Q    You happen to talk to a guy that doesn't know

16   half about torches as you do.  So he thought it was the

17   wrong kind of nozzle.  What do you recall him saying

18   about that?  Was it for a different type of canister, in

19   his opinion, or --

20   A    I believe, in his opinion, he thought there

21   should have been a different type that was on there for

22   the type of gas that we were talking about, for the MAPP

23   gas, so --

24   Q    And you did not share that opinion?

25   A    No, I did not.

77

1      Q     Was it your opinion that the type of torch tip

2   that was attached, as it were, to the tank, was designed

3   or meant for MAPP gas?

4      A     Yes.  It's been my experience.  I've used that

5   same torch and nozzle with MAPP gas all the time.  Still

6   do today.

7      Q     I've taken enough depositions to know I never

8   disagree with a witness about what they are talking

9   about, because they usually know far more than I ever

10  do.  All right.

11        Do you remember any other issues that you and

12  Mr. Stephens had a disagreement about with regard to the

13  torch?

14     A     It wasn't so much a disagreement.  We had a

15  discussion of our opinion.

16     Q     Okay.

17     A     We opinionized (sic) the -- from what we heard

18  and --

19     Q     Let me ask it differently.  Did you have, not

20  necessarily a disagreement, but a difference of opinion

21  about what you believed you thought might have caused

22  the incident or anything along those lines?

23     A     Well, he said to me he recalled what somebody

24  else had said -- and I don't know who he said stated

25  that, but -- and based on what people had told me, I

1   kind of went with what I had heard.

2       Q    So you had both heard different accounts of

3   what had happened?

4       A    I was interviewing other people that he didn't

5   interview, and he was interviewing other people that --

6   I had put him basically with Mr. Shalaby and his family

7   to talk to them.

8       Q    That's what we call, basically, double or

9   triple hearsay, but --

10      A    Right.

11      Q    -- for purposes of our discovery and our

12   trying to figure out what happened, looking back, can

13   you relay to me as best as you can what Mr. Stephens --

14   or what Randy said he had heard happened versus what you

15   had heard happened?

16      A    Well, he said that Mr. Shalaby had said that

17   he -- "I made a stupid mistake," you know, I guess,

18   while the fire department and all was there.  He made

19   the statement that he dropped it in the fire or

20   something like that.

21      Q    And this is what Mr. Stephens said he heard

22   Mr. Shalaby say?

23      A    Yes.  In our conversation between Randy and

24   myself -- or Mr. Stephens.

25      Q    Okay.  Do you remember Randy saying anything

1  else about what somebody else said about the occurrence

2  of the incident that was different from what you had

3  heard had happened?

4      A      That was pretty much all that I --

5      Q      Okay.  I estimate another ten minutes of

6  questions.

7      A      I thought you were going to be all day.

8      Q      I don't want to do that to you.  When you were

9  observing the tank with Randy Stephens after the

10  incident, at that time, did you feel that the tank posed

11  any immediate danger of explosion or fire?

12      A      Oh, no.  You mean after?

13      Q      After the fact.

14      A      No.

15      Q      I should have been more specific, because if

16  somebody hit somebody over the head with it, that would

17  be a danger.

18      A      Yeah, here you go.

19      Q      Earlier, you testified that in your experience

20  MAPP gas is typically used, and you typically use it,

21  for such uses as soldering and welding pipes and the

22  like.  Are you familiar with other intended use of MAPP

23  gas torches?

24      A      That's pretty much its primary use that I've

25  always experienced with it.  And my experience is from

80

1  forefathers before me.

2       Q    Okay.  Got it.  I'm definitely not doubting

3  your experience here.  I can't recall if you testified

4  about this or not, but to the best of your recollection,

5  what was the weather condition like on the evening of

6  the incident?

7       A    Clear.  Dark.

8       Q    Windy?

9       A    No, I don't believe, no wind.  Maybe a slight

10 breeze.

11      Q    Do you recall it being humid at all?

12      A    No.

13      Q    I was going to ask if it was, to the best of

14 your recollection, a warm evening, but I come from

15 Northern California, so every evening down here is warm

16 to me.  Was it a particularly warm or cool evening to

17 you?

18      A    It was a nice, cool evening.

19      Q    Have you, in your experience being in the Navy

20 or after, ever heard of another incident similar to the

21 one that Mr. Shalaby experienced, with a MAPP gas torch?

22      A    Exploding or --

23      Q    Yes.

24      A    Yeah.

25      Q    You have.  Have you actually witnessed it

81

1 before?

