8

1 Randy, let me know. I'll try to rephrase them so that

2 you do understand. Sometimes, my questions don't come

3 out as clear as I'd like them to.

4       If you don't hear any of my questions, let me

5 know. That way, we can be sure that the answer that you

6 are giving is corresponding to the question that I'm

7 asking. Fair enough?

8     A    Fair enough.

9     Q    Okay. And if you need to take a break at any

10 time, that's okay. We're trying to make this as

11 comfortable for you as possible, recognizing the fact

12 that you'd probably rather be someplace else. But

13 that's not supposed to be an ordeal, so --

14       Do you have any questions about what's going

15 to happen before we get started?

16     A    No. I would like to tell you that I have had

17 a little bit of a sore throat and I'm still -- if I have

18 to clear my throat once in a while --

19     Q    That's fine.

20       MR. EPSTEIN: We'll forgive you.

21       THE WITNESS: It's a slight cold.

22 BY MR. MOORHEAD:

23     Q    You are not under the influence of any

24 medication that might impair your ability to give good

25 testimony today?

9

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | What's your business address? |
| 3 | A | 2211 Pacific Beach Drive. |
| 4 | Q | That's in San Diego? |
| 5 | A | San Diego, California, yes, sir. |
| 6 | Q | And the ZIP code? |
| 7 | A | 92109. |
| 8 | Q | And the business phone? |
| 9 | A | That would be Area Code (858) 581-4219. |
| 10 | Q | And your home address? |

11     A     Let's see.  I just moved.  I can give you
12 where I live.

13     Q     Well, I'm only asking so if we need to get
14 ahold of you if you were to decide Campland is not
15 paying you enough and you were to move away.

16     A     I live in an RV park.  So my mailing address
17 is 42566 Escolacata -- this is a mouthful --
18 E-s-c-o-l-a-c-a-t-a, Drive, okay.  And that's in
19 Temecula.  That's my permanent address.

20     Q     What's the ZIP code up there in Temecula?

21     A     It is 92592.

22     Q     All right.  And your date of birth?

23     A     10/3/69.

24     Q     By whom are you currently employed?

25     A     Terra Vista Management; Campland on the Bay.

1     Q    So the company you work for is Terra Vista

2 Management?

3     A    Yes, sir.

4     Q    And the place you work at is Campland --

5     A    Yes, sir.

6     Q    -- on the Bay?  You're jumping in on me a

7 little bit.

8     A    Oh.  Sorry.

9     Q    She is going to scream at me pretty soon if we

10 don't stop.  How long have you worked at Campland on the

11 Bay, roughly?

12     A    Roughly, coming on three years.

13     Q    And your current position there?

14     A    I am a ranger.

15     Q    How long have you held that position?

16     A    The three years I've been there.

17     Q    Okay.  Who is your immediate supervisor at the

18 present time?

19     A    Darrin Sessler.  D-a-r-r-i-n, S-e-s-s-l-e-r.

20     Q    How long has Darrin been your immediate

21 supervisor, roughly?

22     A    Roughly, I want to say a year, a year and a

23 half.  They changed over supervisors.

24     Q    Was Therese Kiel a supervisor of yours at one

25 time?

11

```
1    A    Yes, sir.

2    Q    Is that immediately prior to Darrin?

3    A    Yes.  She is Darrin's predecessor.

4    Q    Okay.  Do you know which of them was your

5  supervisor in April of 2006?

6    A    That would have been Therese Kiel.

7    Q    All right.  Were you on duty at Campland on

8  the Bay on the evening of April 21, 2006, when a camper

9  named Andrew Shalaby suffered burns at his campsite?

10   A    Yes, sir, I was.

11   Q    Do you recall that event, at least somewhat?

12   A    Yes, I do.  Yeah, to a decent degree of --

13   Q    Okay.  How did you personally become aware of

14  Mr. Shalaby's incident?

15   A    A woman came up to the ranger gate.  This is

16  what I was told.  I was radioed to go to, I believe it

17  was, site D19, regarding a personal injury of a man

18  severely burned at the site, at which time I -- we asked

19  that 911 be called from our gate.

20   Q    Let me stop you there.

21   A    Yeah.

22   Q    You didn't -- you weren't contacted by the

23  person who came to the gate; you were radioed in?

24   A    I was radioed by Warren.

25   Q    Mr. Ratliff?
```

12

1      A      I believe Mr. Ratliff was at the gate, to the

2  best of my knowledge.

3      Q      Do you remember where you worked?

4      A      On the cart, somewhere on the property, is all

5  I can say.  Patrolling.

6      Q      So essentially, if I'm understanding you,

7  Warren radioed you while you were on the cart and told

8  you what had happened and told you where it happened and

9  told you to go there, essentially?

10     A      Yes.  Yes.

11     Q      Do you recall whether, at the time you

12 received the radio call from Warren, you were alone or

13 with other Campland employees?

14     A      To my recollection, I was alone.  I can't for

15 sure say that, because we do ride with partners

16 sometimes.

17     Q      What was Warren's position with Campland at

18 that time?

19     A      He was also a ranger.  He is like -- he is --

20 technically, he is our supervisor.

21     Q      Okay.

22     A      Darrin is our direct boss.

23     Q      So he was senior to you in the chain of

24 command, but Darrin was the one that they called a

25 supervisor?

1    A    Well, actually, it could have been Therese at

2 the time. Excuse me.

3    Q    Anyway, besides you and Warren, were there any

4 other rangers on duty at the time this happened?

5    A    You know what? I can't say for sure, because

6 this is so -- it was both the same time as this time

7 last year, approximately.

8    Q    Right.

9    A    I can't remember if we had two or three people

10 on duty. I just don't know.

11    Q    Okay. If there were two, it would have been

12 you and Warren?

13    A    Yes, which -- which I tend to think. But I'm

14 not going to say for sure, because Warren did have

15 somebody from the office relieve him at the gate to

16 assist me at the scene.

17    Q    Okay.

18    A    So I -- I would assume or state that I think

19 it was two.

20    Q    So your best recollection is that when the

21 radio call came to you, you were probably alone?

22    A    I was -- I was -- I believe I was alone and I

23 was one of the first responders at the scene.

24    Q    Okay. And you learned from Warren or from

25 some other source that when Warren radioed you and told

14

1  you to go there, that he was having somebody come and

2  relieve him at the gate, right?

3      A    Not immediately. Immediately, it was -- it

4  was -- I was called to the scene, which is standard for

5  any kind of accident or whatever. We have one person go

6  kind of assess to see if it's -- if it's an emergency or

7  it's life-threatening or extreme body injury or if it's

8  just, you know, somebody stubbed their toe or somebody

9  twisted their ankle.

10      Q    But somehow you found out that he was going to

11  have someone relieve him?

12      A    I got there. I called Warren to tell him we

13  definitely needed 911 called immediately. Now, we found

14  out, obviously, through the -- how things happened, that

15  obviously somebody had called them, too, because their

16  response time was probably three to five minutes from

17  what I got there, which is an extremely fast time.

18      Q    So it is your understanding that even before

19  you told Warren to call 911, that somebody had already

20  called?

21      A    I assume another camper did. Once again, I

22  don't know as far as that goes.

23      Q    The contact that you first received from

24  Warren, was that by two-way radio, a cell phone,

25  face-to-face? How was that?

15

1        A        It would be a two-way radio.

2        Q        At that time, back in April of 2006, Randy,

3    did Campland have any type of procedure for logging in

4    that type of communication between you and Warren?

5        A        Just standard how I do it.  Normally, we have

6    a notepad that's like a little notebook.  I flip it over

7    and I always write down times.  Because I was in the

8    military, I tend to always log things in a 24-hour

9    period.

10       Q        So whether or not you remember doing it in

11   this instance, your normal habit would have been to take

12   that notepad and write down, "Got a call from Warren at

13   1530 hours," or whatever?

14       A        Yes, sir.  I would write -- you know, on this

15   pad I'd write "1500," then -- I'd just write that time.

16   Then, normally, if EMS or 911 is called, I'll write the

17   time, look at my watch, and see what time I had 911

18   called, what time they arrive, what time they depart.

19       Q        Do you have a recollection as you sit here

20   today, four years later, whether you did that in this

21   particular instance?

