1  happened, from different people, and you couldn't place

2  necessarily the identity of each of those people, but

3  one of them was, you had heard somebody say that they

4  thought Mr. Shalaby might have been using the torch to

5  light a water heater.

6       A     It was -- like I had said, I couldn't remember

7  if it was a water heater or a campfire.  He was using

8  the torch to ignite a source.

9       Q     Okay.  One of the individuals you recall

10  saying something to the effect that he was -- that he or

11  she thought Mr. Shalaby was kicking around the cylinder

12  in the coals; is that correct?

13       A     Yes.  That was --

14       Q     All right.  And then one of the individuals,

15  or one person or group of persons, also said that they

16  thought Mr. Shalaby may have been hitting the torch on

17  the fire ring that we were just describing; is that

18  correct?

19       A     Right.

20       Q     All right.

21       A     Like I said, those are just, like, hearsay

22  things that we heard in the general --

23       Q     And I was just going to -- you didn't

24  actually -- first of all, you weren't at campsite D19

25  before the -- or at the moment the incident occurred; is

1    that correct?

2        A     No, sir.  No, sir.

3        Q     And you didn't personally see Mr. Shalaby or

4    anyone take the torch and strike it against anything?

5        A     No, sir.  I didn't see any of the -- the

6    allegations of what might have happened.

7        Q     Okay.  And I think you answered this question,

8    but just so I can recall, you didn't see any evidence on

9    the torch itself consistent with it being banged against

10   a hard surface; is that correct?

11       A     No, sir.

12       Q     Getting back to the portion of the torch --

13   the tank that you saw lying on the ground, you mentioned

14   earlier that you saw a split between the -- at the point

15   where the neck reaches the -- I don't know if you'd call

16   it the top lip or where the ring is?

17       A     Right.

18       Q     Can you describe any more the appearance of

19   the split you saw there?  I mean, could you tell, for

20   instance, the direction in which the metal had separated

21   or come apart?

22       A     Yeah, you could.  Well, like I said, it was

23   right at where the -- where the threads meet the actual

24   shoulders of the cylinder.  And it was elliptical in

25   shape.  And you could tell it was -- it was -- it's hard

73

1  to explain.  There were little bends out, you know,

2  like -- like --

3       Q     Bends in an outwardly direction?

4       A     Yeah.  Yeah.  Like a split.  Like -- I'm

5  trying to think of what -- you could just -- you could

6  see that there wasn't a puncture going in.  You know

7  what I mean?  There was the lip.  The edges of it

8  were -- were kind of out.

9       Q     In examining the split for however long you

10  did, could you get a sense, based on your experience, of

11  what might have caused that to occur?

12       A     The actual cause?  No.  I did see, right where

13  the split was -- 'cause it was right at the neck of

14  where the torch body meets the bottle -- it was actually

15  bent.  Like, the torch body itself and the -- and

16  everything above where the split was was actually, like,

17  bent off to the side a little bit.  You know what I

18  mean?

19       Q     In an outwardly direction, away from the

20  inside of the bottle?

21       A     I can -- At the opening of the split.  If it

22  was right at the seam, the split would be going around

23  the neck.  Right where it opened, the top edge, it bent

24  the -- do you understand?  The neck of the bottle

25  actually, like, bent a little bit, so it wasn't

1  completely straight.

2      Q      Yes.

3      A      Where the -- where it blew out the neck of the

4  bottle, actually, it would have been a little cockeyed.

5      Q      I'm just -- I see what you're doing with your

6  fingers.  I'm just describing it for the record, because

7  it's --

8      A      I'm sitting here, trying to word it.  And it's

9  almost impossible.

10      Q      When you were showing how it was bent, you

11  meant it was bent in a direction from the inside of the

12  tank outward?

13      A      Right.  The edges would have been curled out,

14  and the split itself caused the actual neck to be

15  offset.

16      Q      Okay.  Then, getting back to the issue of the

17  torch, or the torch tip, as it's been called, if you

18  were to look at both -- what's been marked as

19  Exhibits 6 and 7, in looking at those photographs, as

20  you sit here today, can you say with any -- with

21  certainty that that was not the torch tip that you saw

22  on the evening of the incident?

23      A      With certainty, no.

24      Q      But as you sit here today, you have some sort

25  of recollection that the torch tip may have been one

1  that you were more familiar seeing as attached to MAPP

2  gas -- excuse me -- to a propane tank?

3       A    To my -- to my knowledge.  I can't say, you

4  know, as a written fact, that that was it.

5       Q    I understand.  You didn't, for example, look

6  closely at the torch itself to see any wording on it

7  that said "Propane Torch" or anything like that?

8       A    No, sir.  No, sir.

9       Q    Do you recall, after the incident, and after

10  the fire department and the EMS personnel had left,

11  examining the torch with Mr. Ratliff?  Do you have any

12  recollection of doing that?

13       A    I remember us looking at it as far as when it

14  was laying in the dirt, like, you know, staring -- like

15  me and him looking down like this.

16            And I also remember -- I never physically had

17  any hands on it.  I believe Warren did, and I believe we

18  might have looked at it at the gate, at the split on the

19  side.  I guess we were more focused on, actually,

20  Mr. Shalaby, you know, his thing and the torch thing.

21  But we were looking at the torch.  We were mainly

22  looking at the split, you know, going, "Wow."

23       Q    And, again, when I ask you these questions, I

24  realize that it's been about a year on so.  I just want

25  your best recollection.

1      A      Okay.

2      Q      Do you remember:  For instance, the split that

3   you and Mr. Ratliff observed, was that -- was that

4   something you had seen before in a MAPP gas tank?

5      A      I've never seen it -- I've seen large

6   cylinders, like, when I was in the service, like, the

7   actual tops break off, and I've seen them spin around.

8   That's the big welding cylinders.  I've never seen a

9   MAPP gas or a propane cylinder split like that.

10     Q      Was it your impression that Mr. Ratliff found

11  that split to be unusual, in his experience?

12     A      I think we both did.  I mean, it's something

13  that you don't see every day.

14     Q      Do you remember any other words that you and

15  Mr. Ratliff exchanged about the split that you saw in

16  the torch -- I mean, in the tank?

17     A      Not exact wordings or what it is.  I know that

18  we were amazed.  It was quite a split.

19     Q      Okay.  Was there anything remarkable about the

20  torch, the torch tip, that you were talking about with

21  Mr. Ratliff at that moment, up by the front gate?

22     A      I don't remember.  I can't remember.

23     Q      That's okay.

24     A      I remember that me and Warren had -- had -- we

25  both -- we were discussing the tip and we had varying

Case 3:06-cv-07026-MLJ  Document 58-5   Filed 09/04/2007   Page 77 of 82
Case 3:07-cv-02107-W-BLM   Document 3-5   Filed 10/30/2007   Page 7 of 46

77

1   views on it, but --

2       Q    Okay.  And can you describe for me what your

3   varying views were?

4       A    I stated that I didn't think it was the

5   correct tip.  Like I said, I can't identify through the

6   picture whether --

7       Q .  Understood.

8       A    But he was saying that it was fine.  I don't

9   know.

10      Q    As you sit here today, do you have any opinion

11  or sense of what caused the torch to do what it did on

12  the night of the incident?

13      A    Me not being a -- the professional fire

14  investigator, no.  I mean, I realize there was some kind

15  of -- some kind of explosion.  I don't know what

16  happened to create that explosion.  I couldn't -- I

17  wasn't there.

