1   Shelley G. Hurwitz (SBN 217566)
    HOLLAND & KNIGHT LLP
2   633 W. Fifth Street, 21st Floor
    Los Angeles, CA 90071
3   Telephone: (213) 896-2400
    Facsimile (213) 896-2450
4   Email: shelley.hurwitz@hklaw.com

5
    Beth S. Naylor (*admitted pro hac vice*)
6   Douglas R. Dennis (*admitted pro hac vice*)
    FROST BROWN TODD LLC
7   2200 PNC Center
    201 East Fifth Street
8   Cincinnati, Ohio 45202
    Telephone: (513) 651-6727
9   Facsimile: (513) 651-6981
    Email: ddennis@fbtlaw.com
10

11  Attorney for Defendants IRWIN INDUSTRIAL TOOL COMPANY, INC.
12  and THE HOME DEPOT, INC. and Third-Party Plaintiff BERNZOMATIC

13

14              **UNITED STATES DISTRICT COURT**

15       **SOUTHERN DISTRICT OF CALIFORNIA – SAN DIEGO**

| | |
|---|---|
| 16  ANDREW SHALABY, an individual, and SONIA DUNN-RUIZ an individual, | **Case No.: 07-CV-2107 W BLM** |
| 17              Plaintiffs, | **EXHIBITS TO MOTION FOR LEAVE TO DESIGNATE EXPERT WITNESS JASON LUSK** |
| 18       vs. | |
| 19  IRWIN INDUSTRIAL TOOL COMPANY, THE HOME DEPOT, INC., and DOES 2 through 100, inclusive, | |
| 20              Defendants. | Judge: Hon. Thomas J. Whelan |
| 21  | Magistrate Judge: Hon. Barbara Major |
| 22  BERNZOMATIC, | **Date: October 2, 2008** |
| 23              Third Party Plaintiff, | **Courtroom: A** |
|         vs. | **NO ORAL ARGUMENT** |
| 24  | **REQUIRED** |
| 25  WESTERN INDUSTRIES, INC., WORTHINGTON INDUSTRIES, AND ROES 2 through 100, inclusive, | Mand. Settlement Conf: October 14, 2008 |
| 26  | Pretrial Conference: January 12, 2009 |
| 27              Third Party Defendants. | |

28

CASE NO.: 07-CV-2107 W                    1
                        EXHIBITS

1

## EXHIBITS TO MOTION

2

3

| Exhibit No. | Exhibit | Page Nos. |
|---|---|---|
| 1 | Photographs of an exemplar Bernzomatic hand held torch, model number TS4000, and MAPP gas cylinder. | 1-3 |
| 2 | Deposition of Warren Ratcliff | 4-8 |
| 3 | Deposition of Joe Russo | 9-11 |
| 4 | Scheduling Order | 12-17 |
| 5 | Plaintiffs' Disclosure of Experts. | 18-22 |
| 6 | Dr. Anderson's Expert Report | 23-27 |
| 7 | Dr. Anderson's Supplemental Expert Report | 28-30 |
| 8 | Jason Lusk's Expert Report | 31-32 |
| 9 | Meet and confer correspondence, and Plaintiff's Objection. | 33-40 |
| 10 | Deposition of Dr. Anderson | 41-44 |

# EXHIBIT 1





EXHIBIT 2

MAY 1 2007

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANDREW SHALABY and SONIA DUNN-RUIZ,  )
                                      )
            Plaintiffs,               )
                                      )
vs.                                   )  No. C06-07026CW
                                      )
NEWELL RUBBERMAID, INC., RUBBERMAID,  )
INCORPORATED, and THE HOME DEPOT,     )
INC.,                                 )
                                      )
            Defendants.               )
_____)

DEPOSITION OF WARREN L. RATLIFF, JR.

Taken at San Diego, California

April 17, 2007

Reported by Catherine Gautereaux, CSR
Certificate No. 3122

Condensed Copy

5

18

1  A    Several campers and guests that were in other
2  sites; my ranger staff, Randy; I believe, the
3  gentleman's wife or girlfriend -- I'm not sure of that.
4  I recall one child, and the fire truck with its crew,
5  and the paramedics and their crew.
6  Q    And they were basically traveling with you?
7  A    Yes. They were behind me.
8  Q    While you were there at the campsite where the
9  incident had happened, did anyone else arrive?  And by
10 that I would include, did any police respond or
11 ambulance or anything else?
12 A    The ambulance did come behind the fire staff.
13 Q    Were they in the same --
14 A    Yes.
15 Q    -- caravan, basically?  Did any police
16 agencies respond at all?
17 A    No, sir.
18 Q    I realize there were a lot of different people
19 there doing a lot of different things, and right now
20 this question pertains to you specifically, Mr. Ratliff.
21      Did you make a list anywhere of the names of
22 the fellow campers that came to the site, that were
23 milling about, that might have information?
24 A    I did not make a list of names.
25 Q    Whether or not you know any of their names,

19

1  did you speak with any of them about what happened?
2  A    Yes, I did.
3  Q    Do you have any recollection, as you sit here
4  today, of what any of these people told you?
5  A    Well, I have different stories from each
6  individual.
7  Q    All right.  I know it would be difficult to
8  put a name with a story, but maybe you could do it
9  chronologically or in your mind, "This person that
10 looked like this said 'X.'"  Can you kind of tell us the
11 various stories that you heard?
12      MR. STEPHAN:  I'll just object.  Vague as to
13 time.  I guess, talking about that night?
14      MR. MOORHEAD:  Yes.
15 BY MR. MOORHEAD:
16 Q    I'm just talking about there, at the site
17 things that were told to you.
18 A    Well, when I arrived on the site, I secured
19 the site, observed the individual.  We tried to help the
20 fire department take care of that individual, first.
21      At that time I had Randy continue to do --
22 stay with him and monitor him and the campsite itself.
23 I then went to the first campsite to the left of that
24 campsite -- those were the individuals that also made
25 the original call, I guess, for 911 -- and spoke to

20

1  them.
2      The one female in that group gave me a story
3  of -- that the guest in that site was trying to light
4  the campfire with the torch and it would not light, and
5  was banging the torch on the side of the fire ring.
6  Q    Okay.
7  A    Another guest --
8  Q    Now, I don't want to go further because I want
9  to make sure I understood the question.  A lady from the
10 campsite to the left of Mr. Shalaby's campsite --
11 Mr. Shalaby being the individual that was injured -- to
12 the left as you're facing --
13 A    Facing his campsite.
14 Q    His campsite.  A woman in that group told you
15 that she had observed him trying to light the campfire
16 unsuccessfully and banging the torch on -- what did you
17 say?  On the campfire ring?
18 A    On the campfire ring.
19 Q    Then, did somebody else give you a story?
20 A    Another individual in that same campsite said
21 that he heard the gentleman was frustrated at not being
22 able to fight -- or to light the campfire.  And that was
23 it in that group.
24 Q    Okay.  Before we move on, 'cause there may be
25 others, when you arrived, was there a campfire burning

21

1  in Mr. Shalaby's fire ring?
2  A    There was a small campfire that was -- that
3  was lit.
4  Q    All right.  We talked about the group that was
5  in the campsite immediately to the left of the Shalaby
6  campsite.  Did you speak with any other individual?
7  A    I spoke with the other campsite to the right
8  of them.
9  Q    Okay.
10 A    They had a blanket partition, a man-made
11 blanket partition between them.
12 Q    Sort of a privacy thing?
13 A    Right.  Yes, sir.
14 Q    Okay.
15 A    Then the individual there said they heard a
16 explosion, a large flame.  Actually, all of them
17 explained that to me.  So there was a large ball of
18 flame and explosion.  And that was pretty much it from
19 them.
20 Q    Okay.  Was that a male or female that gave you
21 that story, if you remember?
22 A    I believe it was a male and -- a husband and
23 wife.
24 Q    All right.  That's all from the campsite
25 immediately to the right of the Shalaby campsite.  Did

6 (Pages 18 to 21)

VERITEXT/NEW JERSEY REPORTING   (973) 410-4040

66

1    A    Yes.
2    Q    Okay. When you did that, were you familiar
3 with the torch that you saw?
4    A    Yes.
5    Q    Was that the same type of torch that you had
6 used in the past?
7    A    Yes.
8    Q    And was there any -- was there any doubt in
9 your mind that it was a Burnzomatic brand torch?
10    A    No, I don't believe so.
11    Q    When you -- skipping a little bit ahead in
12 your testimony, when you spent some time observing the
13 torch, I believe you testified that that was after you
14 had spoken with the fire department personnel about
15 whether or not they wanted you to keep it or not?
16    A    Yes. I secured the -- pretty much secured the
17 torch; in the meantime, was worried about Mr. Shalaby's
18 well-being, first. I just did not want the torch to end
19 up in the wrong hands.
20    Q    Okay. And when you -- can you tell me
21 approximately how long you spent examining the torch?
22    A    Oh, probably, I'd say an hour. During my
23 entire report writing.
24    Q    And was that back at the -- I forget what you
25 call that -- the front gate? Was that back at the

67

1 station?
2    A    In my -- in the office. In my office.
3    Q    You call it the ranger station?
4    A    Well, the ranger station and my office are two
5 different places.
6    Q    Are they in the same general vicinity?
7    A    It's the next building behind it.
8    Q    I actually haven't had the benefit of seeing
9 the location. But, basically, you spent an hour or so
10 examining the torch back at your office?
11    A    Yes.
12    Q    And I believe you testified that the labels
13 had not been destroyed on the torch, they had not been
14 burned off?
15    A    No, sir. It appeared normal wear and tear to
16 me.
17    Q    To the best of your recollection, did the
18 front label say "Burnzomatic" on it?
19    A    I don't recall the -- the "MAPP" is what
20 catches -- caught my eye.
21    Q    Getting back to the breach or the hole you
22 described at the point where the nipple or the thread
23 joins the neck of the bottle, is that about roughly the
24 area of the tank where you saw the hole?
25    A    Yes.