2     A    I have witnessed containers exploding, yes.

3     Q    MAPP gas in particular?

4     A    I -- I wouldn't say yes or no, because I know

5 we have that, so -- it's been a long time since I

6 recall.

7     Q    Can you give me -- tell me approximately how

8 many times.  Was it more than once that this happened?

9     A    I've seen it twice in my life.

10     Q    Was that while you were in the Navy or in

11 other --

12     A    Outside of the Navy.

13     Q    Can you describe the first such incident to

14 me?

15     A    The first incident was an acetylene tank that

16 exploded and went through the rooftop of the building.

17     Q    Did you ever find out why that occurred?  Or

18 did anybody figure it out?

19     A    Again, we figured it was -- the tank was old.

20 We know that much, so -- outdated, I think, at that

21 time.

22     Q    Was there anything in particular about the

23 conditions or the use of that acetylene tank that caused

24 that to happen?

25     A    Just that it was aged.

1    Q    Better to replace those tanks early?

2    A    Yeah.  There is a format to kind of go through

3 any kind of tank, to inspect it.

4    Q    What about the second such incident?

5    A    The second such incident was a -- I believe,

6 was just -- it was a propane cylinder and it was due to

7 a rusted -- a rusted bottom, that somebody had left in

8 a -- a lot of plumbers, you know, they work around water

9 and stuff like that.

10         Then, a lot of plumbers carry their tools and

11 supplies in a five-gallon bucket.  And he had some

12 moisture in the bottom of his bucket and, I believe, his

13 container, when we examined it, sat in that water a

14 little too long and rusted the bottom.

15    Q    In your experience doing plumbing work and

16 other handy work, have you had occasion to use propane

17 torches before?

18    A    Oh, yes.

19    Q    Are those also commonly used in plumbing

20 applications?

21    A    Yes.

22    Q    Can they be used to solder pipes, as well?

23    A    Yes.

24    Q    Okay.  Does propane burn at a different

25 temperature than MAPP gas?

1      A      Very much so, yes.

2      Q      Hotter or cooler?

3      A      Cooler.

4      Q      Cooler.  Okay.  Getting back for a moment to

5   the earlier testimony about Mr. Stephens' opinion that

6   there may have been the wrong torch tip on the MAPP gas

7   torch that was involved in the incident with

8   Mr. Shalaby, have you -- do you have any knowledge as to

9   whether or not a -- strike that.

10         To your knowledge, do MAPP gas torches and

11  propane torches have different -- differently designed

12  tips, say, with different threading or different --

13     A      No.

14     Q      To your knowledge, will a tip that is designed

15  for a propane torch -- will that fit on a MAPP gas

16  torch?

17     A      Well, there is a propane torch nozzle

18  that's -- that's only strictly for the propane torches,

19  so -- but it will not fit on the MAPP gas container.

20     Q      Is that because the threading is designed

21  differently?

22     A      I believe it's the whole dimension.

23     Q      I see.  It just will not fasten to a MAPP gas

24  torch?

25     A      Right.  Right.

84

1     Q    So in your opinion, could the torch tip that

2  was attached to the MAPP gas cylinder that was involved

3  in the incident with Mr. Shalaby -- could that have been

4  a propane torch tip on there?

5     A    I believe that you can use the same torch that

6  was on a torch bottle -- I mean on a propane bottle, I'm

7  sorry -- as well as the MAPP gas, but the torch nozzle

8  was designed for either/or.

9     Q    I'm sorry.  The nozzle -- maybe I'm

10  misunderstanding.  I thought you testified a moment ago

11  that the -- at least part of the torch tip -- the torch

12  for MAPP gas -- I'm sorry.  Strike that again.

13        I thought you testified that part of the torch

14  nozzle for propane will not fit on a MAPP gas tank neck.

15  And I realize this is somebody who doesn't understand

16  how these things work, but I'm trying to understand.

17     A    I wish I had my stuff here.

18        MR. MOORHEAD:  If you don't know or you don't

19  remember --

20        THE WITNESS:  Yeah.  I don't know.  I don't

21  know.  I understand, but I'm not -- you know, without

22  actually showing you what I'm talking about --

23        MR. EPSTEIN:  Okay.  That's fine.

24  BY MR. EPSTEIN:

25     Q    I'm sorry, I don't mean to put you in a

85

1    squeeze here.  This is for me learning.

2        A    Right.

3        Q    All right.  Getting back to the one question,

4    I'm not sure if I got a clear answer to that or not, but

5    in your opinion, was the torch tip that was attached to

6    the MAPP gas cylinder involved in the incident -- was

7    that one that was designed for a MAPP gas torch as

8    opposed to a propane torch?