22       A        From my report, I can tell that I must have,

23   because -- or I must have had some type of

24   documentation, because I did document the times and the

25   arrivals of EMS.  I'm pretty sure I did.

1     Q    Any reason to believe that you would still

2  have the notepad with the information that you first

3  wrote down?

4     A    No, I'm sure I don't.  That is why I made out

5  this form.

6     Q    All right.  Is there a procedure -- or let me

7  ask it differently:  In April of 2006, when this

8  happened, was there a procedure whereby anybody else,

9  other than you and Warren, within the Campland family of

10  employees, would have normally been notified that this

11  happened; Mr. Campland, who runs the place, or whatever?

12  Was there anybody else in the chain of command that

13  would have been notified?

14     A    Normally -- and I don't know, because I was

15  radioing to Warren in the beginning -- normally, our

16  direct supervisor would have been contacted, her being

17  Therese Kiel at the time.  As far as I know, that's what

18  happened.

19     Q    Okay.  And since you didn't mention that

20  somebody was on duty at the time, Warren would have had

21  to call her on the phone, right?

22     A    She would have subsequently been called on the

23  phone.  Now, how she was contacted, I don't know

24  immediately, but I do know that she was there before the

25  paramedics departed.

17

1    Q    Okay.

2    A    She was on scene, because her apartment is

3  directly overlooking the sites where it happened.

4    Q    Does she live on --

5    A    She lived on the property where Darrin

6  currently resides.

7    Q    So sometime before the emergency personnel

8  departed, Therese Kiel came to the incident scene?

9    A    She was at the scene.  She was talking to the

10  firefighters.  She was not a direct responder or a, you

11  know --

12    Q    Right.  And you're not sure how she became

13  aware, but it could have been the sirens and the lights

14  flashing and things like that?

15    A    It very well could have been.

16    Q    Did you have any conversations with her at the

17  incident site?

18    A    I do not recall that.

19    Q    Okay.  Do you know, from what you observed,

20  whether she had conversations with any of the fire

21  department personnel at the scene?

22    A    I know she had contact with the fire

23  personnel, the engineer, and some of the EMS.  I'm not

24  sure who and to what capacity.

25    Q    Do you know, from your observations, whether

1  she had any conversations with the victim of the fire?

2      A    That, I don't believe she did.  I do not know,

3  you know, for sure.  She was out of uniform because she

4  was off -- off duty at the time.  We happened to catch

5  her, you know, at her residence -- or they caught her at

6  her residence.

7      Q    Same type of question:  Do you know whether

8  she had any conversations with any of the other campers

9  or people in the general vicinity of where this

10  happened?

11      A    That, I am not aware of, either.

12      Q    Did you have access to some kind of a vehicle

13  at the time?

14      A    Yes.  I was -- you know, I don't remember

15  exactly, due to the length of time, but I would have

16  either been in -- I believe I was on a golf cart and --

17  because I believe Warren used the truck to respond and

18  guide an EMS.

19      Q    Besides Warren and yourself and whoever it was

20  in the main building that relieved him at the gate, any

21  other Campland employees that you remember being on duty

22  at the time this happened?

23      A    No.  Not sure.

24      Q    Any janitorial staff?

25      A    I don't -- I don't really remember that.  It

19

1  was quite a while ago.

2      Q    Okay.  Anybody else besides Warren, you, and

3  Therese Kiel that worked for Campland that you are aware

4  of that came to the incident site?

5      A    That -- that's all that I am aware of.

6      Q    Okay.  So after getting the radio call from

7  Warren, you went to -- I think you said it was D19?

8      A    Let me check in my report, but I believe

9  that's where we were yesterday.  Yes, D19.

10     Q    And that's mentioned someplace in your report.

11 That's how I know.

12     A    Yes.  It's on the site -- the site number and

13 corresponding on the top.

14     Q    Do you have any documentation that would show

15 when those campers had arrived at Campland?

16     A    I believe the -- it is in our computer system.

17 I have the -- I believe, the -- Campland -- right here.

18 This is their check-in active history.  I believe you

19 guys have it.  And it's also labeled on the top, which I

20 looked up from the computer on the incident report.

21 It's got the date in, date out, okay.  It's right on the

22 top of the incident report.

23          Now, I do believe they did -- I don't know if

24 it matters or not -- but I believe you talked to Darrin

25 about that, that they did change sites, I guess, because

20

1 one is only for one overnight period.

2     Q    Okay.  We're going to get to your handwritten

3 incident report in a little while, but that's what I

4 think you've been referring to as far as date in and

5 date out.  And you are talking about the 4/21/06 date

6 and 4/22/06 for out?

7     A    Yes, sir.

8     Q    And that's the date in and out of campsite

9 D19?

10     A    D19, yes.

11     Q    But that they might have been at a different

12 campsite in the days preceding that?

13     A    Right.  And we just found that out yesterday,

14 to my knowledge.  That's why it's listed on here as the

15 21st and the 22nd.

16     Q    Okay.  And whatever you have in front of you,

17 does that tell what day they actually arrived?  This is

18 what you show me?

19     A    No.  This paper would show when they actually

20 arrived, right.  No, this is only from that site.  I

21 don't have the information.  My employer has it.

22     Q    Okay.

23     A    Because if you remember, yesterday, we did

24 find out that they transferred sites.  See, when I look

25 it up on the computer, I see -- all it shows is the

1  return reservation.  So when they transferred sites,

2  that's all I have on this page.  So, unfortunately, I

3  thought you did get that from Darrin yesterday, but I

4  don't have it with me.

5      Q    He might have given it to me.  If he did, I

6  don't see it now.  But that's not a problem.

7      A    Okay.

8      Q    Do you know, as you sit here today, what other

9  campsites they had been at?

10     A    Yesterday it was stated -- it was stated to me

11 it was D32, is my recollection.

12     Q    If you know, where is that, in comparison with

13 D19?

14     A    That would be -- I wish I would have brought

15 my map.  Do you guys have a map of the property?  I can

16 show you.  It would be -- would be on the -- they are on

17 the outer circle, on D19.  It would be on the inner

18 circle portion, on the other side.  If we can find a

19 map, I can show you, yes, sir.

20         MR. EPSTEIN:  Should we mark this as an

21 exhibit?

22         MR. MOORHEAD:  Might as well.

23 BY MR. MOORHEAD:

24     Q    You can go ahead and look at it, first.  Then,

25 we'll mark it.  See if it helps you find what you're

22

1  looking for.

2      A      D19 is represented with an "X" here, okay.

3  D32 would be -- and D33 are right here, on the other

4  side.  So D19 is where we responded to the incident

5  right here, okay.  D32 -- I accidentally did mess up

6  here.  D32 is right here.  So in between here, there is

7  a small break fence, and which is --

8              MR. STEPHAN:  Maybe we can put an "A" by D32

9  and --

10             THE WITNESS:  I can change it if you'd like.

11             MR. EPSTEIN:  I'm sorry to chime in.

12             Can you tell from that which is which, or is

13  it clear?  Can you tell me where the front gate is?

14             THE WITNESS:  Sure.  It's right here, where it

15  says "Check in."  Right here would be the front gate,

16  okay.  So it's -- if you're entering the park, it would

17  be to the far right-hand corner.

18             MR. EPSTEIN:  Let's mark this as an exhibit.

19             (Exhibit 4 marked.)

20  BY MR. MOORHEAD:

21      Q      And then let me show you the only thing that I

22  could find, that might be what you were talking about.

23  Is this what you're talking about, that shows when they

24  came in?

25      A      Yes, sir.  The top reservation would be Andrew

1  Shalaby, reservation 544238, and that would be for his

2  site at D32, okay.  That was the 16th through the 21st.

3  And then, on the 21st of '06, he moved to site D19,

4  which is the second reservation listed on the form.

5          (Exhibit 5 marked.)

6  BY MR. MOORHEAD:

7      Q   So it shows that they first arrived on

8  April the 16th, did you say?

9      A   Yes, sir.  That's what it shows from that

10 reservation.

11     Q   Do you remember, Randy, about what time of day

12 it was -- and you can look at your report if that helps

13 you -- about what time of day it was that you learned

14 about the incident?

15     A   I can tell you I know it was after dark.  It

16 was -- from my statement here, it says that I responded

17 at -- at 2215.  So it would be 10:15.