18      Q    All right.  This delay is good.  That means

19  I'm getting close to the end here.

20      A    No problem.  One thing I did want to bring to

21  your attention -- I don't know if it needs to be on the

22  record or not -- on the subpoena, my name is misspelled.

23  But it's -p-h-e-n-s.  That's all.

24      Q    On the evening of the incident, can you

25  describe for me as best as you can the weather

1    conditions that night.

2         A    I know it was -- it wasn't raining or

3    anything.   It was a standard San Diego summer night,

4    probably, I'd say, mid-seventies.   It was pitch-black.

5    It was dark.

6         Q    Any breeze that you can recall?

7         A    That, I don't know.   I'm not sure.

8         Q    In examining the cylinder on the evening of

9    the incident, do you recall any part of it being dimpled

10   or crushed or distorted in any way?

11        A    No.

12        MR. EPSTEIN:   Okay.   Thank you.

13

14                 FURTHER EXAMINATION

15   BY MR. MOORHEAD:

16        Q    One thing I want to follow up on, Randy,

17   because I'm not sure that the record is going to be

18   clear with some of our descriptions and stuff, but let's

19   use Exhibit 6 as our frame of reference here, because

20   it's got a pretty good picture of a cylinder and a

21   torch.   And let's just assume, for the purposes of our

22   series of questions, that that's the cylinder and the

23   torch involved in the incident before the event occurs.

24             When you saw it after the incident, you've

25   described the neck of the cylinder being tilted, right?

79

1   A    Yes, sir.

2   Q    Again, this is just for the sake of example.

3  If we use Exhibit 6 and we indicate that it was tilted

4  to your right, towards the woman sitting there, getting

5  ready for the Metallica concert, both the neck of the

6  cylinder and the black part of the torch that attaches

7  to it would have been tilted to your right; is that

8  correct?

9   A    If I remember right, it was my left, because I

10 believe the split -- the split would have been right at

11 the neck level right here.  But yeah.

12  Q    Let's use left, then.  Looking at that

13 photograph, the neck and the black portion of the torch

14 that we see in this laser color photocopy of the

15 photograph would have been tilted off center towards

16 your left?

17  A    Yes, sir.  Yes, sir.

18  Q    All right.  And the split, I think we've

19 called it, or fracture, or whatever it is, would have

20 been, under those circumstances, on the right side of

21 the neck --

22  A    Yes.

23  Q    -- is that correct?

24  A    Yes.  Almost exactly where -- where everything

25 meets -- where the neck meets the shoulder body, right

80

1  here, going -- going in a circular pattern.

2        Q    Can you give us any estimate at all of how

3  far, in degrees, off to dead center this angle was?

4  Straight across would be 90 degrees.

5        A    Yeah.

6        Q    Straight up is zero.

7        A    Probably, maybe, like, what, 5 degrees,

8  10 degrees, maybe.  It would -- if it was directly up

9  and down, it would have been like that.  So I'd say

10 about five to 10 degrees.

11       Q    Okay.  Now, do you know, as you sit here

12 today, Randy, whether the crack that you saw, or split,

13 or whatever you want to call it, caused the neck to tilt

14 or whether the neck got bent, for the sake of example,

15 by being banged on the fire ring, and that caused the

16 crack?  Do you know one way or the other?

17       A    I couldn't tell what caused the crack, no.

18       Q    There could have been some other cause, as

19 well?

20       A    Could have been, yeah.

21            MR. EPSTEIN:  Objection.  Calls for

22 speculation.

23            MR. MOORHEAD:  No further questions.  Thanks,

24 Randy.

25            MR. EPSTEIN:  I'm sorry.  One last one.

FURTHER EXAMINATION

BY MR. EPSTEIN:

Q    The woman who is depicted in Exhibits 6 and 7,
do you recognize her?

A    Well, I recognize the woman.  I think that's
Ms. Shalaby.  I believe.

Q    And the boy who is depicted in Exhibit 7, do
you recognize him?

A    That's -- that's the adolescent male that I
described.

Q    And do you recognize the girl who is depicted
in the picture?

A    There was a young female girl there.  I
think -- I can't really point her out, but I know -- I
recognize the boy.

MR. EPSTEIN:  Okay.  Thank you.

THE WITNESS:  You're welcome.

MR. MOORHEAD:  Nothing further.  Let's just
have the same stipulation.

For your benefit -- we can go off the record.

(Deposition concluded at 2:45 p.m.)

*  *  *  *  *

1  STATE OF CALIFORNIA  )

2                       ss:

3  COUNTY OF SAN DIEGO  )

4

5          I, Catherine A-M Gautereaux, Certified

6  Shorthand Reporter in and for the State of California,

7  do hereby certify that the witness in the foregoing

8  deposition was duly sworn by me to testify the truth,

9  the whole truth, and nothing but the truth in the

10  foregoing cause; that said deposition was taken before

11  me at the time and place herein named; that the

12  testimony of said witness was reported by me and was

13  thereafter transcribed in my presence.

14          I do further certify that I am a

15  disinterested person and am in no way interested in the

16  outcome of this action or connected with or related to

17  any of the parties in this action or to their

18  respective counsel.

19          IN WITNESS WHEREOF, I have hereunto set my

20  hand this 24th day of April, 2007.

21

22

23  _____

                Catherine A-M Gautereaux
24                  CSR No. 3122

25

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4                                           COPY

5   ANDREW SHALABY, an individual,    )
    and SONIA DUNN-RUIZ, an           )
6   individual,                       )
                                      )
7              Plaintiffs,            )
                                      )
8        vs.                          )   Case No. C 06 7026 CW
                                      )
9   NEWELL RUBBERMAID, INC., a        )
    Delaware Corporation; THE HOME    )
10  DEPOT, INC., a Delaware           )
    Corporation,                      )
11                                    )
               Defendants.            )
12  _____  )

13

14

15

16

17            DEPOSITION OF ROBERT KEVIN PRICE

18              San Diego, California

19              Wednesday, May 30, 2007

20

21

22  Reported by:
    FRAUKE KUO
23

24

25

1    A.    Okay.

2    Q.    -- and we will mark it as Exhibit 8 to this depo

3  as well.

4          (Defendants' Exhibit No. 8 was marked for
           identification by the court reporter.)

5

6    MR. MOORHEAD:  Okay.

7  BY MR. MOORHEAD:

8    Q.    Now, the stuff that you input into the -- into

9  this report would have been done by a Palm Pilot?

10    A.    Correct.

11    Q.    Was that done at the scene, during transport,

12  after the call was over, or some combination of those?

13    A.    Combination.

14    Q.    Okay.  And when I look at the hard copy version

15  of this report, it appears that some of the print is in --

16  in bold.  Is that the stuff that's, basically, in the form

17  and you just fill in the blanks?

18    A.    I believe so.

19    Q.    Okay.  Do your best, if you can, Kevin, to read

20  for me what it was that you inputted under "History," just

21  so I am not guessing.  In other words, read it like you

22  were intending.  You don't have to use abbreviations.

23  What does it say?

24    A. .  "Patient was kicking around a propane torch.  It

25  went into a fire and blew up and burned him.  Family

20

1  called 911."

2      Q.   Do you know -- and I realize it's been over a

3  year ago, and you have responded to many other things --

4  whether or not the information you gathered that goes into

5  the "History" section was obtained directly from

6  Mr. Shalaby, the patient, or from other sources?

7      A.   I --

8      Q.   Do you know whether that information was imparted

9  to you when you were at Mr. Shalaby's side?  In other

10  words, he could have heard somebody say how it happened

11  when that was communicated to you?