68

1    Q    Was it, in fact, a hole that you saw, and was
2 there --
3    A    It appeared to be a crack forced open.
4 outward.
5    Q    It was forced open, outward?
6    A    Like an explosion outward.
7    Q    From inside the bottle towards the outside?
8    A    From inside the container, yes. It was a
9 crack, and just one side of the crack appeared to be a
10 U-shape form.
11    Q    I apologize to the court reporter. I think I
12 was jumping in and speaking over you, which is something
13 I always tell the witness not to do. But in this case,
14 I was doing it, so --
15         And just so the record is clear, because I do
16 think I was speaking over you, you were saying that the
17 crack appeared to have been forced outward from inside
18 the neck of the tank?
19    A    Yes.
20    Q    And you believe that it was roughly a U-shaped
21 crack or hole?
22    A    No. It appeared to be a straight line. Just
23 the one side of the crack appeared to be more outward
24 than the other side of the crack.
25    Q    Okay. Based on your experience working with

69

1 torches and the like, what did that indicate to you,
2 that hole, if anything?
3    A    Personally?
4    Q    Yes.
5    A    Abuse.
6    Q    In what -- why did it indicate abuse?
7    A    Appeared to me that the container was used
8 other than what it was for.
9    Q    Can you be any more specific? In other words,
10 did it strike you that there had been some sort of force
11 applied, or what is it you're describing?
12    A    Just my personal opinion, you're asking me,
13 or --
14    Q    Yes. That's all I can ask for.
15    A    Okay. It appears to me that it was banged
16 against -- the top of the nozzle was banged against
17 something of a hard surface and not created the crack,
18 but maybe, in my experience, that weakened the
19 connection between the torch nozzle and the cylinder
20 itself.
21         I have experienced other employees, when
22 they -- in my presence, when they were not able to light
23 that torch, do several other abusive things to get it to
24 light.
25    Q    Have you ever -- in your experience, have you

18 (Pages 66 to 69)

70

1 seen a crack like that before?
2    A    Not that particular type of crack, no.
3    Q    Did the -- getting back to your testimony, you
4 described -- I'm going to roughly paraphrase it -- but
5 the crack appeared to have been forced outward. Did
6 that give any indication to you of what had transpired
7 or caused the crack?
8    A    I was under the impression that was from the
9 explosion.
10    Q    Was there anything in particular about the
11 crack or otherwise about the tank you saw that suggested
12 to you that it had been -- may have been banged on a
13 hard surface?
14    A    It appeared to me that the torch was -- might
15 have been banged against something that might have
16 adjusted the thread area of where the torch nozzle and
17 the canister would connect and had -- may have weakened
18 that area in the process of being banged, I guess you
19 would say.
20    Q    Okay. But was there anything -- other than
21 the existence of the hole or the crack itself, was there
22 anything else; for example, scratches in the paint,
23 blunt --
24    A    Oh, the threaded part was this -- from the
25 crack itself. was forced at a right angle of the

71

1 cylinder itself.
2    Q    Is that what you were testifying about
3 earlier, that right angle?
4    A    Yes, the right angle. Not the torch nozzle,
5 but the cylinder and the torch nozzle. The cylinder is
6 here. The torch nozzle is on top, straight, and there
7 is a natural bend by manufacture at the connection of
8 the threaded area and the torch nozzle itself, at a
9 right angle. And on the right side or the side that
10 was -- I don't know how to say this -- on the --
11      MR. STEPHAN: Opposite.
12      THE WITNESS: Opposite of the bend of the
13 side -- on the side of where the crack was, the angle
14 went to the right; right-side angle of that crack.
15 BY MR. EPSTEIN:
16    Q    When you say, "The angle went to the right," I
17 understand, or at least I think I do, that the torch
18 nozzle you saw, or the torch tip, was at a bend. But
19 are you saying that the actual threaded portion of the
20 cylinder was bent off from the yellow painted --
21    A    The base of the threads.
22    Q    Right. In other words, if I'm describing
23 correctly, you've got your yellow painted cylinder, if
24 you will?
25    A    Cylinder, yes, sir.

72

1    Q    It comes to a neck, kind of like
2 Mr. Moorhead's bottle here?
3      MR. MOORHEAD: They call this portion
4 "threaded," which attaches to the top of the neck. That
5 will help in the terminology when you are discussing it.
6      MR. EPSTEIN: Sure.
7 BY MR. EPSTEIN:
8    Q    At the neck of this tank there is, then, a
9 threaded tip, if you want -- maybe made of copper. Or
10 can you tell me what the metal is at the top?
11    A    I would assume, aluminum.
12    Q    Aluminum?
13    A    Aluminum. Pressed aluminum.
14    Q    But, in any event, it's not painted yellow,
15 right, the part with the threads?
16    A    I don't recall.
17    Q    But at the point where the threaded metal
18 meets the neck of the tank that is not threaded, it
19 becomes bent? If I understand you correctly, you saw
20 that bend, that right-angle bend you were talking about,
21 start at that point, where the threaded portion of the
22 bottle meets the neck?
23    A    Yeah. At the end, the bottom of the last
24 thread, between the last thread and the cylinder itself
25 is where the bend took place, and the explosion -- or

73

1 the crack was in that same area.
2    Q    Got it. Was it an actual 90-degree angle that
3 you saw?
4    A    No. It was a slight-angle bend.
5    Q    Slight angle. And the torch tip was still
6 attached to the threads? It was still screwed on when
7 you picked it up?
8    A    When I picked it up, it was -- appeared to be
9 loose at the -- it didn't appear to be all the way
10 attached, or all the way screwed on.
11    Q    Got it. And could you tell at that time
12 whether that was because -- and when I say that, I mean
13 the fact that the torch tip was not screwed all the way
14 on -- because it was not screwed all the way on
15 initially, or the force of whatever had happened had
16 forced --
17    A    I would not be able to tell you. I don't have
18 that knowledge to answer that.
19    Q    Just bear with me. I'm going to scan through
20 my notes. I think Mr. Moorhead covered most of what I
21 was going to ask you, so I'm just going to condense
22 whatever remaining questions I do have.
23      Other than the one crack -- I'm going to use
24 the term "crack" -- you described up on the neck of the
25 bottle, did you see any other breaches in the metal

19 (Pages 70 to 73)

# EXHIBIT 3

MAY 9  2007

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3

4         ANDREW SHALABY, an           )
          individual, and SONIA        )
5         DUNN-RUIZ, an individual,    )
                                       )
6                    Plaintiffs,       )
                                       )
7         vs.                          )  Case No. C 06 7065 CW
                                       )
8         NEWELL RUBBERMAID, INC., a   )
          Delaware Corporation, THE    )
9         HOME DEPOT, INC., a          )
          Delaware Corporation,        )
10                                     )
                     Defendants.       )
11        _____)

12

13

14                       DEPOSITION OF:

15                        JOE RUSSO

16               WEDNESDAY, APRIL 18, 2007

17

18

19

20

21

22     Reported by:  Sally D. Phelps
                     CSR 3485
23

24

25

22

1 thought may have occurred.
2    Q. Did anybody assist you in that function?
3    A. Bonnie may have and also Captain Spangler.
4    Q. Captain Spangler may have or you're sure he did?
5    A. May have.
6    Q. As part of that function -- when I use that
7 function in the rest of these questions in that area I'm
8 talking about that information gathering function as
9 opposed to treatment.
10   A. Okay.
11   Q. In that function that you were performing did
12 you interview the victim at all?
13   A. I did not but my intern did.
14   Q. So now we're talking about Mr. Price?
15   A. Robert Price, yes.
16   Q. Were you present when that interview took place?
17   A. Yes.
18   Q. What information was gathered from the victim
19 concerning what had happened?  Again if there is
20 something there that will help you feel free to refer to
21 it, if there is not anything there --
22   A. There is. I have his initial of what he got,
23 and I stood over him and my best recollection was I
24 remember the patient stating that he kicked something.
25 He kicked the thing into the fire and it exploded.