9        A    In my opinion, yes.

10       Q    Then, we'll leave it at that.

11       A    I use that same torch.

12       Q    Have you spoken with any of the fire

13   department personnel who responded to the scene since

14   the evening of the incident?

15       A    No, sir.

16       Q    Okay.  What about any of the paramedics or

17   ambulance personnel?

18       A    No, sir.

19       Q    Any of the doctors that treated Mr. Shalaby?

20       A    No, sir.

21            MR. EPSTEIN:  Thank you.

22            THE WITNESS:  Okay.

23            MR. MOORHEAD:  I want to follow up on a few

24   things, because he asked questions I didn't even think

25   of.  See, he is a lot smarter than me.

86

FURTHER EXAMINATION

BY MR. MOORHEAD:

    Q    All right.  There is something that I want to follow up on.  You said that when you picked up the torch -- and I'm going to use "torch" instead of "nozzle."  I'm talking about the apparatus that you ignite and it makes the fire come out at the end.  I'm going to call that "the torch."  And I'm going to call the bottle that has the gas in it "the cylinder."

    A    Okay.

    Q    When you picked up the cylinder and the torch, it didn't appear to you that the torch was all the way on the cylinder; is that correct?

    A    The -- yes.

    Q    Now, I'm trying to figure out what gave you that impression.  Was it not all the way down on the threads or was it wobbling or a combination of those things?

    A    It appeared to be loose in nature as if you took a soda bottle cap and you loosened it up.

    Q    So it was not all the way down on the threads?

    A    Yes.

    Q    That's correct?

    A    That would be correct, yes.

    Q    And if you played with it, did it wobble some,

1  like a cap would?

2      A    No, sir.

3      Q    You've talked about your experience with other

4  people that probably shouldn't be handling these types

5  of products, using them in strange ways.  Did you ever

6  see anybody use a torch as a lever?

7      A    Yes.

8      Q    Bad plan, isn't it?  Do you know whether

9  Mr. Shalaby had done that with this particular --

10     A    No, sir.

11     Q    You don't know either way.  You mentioned

12  having plenty of experience buying torches and cylinders

13  with MAPP gas from Home Depot, correct?

14     A    Yes, sir.

15     Q    And you've also used propane.  Did you buy the

16  propane cylinders from Home Depot, too?

17     A    Yes, sir.

18     Q    Okay.  Any other types of gas -- I don't even

19  know what they sell at Home Depot.  Besides MAPP and

20  propane, are there other types of gases that they sell

21  in these little cylinders at Home Depot?

22     A    No, I don't believe so.

23     Q    So if you were going to go to the store

24  looking for gas for a torch, you'd either be looking for

25  propane or MAPP at Home Depot?

1    A    Yes.

2    Q    From your experience, do the cylinders come

3 sometimes matched with the torch and sometimes on their

4 own?

5    A    Yes.

6    Q    And are these cylinders a thing that -- they

7 can be refilled, can't they?

8    A    No, sir.

9    Q    Did you make any observations as to whether

10 the threads that were visible on the cylinder in the

11 Shalaby incident had any signs of rust or dirt or things

12 like that that would indicate perhaps it was not a good

13 cylinder to be using with a torch at that time?

14   A    The threads appeared normal.

15   Q    Okay.  You indicated, in answer to

16 Mr. Epstein's questions, that MAPP gas is typically used

17 in plumbing type applications and not in very much more.

18 Is that the type of product that you would think was

19 appropriate for lighting campfires?

20   A    No, sir.

21   Q    You mentioned a couple of incidents that I

22 believe you said you were actually an eyewitness to,

23 when tanks exploded.  And the first one you talked to

24 was acetylene.

25        When I think of acetylene -- was it one of

1  these great big tanks that welders use --

2      A    Yes, sir.

3      Q    -- not the little bitty one?

4          MR. MOORHEAD:  I think that's everything.

5  Well, let me look real quick here.  No, that's all I

6  have.  Thank you, Mr. Ratliff.

7          MR. EPSTEIN:  Be aware whenever a lawyer says

8  that.  Thank you.

9          MR. MOORHEAD:  Let me propose a stipulation,

10 then, with respect to how we're going to deal with this.

11 I propose that we relieve this nice court reporter of

12 her obligations under the California Code of Civil

13 Procedure, although I'm not sure they are applicable in

14 federal cases.