18     Q   P.m.?

19     A   P.m.

20     Q   The "2215" is military time, right?

21     A   Yes.  That's how I tend to label all my stuff.

22 Oh, one thing I didn't notice -- sorry -- but there were

23 three of us on duty, because in my report I always write

24 down who I contacted.  I contacted 56 -- a male

25 contacted 56, excuse me, which is Donna Tank, okay.  And

24

1  so that answers our question earlier.

2      Q    It would have answered a few of them.  She was

3  not with you if you had to contact her, right?  She was

4  someplace on the property but not with you physically?

5      A    It must be, because, like I say, it was a year

6  ago.  A lot of things happened between here and there.

7      Q    And her assigned number is 56, you say?

8      A    Her number is 56.

9      Q    And her name is Donna What?

10     A    Tank, T-a-n-k.

11     Q    And she is also a park ranger?

12     A    She is also a park ranger, yes, sir.

13     Q    Do you have any recollection, now that you've

14  seen that, as to whether Donna ever came to the incident

15  site that evening?

16     A    I don't recall.

17     Q    Okay.

18     A    I'm glad that it was listed in my paperwork.

19  I didn't even notice that before.

20     Q    Do you have an estimate of how long it took

21  you to get from where you received the radio call from

22  Warren to D19, approximately?

23     A    Okay.  That, I don't know.  I have listed the

24  time when we were told, which is 2215.  So more than

25  likely -- I remember that I was there and I was not

25

1  there more than a couple of minutes and I've got the

2  medic unit arrived -- I've got the medic unit arriving

3  at 2220.  So this all happened within a five-minute

4  period.

5       Q    Okay.  Do you recall -- you've given us a

6  little bit of information, but do you recall what it was

7  Warren told you when he radioed you?  He said something

8  about a personal injury being involved?

9       A    To respond to D19 due to a severe burn.

10      Q    So he told you it was a burn incident?

11      A    Right.  And our normal protocol is to go to

12  the scene, assess the situation, because each person's,

13  you know, idea of an emergency can be different.

14      Q    Did Warren tell you anything else in that

15  radio call about what had happened as opposed to what he

16  wanted you to do?

17      A    Negative.  Normally, at the time the person at

18  the scene -- so once Warren had sent me to the scene, I

19  basically take charge of -- 'cause he can't assess,

20  because he is not there.

21      Q    Right.

22      A    So I would have been telling him there is

23  various things.  Usually, the age -- because he -- when

24  I tell him to radio 911, the first thing we do is take

25  basics:  The person's age, gender, description of what

26

1 happened, you know, the injury; and, you know, a level

2 of consciousness.  Typical.

3      Q    So the typical MO for you would have been,

4 upon receiving the call to go to the incident scene, to

5 assess it and then contact him and let him know whether

6 it was truly an emergency or, I think you used "stubbed

7 their toe"?

8      A    Well, yeah.  I mean, to each person, a level

9 of --

10     Q    Seriousness?

11     A    -- seriousness or emergency.  You know, to

12 them, it's always an emergency, but whether it's going

13 to be technically a 911 call or not, I have to kind of

14 assess that.

15     Q    Do you recall what you relayed back to Warren

16 once you got there and made your assessment?

17     A    Yes.

18     Q    What did you tell him?

19     A    Well, exact wording, I can't tell you, but I

20 do recall that I said, "We have a serious burn here, a

21 third-degree burns to both legs."  I then took -- I

22 didn't get a lot of time because, like I said, EMS did

23 arrive when I was just -- we were still on the 911 call

24 to them when we heard the sirens that they were

25 arriving.

27

1        So I know I stated that we had a man in his

2    forties.  I hadn't gotten his name yet because we were

3    trying to keep him calm, because he was shaking

4    severely.  I do recall that we put jackets and blankets

5    that were provided -- I know he had my jacket, and

6    blankets that were provided by whoever was around -- I

7    can't even remember -- to keep him from going into

8    shock, and that I had given him -- I was giving him the

9    basics when the eMS arrived.  I didn't even know

10   Mr. Shalaby's name at the time.

11       Q    Did you recommend to Warren that he should

12   come to the site?

13       A    No.  That's a standard:  When we have a 911,

14   either police or medical emergency, if -- if we are --

15   our staff to where we can't meet all of our rangers in

16   that area, whether to stop, get the other campers back

17   or to assist in on actual assistance with EMS or

18   whatever, standard protocol:  We have somebody from the

19   front desk, the registration office, if it's opened,

20   watch it.

21       Otherwise, we actually leave the one arm up to

22   get into the park for campers to get in, and we actually

23   lock the front gate and just respond to the emergency.

24       Q    Okay.  You've indicated that when you arrived

25   at the scene you observed the victim had burns to both

1  begs?

2       A     Yes.

3       Q     What else can you remember seeing, either

4  about him or the campsite or conditions, upon your

5  arrival?

6       A     The male was seated probably about three to

7  four feet away from the actual fire ring, with his back

8  to the fire ring.  So if I was sitting how he was

9  seated, the fire ring would have been approximately at

10 the wall.

11            There was another chair in front of him.

12 There wasn't anybody seated there.  There were various

13 people that were maybe from his family or whatever,

14 trying to keep him calm when I arrived.

15      Q     Did he have his feet up on that chair?

16      A     No.  He was sitting, rather -- kind of rocking

17 like this, and very shaking, because he did have

18 extensive injuries.  And his legs were -- I remember he

19 was barefooted and his legs were charred and actually

20 popped open, similar to a -- like a hot dog if you put

21 it on a fire.  It sounds graphic, but that's how it

22 looked.  It actually looked like it burst open.

23      Q     You mentioned charring to his legs.  Any other

24 parts of his body?

25      A     He also had a, I remember, pinkness.  The

1  charring was on his shins.  He had pinkness to -- almost

2  like a severe, severe, sunburn up in -- on the tops of

3  his thighs, on his chest region; actually, on his -- I

4  believe, on his neck region and even to his face

5  where -- I don't know if it was a flash burn or type

6  thing, but it was like an extreme pinkness.

7        Q     Okay.

8        A     Okay.

9        Q     How about his upper extremities, arms?

10       A     His arms, I didn't notice, because Mr. Shalaby

11  was -- he was shaking.  He was probably on the verge of

12  going into shock.

13       Q     Okay.  And --

14       A     And he was -- he was mumbling to himself and

15  shaking, basically.

16       Q     Were there other people at the campsite,

17  besides Mr. Shalaby, when you arrived?

18       A     Yes, sir.  There was a female and at least one

19  juvenile child under the age of, probably, 12, I think.

20       Q     Okay.

21       A     And also -- sorry.

22       Q     No.  Go ahead.

23       A     Also, there were people from the associating

24  campsites around there when I got there.  And I kind of

25  dispersed them.  And they helped me put the blankets and

1  the jackets on Mr. Shalaby's upper extremity to try to

2  keep him warm.

3       Q    Was there a fire burning in the fire ring?

4       A    Whether it was burning or -- I know there was

5  at least red ambers, because we did see that.  And there

6  was like -- light smoke coming around.

7       Q    Okay.

8       A    As far as whether there was actual flame or

9  whether it was just the cherry coals, I can't tell you.

10  I just remember it was pitch-black and there was, like,

11  I believe, a propane -- or it might have been electric,

12  but it was a lantern illuminating where I could see

13  Mr. Shalaby.

14       Q    Okay.  How about:  There is some indication

15  that this might have involved some kind of a compressed

16  gas cylinder and torch.  Did you see anything like that

17  in the area?

18       A    Yes, I did.

19       Q    Was that object that you saw on fire?

20       A    No.

21       Q    Where was it in relation to the fire ring when

22  you saw it?

23       A    It was -- I want to say it was approximately a

24  foot to two and a half feet to -- a foot to two feet in

25  back of the fire ring.  So it would have been

31

1    approximately four feet to the rear of Mr. Shalaby.

2         Q    So the sequence would have been Mr. Shalaby,

3    the fire ring, and then this apparatus?

4         A    Yes, sir.  Yes, sir.  It was about

5    approximately a foot to two feet beyond the fire ring,

6    in the dirt.

7         Q    But it was not engulfed in flame when you saw

8    it?

9         A    No, sir.

10        Q    Was it both a compressed gas cylinder and a

11   torch, or was it two separate pieces, or was there one

12   of those two objects nearby, or what?