12     A.   Sorry.  I don't understand that question.

13     Q.   Okay.  I think you told us earlier you are not

14  sure whether what's in the "History" section was given to

15  you by Mr. Shalaby, by someone else at the scene, or

16  perhaps someone like Captain Spangler.

17     A.   Right.

18     Q.   What I am asking is:  Do you remember where you

19  received that information physically?  So I am asking

20  whether it was possible that Mr. Shalaby, if he wasn't the

21  reporting person -- whether he could have heard someone

22  else saying it, or is this told to you back at the

23  station, while you were en route, or by something where he

24  might not be able to hear?

25     A.   I am not sure, but I would think it would have

1   been on scene, before we got in the ambulance.

2        Q.   But you are not sure?

3        A.   I am not sure.

4        Q.   Do you know whether you interviewed any of his

5   family members to find out what happened?

6        A.   I didn't.

7        Q.   Do you know if anyone else did?

8        A.   I think so.  I'm -- Sorry.  I am not positive.

9   Captain Spangler or Joe Russo probably did.  That's

10   normally their job.  I was busy with my patient at the

11   time.

12        Q.   Okay.  Do you have any recollection of

13   interviewing any of the adjacent campers to find that out?

14        A.   No.

15        Q.   Do you know if anybody else did?

16        A.   No.

17        Q.   Now, the "History" section here makes reference

18   to a propane torch.  Did you ever see the propane torch

19   that was reported to you to be involved in the incident?

20        A.   I don't remember.

21        Q.   As far as you can recall, did Fire Department

22   personnel take the torch that's mentioned in the "History"

23   section into custody at the scene?

24        A.   No.  Not that I recall.

25        Q.   Okay.  Do you know if anybody associated with the

```
                    JURAT
              I, _____, do
hereby certify that I have read the
foregoing transcript of my testimony,
taken on  _____, 2007, and have signed
it subject to the following changes:
PAGE  LINE          CORRECTION          REASON
```

```
                    _____
```

```
Sworn and subscribed to before me on this
_____ day of  _____, 2007.


NOTARY PUBLIC   _____
```

## AFFIDAVIT OF JOHN K. STIPANCICH

STATE OF NORTH CAROLINA   )
                                 ) SS:
COUNTY OF MECKLENBURG   )

      I, John K. Stipancich, being duly cautioned and sworn, state and depose as follows:

      1.      I am an officer of Irwin Industrial Tool Company.

      2.      Bernzomatic is an unincorporated division of Irwin Industrial Tool Company.

      3.      Among other things, Bernzomatic is in the business of manufacturing, distributing and selling fuel gas torches. It is also in the business of distributing and selling fuel gas cylinders.

      4.      Irwin Industrial Tool Company is a wholly owned subsidiary of Newell Rubbermaid Inc.

      5.      Neither Newell Rubbermaid Inc. nor Rubbermaid Inc. is in the business of manufacturing, selling and/or distributing fuel gas cylinders or torches.

      Further Affiant sayeth naught.

                                         
John K. Stipancich

Sworn to before me and subscribed in my presence this 9th day of February, 2007.

Notary Public
my Commission Expires:
May 9, 2009



1  MICHAEL J. VEILUVA (State Bar No. 100419)
   MARK D. EPSTEIN (State Bar No. 168221)
2  ALBORG, VEILUVA & EPSTEIN LLP
   200 Pringle Avenue, Suite 410
3  Walnut Creek, CA 94596
   Telephone: (925) 939-9880
4  Facsimile: (925) 939-9915

5  Attorneys for Plaintiffs
   Andrew Shalaby and Sonia Dunn-Ruiz
6

7

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10 ANDREW SHALABY and SONIA DUNN-        Case No. C 06-07026 MJJ
   RUIZ,
11                                        [PROPOSED] ORDER DENYING THIRD
                Plaintiffs,               PARTY DEFENDANT WORTHINGTON
12                                        INDUSTRIES, INC.'S MOTION TO
                                          TRANSFER VENUE
13         vs.

14 IRWIN INDUSTRIAL TOOL COMPANY,         Date:   September 25, 2007
   INC., THE HOME DEPOT, INC., and DOES  Time:   9:30 a.m.
15 2 through 100, inclusive               Ctrm:   11, 19th Floor
                                          Judge:  Hon. Martin J. Jenkins
16            Defendants.
                                          Complaint filed: October 10, 2006
17                                        Case Removed: November 9, 2006

18

19        Third party defendant Worthington Industries, Inc.'s ("Worthington's") motion to

20 transfer venue came on regularly for hearing on September 25, 2007 at 9:30 a.m. in Courtroom

21 11 of this Court, before the Honorable Martin J. Jenkins.  Richard A. Ergo of Bowles & Verna

22 LLP appeared on behalf of Worthington.  Mark D. Epstein of Alborg Veiluva & Epstein LLP

23 appeared on behalf of plaintiffs.
24

25        The Court, having considered the papers submitted in support of and in opposition to said

26 motion, the oral arguments of counsel, and good cause appearing therefore,

27 IT IS HEREBY ORDERED that Worthington's motion is DENIED.  Worthington has failed to

28 meet its burden that the convenience of the witnesses and/or the interests of justice would be

1   served by transferring this case to the United States District Court for the Southern District of

2   California.

3           IT IS SO ORDERED.

4

5   Dated: _____          _____

6                                           The Honorable Martin J. Jenkins
                                            United States District Court Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                    2      900725.pld.Proposed Order Re Opp to Mtn to Transfer.mpa.doc

                                    ORDER DENYING MOTION TO TRANSFER

1 | Lowell T. Carruth, # 034065                    (SPACE BELOW FOR FILING STAMP ONLY)
McCormick, Barstow, Sheppard,
2 | Wayte & Carruth LLP
P.O. Box 28912
3 | 5 River Park Place East
Fresno, CA  93720-1501
4 | Telephone:    (559) 433-1300
Facsimile:    (559) 433-2300
5 |
6 | Attorneys for Third-Party Defendant
WESTERN INDUSTRIES, INC.

7 |

8 |                  UNITED STATES DISTRICT COURT

9 |                 NORTHERN DISTRICT OF CALIFORNIA

10 |

11 | ANDREW SHALABY, an individual, and        Case No.  C 06-07026 MJJ
SONIA DUNN-RUIZ, an individual,
12 |                                           **STIPULATION AND ORDER
                                            WITHDRAWING MOTION TO STRIKE
13 |              Plaintiffs,                  AND EXTENDING DUE DATE FOR
                                            FILING RESPONSE TO THIRD-PARTY
14 |      v.                                  COMPLAINT**

15 | IRWIN INDUSTRIAL TOOL                     Judge:    Martin J. Jenkins
COMPANY, THE HOME DEPOT, INC.,
16 | and DOES 2 through 100, inclusive,

17 |              Defendants.

18 | BERNZOMATIC,

19 |              Cross-Complainant,

20 |      v.

21 | WESTERN INDUSTRIES, INC.,
WORTHINGTON INDUSTRIES, AND
22 | ROES 2 through 100, inclusive,

23 |              Cross-Defendants.