23

1    Q. Did he elaborate at that time on what he meant
2 by the thing?
3    A. He did say it was a propane.
4    Q. So you understood that he was telling you that
5 he had kicked some type of compressed gas cylinder into a
6 campfire basically?
7    A. Yes.
8    Q. All right. Mr. Price would have been present
9 when he made that statement because he was the one that
10 was actually interviewing him.
11   A. Yes.
12   Q. Were there any more members of your fire
13 department team that would be able to confirm or disprove
14 that this is what he was saying that you know of?
15   A. I don't know. Maybe all of them, maybe none. I
16 don't know.
17   Q. But you're sure at least you and Mr. Price,
18 Robert Price?
19   A. Correct.
20   Q. Any other information, limiting it just now to
21 the victim, that was provided to you about what had
22 happened?  In other words, maybe he elaborated on why he
23 kicked it into the fire, how he kicked it into the fire,
24 or maybe it wasn't him that kicked it into the fire it
25 was somebody else in his presence, anything like that?

24

1    A. No. I just remember him stating that he kicked
2 it into the fire.
3    Q. Did you interview his spouse about what had
4 occurred?
5    A. No.
6    Q. Do you know whether Mr. Price did?
7    A. No. That interview would have most likely
8 occurred by one of the engine companies.
9    Q. So if that was done it was done by somebody in
10 the engine company?
11   A. Yes. There was a potential that maybe she said
12 something to one of us during that time, but most of the
13 time the engine company's role would be to interview the
14 wife or bystanders or whatever else then let us know as
15 we interview the patient. So there is two dynamics going
16 on at the same time.
17   Q. Perfect. So if that was done, and you're not
18 sure if it was done, it was done by someone in the engine
19 company?
20   A. Correct.
21   Q. If you look at your paperwork can you determine
22 whether they had such an
23 interview and if so, B, what she said?
24   A. It would not be written in here.
25   Q. Okay. It's not written in there but that would

25

1 not be unusual. Is that what you're telling me?
2    A. Correct. This is the -- this is designated
3 specifically for the patient not for --
4    Q. This is a hypothetical. I don't know whether
5 anybody talked to his spouse, but if that had happened in
6 a typical investigation where would the information
7 gathered by the engine company from the spouse be
8 located?  If it's not in that report where would it be?
9    A. Okay. What happens is the engine company will
10 gather information. They will then do a face to face
11 with us, myself and Robert, at that point and let them
12 know what's going on. This is what happened. This is
13 what she said. Then unless -- sometimes it may be put in
14 here, and sometimes it may not, depending on how
15 pertinent the information may be.
16   Q. In the normal course would they ever prepare a
17 companion report or report of their own?
18   A. No.
19   Q. So if anything is going to get written about the
20 interview with the spouse it will only be if they tell
21 you and you decide to put it into the report?
22   A. Correct.
23   Q. Got it.
24   A. Now, there is a fire department log, and I don't
25 know what they put in there.

7 (Pages 22 to 25)

# EXHIBIT 4

1
2
3
4
5
6
7
8  UNITED STATES DISTRICT COURT
9  SOUTHERN DISTRICT OF CALIFORNIA

10  SHALABY, ET AL,                              Civil No.   07cv2107-W (POR)
11                            Plaintiffs,        **SCHEDULING ORDER REGULATING**
                                                 **DISCOVERY AND OTHER PRETRIAL**
12            v.                                 **PROCEEDINGS**
13  NEWELL RUBBERMAID, INC. ET AL,
14                            Defendants.
15

16       On January 16, 2008, the court held an Early Neutral Evaluation.  Appearing before the

17  Court were: Mark D. Epstein, counsel for Plaintiffs; Plaintiff Andrew Shalaby; Plaintiff Sonia Dunn-

18  Ruiz; John Moorhead, counsel for Defendant BernzOmatic; Maxine Schroll, a representative of

19  Defendant BernzOmatic; Rich Ergo, counsel for Third Party Defendant Worthington Industries; Tim

20  Doney, a representative of Third Party Defendant Worthington Industries; Lowell T. Carruth,

21  counsel for Third Party Defendant Western Industries, Inc.; and Mark Stevens, a claims

22  representative for Third Party Defendant Western Industries, Inc.  The case did not settle.  Counsel

23  represented that they have already held their Rule 26(f) conference.  Based thereon, the Court held a

24  Case Management Conference pursuant to Rule 16 of the Federal Rules of Civil Procedure.  After

25  consulting with the attorneys of record for the parties and being advised of the status of the case, and

26  good cause appearing, IT IS HEREBY ORDERED:

27       1.    Counsel orally stipulated that they do not intend to amend the pleadings.  Therefore,

28  the Court will not set a deadline for amending the pleadings.

         2.    A Settlement Conference shall be held on **March 24, 2008** at **9:30 a.m.**  The

                                    - 1 -                                    07cv2107

1   conference shall be <u>telephonic,</u> with <u>attorneys only</u>. Plaintiff's counsel shall initiate and coordinate

2   the call.

3       3.      On or before **March 28, 2008** all parties shall exchange with all other parties a list of

4   all expert witnesses expected to be called at trial. The list shall include the name, address, and

5   phone number of the expert and a brief statement identifying the subject areas as to which the expert

6   is expected to testify. The list shall also include the normal rates the expert charges for deposition

7   and trial testimony. On or before **April 11, 2008**, any party may supplement its designation in

8   response to any other party's designation so long as that party has not previously retained an expert

9   to testify on that subject.

10      4.      Each expert witness designated by a party shall prepare a written report to be

11  provided to all other parties no later than **July 3, 2008**, containing the information required by

12  Federal Rule of Civil Procedure 26(a)(2)(A) and (B).

13          *Except as specifically provided below, any party that fails to make these disclosures shall*

14  <u>*not*</u>, *absent substantial justification, be permitted to use evidence or testimony not disclosed at any*

15  *hearing or at the time of trial. In addition, the Court may impose sanctions as permitted by Federal*

16  *Rule of Civil Procedure 37(c).*

17      5.      Any party, through any expert designated, shall, in accordance with Federal Rules of

18  Civil Procedure 26(a)(2)(C) and 26(e), supplement any of its expert reports regarding evidence

19  intended solely to contradict or rebut evidence on the same subject matter identified in an expert

20  report submitted by another party. Any such supplemental reports are due on or before **July 18,**

21  **2008**.

22      6.      Discovery, except expert discovery, shall be completed on or before **June 27, 2008**.

23  Expert discovery shall be completed on or before **August 8, 2008**. *"Completed"* means that all

24  discovery under Federal Rules of Civil Procedure 30-36 must be initiated a sufficient period of time

25  in advance of the cut-off date, so *that it may be completed* by the cut-off date, taking into account

26  the times for services, notice, and response as set forth in the Federal Rules of Civil Procedure. All

27  disputes concerning discovery shall be brought to the attention of this Court no later than 30 days

28  following the date upon which the event giving rise to the discovery dispute occurred. Counsel shall

- 2 -

07cv2107

1  meet and confer pursuant to the requirements of Federal Rule of Civil Procedure 26 and Local Rule

2  26.1(a) before contacting the Court regarding discovery disputes.

3        7.    A Mandatory Settlement Conference shall be conducted on **July 28, 2008,** at

4  **10:00 a.m.,** in the chambers of the Honorable Louisa S. Porter.  Counsel shall lodge settlement

5  statements, if any, directly with the chambers of Judge Porter via email to

6  efile_porter@casd.uscourts.gov on or before **July 23, 2008**.  The settlement statements should

7  include a neutral factual statement of the case, identify controlling legal issues, and concisely set out

8  issues of liability and damages, including any settlement demands and offers to date and addressing

9  special and general damages where applicable.  The parties shall exchange settlement statements.

10 The settlement statements **shall not** be filed with the Clerk of the Court.

11       All parties and claims adjusters for insured defendants and representatives with complete

12 authority to enter into a binding settlement, as well as the principal attorney(s) responsible for the

13 litigation, *must be present* and legally and factually prepared to discuss and resolve the case at the

14 mandatory settlement conference.  All conference discussions will be informal, off the record,

15 privileged and confidential.

16       Mandatory settlement conferences shall not be rescheduled without a showing of good cause

17 and adequate notice to the Court.  If counsel wish to reschedule this conference, they shall contact

18 the Court at least ten days prior to the conference.  Absent exceptional circumstances, the Court will

19 not reschedule this conference with less than ten 10 days' notice.  <u>Only in extreme circumstances</u>

20 <u>will the Court reschedule a mandatory settlement conference with less than 24 hours' notice.</u>

21       8.    All motions, other than motions to amend or join parties, or motions in limine, shall

22 be **FILED** on or before **September 12, 2008.**

23       Motions will not be heard or calendared unless counsel for the moving party has obtained a

24 motion hearing date from the law clerk of the judge who will hear the motion.  <u>Be advised that the</u>

25 <u>parties must file their moving papers within three days of receiving the motion hearing date from the</u>

26 <u>Court. Be further advised that the period of time between the date you request a motion date and the</u>

27 <u>hearing date may be **up to three months**.  Please plan accordingly.</u>

28       Briefs or memoranda in support of or in opposition to any pending motion shall not exceed

1  25 pages in length without permission of the judge or magistrate judge who will hear the motion.