15         When she has completed the transcription of

16 today's proceedings, she will send them to Mr. Sessler,

17 at Campland on the Bay, which address is 2211 Pacific

18 Beach Drive, San Diego, California 92109.  The folks at

19 Campland, I guess, will be instructed to make it known

20 to you that it's come in, will make it available to you

21 to review it, make corrections, if necessary, in order

22 to make it accurate.  And then there will be a signature

23 line for you to date and sign your review.  And then I

24 will have the court reporter send to you a

25 postage-prepaid envelope so that you can send the

90

1   transcript to me.

2           And whatever corrections you make, if you make

3   them on the transcript, that's okay with me.  If you

4   want to make them on a separate sheet of paper, make

5   sure you enclose the separate sheet of paper, so we know

6   what changes were made.

7           If we give you 30 days, will that be enough

8   time?  You said you were going to go to Costa Rica.  But

9   it's not in the near future, right?

10          THE WITNESS:  Not in the fear future.

11          MR. MOORHEAD:  You'll have 30 days to do that.

12  You'll send it to me.  Within 10 days thereafter, I'll

13  let opposing counsel know whether or not it's been

14  corrected and signed and, if so, what corrections have

15  been made.  I'll make it available, if necessary, for

16  trial or other proceedings without the need for formal

17  request.

18          If the original transcript is lost, misplaced,

19  or otherwise unavailable, or if it's not corrected

20  and/or signed in accordance with the stipulation, then

21  we can use a certified copy as though it was a signed

22  original.

23          MR. STEPHAN:  That's fine.

24          MR. EPSTEIN:  So stipulated.

25          (Deposition concluded at 11:50 a.m.)

STATE OF CALIFORNIA   )

                        ss:

COUNTY OF SAN DIEGO   )


       I, Catherine A-M Gautereaux, Certified

Shorthand Reporter in and for the State of California,

do hereby certify that the witness in the foregoing

deposition was duly sworn by me to testify the truth,

the whole truth, and nothing but the truth in the

foregoing cause; that said deposition was taken before

me at the time and place herein named; that the

testimony of said witness was reported by me and was

thereafter transcribed in my presence.

       I do further certify that I am a

disinterested person and am in no way interested in the

outcome of this action or connected with or related to

any of the parties in this action or to their

respective counsel.

       IN WITNESS WHEREOF, I have hereunto set my

hand this 24th day of April, 2007.


                    _____
                      Catherine A-M Gautereaux
                          CSR No. 3122

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA



ANDREW SHALABY and SONIA DUNN-RUIZ,    )
                                       )
          Plaintiffs,                  )
                                       )
vs.                                    )  No. C06-07026CW
                                       )
NEWELL RUBBERMAID, INC., RUBBERMAID,   )
INCORPORATED, and THE HOME DEPOT,      )
INC.,                                  )
                                       )
          Defendants.                  )
_____)


DEPOSITION OF RANDY T. STEPHENS

Taken at San Diego, California

April 17, 2007


Reported by Catherine Gautereaux, CSR
Certificate No. 3122

2

Appearances:


    For Plaintiffs:

        Alborg, Veiluva & Epstein LLP
        By:  Mark D. Epstein
        200 Pringle Avenue, Suite 410
        Walnut Creek, California 94596-7380
        (925) 939-9880   fax (925) 939-9915
        mepstein@avelaw.com


    For Defendants:

        Keller, Price & Moorhead
        By:   J. Phillip Moorhead
        229 Avenue, Second Floor
        Redondo Beach, California 90277
        (310) 540-1332   fax (310) 540-8480
        jpm@kpmlawyers.com


    For Warren Ratliff:

        Grimm Vranjes McCormick & Graham LLP
        By:  Gregory D. Stephan
        550 West C Street, Suite 1100
        San Diego, California 92101
        (619) 231-8802   fax (619) 233-6039




            DEPOSITION OF RANDY T. STEPHENS,

taken by the Defendants at 1515 Hotel Circle South,

San Diego, California, commencing on Tuesday, April 17,

2007, at 12:50 p.m., before Catherine A-M Gautereaux,

Certified Shorthand Reporter in and for the State of

California.