13        A    Okay.  It is a standard two-piece unit.  It's

14   a compressed gas cylinder and then a screw-on torch tip.

15   Standard.

16        Q    When you saw it for the first time, though,

17   were those two connected to each other?

18        A    Yes, sir, they were.

19        Q    He was charred and rocking, maybe about to go

20   into shock, but when you first saw Mr. Shalaby, he was

21   still conscious?

22        A    He was conscious all the way through, as far

23   as I know.

24        Q    Was he conversing with anyone when you

25   arrived?

1       A     Yes.  When -- when I first arrived, we were

2  telling him to relax; you know, we had EMS on the way.

3  He had stated that he was cold, I think, and we saw him

4  shaking.  So immediately, from my past knowledge --

5  because I was an EMT years ago -- I knew that he was

6  possibly going into shock.

7            At that time I asked him if he knew where he

8  was, who he was, things like that.  And I proceeded to

9  put coverings on him to keep him warmer.

10      Q     Did he seem to know who and where he was?

11      A     Yes.  Yes.

12      Q     Okay.

13      A     I didn't know his full name.  He did say his

14  name was Andrew or Andy.  I can't remember what it was.

15  I believe it was Andrew.

16      Q     Neither any part of him nor his clothing was

17  still on fire at the point you arrived, was it?

18      A     No.  You could tell that the wounds to his

19  legs were very fresh and they were still oozing.  They

20  were actually charred.  It was quite graphic.  I mean,

21  you could literally, just looking at him, whether he was

22  still -- like I say, he was shaking.  It was so recent,

23  and the wounds were so fresh, that it's nothing like

24  I've ever seen before.

25      Q     Okay.  Warren gave you some indication he was

1  going to call 911, and you got some indication that

2  someone had already done that?

3       A    Actually -- to my recollection, we were

4  actually on the -- I was relaying, while Warren was on

5  the phone, with the 911 operator.  And somebody else

6  must have called, and we've deducted this from the

7  timing that the EMS arrived.  It was very, very fast.

8       Q    Okay.  Do you remember whether the juvenile

9  that you saw at the campsite was male or female?

10      A    I want to say male.  I'm pretty sure it was

11  a -- it was a -- maybe adolescent boy, I believe.

12      Q    All right.  So shortly after your arrival at

13  the scene, fire department personnel came?

14      A    Yes.  There was -- I believe it was Engine 21.

15  I'm pretty sure.  That's the normal responding engine

16  for Pacific Beach area.

17      Q    And what apparatus did they bring?

18      A    They brought -- they brought the standard.

19  They brought -- I believe it was the ladder truck and

20  EMS ambulance.

21      Q    So there would have been a fire truck

22  involved.  There would have been a paramedic truck.  And

23  then did they also have an ambulance come separate from

24  that?

25      A    No.  I meant the paramedic unit.  I'm sorry.

34

1    Q    About how long after your arrival did they

2  actually show up there at D19?

3    A    It would have been within five minutes.  I

4  would approximate five -- three to five minutes.  They

5  were very, very fast.  And they transported him almost

6  immediately.

7    Q    Randy, give me your best estimation of how

8  long you were at campsite D19 that evening, total.

9    A    I would say approximately 10 to 12, 15

10  minutes, something like that; 10 to 15 minutes --

11    Q    Okay.

12    A    -- total.

13    Q    And was there a reason that you departed after

14  that period of time?  In other words, were you

15  reassigned to something else?  Was everything done, or

16  what?

17    A    I departed the scene, in fact -- well, I know

18  I departed at the time that the -- there was an EMS

19  unit, and the fire truck left, because normally, as the

20  case scenario goes, we have to guide them out because it

21  is quite tricky to get around in there.  So I guarantee

22  you that I led them out.

23    Q    So you would have probably driven away from

24  the scene when the fire department personnel were ready

25  to go?

1      A      Right.  In fact, I remember them actually

2   packaging -- well, Mr. Shalaby, pretty much, to my

3   knowledge, actually stepped and sat onto the gurney

4   because of his injuries.  And they were -- they had him

5   in a -- in a semi-prone thing and they were loading him

6   in and, I believe, probably doing the standard -- I

7   remember them giving him oxygen.  And I'm not sure if

8   they started an IV line or stuff like that.  And then

9   once they had him packaged and they were ready to go, I

10  guided them out with lights and sirens.

11     Q      Now, you made reference to trying to comfort

12  Mr. Shalaby, putting a coat and blankets on him, telling

13  him that 911 had been called, et cetera.  Did you have

14  any conversations directly with him about what had

15  happened?

16     A      Varying -- it wasn't so much a conversation as

17  to when he was rocking back and forth, he just kept

18  saying, "I'm an idiot.  I can't believe I'm so stupid,"

19  something regarding this.

20            And we were telling him, "Just calm down."

21  You know, "We got help on the way."  And, you know, it

22  was coherently, but yet he was -- you could tell -- you

23  know, he was rocking back and forth, "This is all my

24  fault."  You know, "I'm so stupid."

25            He felt bad, basically, I think, for --

1 because his family vacation had come to an early halt

2 for something that he had caused.

3      Q      Did he ever tell you what it was that he

4 thought he had done wrong that gave rise to him saying

5 it was all his fault?

6      A      That, I don't know.  I know that there was a

7 couple of different -- during that time when I was there

8 with EMS and they were mainly concentrating on

9 Mr. Shalaby, trying to get him comfortable and getting

10 him into the unit, we got varying -- between me and

11 Warren, we got varying stories.

12      Q      Those were from other people, though, right?

13      A      Those were from third-party people.

14      Q      But I want to focus right now on:  Did

15 Mr. Ratliff -- not Mr. Ratliff -- did Mr. Shalaby

16 himself ever say anything in your presence, whether he

17 was talking directly to you, Randy, or talking to

18 someone else, that you could hear, did he ever give any

19 explanation as to why he was taking the blame for it?

20      A      I didn't understand your question, sorry,

21 somewhat.

22      Q      Okay.

23      A      I heard -- he said, "I was trying to light --"

24 and then I couldn't understand, because the EMS was in

25 there and everything else, and I had kind of stepped

1  back.  And then I got very much varying stories from

2  other people.  So he was -- he said he was trying to

3  light something.

4          Now, at first, I thought he said "campfire."

5  I can't be positive.

6      Q    But that's all you got from him directly?

7      A    Right, mainly.  Once EMS got there, I was kind

8  of -- well, and should have been -- kind of pushed to

9  the back, and I had to get the information I could.

10     Q    So as part of the job you did there at the

11 scene, you spoke with campers from adjacent campsites?

12     A    Actually, once he was gone, it wasn't that I

13 spoke to other people, because we asked the fire

14 department -- because they were pretty much interviewing

15 everybody.

16         It was what I heard in the background, you

17 know, different people saying that he was lighting --

18 you know, doing different things.  So I can't -- it's a

19 third-person account of what I got beyond that.

20     Q    I'm just trying to untangle this so I follow.

21 You didn't necessarily have interviews with adjacent

22 campsite campers, but while you were there on scene, you

23 heard their conversations with investigating fire

24 personnel?

25     A    Right.  And amongst each other.  Right,

38

```
 1   exactly.

 2         Q     All right.  Besides assessing the situation,

 3   calming Mr. Shalaby, and crowd control, I guess I'll

 4   call it, while the fire department was there, and then

 5   leading them out, did you have any other

 6   responsibilities at the scene as far as you understood

 7   it?

 8         A     No, because we -- we had asked the fire -- the

 9   engineer and the other rescue personnel if they actually

10   needed the torch and the body -- the torch body and the

11   tip.  And they said that -- that the patient had already

12   told them pretty much what happened and that they didn't

13   need it for further investigation.

14         Q     Now, before we move away from the campsite,

15   before you left, I guess what you're telling us -- or I

16   gather that you're telling us that you overheard

17   conversations between campers, whether they were talking

18   to themselves, to each other, or talking to fire

19   department personnel about what had happened?

20         A     Yes, sir.

21         Q     Do you remember what any of those stories

22   were?

23         A     There were -- like I said, there were a

24   couple.  And who to believe, we don't know.

25         Q     I'm not asking you to assess their
```

1  credibility.