24 |

25 |       IT IS HEREBY STIPULATED by and between Defendant and Third Party Plaintiff

26 | BERNZOMATIC, an Unincorporated Division of Irwin Industrial Tool Company, and Defendant

27 | THE HOME DEPOT, INC. (collectively referred as "BERNZOMATIC") and Third Party

28 | Defendant WESTERN INDUSTRIES, INC., ("WESTERN") and by and through their respective

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
5 River Park Place East
Fresno, CA 93720-1501

STIPULATION AND ORDER WITHDRAWING MOTION TO STRIKE AND EXTENDING DUE DATE FOR
RESPONSE TO COMPLAINT  C 06-07026 EDL

1   attorneys of record that the Motion To Strike Cross-Complainant's Third Party Complaint

2   Against Cross-Defendant, Western Industries, Inc., shall be withdrawn.   WESTERN'S response

3   to BERNZOMATIC's Third Party Complaint shall be due twenty (20) days after the Court rules

4   on Defendant WORTHINGTON INDUSTRIES' Motion for Change of Venue.

5   Dated: September 5, 2007                     McCORMICK, BARSTOW, SHEPPARD,
                                                WAYTE & CARRUTH LLP
6

7

8                                       By:_____/s/ Lowell T. Carruth_____
                                                Lowell T. Carruth
9                                               Attorneys for Third-Party Defendant
                                                WESTERN INDUSTRIES, INC.
10

11

12   Dated: August 27, 2007                       KELLER, PRICE & MOORHEAD

13

14                                       By:_____/s/ J. Phillip Moorhead_____
                                                J. Phillip Moorhead
15                                              Attorneys for Defendant and Third Party
                                                Plaintiff BERNZOMATIC, an
16                                              Unincorporated Division of Irwin
                                                Industrial Tool Company, and Defendant
17                                              THE HOME DEPOT, INC.

18                                       **ORDER**

19        The Court, having considered the above Stipulation and good cause appearing, hereby

20   orders that the Motion To Strike Cross-Complainant's Third Party Complaint Against Cross-

21   Defendant, Western Industries, Inc., shall be withdrawn.   WESTERN'S response to

22   BERNZOMATIC's Third Party Complaint shall be due twenty (20) days after the Court rules on

23   Defendant WORTHINGTON INDUSTRIES' Motion for Change of Venue.

24        IT IS SO ORDERED.

25   Dated: _____         _____
                                                U.S. Magistrate Judge
26

27   03664/00161-1127231.v1

28

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

STIPULATION AND ORDER WITHDRAWING MOTION TO STRIKE AND EXTENDING DUE DATE FOR
FILING RESPONSE TO THIRD PARTY COMPLAINT C 06-07026 EDL

1  RICHARD A. ERGO (# 110487)
   CATHLEEN S. HUANG (# 219554)
2  BOWLES & VERNA LLP
   2121 N. California Boulevard, Suite 875
3  Walnut Creek, California  94596
   Telephone:  (925) 935-3300
4  Facsimile:  (925) 935-0371
   Email:  raergo@bowlesverna.com
5
   Attorneys for Third Party Defendant
6  Worthington Industries, Inc.

7

8
                    UNITED STATES DISTRICT COURT
9
                    NORTHERN DISTRICT OF CALIFORNIA
10

11  ANDREW SHALABY, an individual, and SONIA          Case No.:  C06-07026 MJJ
    DUNN-RUIZ an individual,
12                                                     Judge Martin J. Jenkins
                   Plaintiffs,
13                                                     THIRD PARTY DEFENDANT
           vs.                                         WORTHINGTON INDUSTRIES INC.'S
14                                                     REPLY BRIEF IN SUPPORT OF MOTION
    IRWIN INDUSTRIAL TOOL COMPANY, THE                 TO TRANSFER VENUE
15  HOME DEPOT, INC., and DOES 2 through 100,
    inclusive,                                         Date:        September 25, 2007
16                                                     Time:        9:30 a.m.
                   Defendants.                         Ctrm:        11, 19th Floor
17

18  BERNZOMATIC,

19                 Third Party Plaintiff,

20         vs.

21  WESTERN INDUSTRIES, INC.,
    WORTHINGTON INDUSTRIES, AND ROES 2
22  through 100, inclusive,

23                 Third Party Defendants.

24

25                            I. INTRODUCTION

26      Worthington Industries, Inc. ("Worthington") seeks to transfer this case from the Northern

27  District to the Southern District where the accident took place and where key third party witnesses

28  reside and/or work. These witnesses have testified that, among other things, plaintiff Andrew Shalaby

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                          1

THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES INC.'S REPLY BRIEF IN SUPPORT OF
MOTION TO TRANSFER VENUE

admitted that the accident occurred when he kicked his MAPP gas cylinder into a fire and that he stated "I'm an idiot. I can't believe I'm so stupid," and "[t]his is my fault." It is anticipated that Shalaby will deny kicking the cylinder into a fire, and/or admitting fault for the accident. Moreover, some of these witnesses have testified as to the physical description of the cylinder after the accident, specifically the existence of a hole near the top of the cylinder. Because the cylinder was thrown away after the accident, experts will have to rely on these descriptions in evaluating the possible causes of the accident.

Plaintiffs counter this motion by characterizing the Southern California witnesses' testimony as "ancillary" and "incidental" and pointing out that numerous doctors who reside in Northern California may be called as witnesses. Admissions of fault coupled with clearly dangerous actions (kicking a cylinder with flammable gas into a campfire) are hardly inconsequential. Rather, they demonstrate that Shalaby's extreme misuse of the product, and not a defect, caused the accident.

As to the doctors, unlike the Southern California witnesses, they will be paid substantial sums of money to testify and will no doubt cooperate with Plaintiffs in attending trial. Moreover, the doctors' testimony will go to damages, an issue that will not be vigorously contested.

On the other hand, liability – how the accident occurred – will be vehemently disputed. Thus, it is extremely important that the Defendants be able to present the Southern California witnesses live at trial. If the trial is venued in Northern California, the practical reality is that some, or all of them, will not appear to testify.

Plaintiffs also argue that their choice of venue should be given great deference. However, the convenience of third party witnesses is the most important factor. Further, when the venue has no connection to incident, Plaintiffs' choice is accorded less significance. Accordingly, to promote the convenience of third party witnesses, whose testimony is critical to the liability issue, and to promote the interests of justice, this action should be transferred to the Southern District.

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                                2
THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES INC.'S REPLY BRIEF IN SUPPORT OF
MOTION TO TRANSFER VENUE

## II.    LEGAL ARGUMENT

**A.    Convenience of Important Non-Party Witnesses and Other Potential Witnesses in San Diego Warrant A Transfer**

The convenience of the witnesses is "the most important factor to be considered in ruling on a motion under 1404(a)." *Saleh v. Titan Corp* (SD Cal 2005) 361 F. Supp. 2d 1152, 1160. While the convenience of party witnesses is a factor to be considered, "**the convenience of non-party witnesses is the more important factor**." *Id.* (emphasis added.) Worthington has already identified four key witnesses to this case, who work and reside in San Diego. If a transfer is not granted, they will have to leave their homes and their job posts, and be unable to respond to emergency situations such as Shalaby's. Plaintiffs suggest that the Southern Californians can offer their testimony through deposition transcripts. However, "[w]hen possible, live testimony is preferable to depositions and transfer of this action would allow for live testimony of important witnesses." *Geo M. Martin Co. v. Royal Ins. Co. of Am.* (ND Cal 2004) 2004 U.S. Dist. LEXIS 8927.