2  No reply memorandum shall exceed ten pages without leave of the judge or magistrate judge who

3  will hear the motion.

4     Pursuant to Civil Local Rule 7.1(f)(3)(c), if an opposing party fails to file opposition papers

5  in the time and manner required by Civil Local 7.1(e)(2), that failure may constitute a consent to the

6  granting of a motion or other request for ruling by the court. Accordingly, all parties are ordered to

7  abide by the terms of Local Rule 7.1(e)(2) or otherwise face the prospect of any pretrial motion

8  being granted as an unopposed motion pursuant to Civil Local Rule 7.1(f)(3)(c).

9     Should either party choose to file or oppose a motion for summary judgment or partial

10  summary judgment, no Separate Statement of Disputed or Undisputed Facts is required.

11     9.     Despite the requirements of Local Rule 16.1(f), neither party is required to file

12  Memoranda of Contentions of Fact and Law at any time. The parties shall instead focus their efforts

13  on drafting and submitting a proposed pretrial order by the time and date specified below.

14     10.    All parties or their counsel shall fully comply with the Pretrial Disclosure

15  requirements of Federal Rule of Civil Procedure 26(a)(3) on or before **December 22, 2008**. *Failure*

16  *to comply with these disclosures requirements could result in evidence preclusion or other sanctions*

17  *under Federal Rule of Civil Procedure 37.*

18     11.    Counsel shall meet together and take the action required by Local Rule 16.1(f)(5) on

19  or before **December 29, 2008**. At this meeting, counsel shall discuss and attempt to enter into

20  stipulations and agreements resulting in simplification of the triable issues. Counsel shall exchange

21  copies and/or display all exhibits other than those to be used for impeachment. The exhibits shall be

22  prepared in accordance with Local Rule 16.1 (f)(3)(c). Counsel shall note any objections they have

23  to any other parties' Pretrial Disclosures under Federal Rule of Civil Procedure 26(a)(3). Counsel

24  shall cooperate in the preparation of the proposed pretrial conference order.

25     12.    The proposed final pretrial conference order, including objections any party has to

26  any other parties' Rule 26(a)(3) Pretrial Disclosures shall be prepared, served and lodged with the

27  Clerk of the Court on or before **January 5, 2009**, and shall be in the form prescribed in and in

28  compliance with Local Rule 16.1 (f)(6). Counsel shall also bring a copy of the pretrial order to the

07cv2107

1    pretrial conference for the Court.

2        13.    In addition to the proposed final pretrial conference order, the parties are further

3    ordered to prepare separate informal letter briefs, not exceeding two single-spaced pages. The

4    informal letter briefs shall be served on opposing counsel and lodged with the chambers of the

5    **Honorable Thomas J. Whelan** (and **not** filed with the Clerk of the Court), on or before **January 7,**

6    **2009.**

7        The letter brief should be a relatively informal and straightforward document. It should

8    outline a short, concise and objective factual summary of the party's case in chief, the number of

9    hours/days each party intends to expend at trial, the approximate number of witnesses, whether

10   certain witnesses will be coming from out of town, the number of testifying expert witnesses,

11   whether any unique demonstrative exhibits may be presented, the number of proposed motions in

12   limine that may be filed, precisely when the parties would be prepared to submit their in limine

13   papers (and whether the parties have met and conferred with respect to in limine issues), the issue of

14   proposed jury instructions and when the parties intend to submit them before trial, and voir dire

15   issues, either party's preference as to what date(s) the trial should begin and any other pertinent

16   information that wither party may deem useful to assist the Court in the execution of the pretrial

17   conference and in setting the matter for trial.

18       14.    The final pretrial conference shall be held before the **Honorable Thomas J. Whelan**,

19   on **January 12, 2009**, at **10:30 a.m.**

20       15.    The dates and times set forth herein will not be further modified except for good

21   cause shown.

22

23   DATED:  January 16, 2008

24

25                                                          LOUISA S PORTER
                                                            United States Magistrate Judge
26

27   cc:    The Honorable Thomas J. Whelan
            all parties
28

# EXHIBIT 5

SG4

1  MICHAEL J. VEILUVA (State Bar No. 100419)
   MARK D. EPSTEIN (State Bar No. 168221)
2  ALBORG, VEILUVA & EPSTEIN LLP
   200 Pringle Avenue, Suite 410
3  Walnut Creek, CA 94596
   Telephone: (925) 939-9880
4  Facsimile: (925) 939-9915

5  Attorneys for Plaintiffs
   Andrew Shalaby and Sonia Dunn-Ruiz

6

7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10  ANDREW SHALABY and SONIA DUNN-    | Case No. C 06-07026 EDL
    RUIZ,
11                                     | **PLAINTIFFS' DISCLOSURE OF**
                  Plaintiffs,          | **EXPERTS**
12
          vs.
13
    IRWIN INDUSTRIAL TOOL COMPANY,
14  INC., THE HOME DEPOT, INC., and DOES
    2 through 100, inclusive,
15
                  Defendants.
16

17  Plaintiffs ANDREW SHALABY and SONIA DUNN-RUIZ hereby disclose the following expert

18  witnesses who are anticipated to testify at trial:

19                    **Retained Experts**

20  Robert N. Anderson, PhD, PE, RNA Consulting, Inc., 27820 Saddle Court, Los Altos Hills, CA

21  04022-1810, (650) 949-1092.

22       Subject matter:  Dr. Anderson is anticipated to testify regarding physical properties and

23  combustibility of MAPP gas, metallurgy, tank manufacture, explosions, product defects

24  and accident reconstruction involving the MAPP gas torch.

25  Hourly rate:  $360

26

27  ///

28  ///

                              1                    900725.disc.plfs disclosure of experts.doc

19

1  Alison Vredenburgh, PhD, CPE, Vredenburgh & Associates, Inc., 2588 El Camino Real, #353,

2  Carlsbad, CA 92008, (760) 434-4741.

3      Subject matter: Dr. Vredenburgh is anticipated to testify on the adequacy of consumer

4      warnings and consumer use of the product in question.

5      Hourly rate: $300 for consulting services; $400 for testimony (whether for deposition,

6      arbitration, or trial); $500 for videotaped deposition.

7  Adam J. Goldyne, M.D. Assistant Clinical Professor of Psychiatry, University of California, San

8  Francisco, 3611 Sacramento Street, San Francisco, CA 94118, 415-826-9639.

9      Subject matter: Dr. Goldyne is a clinical psychiatrist who is anticipated to testify on his

10     psychiatric evaluation of Mr. Shalaby including long-term injuries and post traumatic

11     stress disorder.

12     Hourly rate: $500. Flat fee for appearances of $2,500/half-day and $5,000/full day.

13  Eric S. Morgenthaler, PhD, 1390 Market Street, Suite 301, San Francisco, CA 94102-5405, (415)

14  355-1818.

15     Subject matter: Dr. Morgenthaler is a clinical psychologist who is expected to testify

16     regarding Mr. Shalaby's psychological injuries including post traumatic stress disorder.

17     Hourly rate: $350 for evaluation and reporting, $450 for testimony, $300 for travel time.

18  Thomas Chapman, CPA, 1220 Oakland Blvd., Suite 200, Walnut Creek, CA 94598, (925) 210-

19  2180.

20     Subject Matter: Mr. Chapman is expected to testify on the subject of Andrew Shalaby's

21     lost earnings and lost future earnings as a result of the accident.

22     Hourly rate: $320

23

24

25

26

27  ///

28  ///

PLAINTIFFS' DISCLOSURE OF EXPERTS

1

**Non-Retained Treating Physicians**

2

(Will not be preparing reports)

3   Thomas P. Harries, MD. St. Francis Memorial Hospital, 900 Hyde St., San Francisco, CA

4   94109, (415) 353-6000.

5   Kenneth J. Gjeltema, MD.   500 San Pablo Avenue,  # 300, Albany, CA 94706, (510) 524-1580.

6   Lynda Posner, MD, St. Francis Memorial Hospital,  900 Hyde St., San Francisco, CA 94109,

7   (415) 353-6000.

8   Gifford S. Leung, MD, St. Francis Memorial Hospital, 900 Hyde St., San Francisco, CA 94109,

9   (415) 353-6000.

10  Guido J. Gores, Jr., MD, St. Francis Memorial Hospital, 900 Hyde St., San Francisco, CA 94109,

11  (415) 353-6000.