3

1                      I N D E X

2

3     EXAMINATION BY                              PAGE

4              Mr. Moorhead                 4, 60, 78

5              Mr. Epstein                 59, 67, 81

6

7

8

9                    E X H I B I T S

10   NUMBER              DESCRIPTION              PAGE

11     4 - Site map for Campland on the Bay        22

12     5 - Reservation sheet for Andrew Shalaby,   23
           showing a move from D32 to D19
13
       6 - Black-and-white photograph of a        51
14         woman and a little girl

15     7 - Black-and-white photograph of a        51
           woman, a little girl, and a boy
16
       8 - Subpoena for the appearance of         64
17         "Randy Stevens"

18

19

20

21

22

23

24

25

4

```
 1              SAN DIEGO, CALIFORNIA; TUESDAY, APRIL 17, 2007

 2                            12:50 P.M.

 3                        RANDY T. STEPHENS,

 4                  having been first duly sworn,

 5                     testified as follows:

 6

 7                          EXAMINATION

 8   BY MR. MOORHEAD:

 9        Q     Now that we are on the record, why don't we

10   have you give us your full name for the record.

11        A     Randy Thomas Stephens.  Do you want me to

12   spell it?

13        Q     Sure.

14        A     It's S-t-e-p-h-e-n-s.

15        Q     Is it okay if I call you "Randy"?

16        A     Yes, it is.

17        Q     Okay.  Randy, we met yesterday --

18        A     Yes, sir.

19        Q     -- when I came out to take a look at Campland.

20   I'll introduce myself again.  My name is John Moorhead.

21   I represent a company called Burnzomatic and some other

22   related entities in a lawsuit that's been filed by a

23   fellow by the name of Shalaby, and we're here today to

24   take your deposition.  Have you ever had your deposition

25   taken before?
```

5

1      A      I have done live testimony in other court
2  cases, but not an actual, just deposition like this, no.
3      Q      So you've been called to testify at a trial or
4  two?
5      A      Yes, in the past.
6      Q      This is somewhat similar to that.  At the risk
7  of telling you things that you might already know or
8  things that your company's attorney might have said to
9  you about the process, let me kind of describe what
10 we're going to be doing here today so that we're on the
11 same page when we get to the substantive questions.
12         The court reporter, seated to your right, is
13 trying to take down everything that we say.  We're going
14 to make her job a lot easier if we don't speak at the
15 same time.  So try to wait until my question has been
16 completed before you give me an answer so that she takes
17 down only one person speaking at a time.  And I'll try
18 to make sure that your answer is done before I ask the
19 next question.
20         It's harder to do than it sounds because in a
21 normal conversation we can speak and hear at the same
22 time and communicate just fine, but since she is trying
23 to take things down in a chronological order, if we
24 overlap, the record gets pretty hard to follow.  So try
25 to wait until the question is done before you answer.

1 I'll try to wait until the answer is done before I ask

2 the next question.

3           At a later point in time, the transcript of

4 today's proceedings will be typed up and made available

5 to you.  You can read it over.  If corrections are

6 necessary in order to make your testimony accurate, you

7 can make changes.  And then you'll be asked to sign it

8 under the penalty of perjury.

9           You are not a party to this case.  Campland is

10 not a party to this case.  But, obviously, if you can

11 avoid making changes in the transcript, it will

12 eliminate the risk that someone might view that

13 unfavorably with respect to your credibility because of

14 one thing you said today and you changed at a later

15 time.  So we're going to try to get your very best

16 testimony today.

17           I'm going to ask you to follow a few ground

18 rules for me in answering the questions, which will

19 minimize the changes that need to be made later.  The

20 first of those is, please answer all of the questions

21 audibly.  It's okay for you to shake your head or make

22 gestures, or whatever -- we are not trying to preclude

23 that -- but you'll have to do more than that, because

24 that won't come out on the record.

25           So if the answer to a question is yes, you can

7

1  either just say yes or you can say yes and go up and

2  down all you want, but at least put the "Yes" in there.

3        I'd also ask that you make all your responses

4  words as opposed to sounds.  I made reference in

5  Warren's deposition to the fact that I have a bad habit

6  of using uh-huh and un-unh.  While we are sitting here,

7  you can tell which was which, but when you are trying to

8  read that in the transcript, it's pretty hard to tell

9  which one was the negative and the positive.  So try to

10 avoid using those types of sounds.

11        I may ask you questions that call for

12 estimates of such things as distance or time.  I realize

13 that you didn't have a tape measure or a stopwatch, and

14 I don't expect that type of a precision, but I am

15 entitled to your best estimates of such things.

16 However, I don't want you to guess.  That doesn't do

17 anybody any good.

18        If you don't know how far or how long these

19 things are that I'm asking you about, just tell us that.

20 We may ask the question slightly differently in an

21 effort to make it easier for you, but if all we're doing

22 is asking you questions about things that you don't know

23 or you don't remember, let us know and we'll move on to

24 something else.

25        If you don't understand any of my questions,