2      A     Right.  Right.  We had heard that he was

3  lighting a water heater on the pilot light.  We had also

4  heard -- these were -- I think there was three different

5  ones that I heard:  That he was lighting a campfire and

6  that he was kicking around the cylinder, like, in the

7  coals.  There was, like -- he presumed empty.  Now,

8  which one, I don't know.

9      Q     I don't want you to guess which one was

10  accurate.

11      A     I could not guess.

12      Q     I just want to make sure I have the full sum

13  and substance of what stories were told to you.  So you

14  were told that he might have been trying to light a

15  pilot light on a water heater?

16      A     Right.

17      Q     He might have been trying to light a campfire?

18      A     Right.

19      Q     And he might have been kicking a compressed

20  gas cylinder, I guess you're talking about, in or around

21  the campfire ring?

22      A     And there was one other one:  That he was

23  hitting it on the ring and it burst.

24      Q     But you don't have any way, as you sit here

25  today, to identify for us who said which of those

40

1  stories, do you?

2      A    No.  No.

3      Q    Okay.

4      A    When -- when I --

5           MR. STEPHAN:  You've answered.

6           THE WITNESS:  Okay.

7  BY MR. MOORHEAD:

8      Q    Did you, as part of your duties, make a list

9  of any of the people that were offering stories?

10  Whether or not you said, you know, "Witness No. 1 says

11  he was lighting a pilot light; witness No. 2 says he was

12  banging it on the campfire ring," did you at least make

13  a list of the people who gave you stories of what

14  happened?

15      A    No, because at that point, once EMS and the

16  fire investigative people had gotten there, it's their

17  scene; it's not mine anymore.  I have no authority.

18  They do.

19      Q    Did you overhear any of these people who were

20  offering these varied stories -- did you hear any of

21  them make the comment that they had actually witnessed

22  what they were saying, or were they telling the fire

23  department personnel or each other, "I heard that he was

24  doing X, Y or Z"?

25      A    That, I don't know.  I didn't hear exactly the

1  context.

2      Q    And even though the only conversation you had

3  directly with Mr. Shalaby about what might have happened

4  was, "I was lighting" -- and he kind of trailed off when

5  the fire department personnel arrived, did you overhear

6  any kind of story he gave about what might have

7  happened, like you had heard from the other campers?

8      A    No.

9      Q    When you saw the cylinder and the torch beyond

10  the campfire ring from where Mr. Shalaby was sitting,

11  did you take it upon yourself to gather it up, or did

12  you just leave it there?

13      A    I looked at it.  Warren, I believe, is the one

14  who actually collected it, yeah.  And the unit was

15  together.

16      Q    I might have asked you this -- and if I did, I

17  apologize -- but was it on fire when you saw it?

18      A    No.  It was -- it was burst open.

19      Q    So it's not in flames when you see it.  Did

20  you touch it?

21      A    No, I don't believe I did.

22      Q    So you wouldn't be able to tell us, as you sit

23  here today, whether it was hot, warm, cold or otherwise?

24      A    Well, basically, the answer is no, I would not

25  be able to tell you.

42

1    Q    Okay.  You said it was burst open.  I assume

2  by that you mean the cylinder?

3    A    The cylinder itself, right where the -- I

4  don't know if you've ever seen a propane cylinder, but

5  right at the top, where it domes and then creates the

6  threads, it was burst just beyond the threads at the

7  neck.

8    Q    Anyway, the cylinder that you're talking about

9  is roughly the shape of like a two-liter bottle, right?

10    A    Yeah.  Yeah, but slightly slimmer and -- yeah.

11    Q    The sides essentially go straight up and then

12  taper like shoulders into a neck that's threaded?

13    A    Right.  Right.  Exactly.

14    Q    And the place that you saw -- are we talking

15  about a hole, a crack, or what did you see that had

16  burst?

17    A    Well, if I use this right here -- it's

18  glass -- but right at the -- if this is the neck of the

19  bottle right here, it was split approximately two and a

20  half inches long.

21    Q    That's the length?

22    A    Long.  And maybe a quarter-inch wide.

23    Q    Okay.  So we are talking basically about,

24  like, a slit or a crack as opposed to a round hole?

25    A    Yeah.  Like a split.  It was kind of

1 elliptical-shaped, I guess.

2     Q    Okay.  And that was near where the -- or at

3 the point where the shoulders of the cylinder become the

4 threaded neck?

5     A    Right.  It was right at the neck.  Right at

6 the base of the neck.

7     Q    All right.  In or below the threads?

8     A    Below the threads.

9     Q    And basically running in the same direction as

10 the threads, as opposed to perpendicular to them?

11     A    Right.  Right.

12     Q    Did you observe in any way, shape or form,

13 either by manipulating it or looking at it or in any

14 other fashion, whether the torch was all the way onto

15 the cylinder?

16     A    That, I don't know.

17     Q    Okay.  Did you observe any damage to the

18 torch, as opposed to the crack you've talked about in

19 the cylinder?

20     A    No, no.  It was -- I didn't want to touch it

21 too much because I thought it was still -- I don't know.

22 I didn't notice the crack.  I didn't notice if the torch

23 body was still on the torch tip.

24     Q    Did you make any observations, however

25 unscientific they may have been, as to whether it

1   appeared that the torch was properly affixed to the

2   cylinder?

3       A    That, I -- I didn't touch it.

4       Q    Could you see any of the threads? I mean, I

5   know you know which direction they would normally run

6   in, but --

7       A    Yeah. But all you could see was the bottom of

8   the threads. There is probably a 1/4 to an 1/8 inch to

9   where the neck meets the shoulders, and you could see

10   the bottom of the -- of a thread. Now, I don't know if

11   they thread completely down or --

12      Q    What color was the threaded area, if you

13   remember?

14      A    I don't recall.

15      Q    You don't have any recollection of whether

16   what you saw was, for the sake of an example, silver or

17   rusty or yellow or black or anything else?

18      A    I don't recall. I honestly don't recall.

19      Q    Was there any evidence, in the area where you

20   saw this fracture of the neck of the cylinder, that

21   there were any by-particles of combustion, like soot or

22   anything?

23      A    No. In fact, I didn't even see -- I didn't

24   even see like a scorching around where the crack was. I

25   don't know exactly how the explosion worked, but I

45

1  didn't see, like, burning to the actual cylinder itself.

2  Not that it wasn't there, but --

3       Q    And as you sit here today, you don't have any

4  way of knowing whether that crack that you saw in the

5  neck of the cylinder was there before Mr. Shalaby

6  attempted to light the torch or was a result of him

7  lighting the torch, do you?

8       A    No, I don't have any way of knowing that.

9       Q    But, in any event, you don't recall seeing any

10  damage to the torch apparatus itself?

11      A    No, sir.

12      Q    With respect to the cylinder, still, did it

13  have any labels on it?

14      A    Yes, it did.  It said -- I believe it was

15  "Burnzomatic," but it didn't -- like, as far as the

16  actual -- I didn't see the actual, like, embossing or

17  anything.  I saw the standard label that was on it.

18      Q    That was still intact?

19      A    I believe it was mostly intact.  Like I said,

20  once again, it was lying in the dirt.  Now, I believe

21  that the label might have been a little bit, like, you

22  know, peeled, just from where -- from what I remember,

23  but I remember that the cylinder was yellow.  That's --

24  that's all I can tell you.

25      Q    And you do remember seeing at least some of

46

1  the label still on it?

2      A     Yes.

3            MR. EPSTEIN:  Do you mind if we take five

4  minutes?

5            MR. MOORHEAD:  No, not at all.

6            (Recess.)

7            MR. MOORHEAD:  Let's go back on the record.

8  BY MR. MOORHEAD:

9      Q     Before we get too far away from it, do you

10 remember what color the cylinder was?

11     A     Yes.  It was yellow.

12     Q     Okay.  Do you know what type of compressed gas

13 was in it?

14     A     Yes, I do.

15     Q     What kind?

16     A     To prior knowledge, I've used this before.

17 The yellow cylinder is reserved only for MAPP gas.

18     Q     Do you know what "MAPP" stands for?

19     A     Not offhand.  I know what it's used for.

20     Q     Good.  How about the torch?  What color was

21 it?

22     A     I believe the body is black.

23     Q     And I think you said earlier that with

24 whatever remaining portions of the label you saw on the

25 cylinder, you believe it was -- Burnzomatic was the

1   label on it?