To counter-balance against a transfer, Plaintiffs have named their own list of witnesses who reside in Northern California (namely Shalaby's treating physicians and Joe Tancredy, Bernzomatic's insurance adjuster.)[1] However, the determination of a transfer motion does not hinge on the number of witnesses on each side, "but, rather,…**the importance of the witnesses**." *Saleh, supra* at 1161 (emphasis added.) It is beyond dispute that the San Diego witnesses are more essential than the Northern California doctors -- as the focus of this trial will be on liability. Specifically, the key issue is whether an alleged defect in the cylinder or torch or whether Shalaby's misuse of the cylinder caused it to fail. On this issue, it is the San Diego residents who can provide the probative testimony.

//

//

---

[1] Mr. Tancredy does not object to traveling to San Diego to testify at trial. (See Declaration of Joseph Tancredy at ¶2.)

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

### 1. The San Diego Witnesses Are Crucial To The Causation Determination

In an attempt to block a transfer, Plaintiffs try to trivialize the San Diego witnesses by arguing that they are merely "ancillary" and "incidental." However, the evidence defies such a portrayal. In reality, the testimony of these San Diego witnesses is so crucial to the causation determination that, if believed by the jury, it will preclude Plaintiffs' recovery.

Although not eyewitnesses to the incident, these witnesses came on the scene shortly thereafter. They are able to testify as to Shalaby's critical admissions, other campers' statements, and their own observations of the remnants. Collectively, their testimony illustrate that Shalaby's misuse caused the incident. Through no fault of Worthington's, the cylinder is no longer available. Consequently, Worthington can only rely on these witnesses to exonerate itself from the allegations of a defect.

#### a. Two Fire Department Personnel Heard Shalaby Admitting Kicking The Cylinder Into The Fire And Causing The Explosion

Robert Price, a paramedic intern, responded to the scene. (*See* Declaration of Cathleen S. Huang previously submitted in support of Worthington's Motion to Transfer ("Huang Decl.") Exhibit C, Price dep., 6:15-7:14.) Price treated and interviewed Shalaby and inputted information in the San Diego Medical Service Enterprise Billing Report. (Huang Decl., Exh. C, Price dep., 9:5-10:23; 12:2-13:24; 19:19-20:1.) Price's entry in the "history" section of the report reflects:

> "Patient was kicking around a propane torch. It went into a fire and blew up and
> burned him. Family called 911." (Huang Decl., Exh. C, Price dep., 19:19-20:1; Exhibit 8.)

In vain, Plaintiffs try to ameliorate the impact of this evidence by arguing that Price could not remember the source of the information. However, Joe Russo, Price's supervisor, was present when Price was interviewing Shalaby. (Huang Decl., Exh. D, Russo dep., 14:3-25; 22:6-23:11; *See* Declaration of Cathleen S. Huang In Support of Reply Brief to Motion to Transfer, ("Huang Decl. (Reply)) Exh. A, Price dep., 17:2-6; 26:16-17.) Russo specifically heard Shalaby tell Price that he had kicked a "propane" cylinder into the fire and that it exploded. (Huang Decl., Exh. D, Russo dep., 22:11-23:11.) After transporting Shalaby to the Burn Center, Russo and Price exclaimed "how it is

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                4

THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES INC.'S REPLY BRIEF IN SUPPORT OF
MOTION TO TRANSFER VENUE

1  surprising that someone would kick a propane torch into a fire pit." (Huang Decl.(Reply), Exh. A, Price

2  dep., 33:20-23.)

3

4       There is more corroboration that the statement is attributable to Shalaby. First, Shalaby

5  admitted fault: "I'm an idiot. I can't believe I'm so stupid…This is all my fault," which park ranger

6  Randy Stephens heard Shalaby state. (Huang Decl., Exh. A, Stephens dep., 35:11-25.) Plaintiffs try to

7  suggest Shalaby's fault admission was unreliable because he had been badly burned. However,

8  admission by parties is admissible. FRE 801(d)(2)(A).[2] If Plaintiffs want to challenge the reliability of

9  this statement, they will have the opportunity at trial.

10      Second, when park ranger supervisor, Warren Ratliff, Jr., arrived at the scene, he observed a

11  campfire burning in Shalaby's fire ring. (Huang Decl. (Reply), Exh. B, Ratliff dep., 20:24-21:3.) This

12  would contradict Plaintiffs' story that Shalaby was trying to start a campfire when the explosion

13  occurred. (Opposition 5:3-4.) To the contrary, the burning campfire is consistent with an ongoing fire

14  into which Shalaby could have kicked the cylinder.

15

16              **b.      One Park Ranger Heard Campers Describe Shalaby's Misuse of the
17                        Cylinder**

18      Other campers' descriptions of Shalaby's misuse are also consistent with Shalaby's admissions.

19  When Ratliff arrived at the scene, he spoke to several campers and guests on site. One of whom told

20  Ratliff that Shalaby "was trying to light the campfire with the torch and it would not light, and was

21  banging the torch on the side of the fire ring." (Huang Decl., Exh. B, Ratliff dep., 19:16-20:5.) Another

22  told Ratliff: "he heard [Shalaby] was frustrated at not being able to fight – or to light the campfire."

23  (Huang Decl., Exh. B, Ratliff dep., 20: 19-23.)

24

25

26

27  [2] Federal Rules of Evidence Rule 801(d)(2)(A) provides in relevant portion: "[s]tatements which are not hearsay. A statement is not hearsay if (2) Admission by party-opponent. The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity…"

28

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                5

THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES INC.'S REPLY BRIEF IN SUPPORT OF
MOTION TO TRANSFER VENUE

1    Worthington acknowledges that these statements are not as compelling as Shalaby's own·

2    admissions; few things are. Nevertheless, these statements are still significant. Worthington, who only

3    recently appeared in the action, will try to locate these campers so that they can directly testify.

4    Plaintiffs scoff at this testimony as inadmissible hearsay. However, these statements were made

5    immediately after a startling event that would negate the likelihood of deliberate misrepresentation. As

6    such, they could be admissible as an excited utterance. FRE 803(2).[3] Other campers at Campland who

7    came to alert Ratliff of the incident were "in a frantic state." (Huang Decl., Exh. B, Ratliff dep., 11: 8-

8    13.) It would be reasonable to expect that the campers on the scene were similarly excited. Since

9    Worthington was not at the deposition, it did not have the opportunity to pave the foundation for their

10   admissibility. Rather than excluding this testimony at this time, Worthington should be given the

11   opportunity to make an offer of proof before trial.

12

13         c.      **Two Park Rangers Examined The Torch/Cylinder Remnants and Made Observations That Are Consistent With Shalaby's Misuse**

14         The critical testimony does not end there. Shalaby's admissions are also substantiated by the

15   physical evidence. Ratliff and park ranger Randy Stephens examined the torch and cylinder remnants

16   and both made observations that indicate misuse. Specifically, Ratliff observed a crack at the top of

17   the cylinder and the threaded neck tilting away from the crack at a slight angle, which appeared to have

18   been caused by banging the cylinder against a hard surface. (Huang Decl., Exh. B, Ratliff dep., 67:21-

19   70:19; 72:17-73:4) When Ratliff picked up the torch and cylinder, the torch apparatus was still

20   attached, but it was loose and did not appear to be screwed on entirely. (Huang Decl., Exh. B, Ratliff

21   dep., 73:5-10.) Similarly, Ranger Stephens observed a split approximately two-and-a-half inches long

22   and a quarter inch wide at the neck of the cylinder. (Huang Decl., Exh. A, Stephens dep. 42:14-43:1.)