12  Bruce M. Potenza, MD, University of California, San Diego Medical Center, Department of

13  Surgery Burn Center, 200 West Arbor Dr., #8825, San Diego, CA 92103, (619) 543-6711.

14  Jonah B. Hulst, University of California, San Diego Medical Center, Department of Surgery

15  Burn Center, 200 West Arbor Dr., #8825, San Diego, CA 92103, (619) 543-6711.

16  Lawrence Sweeney MD (Radiologist) University of California, San Diego Medical Center,

17  Department of Surgery Burn Center, 200 West Arbor Dr., #8825, San Diego, CA 92103, (619)

18  543-6711.

19  Lorene E. Romine, MD, University of California, San Diego Medical Center, Department of

20  Surgery Burn Center, 200 West Arbor Dr., #8825, San Diego, CA 92103, (619) 543-6711.

21

22  Dated: March 28, 2008                    ALBORG, VEILUVA & EPSTEIN LLP

23

24                                          By: _____

25                                              MICHAEL J. VEILUVA
                                                Attorneys for Plaintiffs

26

27

28

900725.disc.plfs disclosure of experts.doc

PLAINTIFFS' DISCLOSURE OF EXPERTS

## CERTIFICATE OF SERVICE

I, Jan Baerwald, certify and declare as follows:

I am over the age of eighteen (18) years and not a party to this action. My business address is Alborg, Veiluva & Epstein LLP, 200 Pringle Avenue, Suite 410, Walnut Creek, California 94596, which is located in the city, county and state where the mailing described below took place. On the date set forth below, I deposited in the United States Mail at Walnut Creek, California, and faxed to the numbers shown below, the foregoing document described as **PLAINTIFFS' DISCLOSURE OF EXPERTS**, addressed as follows:

| | |
|---|---|
| **Attorneys for Defendants Newell Rubbermaid, Inc. and Rubbermaid Inc.** | J. Phillip Moorhead, Esq.<br>Keller, Price & Moorhead<br>229 Avenue I, Second Floor<br>Redondo Beach, CA 90277-5600<br>Fax:    310-540-8480 |
| | Beth Schneider Naylor, Esq.<br>Frost, Brown & Todd, LLC<br>2200 PNC Center<br>201 East Fifth Street<br>Cincinnati, OH 45202<br>Fax:    513-651-6981 |
| **Attorneys for Third Party Defendant Western Industries** | Lowell T. Carruth, Esq.<br>Devon R. Darrow, Esq.<br>McCormick, Barstow, Sheppard et al. LLP<br>P.O. Box 28912<br>5 River Park Place East<br>Fresno, CA 93720-1501<br>Fax:    559-433-2300 |
| **Attorneys for Third Party Defendant Worthington Industries** | Richard A. Ergo, Esq.<br>Bowles & Verna LLP<br>2121 N. California Blvd., Suite 875<br>P.O. Box 8180<br>Walnut Creek, CA 94596<br>Fax:    925-935-0371 |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed in Walnut Creek, California on March 28, 2008.

JAN BAERWALD

EXHIBIT 6

23

# R N A   C o n s u l t i n g ,   I n c o r p o r a t e d
*Specializing in forensic materials engineering and sciences*

**Robert N. Anderson, Ph.d., P.E., President**

27820 Saddle Court
Los Altos Hills, CA
94022-1810   USA

Bus: 650-949-1092
Fax: 650.949.5641
email: robertNA@aol.com

June 25, 2008

Mark D. Epstein
Alborg, Veiluva & Epstein LLP
200 Pringle Avenue, Suite 410
Walnut Creek, CA 94596-7380

Re: Shalaby v. Irwin, et al.

Dear Mr. Epstein:

At your request, I have examined the 4/21/06 incident where Mr. Andrew Shalaby was injured while using a 16 oz cylinder Bernzomatic MAPP gas torch. MAPP gas is a trademark of the Dow Chemical Co. and is composed of extremely flammable methylacetylene-propadiene-propane.

It is my understanding that Mr. Shalaby was in the process of igniting logs in a fire pit, using a TS4000 torch head and Bernzomatic MG9 MAPP gas cylinder when the cylinder vented and he was burned. In the incident, the center valve housing, attached to the canister by brazing material, ruptured.

## Materials Reviewed:

I have reviewed the following documents:

1. Deposition of **Michael Ridley**, Senior engineering manager, Irwin Industrial Tool Co., taken 11/13/07.
2. Deposition of **Steven T. Gentry**, Quality Control Department Worthington Cylinder Corp., 11/14/07.
3. Deposition of **Andrew W. Shalaby** volume I and II, Plaintiff, 10/24/07 and 10/25/07.
4. Deposition of **Warren L. Ratliff, Jr.**, Park ranger supervisor, Campland, 4/17/07.
5. Deposition of **Randy T. Stephens**, Ranger at Campland, 4/17/07.
6. Deposition of **Joe Russo**, Paramedic, 4/18/07.
7. Miscellaneous manufacturing drawings of torch parts.
8. Health & Safety Laboratory report 2006/121.
9. Bernzomatic instruction manuals 96001, 97090
10. Bernzomatic catalog.
11. Investigative Report with reference to interview of Anne Carrol and David Borger by Howard Felder 10/6/07.
12. Consumer Product Safety Commission Release # 78-088.
13. Transcribed statement of Andrew Shalaby by Joe Tancredy, 6/1/06
14. Material Safety Data Sheet for MAPP Gas.
15. Supplemental Response to Request for Production of Documents (Set No. One).
16. Worthington Industries Expert Witness Disclosures.

24

17. Third-Party Defendant/Cross Claimant Western Industries, List of Expert Witnesses.
18. Disclosure of Experts by Defendants, Bernzomatic.
19. Protective Order.
20. Defendants' Initial Disclosures.
21. Drawing 304432.
22. MAPP gas cylinder specifications.

## Analysis:

The failure of the Bernzomatic MAPP gas torch Mr. Shalaby was using appears to be at the collar or threaded area between the center valve housing and the cylinder. The center valve housing is fastened to the cylinder by a copper-nickel brazing material. The Rangers in the park that examined the gas torch confirm that the failure was in that location.

- Park Ranger Supervisor Warren Ratliff, in his deposition, comments were that there "appeared to be a crack in the cylinder at the bottom thread level of the cylinder" page 25, lines 21-25; page 26, lines 24-25.

- Ranger Randy Stephens comments on the failure in his deposition on page 42, lines15-25; page 43, lines 1-11; page 73, lines 9-25; page 74 lines 1-15.

- Also, the recollection of Andrew Shalaby in his transcribed statement to Joe Tancredy on 6/1/06.

Mr. Shalaby was using the torch to ignite firewood in a fire pit and his torch would have been partially inverted in that situation. Health & Safety Laboratory report 2006/121 (report included in test results CD) determined that the torch orientation was important and confirmed that when the cylinder was inverted, explosion could occur. The directions do indicate "Use upright to prevent flare-ups or flashes" caused by the liquid entering the torch. However, this orientation is impossible in some situations.

CPSC Release # 78-088 issued a notice of a recall for fuel cylinders from another manufacture (Cleanweld Products) that separated "where the threaded connector meets the cylinder". A flaw in this area is very serious.

A review of other MAPP gas torch failures involving lawsuits filed since January 2002 and supplied by the Defendant in their Supplemental response to request for production of documents (Set One) had listed 7 lawsuits identified below.

1. Thomas Segrest, Jr. v. Bernzomatic. (Date of injury 2/9/04)
2. Richard Gleen v. Newell Operating Co. (Date of injury 1/3/06)
3. Andrew Gelzer v. Thermadyne (Date of injury 2/13/04)
4. Melvin Wilfredo Bonilla Carranza v. Bernzomatic. (Date of injury 6/13/05)
5. Ross Pelz v. Worthington Industries. (Date of injury 5/29/05)
6. Mark Loewes v. Worthington Industries. (Date of injury 3/27/05)
7. Timothy Welch v. Newell Rubbermaid (Date of injury 7/3/06)

The Glenn v. Newall is a Ventura California case in which a Bernzomatic cylinder failed at the braze material (**Photographs 1, 2**).

In addition, I have reviewed photographs for a Minnesota case called Venderlinde v. Ace Hardware Corp., where a "TurboTorch" failed in the braze material between the center

25

valve housing and the cylinder. There are two Lenox cylinders (John Barrett v. Lenox and Lemaralejo) that also failed in the same location.

## Tests Conducted:

1. Metallography of the brazing material in MAPP gas cylinders.
2. Microhardness of the brazing material in MAPP gas cylinders.
3. Energy Dispersive Spectrum (EDS) of MAPP brazing material.
4. Metallography of corrosion test of the MAPP brazing material.
5. Metallography of brazing material in MAPP PRO gas cylinder.
6. Microhardnes of the brazing material in MAPP PRO gas cylinders.
7. EDS of brazing material in MAPP PRO gas cylinders.

Test data are contained in a compact disc (CD) included with this report.