2       A       I'm -- I'm pretty sure.

3       Q       Did you see any labeling of any type on the

4   torch?

5       A       On the torch body?

6       Q       Yes.

7       A       No, I didn't.

8       Q       Okay.  Did it have any label still on it?

9       A       The torch itself?

10      Q       The torch itself, yeah.

11      A       No, I don't believe it did.

12      Q       Okay.  And did it have any damage to it,

13  consistent with being banged on a hard surface, like one

14  of the people that you overheard said?  Anything you

15  saw, anyway?

16      A       Not that I saw.  All I saw was the slit.

17      Q       But that was on the cylinder, not the torch?

18      A       Right.  On the torch body itself, I didn't see

19  any damage.

20      Q       Okay.  Did you ever see it other than lying on

21  the ground?

22      A       I saw it in the truck.  I never actually

23  touched the torch.

24      Q       At all times that you saw the torch itself,

25  was it attached to the cylinder?

48

1    A    Yes, sir.

2    Q    Other than the crack that you saw at the neck

3  of the cylinder, and I think you said something about

4  maybe part of the label had pulled away, do you remember

5  seeing any other damage to the cylinder?

6    A    Besides the crack?  No, I don't remember.

7    Q    Besides the crack and the label issue?

8    A    No, sir.

9    Q    Okay.  Had you ever seen torches and cylinders

10  of this nature before the date of this incident?

11    A    Yes, sir.

12    Q    And have you used them before?

13    A    Yes, sir.

14    Q    Have you ever actually used MAPP?

15    A    Yes, sir.

16    Q    What other types of compressed gases have you

17  used?

18    A    Propane, MAPP gas, larger tanks with

19  oxyacetylene cutting torches, that kind of stuff when I

20  was in the Navy.

21    Q    So you've used this type of equipment several

22  times before?

23    A    Yes, sir.

24    Q    And your conclusion that the cylinder involved

25  in this incident was filled -- or let me -- at least,

49

1  that one time, with MAPP gas, was that based solely upon

2  the fact that it was yellow, or did you see some

3  labeling that indicated that it was MAPP?

4       A    I think it was solely because I know that that

5  color is reserved for MAPP gas only.  Propane cylinders

6  come in a very variance of colors, but MAPP gas has to

7  be in a yellow -- yellow cylinder.

8       Q    Based upon your observations, did it appear

9  that the torch that was involved in this incident, the

10  one you saw at that location -- was it, in your opinion,

11  the appropriate torch for that cylinder?

12      A    See, that's -- that's where -- to my

13  recollection -- now, I've seen the pictures, but to my

14  recollection, he -- to my recollection, it was the wrong

15  torch tip on the wrong type of cylinder.  That's to my

16  recollection.

17      Q    Okay.

18      A    Once again, I did see it at a distance.  I

19  never actually touched it.

20      Q    So you've seen different types of torches used

21  for different types of gases; is that what you're

22  saying?

23      A    Yes, sir.

24      Q    What's the difference between the torches?

25  What might have been wrong with this one, that caught

50

1  your attention?

2      A    For some reason, I remember it to be the type

3  that only goes on propane bottles; the difference being

4  in the size, the type of fire being introduced, and the

5  igniting. You know, there is an -- actually, a flame

6  arrester on a MAPP gas cylinder -- or, excuse me -- on a

7  torch body, not cylinder.

8      Q    But as you sit here today, you are not a

9  hundred percent sure?

10     A    I am not a hundred percent on that.

11     Q    Do you know why they use different types of

12 torches for propane versus MAPP?

13     A    Why they use different types of torch tips. I

14 know it has something to do with the flame arrester,

15 because the smaller propane tip withstands so much heat

16 before it burns out and the larger one is -- the larger

17 MAPP gas tip can take a higher heat than a propane tip

18 can.

19     Q    Is it your understanding that MAPP burns at a

20 higher temperature than propane?

21     A    Extremely higher.

22     Q    Okay. What -- if you know, from your

23 experience, what are MAPP gas cylinders used for,

24 normally?

25     A    Yes, I do know. They're used for excessive

51

1   heating, such as plumbing, brazing. They've been used

2   for blowing glass. Anything where you need an

3   extreme -- an extreme amount of heat. It burns

4   excessively -- I don't know the exact amount, but I

5   know, hundreds and hundreds of degrees higher than

6   propane itself.

7        Q    Have you ever seen anybody, before this

8   incident, use a MAPP gas cylinder and torch to light a

9   campfire?

10       A    No, sir. That's overkill.

11            MR. MOORHEAD: All right. I'm going to show

12  you the originals of a couple of photographs that

13  Mr. Epstein here has been kind enough to send us. I

14  think I'll just mark as exhibits copies --

15  black-and-white photocopies of those, because we can

16  always get the originals. That will be "6" and "7."

17            (Exhibits 6, 7 marked.)

18  BY MR. MOORHEAD:

19       Q    The one I've labeled as No. 6 is the one that

20  has the young lady making the thingamajig sign. I'm not

21  sure that's what she's actually doing.

22       A    Okay. This is "6."

23       Q    Are these the photos that you were talking

24  about a couple of moments ago, where the torch was not

25  what you recall seeing on the date of the incident?

52

1          A      Yes, sir.

2          Q      And how -- how does the torch in photographs,

3   Exhibits 6 and 7, differ visually -- I'm not asking you

4   for product information -- but how does it differ

5   visually from the propane type torch that you described,

6   that you thought you saw on the night of the incident?

7          A      Okay. Like I said, once again, it's to my

8   recollection, but -- and due to my limited visibility,

9   obviously, in the nighttime, I don't remember it being

10  that big of a tip, which is -- part of a regular torch

11  tip would probably be approximately the length from the

12  tip to the -- where the coupling meets the black flame

13  arrester on that torch.

14         Q      So the propane torches are a lot smaller than

15  the MAPP torches?

16         A      Yes. The torch body itself, yes, sir.

17         Q      Okay.

18         A      The tip is typically all brass, with a small

19  black plastic knob on the propane cylinder.

20         Q      Now, these photographs we have here -- and I

21  don't think anybody in this room is actually positive

22  exactly when they were taken -- but do they appear to

23  you to have been taken at D19?

24         A      No, sir. We looked at these, and you visited

25  the property with me. D19 is an edge -- if we look at

53

the map again, is on the actual outskirts of the

property, okay.  There is no shrub.  There is no marker

lamps, as you see in these photos.

And the break fence itself is a chain-link

wind fence, and that goes from D19 all the way around

the border of Campland here.  And it's a chain-link

fence with the plastic slats put in for privacy.  Right

in here, as I drew in, right in the center of "D" is

actually where this windbreak fence is.

MR. EPSTEIN:  You're referring to the inner

circle there?

THE WITNESS:  Yes.  This picture was actually

taken from site D32, which, beyond -- beyond this light

back here in the distance, in the dark, would be the

other side, over here.  So it's taken from this site,

facing this direction.

MR. EPSTEIN:  Sorry to cut in, but --

MR. MOORHEAD:  Go ahead.

MR. EPSTEIN:  -- if I understand correctly,

the photographs that are before you, Exhibits 6 and 7,

appear to have been taken from site D32?

THE WITNESS:  Yes, sir.

MR. EPSTEIN:  And looking outward past where

D19 would be?

THE WITNESS:  Yes, sir.  Looking outward.

54

1   Because there is no shrubbery.  And if you go to D19,

2   there is no shrubbery or no break fence or no marking

3   lights.

4   BY MR. MOORHEAD:

5       Q    You've indicated that these pictures,

6   Exhibits 6 and 7, would be consistent with being taken

7   from D32.  Are there bushes and lantern lights around

8   D32?

9       A    Yes, sir.  I'm sorry.  The reason I'm saying

10  it's D32 is because in the reservation sheet it does

11  show they were at D32.  There are other areas of the

12  campground.  "E" section has them, too, almost

13  identical; a break fence with a bush area.  And that, I

14  believe, is it.  Yeah, just "D" and "E" sections have

15  those.

16      Q    And the camping adventure that the Shalabys

17  were on at the time of this unfortunate incident is not

18  their only visit at Campland?

19      A    Oh, no.  Mr. Shalaby has been there.  I

20  believe he was there last week.  And his reservations

21  show that he's been there in the past.

22      Q    So none of us took those photos.  We don't

23  know exactly when they were taken, but they don't

24  necessarily had to have been taken on this camping trip?