23

24

25   _____

     [3] Federal Rules of Evidence Rule 803 provides in pertinent part:

26         The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

27

28         **(2) Excited Utterance**. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                    6

THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES INC.'S REPLY BRIEF IN SUPPORT OF MOTION TO TRANSFER VENUE

He also saw that the cylinder had burst open just beyond the threads at the neck. (Huang Decl., Exh. A, Stephens dep. 42:1-7.)

Plaintiffs urge this Court to dismiss Ratliff's and Stephen's opinions that the torch/cylinder "was banged against a hard surface" (Huang Decl., Exh. B, Ratliff dep., 69:14-24) and that the torch was not the proper torch for a MAPP gas cylinder (Huang Decl., Exh. A Stephens dep., 49:8 –50:18) as untrustworthy. However, a lay witness can express an opinion that is "rationally based on the witness's perception." FRE 701.[4] Based on their extensive experience with MAPP gas torches and cylinders and based on their personal observation of the evidence, Ratliff's and Stephen's opinions are helpful to the jury; particularly because the jury is unable to examine the cylinder.

Significant to the issue of liability is that the post-accident descriptions of the torch/cylinder are consistent with the cylinder being kicked into the fire and/or banged against a rock. If the cylinder were in the fire prior to the accident and a flame or ember impinged on the top of the cylinder, the cylinder wall at the point of impingement would weaken. *See* Declaration of Steve Gentry In Support of Worthington's Reply Brief To The Motion to Transfer ("Gentry Decl.") at ¶5. The fire would cause the temperature of the MAPP gas to increase which in turn would cause the pressure inside the cylinder to increase. *Id.* It is possible that the cylinder wall at the point of impingement would weaken to the point where the increased pressure would cause a breach. *Id.* The cylinder walls would not breach in the manner described by the campground employees unless subjected to blunt force or localize heat impingement. *Id.* at ¶4. A breach would not occur when a person simply attempted to ignite a torch that was attached to a cylinder.[5] *Id.*

---

[4] Federal Rules of Evidence Rule 701 governs opinion testimony by lay witnesses and provides: "[i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702."

[5] Plaintiffs try to diffuse the impact of Ratliff's and Stephens' observations by asserting that Tancredy

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                    7

THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES INC.'S REPLY BRIEF IN SUPPORT OF
MOTION TO TRANSFER VENUE

1    Ratliff's and Stephen's observations are even more essential and valuable because the physical

2    evidence has been discarded.  Generally in product liability cases where physical evidence is available,

3    liability often turns on the opinions of experts given after careful examination and testing of the product

4    in question.  Here, Defendants' experts will have no such opportunity.  Without the cylinder/torch,

5    Defendants' experts will have to rely on the two rangers' description as the foundational facts to

6    determine whether the potential theories of the accident offered are consistent with the physical

7    damage.  Thus, again, it is critical to the defense to present live testimony of these witnesses.

8

9        **2.  Other Potential Witnesses and Evidence Could Be Located In San Diego**

10       So far only four crucial witnesses have been identified in San Diego; there may be more.  Other

11   percipient witnesses could include other campers at the scene, other fire department crew (seven in total

12   responded to the emergency call.)  Finally, Shalaby's initial treatment was at a hospital in the San Diego

13   area, where he stayed during the fist week following the incident.  Thus, there may be well in excess of

14   a dozen third party witnesses who need to testify at trial who live and work in the San Diego area.  As

15

16   the epicenter, San Diego will have most, if not all, of the liability witnesses and sources of proof.

17       **3.  Practical Reality May Prevent San Diego Witnesses From Testifying at Trial In**
         **Northern California**

18

19       If the case remains in the Northern District, the witnesses will have to travel 500 miles to San

20   Francisco, spend the night away from home the day before their scheduled testimony, and spend

21   additional nights to the extent they are not called when scheduled or their testimony is not completed by

22   the end of the court day.  The witnesses may be unable to travel and spend one or more nights away

23   from their homes and work.  Faced with inconvenience, the witnesses may simply not appear.

24

---

25   saw visible hairline cracks in Shalaby's spare cylinders which emitted hissing sounds that are audible if
     held against one's ear.  However, this hardly proves that there is a defect in the cylinder in question.  If
26   one had to hold the cylinder up to one's ear to hear the leak and a month and a half after the incident
     there was still gas in the cylinder, then the leak could not have been enough to accumulate gas in a
27   flammable mixture that when ignited would have generated a large enough flame to cause Shalaby's
28   burns.

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                          8

THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES INC.'S REPLY BRIEF IN SUPPORT OF
MOTION TO TRANSFER VENUE

Conversely, if the trial were in San Diego, the witnesses could simply be on standby and appear at trial on short notice. Thus, the interests of justice cry out for this case being transferred to the Southern District.

**B.      Plaintiffs' Choice of Forum, With Little Connection To The Incident, Should Be Given Less Significance**

Plaintiffs urge this Court to give their choice of forum more weight. However, numerous courts have given less deference to the plaintiff's choice of forum "where the action has little connection with the chosen forum." *See Generally Saleh v. Titan Corp* (SD Cal 2005) 361 F. Supp. 2d 1152, 1157. (citing *Cain v. N.Y. State Bd. Of Elections,* (E.D.N.Y. 1986) 630 F. Supp. 221, 227 (noting that, while it respects plaintiff's right to file suit in a forum of his choosing, this choice is not entitled to the weight generally accorded such a decision where there is lacking any material connection or significant contact between the forum and the events allegedly underlying the cause of the action."; *See Also Boyd v. Snyder* (N.D. Ill. 1999) 44 F. Supp. 2d 966, 970 ("When the conduct and events giving rise to the cause of action did not take place in the plaintiff's selected forum, the plaintiff's preference has minimal value even if it is his home forum.")

*Hernandez v. Graebel Van Lines* (E.D.N.Y. 1991) 761 F. Supp. 983, 990-991 (cited by *Saleh*, supra) is factually analogous. In *Hernandez*, the court gave "less significance" to the plaintiff's choice of New York as a forum where the accident occurred in Florida and most of the witnesses were there and the only connection with New York was that the plaintiff resided in New York and received treatment there:

> [w]here the transactions or facts giving rise to the action have no material relation or significant connection to plaintiff's chosen forum, then the plaintiff's choice is not accorded the same "great weight" and in fact **is given reduced significance.** *Id.* at 990. (emphasis added.)

Similar to *Hernandez*, Northern District has no connection to the incident besides being the locale of where Shalaby received his medical treatment. Regardless, the location of Shalaby's treating

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                9

THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES INC.'S REPLY BRIEF IN SUPPORT OF MOTION TO TRANSFER VENUE

physicians should not dissuade against a transfer. As the *Hernandez* Court aptly noted "it has become increasingly common practice in recent years to videotape expert testimony for use at trial in lieu of calling the live witness." *Id.* at 989. A videotape of the Plaintiffs' treating physicians is a viable practical alternative to minimize Plaintiffs' trial costs. Moreover, the issue of damages is not where the central dispute lies.

## III. CONCLUSION

Worthington's responsibility hinges on the testimony of these non-party liability witnesses who all reside and/or work in San Diego. If the trial occurs in Northern California, witnesses critical to the defense will either not appear or will suffer major inconvenience. Moreover, because the evidence has been discarded, the only evidence of the physical condition of the cylinder – which will be critical to expert analysis – will be the testimonies of the two San Diego witnesses. Because these witnesses will contradict plaintiffs' version of the accident, it is imperative that the jury be able to observe the live testimonies rather than hear monotonous readings of deposition transcripts. Therefore, in the interest of justice and for the convenience of the witnesses, Worthington respectfully requests that a transfer to the Southern District be granted

Dated: September __11__, 2007                     BOWLES & VERNA LLP


                                                  By:
                                                     CATHLEEN S. HUANG
                                                     Attorneys for Third Party Defendant
                                                     Worthington Industries, Inc.