The braze material is a copper nickel alloy. The composition was determined to be approximately 61 % (atomic) Cu and 39 % Ni by Energy Dispersive X ray. This is 63% Cu by weight and the specifications on Drawing 32600-23 call for a maximum of 60% by weight Cu. It is possible that the brazing material is off specifications.

Steven Gentry in his deposition (page 89, line 7) states that the brazing temperature is between 2000 and 2100 degrees Fahrenheit, which is 1093 – 1149 degrees centigrade. According to the Cu-Ni phase diagram (See **Figure 1**) from the reference "Hansen, Constitution of Binary Alloys", that temperature is too low to melt the brazing alloy.

It should be noted that the brazing material used in the Bernzomatic MAPP PRO cylinders has been changed to all copper without the addition of nickel. Metallography of the MAPP PRO brazing material is shown on the CD.

## Conclusions/Findings:

Based on the facts of failure in the brazed area, I have examined three exemplar MAPP gas cylinders, (W10G57E, W11G152W and W8G230E), with respect to the Cu-Ni braze between the center valve housing and the cylinder. Microhardness testing of the brazing metal gave values of 23 HRC for W10G57E; 33 HRC for W11G152W, and 97 HRB for W8G230E.

The cylinders have been sectioned in half and four sections have been cut from each cylinder to show a portion of the neck piece and cylinder wall and the brazing material between. These sections have been mounted in plastic and polished and photographically documented. Representative examples of the microphotographs from each cylinder are shown in **Photographs 3, 4, and 5**. The brazing materials have large voids in the bulk and smaller voids in the interface between the cylinder walls and the center valve housing as shown in **Microphotographs 6, 7, and 8**. The brazing on the outer surface of the cylinder is undercut in all three cylinders rather than forming a meniscus. The undercutting is a sign of lack of wetting and penetration of the brazing material with the cylinder and valve. A good meniscus shows that wetting has occurred. The brazing defects shown in photographs 3-8 reduce the strength of the joint and make it more likely that the valve will partially separate from the cylinder and release gas when the torch is used as intended.

26

The outside surface of the brazing material that is undercut represents a lack of wetting and penetration of the brazing material with the cylinder and valve housing. This flaw is sufficient to reject the cylinder. This flaw should have been picked up by the manufacturer with a simple visual inspection of the cylinders.

The Bernzomatic one pound MAPP gas cylinder is manufactured per Federal specification published in 49 CFR 178.65 (D.O.T. 39). The specification for non-reusable (non-refillable) cylinders states "brazed seams must be assembled with proper fit to ensure complete penetration of the razing material throughout the brazed joint." The brazed joints shown in microphotographs 6, 7, and 8 lack complete penetration.

Corrosion tests show that the brazing material is strongly cathodic to the cylinder and valve and will cause the steel to corrode in a suitable moist atmosphere. The interior walls, of the sectioned cylinders, also showed signs of corrosion. See Photograph 9, Interior View of Cylinder W10G57E Showing Corrosion.

In my opinion, the braze material between the center valve housing and the cylinder is the weak element in the assembly, and subject to failure when the torch is attached to the cylinder. The brazing material has voids and lacks sufficient fusion to the cylinder wall and valve housing to resist stresses placed on it when used in a normal manner. This problem with the brazing material is due to a combination of poor cleaning of the brazing area, contamination of the brazing material and improper process parameters such as furnace temperature and time. For these three cylinders that were examined to be offered on the market clearly establishes the failure of Bernzomatic inspection and quality control procedures.

The MAPP gas torch and cylinder is unsafe and unreasonably dangerous as designed and manufactured.

Please call me if you have any questions.

Sincerely,

*Robert N. Anderson*

Robert N. Anderson, Ph.D., P.E.

27

# EXHIBIT 7

# RNA Consulting, Incorporated
*Specializing in forensic materials engineering and sciences*

**Robert N. Anderson, Ph.d., P.E., President**

27836 Saddle Court
Los Altos Hills, CA
91022 1836    USA

Bus.: 650 949 1092
Res.: 650 949 5641
email: mbc::NA@aol.com

July 9, 2008

Mark D. Epstein
Alborg, Velluva, & Epstein, LLP
200 Pringle Ave., Suite 410
Walnut Creek, CA 94596-7381

Re: Shalaby matter: Review of Reports. Comments.

Dear Mr. Epstein:

At your request, I have reviewed the reports of Exponent and of Thomas Eagar. My comments on their reports are presented below:

## Exponent report by Timothy Meyers and William Kane:

The investigators did no testing of MAPP gas cylinders and relied on reviewing various documents to form their opinions. The Exponent report proposes three different scenarios that result in the cylinder contents burning Mr. Shalaby. There is no basis to select among the 3 case scenarios that they describe, and the report concludes that "the cause of the fire and Mr. Shalaby's burns is undetermined."

## Report of Thomas Eagar:

Dr. Eagar did no testing of the MAPP gas cylinders and relied on his review of various documents and Code CFR 178.65 requirements to reach his opinion that the cylinder Mr. Shalaby was using did not have deficiencies in design, in material, and in manufacture. He states "It is improbable that a manufacturing deficiency significant enough to result in a failure of the cylinder in service, will ship from the manufacturing facility." He arrives at abuse being "the sole probable cause of cylinder failure."

## Robert N. Anderson Review and Comments:

CFR 178.65 (iii) states "Brazed seams must be assembled with proper fit to ensure complete penetration of the brazing material throughout the brazed joint." Metallographic examination of a number of commercially obtained cylinders showed this was not the case for the brazing of the center valve to the cylinder and that Bernzomatic was in violation of this requirement. This fact would indicate that the manufacturing deficiency should not be ruled out by Dr. Eager.

If Bernzomatic could not ship a defective cylinder, as stated by Dr. Eagar in his report, then it would necessarily explain all failures in service to be caused by abuse. However, it would not explain the defective brazing found on the commercially obtained cylinders I examined. Also, there is no review of the quality control procedures or analysis to support this claim that a defective cylinder will not leave the manufacturing facility



Dr. Eagar did not review or comment on the other failures of MAPP gas cylinders that have occurred around the country.

Dr. Eagar states "that the braze joint did not fail...." He also states: "It requires a substantial force or impact to split the steel in the cylinder as described by the witnesses." The amount of "substantial force" required was not determined or estimated by Dr. Eagar, nor does he have enough information to assert that the braze joint in Mr. Shalaby's cylinder did not fail.

He is silent on what the level of abuse is to be critical and if Bernzomatic should consider the possibility of customer abuse and therefore design against it, since the consequences are so grave.

### Test Observations:

I performed testing of the MAPP gas cylinders and determined that the center valve fitting would fail at approximately 30 foot-pounds of force. The failures can happen in the cylinder wall or the brazed joint. This amount of force appears to be above the normal abuse level.

Additionally, flame tests were carried out to demonstrate the failure of the brazed fitting and the characteristics of the resultant fire that occurred at failure.

Please call me if you have any questions.

Sincerely,

/s/

Robert N. Anderson, Ph.D., P.E.

30

EXHIBIT 8

**Jason Lusk**
**Lusk Plumbing**
**499 N 10th St**
**Blythe, CA 92225**
**(760) 922-8486**

I am the owner of Lusk Plumbing. I have worked as a plumber for 22 years. I have been employed as a plumber for the State of California, for Desert Plumbing, and now I own my own plumbing business. I have three employees that I supervise who also work as plumbers. I have had experience with every type of plumbing job, from small jobs like repairing a broken sink to large jobs like installing water lines. I am licensed in both California and Arizona.

Throughout my career, I have used torches like the Bernzomatic TS4000, and other types of torches. As a plumber, I use a torch almost everyday. Torches are a very important tool for me, and for every plumber that I know. For example, I have used a torch to solder fittings thousands of times in my career.

I know that the cylinder attached to the torch contains flammable gas. I have used torches that run on both propane and MAPP gas. I know that it is important to use a torch the way that it is intended. I make sure that my employees know how to use a torch properly because it is important to me that no one gets hurt on the job. In my opinion, any person who uses a torch attached to a cylinder would know that the cylinder contains flammable gas, and that it should be handled with care.

I have never, and I would never, intentionally knock a torch and cylinder against a hard object, like a fire ring. I have never, and I would never, intentionally place a torch and cylinder in a fire. It is my belief and opinion that any person who uses a torch would know that these are very dangerous things to do because the gas is flammable. In my opinion, a person who uses a torch would not need a warning to tell them not to do these things, because anyone who uses a torch would know that these are very dangerous things to do. In my opinion, it is not foreseeable that a person would do these kind of things with a torch.

In my opinion, torches are important and safe tools when used for their intended purpose.

I have never testified in court or in a deposition, nor have I published any articles. My rate is $90 per an hour, plus a $250 sitting fee for deposition and trial.