25      A    Exactly.  We don't know that.

55

1      Q      Now, in both of those photos, Exhibits 6 and
2   7, there is a cylinder and a torch.  Does the cylinder
3   at least look to be similar or consistent with the one
4   you saw on the date of the incident?
5      A      Yes, sir.
6      Q      Okay.  And because it's yellow, it's your
7   conclusion that it's MAPP gas?
8      A      Due to both the color and the shape.  A MAPP
9   gas cylinder tends to be long and is cylindrical.  I
10  don't know if it's across the board, but I do know that
11  they're always yellow.
12     Q      From what you see in front of you, do they
13  indicate on them whether they are MAPP gas or not?
14     A      Yes, sir.  You can see the "APP" and G-a-s,
15  gas, on the Burnzomatic label.
16     Q      That would be on Exhibit 6?
17     A      That would be on Exhibit 6, yes, sir.  On the
18  other one all I can see is, it's very --
19     Q      Fuzzy?
20     A      Yes.
21     Q      So, anyway, although the cylinder looks
22  different -- I mean, excuse me -- although the torch
23  looks different from the one that you remember seeing on
24  the night of the incident, this appears to be the same
25  sort of cylinder that you saw that night?

56

1    A    Yes, sir.

2    Q    Can you tell, by looking at those photos,

3  whether it's the exact same cylinder?  Are there any

4  sort of marks or anything --

5    A    No, no.  That's a standard cylinder.

6    Q    I apologize again if I've already asked you

7  this, because I'm trying to separate what I've asked

8  Warren and what I've asked you.  Did you have any

9  conversations with Mr. Shalaby's wife about what

10 happened?

11   A    No, I didn't.

12   Q    Did you have any conversations with

13 Mr. Shalaby's son, if that's who you saw, about what

14 happened?

15   A    Like I said, this is the boy that I remember

16 in my -- in my very bad description, I guess --

17 adolescent boy.  Yes, that is him.

18   Q    Did you have any conversations with the boy

19 that's in Exhibit 7 about what had happened?

20   A    I know the children were quite -- I remember

21 that the children were by their mother; obviously, I

22 know, notably shaken.

23   Q    That's to be understood.

24   A    Exactly.

25   Q    All right.  I already know the answer to this,

57

1 but we'll put it on the record. Did you prepare any

2 type of report in connection with your involvement in

3 this incident?

4     A    Just what I have in front of me. The incident

5 report. They are standard.

6     Q    All right. And we've already marked a copy of

7 your handwritten statement, together with some other

8 pages, collectively as Exhibit 1.

9         MR. EPSTEIN: Yes.

10 BY MR. MOORHEAD:

11     Q    They are out of order in that particular

12 package, but -- all right. Did you create any

13 documents, other than this incident report and the

14 handwritten notes that you had at one time, that you've

15 since disposed of?

16     A    No, sir.

17     Q    And the page of Exhibit 1 that has your name,

18 under "Report Taken By:," is that all in your

19 handwriting?

20     A    Yes, sir, it is.

21     Q    And can you tell us --

22     A    Oh, excuse me. Sorry to interrupt.

23     Q    Go ahead.

24     A    This bottom part right here, "Guest checked

25 out early. Am unable to contact. TK," that is Therese

1  Kiel.  She amended my report at the end.

2      Q    So at the very, very bottom of the page --

3      A    Just at the asterisk.

4      Q    -- on Line 15 and beyond that, that's

5  something that Therese Kiel wrote?

6      A    Yes, sir.

7      Q    Other than that, it's all in your handwriting?

8      A    Other than that, that is my report.

9      Q    All right.  Do you know approximately when it

10 was that you created that document?

11     A    It would have been at 2230 p.m., which is

12 exactly when -- that's when I write them.  I always look

13 at the clock, and we do them at the gate.

14     Q    So you prepared that document, the portion

15 that's in your handwriting, at 10:30 in the evening on

16 the night of the incident?

17     A    Yes, sir.

18     Q    Have you ever had to redo it for anybody?

19     A    No, sir.

20     Q    Do you know whether Therese Kiel prepared any

21 type of a report?

22     A    That, I do not know, sir.

23     Q    Have you ever seen any incident reports

24 prepared specifically by Therese Kiel, other than the

25 asterisk part that's on yours?

1    A    Oh, yes.  I've seen many.

2    Q    In connection with this incident, though?

3    A    Oh, no, sir.  Only for identification

4 purposes.

5    Q    And is this something that you just knew you

6 had to prepare, or did someone direct you to prepare it,

7 or what?

8    A    Oh, no.  It's standard.  If we have anything

9 with either police, fire involvement or anything where

10 Campland could be liable, we always need to make a -- an

11 incidence report of how we saw the incident or results.

12    Q    If you would, Randy, take a moment to look

13 over the portion that you prepared and tell me if there

14 is anything in there that now, a whole year later,

15 appears to you to be inaccurate in any way.

16    A    I believe, no.  That's pretty much how I wrote

17 it.

18         MR. EPSTEIN:  Do you mind if I chime in?  It

19 will save time later.

20

21                    EXAMINATION

22 BY MR. EPSTEIN:

23    Q    Randy, if you look at Lines 5 and 6, when you

24 say "propane torch," as you sit here today, is it still

25 your recollection that it was a propane torch, or was

60

1  this a report of what you had heard had occurred as

2  opposed to what you had seen?

3      A    Well, when you say that, I was standardizing

4  the type of torch, not necessarily the make of the gas,

5  yes.  So that could have been worded --

6      Q    So were you using that kind of more in a

7  generic sense?

8      A    Right.  Yeah.  Yeah.  It should have been --

9  right.  Exactly.

10      Q    Just for my clarification --

11      A    I didn't even notice that at the time.  I was

12  just trying to give a generalization of what type of

13  tool was being used when the accident happened.

14      Q    The way I might say a butane lighter, even

15  though it was not necessarily --

16      A    Exactly.  Like we might say a Bic lighter,

17  even though it wasn't a Bic.

18

19                   FURTHER EXAMINATION

20  BY MR. MOORHEAD:

21      Q    So as you sit here today, you don't have any

22  reason to believe that you put the word "propane" in

23  order to document the fact that the torch didn't seem to

24  match the cylinder?

25      A    I don't know exactly why.  You know, this is

1    looking back a year later.

2        Q    Understood.

3        A    I don't know exactly why I worded it that way,

4    but I just know that it is worded that way.

5        Q    Was the San Diego Fire Department -- I think

6    you said it was Station 21 that responded?

7        A    Yes.  Yes, I know it was engine -- they call

8    it Engine Company 21.  So it would have been a fire

9    engine, not a --

10       Q    At some point in time that evening, did the

11   fire department take possession of the cylinder and

12   torch?

13       A    That, I don't know.  I don't believe so,

14   because I myself remember asking the engineer -- and I

15   believe Warren did, too.  I can't state for sure --

16   whether they needed to collect the torch and torch body

17   for evidence.

18       Q    Limiting it only to your conversation, so that

19   Warren can speak for himself -- you had a conversation

20   with someone from the fire department --

21       A    Yes.  I don't remember exactly who it was.

22       Q    You had a conversation with someone at the

23   fire department, asking them if they wanted you to

24   collect and provide them the torch and the cylinder?

25       A    Yes.

62

1      Q      And what was their response?

2      A      No.   That the gentleman in question, the

3  patient, as they stated, had already told them, and that

4  it was an accident.

5      Q      Okay.   Did you have any follow-up

6  conversations with anybody at the fire department, in

7  the days or weeks after this incident, making sure that

8  they didn't change their mind and want the torch or the

9  cylinder?

10     A      No, sir.

11     Q      Okay.   Do you know what became of the torch

12 and the cylinder after that evening?

13     A      I, myself, saw it the following day in the --

14 still in the truck bed.   Once again, I didn't touch it,

15 because I didn't exactly know why it was there.   And if

16 it's not yours, don't touch it, you know.   But after

17 that, I did not see it again.

18     Q      Okay.   By "truck bed," you're talking about

19 the Toyota?

20     A      The Toyota Tacoma ranger truck, yes.

21     Q      So you saw it -- did you say it was the

22 following day or the same day?

23     A      It would have been the following day, when I

24 came on the shift.