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ                     10
THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES INC.'S REPLY BRIEF IN SUPPORT OF
MOTION TO TRANSFER VENUE

1  RICHARD A. ERGO (# 110487)
   CATHLEEN S. HUANG (# 219554)
2  BOWLES & VERNA LLP
   2121 N. California Boulevard, Suite 875
3  Walnut Creek, California  94596
   Telephone:  (925) 935-3300
4  Facsimile:  (925) 935-0371
   Email:  raergo@bowlesverna.com
5          chuang@bowlesverna.com

6  Attorneys for Third Party Defendant
   Worthington Industries, Inc.

7

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11

   ANDREW SHALABY, an individual, and SONIA        **Case No.: C06-07026 MJJ**
12 DUNN-RUIZ an individual,
                                                    Judge Martin J. Jenkins
13              Plaintiffs,
                                                    **DECLARATION OF CATHLEEN S.**
14      vs.                                         **HUANG IN SUPPORT OF THIRD PARTY**
                                                    **DEFENDANT WORTHINGTON**
15 IRWIN INDUSTRIAL TOOL COMPANY, THE               **INDUSTRIES, INC.'S REPLY BRIEF IN**
   HOME DEPOT, INC., and DOES 2 through 100,        **SUPPORT OF MOTION TO TRANSFER**
16 inclusive,                                       **VENUE**

17              Defendants.

18                                                  Date:      September 25, 2007
                                                    Time:      9:30 a.m.
19                                                  Ctrm:      11, 19th Floor

20 BERNZOMATIC,

21              Third Party Plaintiff,

22      vs.

23 WESTERN INDUSTRIES, INC.,
   WORTHINGTON INDUSTRIES, AND ROES 2
24 through 100, inclusive,

25              Third Party Defendants.

26

27      I, Cathleen S. Huang, declare as follows:

28

Bowles & Verna LLP
2121 N. California Blvd     CASE NO.:  C06-07026 MJJ                    1
Suite 875             ─────────────────────────────────────────────────────────────
Walnut Creek 94596   DECLARATION OF CATHLEEN S. HUANG IN SUPPORT OF WORTHINGTON'S REPLY BRIEF IN
                              SUPPORT OF MOTION TO TRANSFER VENUE

1.    I am an attorney at law duly admitted to practice before all the courts of the State of California and am an associate at the law firm of Bowles & Verna LLP, counsel for Third Party Defendant Worthington Industries, Inc. ("Worthington") herein.  If called as a witness, I could and would competently testify to the facts stated herein.

2.    Attached hereto as **Exhibit A** are true and correct copies of pages 17, 26 and 33 from the deposition transcript of Robert Price.

3.    Attached hereto as **Exhibit B** are true and correct copies of pages 11, 20 and 21 from the deposition transcript of Warren Ratliff.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this ___11th___ day of September, 2007 at Walnut Creek, California.

CATHLEEN S. HUANG

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ          2
DECLARATION OF CATHLEEN S. HUANG IN SUPPORT OF WORTHINGTON'S REPLY BRIEF IN
SUPPORT OF MOTION TO TRANSFER VENUE

1           UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                                          COPY

4

5   ANDREW SHALABY, an individual,    )
    and SONIA DUNN-RUIZ, an           )
6   individual,                       )
                                      )
7              Plaintiffs,            )
                                      )
8        vs.                          )    Case No. C 06 7026 CW
                                      )
9   NEWELL RUBBERMAID, INC., a        )
    Delaware Corporation; THE HOME    )
10  DEPOT, INC., a Delaware           )
    Corporation,                      )
                                      )
11                                    )
              Defendants.             )
12  _____  )

13

14

15

16

17        DEPOSITION OF ROBERT KEVIN PRICE

18             San Diego, California

19          Wednesday, May 30, 2007

20

21

22  Reported by:
    FRAUKE KUO
23

24

25

EXHIBIT "A"

17

1      A.    No.

2      Q.    Joe Russo is supervising your activities; right?

3      A.    Right.

4      Q.    So that he would have, basically, been standing

5  back while you took the pulse and all that kind of stuff?

6      A.    Right.

7      Q.    If he saw you did something wrong, he might speak

8  up?

9      A.    Right.

10     Q.    By the way, we were just going over a document --

11  I don't think I made reference to it on the record.  It's

12  a report.  At the top, it says, "San Diego Medical

13  Services Enterprise - Billing Report," and it has the date

14  4/21/2006.

15          Were you interning for the San Diego Fire

16  Department through this San Diego Medical Services

17  Enterprise?  How did that work?  How does -- In other

18  words, how does San Diego Medical Services Enterprise fit

19  in with the San Diego Fire Department?  Do you understand

20  the question?

21     A.    How does Rural Metro, the ambulance company, fit

22  in with San Diego Fire Department?

23     Q.    I know there is a San Diego Fire Department --

24  Captain Spangler is a captain, or was a Captain, with the

25  San Diego Fire Department.  This report has the name,

26

1    A.    Yes.

2    Q.    Okay.  Did you ask Mr. Shalaby about the incident

3  itself, what happened?

4    A.    I don't remember.

5    Q.    Okay.

6    A.    I can tell you that that's my job to do it, and I

7  always do it, but I -- you know, I didn't document if I

8  heard it from him, so I don't remember.

9    Q.    Okay.  This isn't a test, by the way.  I just

10  want your best recollection as to what happened.

11    A.    I think I asked him, but --

12    Q.    But you don't have a specific recollection of

13  that?

14    A.    No.

15    Q.    Okay.  All right.

16          Do you recall Joe Russo being by your side?

17    A.    Yes.

18    Q.    Okay.  As you sit here today, do you have any

19  recollection of Mr. Russo asking Mr. Shalaby what

20  happened?

21    A.    No.

22    Q.    Do you -- You didn't interview Mr. Shalaby's wife

23  at the scene; is that correct?

24    A.    That's correct.

25    Q.    Do you recall interviewing her at any time after

33

1  finished with this response?

2      A.    Yes.

3      Q.    Do you recall speaking with anybody about this

4  incident after the matter was cleared?

5      A.    No.

6      Q.    Do you recall -- I assume that, after you left

7  UCSD, you returned to Station 21.

8      A.    Right.

9      Q.    Do you recall speaking with Joe Russo about

10 Mr. Shalaby on the ride back?

11     A.    I'm sure we did, because I was an intern and,

12 after calls, we would go over them, but I don't remember

13 what was said.

14     Q.    Do you recall speaking with Mr. Russo, at any

15 point after departing from UCSD Burn Center, about his

16 observations -- or anyone's observations -- of the torch

17 that was involved in the incident?

18     A.    I vaguely remember the conversation, but I don't

19 remember exactly what it was about.

20     Q.    Can you give me, to the best of your

21 recollection, the gist of what the conversation was?

22     A.    We did comment on how it is surprising that

23 someone would kick a propane torch into a fire pit.  It

24 was something along those lines.

25     Q.    Okay.  Anything else?

MAY 1 6 2007

# ORIGINAL

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

ANDREW SHALABY and SONIA DUNN-RUIZ, )
)
             Plaintiffs, )
)
vs. )  No. C06-07026CW
)
NEWELL RUBBERMAID, INC., RUBBERMAID, )
INCORPORATED, and THE HOME DEPOT, )
INC., )
)
            Defendants. )
                      )

DEPOSITION OF WARREN L. RATLIFF, JR.