Dated: July 17, 2008

_Jason Lusk_

A 54H44R5_v1

EXHIBIT 9

33

**Hurwitz, Shelley G (LAX-X52476)**

**From:**      Mark Epstein [MEpstein@avelaw.com]
**Sent:**      Monday, August 18, 2008 1:58 PM
**To:**        Hurwitz, Shelley G (LAX-X52476)
**Subject:**   RE: Shalaby: Jason Lusk

Shelley:

I try to make it a policy to be reasonable, but I"m sorry. We just cannot agree to allow the belated report by an expert who was never disclosed, particularly when no new issues were raised by any of our experts. The opinions expressed by Dr. Anderson in his supplemental report were well within the sccope of issues and subject matter that were described in plaintiffs' expert disclosures. Moreover,whether "banging," "smashing" or kicking a cylinder is an "ordinary" use is simply not an issue in this case: Plaintiffs don't contend that those are acceptable or cusotmary or "normal" uses of a torch, nor does Dr. Anderson or any of our experts. Plaintiffs contend that Mr. Shalaby never used the torch in that fashion, which is an issue of fact (whether or not he did), and frankly is not one on which expert opinion tesimony is even admissible in the first instance.

Shelley: you mentioned last week that you intend to make an ex parte motion if we don't agree to allow you to proceed with Mr. Lusk. I am out of the office this week, and part of next week. If you should proceed with an ex parte motion (which I don't believe is a proper procedure to resolve this issue), I probably won't have an opportunity to file a formal opposition, so please be certain that you advise the court that we oppose your motion, and provide the court with a copy of this e-mail and my prior e-mail to you on this issue from last week, so that the court is aware of our positions.

Thank you.

- Mark

**From:** Shelley.Hurwitz@hklaw.com [mailto:Shelley.Hurwitz@hklaw.com]
**Sent:** Mon 8/18/2008 11:02 AM
**To:** Mark Epstein
**Subject:** Shalaby: Jason Lusk

**Mark,**
**Have you made a decision as to whether we can come to an agreement on Jason Lusk?**
**Thanks**
**Shelley**

**Holland + Knight**
**Shelley G. Hurwitz**
Holland & Knight LLP
633 W. Fifth Street, 21st Floor
Los Angeles, CA 90071
Main   (213) 896-2400
Direct (213) 896-2476
Fax    (213) 896-2450
shelley.hurwitz@hklaw.com
www.hklaw.com

NOTICE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in

## Hurwitz, Shelley G (LAX-X52476)

**From:**          Mark Epstein [MEpstein@avelaw.com]
**Sent:**          Wednesday, August 13, 2008 11:50 AM
**To:**            Hurwitz, Shelley G (LAX-X52476)
**Cc:**            BNaylor@fbtlaw.com; DDennis@fbtlaw.com; TSiddens@fbtlaw.com
**Subject:**       RE: Shalaby: Jason Lusk

**Attachments:**   5537968_1.pdf



5537968_1.pdf (66
KB)

             Shelley:

A brief response to your letter, since I have to address other things right now.

With due respect, you seem to be under a misimpression about what our position is in the
case, and what our experts are opining on.  Please understand that we don't contend that
"banging" or striking a MAPP gas cylinder against concrete, or kicking it into a fire are
"normal" uses of a MAPP gas torch.  We never have.  We vehemently dispute that Mr.
Shalaby ever did either of those things.  I feel comfortable that the hearsay testimony by
Warren Ratliff that he heard some unnamed camper say that he, in turn, heard (not saw) Mr.
Shalaby "banging" the cylinder against concrete is inadmissible and won't come in by
itself.  Your experts are entitled to rely on that "evidence" as a basis for their
opinions if they want to, and frankly, I hope they do.  But that doesn't mean that
plaintiffs have taken the position that striking the MAPP gas cylinder against concrete is
a normal or acceptable use of the torch.


As for the testimony by the EMT responders that Andy said he "kicked"
the torch into the fire, I agree that the testimony will likely be admitted, but please
understand that we dispute that Mr. Shalaby actually, in fact, ever "kicked" the torch,
let alone that he kicked it into the fire.  In case you haven't read all the deposition
tesimony yet, no one can or has testified that they ever saw Mr. Shalaby kick the torch
into the fire, and the only witnesses who were present at the time of the incident
testified that he didn't.

I say all this because Mr. Lusk's opinions are relevant to nothing, and don't respond to
any issues that were raised in our experts' reports or supplemental reports.  I'll repeat
it once more:  We don't contend that deliberately striking or "banging" a MAPP gas
cylinder against concrete is a "normal" use, nor do we contend that kicking a MAPP gas
cylinder into a fire is a normal use.  There may be a dispute of fact in this case as to
whether Mr. Shalaby ever did those things, but that is not an issue that requires expert
opinion testimony:  either he did or he didn't.  Therefore, the opinion testimony of Mr.
Lusk is irrelevant.

Therefore, I don't think it's proper or appropriate, for several reasons, to try to
belatedly sneak Mr. Lusk's report into the mix, particularly over an issue that isn't in
dispute.  The opinions that Dr.
Anderson expressed in his reports are well within the scope of the issues that were
described in our disclosures.

- Mark

Mark D. Epstein
Alborg, Veiluva & Epstein LLP
200 Pringle Avenue, Suite 410
Walnut Creek, CA 94596
(925) 939-9880
(925) 939-9915 (fax)
E-mail: mepstein@avelaw.com

                                      1

35

This electronic mail transmission is intended only for the addressee(s) shown above. It may contain information that is confidential, or otherwise protected from disclosure as an attorney-client or attorney work-product privileged communication. Any review, dissemination or use of this transmission or its contents by persons other than the addressee(s) is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone at (925) 939-9880, and destroy this document.

-----Original Message-----
From: Shelley.Hurwitz@hklaw.com [mailto:Shelley.Hurwitz@hklaw.com]
Sent: Wednesday, August 13, 2008 8:21 AM
To: Mark Epstein
Cc: BNaylor@fbtlaw.com; DDennis@fbtlaw.com; TSiddens@fbtlaw.com
Subject: Shalaby: Jason Lusk


Mark,
Please see attached correspondence regarding Jason Lusk.
Thanks
Shelley

# HOLLAND & KNIGHT LLP

August 13, 2008

SHELLEY G. HURWITZ
213-896-2476

Internet Address:
shelley.hurwitz@hklaw.com

<u>VIA EMAIL AND US MAIL</u>
Mark Epstein
Alborg, Veiluva & Epstein LLP
200 Pringle Avenue, Suite 410
Walnut Creek, CA 94596

Re:    *Shalaby v. Bernzomatic*

Dear Mark:

Jason Lusk's testimony will respond to issues that surfaced in your expert reports that were not identified in the expert disclosures. In his report, Dr. Anderson opined that the "brazing material has voids and lacks sufficient fusion to the cylinder wall and valve housing to resist stresses placed on it when used in a normal manner." However, plaintiffs' expert disclosures served on March 28, 2008 did not indicate that Dr. Anderson would be addressing the issue of the "normal use" of the torch and cylinder. Mr. Lusk will respond to Dr. Anderson's opinion of "normal use" and opine that the manner in which the evidence indicates Mr. Shalaby used the torch was not "in a normal manner".

Moreover, Dr. Anderson opined in his supplemental report that Dr. Eager "is silent on what the level of abuse is to be critical and if Bernzomatic should consider the possibility of customer abuse and therefore design against it, since the consequences are so grave." Mr. Lusk will opine on what constitutes foreseeable abuse.

37

Mark Epstein
Page 2

As we have provided his report two months before the now agreed upon expert discovery deadline, your client has not been prejudiced by his omission from the initial disclosures. We will not object to you designating an additional witness to rebut Mr. Lusk's testimony if you think it is necessary. Moreover, we will agree to a deposition of Mr. Lusk at any time.

Please let me know whether we can come to an agreement. Thank you.

Very truly yours,
HOLLAND & KNIGHT LLP

By:_____
    SHELLEY G. HURWITZ

# 5537968_v1

38

1  MICHAEL J. VEILUVA (State Bar No. 100419)
2  MARK D. EPSTEIN (State Bar No. 168221)
   ALBORG, VEILUVA & EPSTEIN LLP
3  200 Pringle Avenue, Suite 410
   Walnut Creek, CA 94596
   Telephone: (925) 939-9880
4  Facsimile: (925) 939-9915

5  Attorneys for Plaintiffs
6  Andrew Shalaby and Sonia Dunn-Ruiz

*email 8/12*

7

8                     UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10  ANDREW SHALABY and SONIA DUNN-      | Case No. C 07cv2107-W (BLM)
11  RUIZ,
                                         | **PLAINTIFFS' OBJECTIONS TO**
12              Plaintiffs,              | **DEFENDANT IRWIN INDUSTRIAL**
                                         | **TOOL COMPANY'S PURPORTED**
13        vs.                            | **SUPPLEMENTAL DISCLOSURE OF**
                                         | **JASON LUSK AS AN EXPERT WITNESS**
14  IRWIN INDUSTRIAL TOOL COMPANY,       | **WHOSE OPINION THE COMPANY**
    INC., THE HOME DEPOT, INC., and DOES | **INTENDS TO OFFER AT TRIAL**
15  2 through 100, inclusive

16              Defendants.

17        On August 1, 2008, Irwin submitted a report (Exhibit 2) to designate "supplemental

18  expert reports," from Jason Lusk of Lusk Plumbing of Blythe, California, dated July 17, 2008.