25     Q      So the last time you saw the torch or the

63

1  cylinder would have been April the 22nd, 2006?

2      A      Would have been the -- yes, sir.

3      Q      Okay.  Do you have any idea what became of it

4  after that?

5      A      To my immediate knowledge, no.

6      Q      Okay.  You weren't the one -- if this was

7  done, you weren't the one that disposed of it?

8      A      No, sir, I was not.

9      Q      If it was disposed of, do you know who

10  actually accomplished that?

11      A      No.

12             MR. STEPHAN:  Calls for speculation.

13             THE WITNESS:  No, I do not.

14  BY MR. MOORHEAD:

15      Q      So nobody has come to you and said, "I was the

16  guy who pitched it in the Dumpster"?

17      A      No, sir.

18      Q      Let me finish my question so the record is

19  clear.  Did the -- and if I asked you this, again, I

20  apologize.  I'm losing track of what I'm asking -- did

21  anybody from the fire department, either that evening,

22  Randy, or at a subsequent point in time, tell you what

23  they determined the cause of this incident to be?

24      A      Tell me directly?  No, sir.  Typically, they

25  don't give us that information.

64

1      Q     But, in any event, whatever conclusions they

2   reached, though, have they told you that they did not

3   need the torch nor the cylinder?

4      A     Yes, sir.

5      Q     Okay.  You created a handwritten account of

6   your observations and conclusions that evening, and

7   Warren created one.  Have you seen any created by

8   anybody else employed by Campland?

9      A     No, sir.

10         MR. MOORHEAD:  This is going to have to be a

11   new exhibit, because it's Randy.  Let me hand you what

12   we'll mark as Exhibit 8.  And this is the subpoena for

13   your deposition.

14         (Exhibit 8 marked.)

15   BY MR. MOORHEAD:

16      Q     I don't really need you to look at the front

17   page.  It just tells you when and where to come here.  I

18   want you to look at the attachment that talks about the

19   things to be produced.

20         And the court reporter was kind enough to

21   point this out to me:  My secretary inadvertently put

22   the year 2007 on here, but we were talking about the

23   year 2006, as I'm sure you can gather.

24      A     Okay.

25      Q     Look at the first category, if you would, and

1  read into the record what it was that you were to bring.

2      A    "All reports and witness statements taken in

3  connection with the incident involving Andrew Shalaby on

4  April 21, 2000- --" well, "-7," but it should be "-6" --

5  "at Campland."

6      Q    And the only things that you are aware of that

7  Campland has ever had, responsive to that category,

8  would be the handwritten incident report that you

9  prepared and the handwritten incident report that Warren

10 prepared?

11     A    Yes, sir, to my knowledge.

12     Q    All right.  And the second category asked for

13 what?

14     A    "All correspondence generated and received in

15 connection with the incident involving Andrew Shalaby on

16 April 21" -- typo, "2007" -- "at Campland."

17     Q    Okay.  Are you aware of any correspondence,

18 either from Campland to somebody else or to Campland

19 from somebody else, regarding this incident?

20     A    I am not aware.

21     Q    What's the third category there?

22     A    "All photographs taken in connection with the

23 incident involving Andrew Shalaby on April 21, 2007 at

24 Campland."

25     Q    You indicated earlier it might have been

66

1   standard procedure in the normal course of things to

2   take some photographs.  But were any photographs taken

3   in connection with this particular incident?

4       A      No, sir.

5       Q      What's the fourth category?

6       A      Fourth category:  "The canister, or canisters,

7   recovered in the incident involving Andrew Shalaby on

8   April 21, 2007 at Campland."

9       Q      Okay.  And the canister, as far as you are

10  aware, is no longer available?

11      A      Right.  Yes, sir.

12      Q      And you have no idea where it is?

13      A      No, sir, I do not.

14      Q      Okay.  What's the fifth category?

15      A      "The torch recovered from the incident

16  involving Andrew Shalaby on April 21, 2007 at Campland."

17      Q      And, like the canister, you have no idea where

18  the torch is located?

19      A      Yes, sir.  No, sir, I don't.

20      Q      That's correct?

21      A      That's correct.

22      Q      And whether or not you guys took any

23  photographs, you don't know of any photographs taken of

24  the torch or the cylinder either by fire department

25  personnel, the Shalabys, or any of the adjacent campers

1  that evening?

2       A    No, sir, I do not.

3            MR. MOORHEAD:   At this time, Randy, I think

4  I'm out of questions, although Mark will probably make

5  me think of some more.

6            MR. EPSTEIN:   I'll try not to.

7            THE WITNESS:   Okay.

8

9                    FURTHER EXAMINATION

10  BY MR. EPSTEIN:

11       Q    Fortunately, John did a good job and asked

12  most of the questions I was going to ask, but I have a

13  few areas I wanted to get back to.

14            I believe we spoke off the record and you

15  mentioned you were in the Navy for a while, stationed up

16  at Treasure Island.   I am not sure if it was the Navy or

17  the Army.   Which --

18       A    The Navy.

19       Q    Navy.   How long were you in the Navy?

20       A    Four years.   A little over.

21       Q    What span of years was that?

22       A    That would be January -- well, December of

23  '88, technically, to -- I got out in '93, I believe,

24  December.

25       Q    You mentioned earlier that you did, at least,

68

1  a significant amount of welding during that time, is

2  that correct, while you were in the Navy?

3      A    Well, yeah.  I was what they call "tin can

4  Navy."  I was on a small cruiser, a guided missile

5  cruiser.  And so my duties there included some brazing,

6  some -- using oxyacetylene, cutting torches, that kind

7  of things, sometimes.

8      Q    Did you receive any kind of certification for

9  that while you were in the Navy?

10     A    No.  I wasn't a welder.  I was -- actually,

11 it's kind of funny -- but a shipboard firefighter.

12 Called a damage control man.  So we had to use them to

13 possibly cut through water-tank doors, stuff like that.

14     Q    So using the torches was sort of more

15 incidental to your duties in the Navy, if you will,

16 rather than being the main focus of what you were to do?

17     A    Yes, sir.

18     Q    And you were -- actually, you spent time

19 stationed at sea while you were in the Navy?

20     A    Oh, yes, sir.  Yes, sir.

21     Q    During your time in the Navy, did you have

22 occasion to use MAPP gas torches?

23     A    No.  That was -- well, yes.  Yes, in few

24 circumstances, 'cause we also did -- like I told you, I

25 was on a smaller ship.  So we also did hull technician's

69

1  job, which involved a lot of plumbing.  So I did some

2  occasional brazing in which we did use MAPP gas for

3  brazing.

4      Q    After you got out of the Navy in approximately

5  1983, what was the next job you held?

6      A    Let's see.  That was a ways back.  I managed

7  nightclubs for probably 13 years.

8      Q    Okay.  Rather than going through your job

9  history, let me ask you:  Since you've been out of the

10  Navy, have you had occasion to use welding or splitting

11  torches?

12      A    Cutting torches?

13      Q    Cutting torches.

14      A    No.  I've used MAPP gas a couple of times,

15  brazing, like, water lines or stuff on my RV, but that's

16  it.

17      Q    That was personal home use?

18      A    Yes, sir.

19      Q    Is that part of your job duties at Campland at

20  all to use them?

21      A    Oh, no.  Right now, I live in an RV.

22      Q    So you've done basically home plumbing and

23  pipe repairs, basically?

24      A    Right.

25      Q    Both you and Mr. Ratliff used the term "fire

ring." Is that another way of saying "fire pit"?

A Yes. They are used for the same thing. The only thing is, ours are mobile, as you can see in the photograph.

Q Exhibit 6?

A Exhibit 7.

Q "7," yeah.

A Exhibit 7. They are cylindrical, made of a piece of rebar and then put into a cement poured over the rebar. So the rebar holds the cement ring together. And we can relocate them. They can be turned on the side and actually rolled to different areas, the bottom of it being the sand that we put it on.

Q So they are actually portable fire pits?

A Yeah. They're rings, exactly.

Q And the ring is made of, sounds like, reinforced concrete?

A Yes. It's cement with rebar. They use rebar, which is standard tubular steel, and they make a -- weld that into a circle and set it into a die, where they put the cement. And it makes almost like a little curvy rings type thing.

Q Getting back to your testimony a little earlier, I believe you recalled hearing, essentially, four different versions of the story of what might have