Taken at San Diego, California

April 17, 2007

Reported by Catherine Gautereaux, CSR
Certificate No. 3122

**EXHIBIT "B"**

11

1  Shalaby was injured there?

2      A    Yes, sir.

3      Q    You were on duty that evening?

4      A    Yes, sir.

5      Q    Do you have at least some recollection of that

6  event?

7      A    Yes, sir.

8      Q    If you can recall, Mr. Ratliff, how did you

9  personally become aware that the incident had happened?

10     A    Originally was, other guests at Campland had

11  came to the gate in a frantic state, yelling that they

12  had called 911, that there was an individual that was

13  burned.

14     Q    Were you at the gate at the time?

15     A    Yes, sir.

16     Q    So they told you that someone had been burned

17  and that they had called 911?

18     A    That is correct.

19     Q    And these were campers that came to you?

20     A    Yes, sir.

21     Q    Was there a process at that time, Mr. Ratliff,

22  whereby you or someone employed by Campland would

23  typically make some type of a log entry specifically

24  about learning an event, like, "I got a phone call" or

25  "I was approached by people at such and such a moment,"

20

1  them.

2          The one female in that group gave me a story

3  of -- that the guest in that site was trying to light

4  the campfire with the torch and it would not light, and

5  was banging the torch on the side of the fire ring.

6          Q    Okay.

7          A    Another guest --

8          Q    Now, I don't want to go further because I want

9  to make sure I understood the question.  A lady from the

10 campsite to the left of Mr. Shalaby's campsite --

11 Mr. Shalaby being the individual that was injured -- to

12 the left as you're facing --

13         A    Facing his campsite.

14         Q    His campsite.  A woman in that group told you

15 that she had observed him trying to light the campfire

16 unsuccessfully and banging the torch on -- what did you

17 say?  On the campfire ring?

18         A    On the campfire ring.

19         Q    Then, did somebody else give you a story?

20         A    Another individual in that same campsite said

21 that he heard the gentleman was frustrated at not being

22 able to fight -- or to light the campfire.  And that was

23 it in that group.

24         Q    Okay.  Before we move on, 'cause there may be

25 others, when you arrived, was there a campfire burning

21

1    in Mr. Shalaby's fire ring?

2        A    There was a small campfire that was -- that

3    was lit.

4        Q    All right.  We talked about the group that was

5    in the campsite immediately to the left of the Shalaby

6    campsite.  Did you speak with any other individual?

7        A    I spoke with the other campsite to the right

8    of them.

9        Q    Okay.

10       A    They had a blanket partition, a man-made

11   blanket partition between them.

12       Q    Sort of a privacy thing?

13       A    Right.  Yes, sir.

14       Q    Okay.

15       A    Then the individual there said they heard a

16   explosion, a large flame.  Actually, all of them

17   explained that to me.  So there was a large ball of

18   flame and explosion.  And that was pretty much it from

19   them.

20       Q    Okay.  Was that a male or female that gave you

21   that story, if you remember?

22       A    I believe it was a male and -- a husband and

23   wife.

24       Q    All right.  That's all from the campsite

25   immediately to the right of the Shalaby campsite.  Did

RICHARD A. ERGO (# 110487)
CATHLEEN S. HUANG (# 219554)
BOWLES & VERNA LLP
2121 N. California Boulevard, Suite 875
Walnut Creek, California 94596
Telephone: (925) 935-3300
Facsimile: (925) 935-0371
Email: raergo@bowlesverna.com
        chuang@bowlesverna.com

Attorneys for Third Party Defendant
Worthington Industries, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW SHALABY, an individual, and SONIA DUNN-RUIZ an individual,<br><br>        Plaintiffs,<br><br>vs.<br><br>IRWIN INDUSTRIAL TOOL COMPANY, THE HOME DEPOT, INC., and DOES 2 through 100, inclusive,<br><br>        Defendants.<br><br>——————————————<br><br>BERNZOMATIC,<br><br>        Third Party Plaintiff,<br><br>vs.<br><br>WESTERN INDUSTRIES, INC., WORTHINGTON INDUSTRIES, AND ROES 2 through 100, inclusive,<br><br>        Third Party Defendants. | Case No.: C06-07026 MJJ<br><br>Judge Martin J. Jenkins<br><br>**DECLARATION OF STEVEN T. GENTRY IN SUPPORT OF THIRD PARTY DEFENDANT WORTHINGTON INDUSTRIES, INC.'S REPLY BRIEF TO THE MOTION TO TRANSFER VENUE**<br><br>Date:     September 25, 2007<br>Time:    9:30 a.m.<br>Ctrm:   11, 19th Floor |

I, Steven T. Gentry, declare as follows:

    1. I have been employed by Worthington Cylinder Corporation ("Worthington") since 1971. I am currently the Regulatory Affairs Manager for Worthington. My previous positions with Worthington include Quality Control Manager and Project Engineer. My responsibilities over the years

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.: C06-07026 MJJ       1
DEC. OF STEVEN T. GENTRY IN SUPPORT OF WORTHINGTON'S REPLY BRIEF TO THE MOTION TO TRANSFER VENUE

at Worthington have included the design and development of propane cylinders and valves. Since the fall of 2004, I have interacted with the quality control and design departments regarding MAPP gas cylinders. I am familiar with the design and construction of the MAPP gas cylinders and am familiar with the characteristics of the materials used to construct MAPP gas cylinders. As such, I have personal knowledge of the following matters and would and could competently testify thereto if called as a witness.

2. It is my understanding that the MAPP gas cylinder involved in this accident was discarded shortly after the accident. It is also my understanding that campground employees observed a hole in the top area of the cylinder that was approximately two inches long.

3. MAPP gas cylinders contain gas that is under pressure. If there was a hole at the top of the cylinder, that would have allowed gas to escape from the cylinder. The sound of the gas escaping would be very audible and very obvious to anyone handling the cylinder or in the vicinity of the cylinder. As I am not aware that any witness heard the sound of gas escaping before the accident occurred, it seems fairly evident that the hole was not created prior to the accident that caused Mr. Shalaby's injuries.

4. The MAPP gas cylinder walls would not breach in the manner described by the campground employees unless subjected to striking force or localized heat impingement. A breach would not occur when a person simply attempted to ignite a torch that was attached to a MAPP gas cylinder.

5. It is my understanding that one or more persons at the scene of the accident heard Mr. Shalaby say that he kicked the cylinder into the fire. That scenario very well could account for the hole in the cylinder observed after the accident. If the cylinder was in the fire and a flame or ember impinged on the top of the cylinder, the cylinder wall at the point of impingement would weaken. The fire would cause the temperature of the MAPP gas to increase; that in turn would cause the pressure inside the cylinder to increase. It is possible that the cylinder wall at the point of impingement would weaken to the point where the increased pressure would cause a breach.

Bowles & Verna LLP
2121 N. California Blvd
Suite 875
Walnut Creek 94596

CASE NO.:  C06-07026 MJJ                    2
DEC. OF STEVEN T. GENTRY IN SUPPORT OF WORTHINGTON'S REPLY BRIEF TO THE MOTION TO
TRANSFER VENUE

1    I declare under penalty of perjury under the laws of the State of California that the foregoing is

2    true and correct. Executed this __11ᵗʰ__ day September, 2007, at Kansas City, Missouri.

3

4

5                                    _[signature]_

6                                    STEVEN T. GENTRY

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28