19  Irwin never identified Mr. Lusk as one of its expert witnesses in this case, either in its initial

20  disclosure of expert witnesses served March 28, 2008, nor in its supplemental disclosure of

21  expert witnesses served on April 11, 2008. As Irwin did not previously disclose Mr. Lusk as an

22  expert witness whom it expects to use at trial (Fed.R.Evid. §§702, 703 and 705; Fed.R.Civ.P.

23  §26(a)(2).) Accordingly, having failed to disclose Mr. Lusk in either its initial or supplemental

24  expert witness disclosures, Irwin is precluded from calling Mr. Lusk to testify at trial.

25  (Fed.R.Civ.P. §37(c)(1).)

26  Dated:  August 11, 2008                    ALBORG, VEILUVA & EPSTEIN LLP

27                                         By: _____
                                               MARK D. EPSTEIN
28                                             Attorneys for Plaintiffs

                                                                          900725.disc.Objections to Lusk.doc
                           OBJECTIONS TO JASON LUSK AS AN EXPERT WITNESS

39

**CERTIFICATE OF SERVICE**

I, Jan Baerwald, certify and declare as follows:

I am over the age of eighteen (18) years and not a party to this action.  My business address is Alborg, Veiluva & Epstein LLP, 200 Pringle Avenue, Suite 410, Walnut Creek, California 94596, which is located in the city, county and state where the mailing described below took place.  On the date set forth below, I faxed to the numbers shown below and deposited in the United States Mail at Walnut Creek, California, the foregoing document described as **PLAINTIFFS' OBJECTIONS TO DEFENDANT IRWIN INDUSTRIAL TOOL COMPANY'S PURPORTED SUPPLEMENTAL DISCLOSURE OF JASON LUSK AS AN EXPERT WITNESS WHOSE OPINION THE COMPANY INTENDS TO OFFER AT TRIAL** addressed as follows:

| | |
|---|---|
| **Attorneys for Defendants Newell Rubbermaid, Inc. and Rubbermaid Inc.** | Shelley G. Hurwitz, Esq.<br>Doug Dennis, Esq.<br>Holland & Knight<br>633 West Fifth Street, 21st Floor<br>Los Angeles, CA 90071<br>Fax:    213-896-2450 |
| | Beth Schneider Naylor, Esq.<br>Frost, Brown & Todd, LLC<br>2200 PNC Center<br>201 East Fifth Street<br>Cincinnati, OH 45202<br>Fax:    513-651-6981 |
| **Attorneys for Third Party Defendant Western Industries** | Lowell T. Carruth, Esq.<br>Devon R. Darrow, Esq.<br>McCormick, Barstow, Sheppard et al. LLP<br>P.O. Box 28912<br>5 River Park Place East<br>Fresno, CA 93720-1501<br>Fax:    559-433-2300 |
| **Attorneys for Third Party Defendant Worthington Industries** | Richard A. Ergo, Esq.<br>Bowles & Verna LLP<br>2121 N. California Blvd., Suite 875<br>P.O. Box 8180<br>Walnut Creek, CA 94596<br>Fax:    925-935-0371 |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed in Walnut Creek, California on August 11, 2008.

JAN BAERWALD

40

# EXHIBIT 10

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA - SAN DIEGO


ANDREW SHALABY, an individual,  )
and SONIA DUNN-RUIZ, an         )
individual,                     )
                                )
            Plaintiffs,         )
                                )
       vs.                      )  No. 07-CV-2107 W POR
                                )
IRWIN INDUSTRIAL TOOL COMPANY,  )
THE HOME DEPOT, INC., and       )
DOES 2 through 100, inclusive,  )
                                )
            Defendants.         )
_____  )
BERNZOMATIC,                    )
                                )
        Third-Party Plaintiff,  )
                                )
       vs.                      )
                                )
WESTERN INDUSTRIES, INC.,       )
WORTHINGTON INDUSTRIES, AND     )
ROES 2 through 100, inclusive,  )
                                )
        Third-Party Defendants. )
_____  )



DEPOSITION OF ROBERT N. ANDERSON, Ph.D.

Walnut Creek, California

Wednesday, September 3, 2008



Reported by:
ANNA STEINERT
CSR No. 11202
JOB No. 81709

41

153

1        material, and you're doing it normally.

2             If you drop it, throw it, I think that would

3        be above that level.  So under normal conditions, I

4        think that you wouldn't see 30 foot-pounds.

5   03:55:29   Q    Now, your sentence doesn't say this amount of

6        force appears to be above the normal level or normal

7        use level.  Your sentence says, "This amount of force

8        appears to be above the normal abuse level."

9             What did you mean by "normal abuse"?

10  03:55:45   A    Maybe I should have changed the wording, but

11       under normal application of what the torch is designed

12       for.

13            Q    Such as soldering pipes?

14            A    Plumber going out, doing some soldering on the

15  03:55:59 pipe.  He may have to set it down.  He may have to push

16       the solder a little with a tip.

17            Q    So setting the torch down or using it to

18       solder is what you meant -- is encompassed by what you

19       meant by "normal abuse"?

20  03:56:18   A    Right.  If I'm going to pick it up, I'm

21       abusing it.  I'm taking it out of its pristine

22       condition and doing some abuse.  If I use it under a

23       normal circumstance, then this is -- 30 pounds is more

24       than I believe I would experience.

25  03:56:32   Q    Just so I understand this, what you're saying

154

1           is by simply picking up the cylinder -- torch and

2           cylinder, you're abusing the torch and cylinder?

3                A    Yes, I'm putting some forces on it.  Yes.

4                Q    So then by depressing the igniter button on

5    03:56:56 the TS4000 --

6                A    You're putting force on it.

7                Q    By depressing the igniter button on the TS4000

8           torch, is that abuse?

9                A    Probably.  If I'm just holding it up at the

10   03:57:10 top and I'm not holding the bottom, I'm putting some

11          stress on it.

12               Q    If you pick up the cylinder by the cylinder

13          and not by the torch, is that abuse?

14               A    By the cylinder, if I keep it vertical so

15   03:57:20 there is no weight of the torch in any way.  Any way

16          that I apply force to the weakest area, there would be

17          some exceptional abuse.

18               Q    So if I picked up the cylinder with the torch

19          on it and I leaned it forward five degrees, would that

20   03:57:37 be abuse?

21               A    If you put a small amount of force on it,

22          which would probably not be under the level of abuse.

23          In other words, they allow 60 degrees, according to the

24          literature, and that certainly would be enough to put

25   03:57:56 considerable force on it.

**Andrew Shalaby v Newell Rubbermaid, Inc., et al.**
United States District Court, Southern District of CA (San Diego)
Case No. 3:07-cv-02107-W-POR

## PROOF OF SERVICE

STATE OF CALIFORNIA          )
                             )  ss.
COUNTY OF LOS ANGELES        )

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 633 West Fifth Street, 21st Floor, Los Angeles, California 90071.

On **September 12, 2008**, I served the document described as:

**EXHIBITS TO MOTION FOR LEAVE TO DESIGNATE EXPERT WITNESS JASON LUSK**

on the interested parties in this action as follows:

SEE ATTACHED SERVICE LIST

X      **VIA THE ECF FILING SYSTEM** .

I declare under penalty of perjury under the laws of the United States that the above is true and correct and that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

Executed on September 12, 2008, at Los Angeles, California.

_____ /s Shelley Hurwitz _____
Shelley G. Hurwitz

CASE NO.:  07-CV-2107 W                    3
EXHIBITS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Andrew Shalaby v Newell Rubbermaid, Inc., et al.**
United States District Court, Southern District of CA (San Diego)
Case No. 3:07-cv-02107-W-POR

## SERVICE LIST

Mark D. Epstein
Alborg, Veiluva & Epstein LLP
200 Pringle Avenue, Suite 410
Walnut Creek, CA  94596
(925) 939-9880
(925) 939-9915 - Fax

Attorneys for Plaintiffs

Lowell T. Carruth
McCormick Barstow LLP
5 River Park Place East
P.O. Box 28912
Fresno, CA  93720-1501
(559) 433-1300
(559) 433-2300 – Fax

Attorneys for Western Industries, Inc.

Richard A. Ergo
Cathleen S. Huang
Bowles & Verna LLP
2121 North California Boulevard, Suite 875
Walnut Creek, CA  94596
(925) 935-3300
(925) 935-0371 – Fax

Attorneys for Worthington Industries

# 5601205_v1

CASE NO.:  07-CV-2107 W                          4
EXHIBITS