UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA



ANDREW SHALABY and SONIA DUNN-RUIZ, )
                                    )
            Plaintiffs,             )
                                    )
vs.                                 ) No. C06-07026CW
                                    )
NEWELL RUBBERMAID, INC., RUBBERMAID,)
INCORPORATED, and THE HOME DEPOT,   )
INC.,                               )
                                    )
            Defendants.             )
_____)

DEPOSITION OF WARREN L. RATLIFF, JR.

Taken at San Diego, California

April 17, 2007

Reported by Catherine Gautereaux, CSR
Certificate No. 3122

2

1  Appearances:

2

      For Plaintiffs:

3

          Alborg, Veiluva & Epstein LLP
4         By:  Mark D. Epstein
          200 Pringle Avenue, Suite 410
5         Walnut Creek, California 94596-7380
          (925) 939-9880  fax (925) 939-9915
6         mepstein@avelaw.com

7

      For Defendants:

8

          Keller, Price & Moorhead
9         By:  J. Phillip Moorhead
          229 Avenue I, Second Floor
10        Redondo Beach, California 90277
          (310) 540-1332  fax (310) 540-8480
11        jpm@kpmlawyers.com

12

      For Warren Ratliff:

13

          Grimm Vranjes McCormick & Graham LLP
14        By:  Gregory D. Stephan
          550 West C Street, Suite 1100
15        San Diego, California 92101
          (619) 231-8802  fax (619) 233-6039

16

17

18

19        DEPOSITION OF WARREN L. RATLIFF, JR.,

20  taken by the Defendants at the Doubletree Club,

21  1515 Hotel Circle South, San Diego, California,

22  commencing on Tuesday, April 17, 2007, at 9:05 a.m.,

23  before Catherine A-M Gautereaux, Certified Shorthand

24  Reporter in and for the State of California.

25

3

1                          I N D E X

2


3          EXAMINATION BY                          PAGE

4                    Mr. Moorhead                   4, 86

5                    Mr. Epstein                     55

6


7


8                      E X H I B I T S

9   NUMBER            DESCRIPTION                   PAGE

10     1 - Andrew Shalaby's reservation information    40
          for Campland on the Bay; 3-page
11        incident report, dated 4/21/06

12     2 - Subpoena for the appearance of             46
          Warren Ratliff
13
       3 - July 12, 2006, letter from Gary           48
14        Gunther, adjuster, to Therese Kiel;
          facsimile cover sheet, dated 7/13/06
15

16

17

18

19

20

21

22

23

24

25

4

1    SAN DIEGO, CALIFORNIA; TUESDAY, APRIL 17, 2007

2                    9:05 A.M.

3              WARREN L. RATLIFF, JR.,

4          having been first duly sworn,

5              testified as follows:

6

7                  EXAMINATION

8    BY MR. MOORHEAD:

9    Q    Okay.  Mr. Ratliff, I introduced myself

10   before, but I will do it again.  My name is John

11   Moorhead, and I represent the defendants in a lawsuit

12   that has been filed on behalf of a gentleman by the name

13   of Andrew Shalaby and his wife, and we're here today to

14   take your deposition.

15            Now, let me ask, first of all:  You ever had

16   your deposition taken before?

17   A    Yes.

18   Q    Okay.  So you're familiar, at least generally,

19   with the procedure?

20   A    Yes, sir.

21   Q    Okay.  At the risk of telling you things that

22   you already know or things that Mr. Stephan might have

23   spoken with you about yesterday, let me make sure I go

24   through the basic ground rules so that we are on the

25   same page, so to speak, before we get into the

5

1  substantive testimony.

2          The court reporter, seated to your right, is

3  taking down everything that we're saying in the room

4  today, or at least trying to.  And so it's important

5  that we follow some ground rules to increase the

6  likelihood that the transcript that she prepares is

7  readable.

8          The first of those ground rules is to try to

9  wait until I've completed my question before you give

10 your answer, because if both of us are speaking at the

11 same time, it's going to be difficult for her to make an

12 accurate record.  There is also the risk that the last

13 few words of the question might change its meaning

14 somewhat and, therefore, your answer wouldn't correspond

15 if you jumped in too soon.

16         So I'll try to wait until you've completed

17 your answer before I ask another question, and if you

18 would, please try to fight the temptation to answer my

19 question before it's done, even though you'll probably

20 know what it is before I finish it.

21         Now, it's also necessary that you give verbal

22 responses to each question.  Although it's perfectly

23 okay to shake your head or make gestures or whatever,

24 she is not here to interpret those things, and the

25 record won't be clear unless you actually speak up and

6

1   say "Yes" or "No" or "two feet," or whatever the case

2   may be.

3          I have the bad habit, not so much in

4   depositions but in other places, of using uh-huh and

5   un-unh.  I don't know if you have that same malady, but

6   if you would, try to avoid using those sounds for

7   responses because they won't be clear on the record

8   whether it was a positive or a negative.

9          If you forget any of these things, it's likely

10  that either myself or Mr. Epstein may ask you, "Was that

11  a yes?  Was that a no?"  You know, "How far apart are

12  your hands?"  We just recognize, having dealt with a lot

13  of these transcripts, that there is going to be a big

14  void here unless we ask you to speak.  So we're not

15  trying to get you to change your answer or to elaborate.

16  We just want to know whether this was a yes or a no.

17         At a later point in time, the transcript will

18  be prepared and sent, I guess, based upon our previous

19  conversation, to Campland, where you'll have an

20  opportunity to look it over and make corrections, if

21  necessary, in order to make it accurate.  And then

22  you'll be asked to sign it under penalty of perjury.

23         You are not a party in this case.  Campland is

24  not a party in this case.  But it's always best to try

25  to make sure that your best answers are given today and

7

1  that changes are not needed to be made later, because it

2  could have an impact on your credibility if that ever

3  comes up, and we don't want to see that happen, and I

4  know you don't, either.

5        I may ask questions that call for estimates of

6  things like time or distance or whatever.  I recognize

7  that you probably didn't have a stopwatch or a tape

8  measure, and I don't expect that type of precision, but

9  I am entitled to your best estimates of such

10  measurements.  If you don't have an estimate or no

11  recollection whatsoever, it would be a guess, tell us

12  that.  It doesn't help any of us.

13        If you don't understand one of my questions --

14  and, unfortunately, that happens a lot because my

15  questions are not always as artful as I'd like them to

16  be -- please let me know and I will rephrase it until

17  you do understand it.

18        As the proceedings go on, if I get tired, my

19  voice may trail off a bit.  If you don't hear my

20  question, feel free to let me know.  I'll repeat it or

21  I'll ask this nice young lady to read it back to you.

22  But if you give us an answer, we're going to assume that

23  you heard my question and you understood my question and

24  that you mean your answer to correspond to it.  Fair

25  enough?

8

1    A    Yes, sir.

2    Q    Any questions on what's going to happen before

3    we get started?

4    A    No, sir.

5    Q    Okay.  Let's get your full name for the

6    record, please.

7    A    It would be Warren L. Ratliff, Jr.  Middle

8    name, Lee.

9    Q    And what's your business address, Mr. Ratliff?

10    A    2211 Pacific Beach Drive, San Diego,

11    California 92109.

12    Q    And what's the phone number there?

13    A    To our --

14    Q    Main number.

15    A    The main number would be (858) 581-4200.

16    Q    And if we were to call that number and ask for

17    you, they could track you down?  Or maybe not?

18    A    Maybe not.

19    Q    Do you have a better number?

20    A    Yes.

21    Q    What would that number be?

22    A    (858) 581-4219.

23    Q    Okay.  What's your home address?

24    A    Is 1666 Garnet Avenue, G-a-r-n-e-t, No. 116 --

25    or 119.  I'm sorry.

9

1    Q    San Diego?

2    A    San Diego, California.

3    Q    Same ZIP?

4    A    92109.

5    Q    Okay.  Just for reference purposes, what's

6 your date of birth?

7    A    June 11th, 1960.

8    Q    Okay.  By whom are you currently employed,

9 Mr. Ratliff?

10    A    Would be Terra Vista Management; Campland on

11 the Bay.

12    Q    Terra Vista Management is the employer, and

13 the location is Campland on the Bay?

14    A    Yes.  It would be the property location.

15    Q    And the official business address for Campland

16 on the Bay is that 2211 Pacific Beach Drive?

17    A    Yes.

18    Q    Okay.  How long have you worked at Campland on

19 the Bay, roughly?

20    A    Five years.

21    Q    What's your current position with Campland?

22    A    With Campland, park ranger supervisor.

23    Q    So you supervise other park rangers?

24    A    The whole staff, yes.

25    Q    Okay.  And how many rangers does that entail?

1      A      Currently we have, I believe, ten, besides

2  myself and the manager.

3      Q      How long have you been park ranger supervisor?

4      A      Three years.

5      Q      So you were park ranger supervisor in April of

6  2006?

7      A      Yes, sir.

8      Q      And who was your immediate supervisor?

9      A      At that --

10     Q      Now.  Today.

11     A      Today?

12     Q      Uh-huh.

13     A      Is Darrin Sessler.

14     Q      And who was it in April of 2006?

15     A      Would be Therese Kiel.

16     Q      How does Therese spell her first name, do you

17  know?

18     A      Do you mind if I look at --

19     Q      No, absolutely not.  Whatever you need to

20  refer to is fine.

21     A      T-h-e-r-e-s-e.

22     Q      And the last name, K-i-e-l?

23     A      Yes, sir.

24     Q      Were you working at Campland on the Bay in

25  April of 2006, when a fellow by the name of Andrew

11

1    Shalaby was injured there?

2         A    Yes, sir.

3         Q    You were on duty that evening?

4         A    Yes, sir.

5         Q    Do you have at least some recollection of that

6    event?

7         A    Yes, sir.

8         Q    If you can recall, Mr. Ratliff, how did you

9    personally become aware that the incident had happened?

10        A    Originally was, other guests at Campland had

11   came to the gate in a frantic state, yelling that they

12   had called 911, that there was an individual that was

13   burned.

14        Q    Were you at the gate at the time?

15        A    Yes, sir.

16        Q    So they told you that someone had been burned

17   and that they had called 911?

18        A    That is correct.

19        Q    And these were campers that came to you?

20        A    Yes, sir.

21        Q    Was there a process at that time, Mr. Ratliff,

22   whereby you or someone employed by Campland would

23   typically make some type of a log entry specifically

24   about learning an event, like, "I got a phone call" or

25   "I was approached by people at such and such a moment,"

12

1  and put it down in writing somewhere?

2      A    No.  That may be -- okay.

3      Q    When you received word of this incident at the

4  gate, were you at the gate alone as far as employees go?

5      A    I don't recall.

6      Q    Did you have access to any type of a vehicle

7  there?

8      A    Yes, sir.

9      Q    What kind of a vehicle did you have?

10      A    I have a ranger Toyota pickup truck, and golf

11  carts.

12      Q    You mentioned that you had or -- I guess, is

13  the way the question was asked -- about ten other

14  rangers that report to you?

15      A    Yes.

16      Q    Was that essentially the same back in April of

17  2006?

18      A    Approximately, yes.

19      Q    And they work over a 24-hour period, I assume,

20  in, like, maybe three different shifts?

21      A    Yes.

22      Q    Typically, on a shift that would include the

23  hours of, say, nine o'clock p.m. to midnight, how many

24  of those ten or so rangers would be on duty at Campland?

25      A    On that particular evening, I believe there

13

1  was two.

2      Q    And that's in addition to you, or including

3  you?

4      A    Including me.

5      Q    Okay.  What other ranger, if you can recall,

6  was on duty that night?

7      A    Would have been Randy Stephens.

8      Q    Do you know how he spells his last name?

9      A    S-t-e-p-h-e-n-s.

10     Q    In addition to the security staff, which would

11  have involved you and Mr. Stephens or "Steffen," or

12  however he pronounces it, would there have been other

13  Campland employees on duty at that time of night?

14     A    I am not quite understanding you.

15     Q    Your duties, as I understand it, as park

16  ranger, would have been overall supervision of what was

17  going on and anybody who would have been, for the sake

18  of example, working at a snack bar, at a laundry

19  facility, or anybody else that was employed by Campland

20  at that time of night?

21     A    Yes.

22     Q    Okay.  Who else would have been employed at

23  that time of night?

24     A    We do have janitorial staff.

25     Q    Okay.  Do you remember any of them that were

14

1  on duty that particular evening?

2      A    No, sir, I do not.

3      Q    Okay.  Other than rangers and janitorial

4  staff, any other Campland employees that likely would

5  have been on duty at or about the time this incident was

6  recorded?

7      A    I don't recall, but there was a possibility.

8      Q    If there was somebody else, what in your mind

9  might have been their function for Campland?

10     A    We do have a game room attendant, usually,

11 till eleven o'clock.

12     Q    Do you know who that would have been in April

13 of 2006?

14     A    No, sir.

15     Q    Is there anybody that would perform the

16 function, say, of dispatcher or clerk or something so

17 that if you guys were out patrolling the Campland area

18 and an event was recorded, they could get on the radio

19 or a cell phone, or however you communicate, and say,

20 "We need you over at Campsite G112" or whatever?

21     A    That would have been myself.

22     Q    That would have been you, okay.  Once you

23 learned about this incident from the campers who came to

24 the gate, did you go to the incident site?

25     A    I told my employee, Randy Stephens, to

15

1  dispatch himself immediately to the site.

2      Q    And how was that done, Mr. Ratliff?  By phone?

3  By radio?

4      A    I believe, by radio.  And I could have called

5  out.  He might have been in the proximity where I was

6  able to yell at him.

7      Q    I went out there yesterday.  It's not far from

8  the guard shack to where what I call "the main building"

9  is.  Is it conceivable that he might have been in the

10  main building?  Is that what you mean by earshot?

11      A    In or around that area.

12      Q    In any event, you dispatched Randy to go to

13  the incident site?

14      A    Yes, sir.

15      Q    Do you know how he traveled there?  I mean by

16  foot, in a car or --

17      A    By golf cart.  Or I should say a golf car.

18      Q    In addition to dispatching Randy to the scene,

19  did you do anything else at that point in connection

20  with dealing with this incident?  By that I would

21  include maybe yourself calling 911, calling your

22  supervisor or anything like that.

23      A    At that particular moment I heard the sirens

24  that was on their way.  I then had the -- oh, may I back

25  up a little bit?

16

1    Q    Sure.

2    A    Other staff that was working at that

3  particular time would have been our registration.  We

4  had a registration staff there -- that was there.

5    Q    Okay.

6    A    So I did call him to come and relieve me at

7  the gate and I proceeded to the incident myself by truck

8  and waited as the fire personnel arrived on the scene.

9  Then I escorted them, with them behind me, to the site.

10    Q    So if we back up a little bit, in addition to

11  the potential janitorial staff, the game room attendant,

12  there would have been someone in charge of registering

13  guests?

14    A    He was normally off at that time, but he

15  happened to be a little bit late that day.

16    Q    Do you remember what his name was?

17    A    I believe on that particular night it was

18  Alexander, and I do not know the last name.

19    Q    Would he have been normally located in what I

20  called the main building, just beyond the guard shack?

21    A    Yes.

22    Q    Okay.  So you asked Alexander to come over and

23  relieve you at the gate?

24    A    To monitor the gate for me, yes.

25    Q    All right.  And then you waited for the fire

17

1  department personnel to arrive so that you could take

2  them to the incident scene?

3       A    Yes, sir.

4       Q    And did you ride with them?  Did you take one

5  of the golf cars or carts?  Did you take your Toyota?

6  How did you get to the incident scene?

7       A    The ranger truck.

8       Q    And you knew where the incident occurred

9  because the campers that reported it to you told you

10 what campsite they were at or what --

11      A    The campsite where they were at.

12      Q    Great.  Give me your best estimate in feet,

13 yards, miles, or whatever, how far it would have been

14 from the gate, where you were working, over to the

15 incident site by way of travel.  Not the way the crow

16 flies, but how far did you have to drive to get there,

17 roughly?

18      A    I would estimate anywhere from 300 to

19 400 yards.

20      Q    So it would have only taken you probably a

21 minute or less to get there?

22      A    Yes, sir.

23      Q    Mr. Ratliff, when you arrived at the campsite

24 where the incident had occurred, who else was already

25 there?

18

1      A      Several campers and guests that were in other

2   sites; my ranger staff, Randy; I believe, the

3   gentleman's wife or girlfriend -- I'm not sure of that.

4   I recall one child, and the fire truck with its crew,

5   and the paramedics and their crew.

6      Q      And they were basically traveling with you?

7      A      Yes.  They were behind me.

8      Q      While you were there at the campsite where the

9   incident had happened, did anyone else arrive?  And by

10  that I would include, did any police respond or

11  ambulance or anything else?

12     A      The ambulance did come behind the fire staff.

13     Q      Were they in the same --

14     A      Yes.

15     Q      -- caravan, basically?  Did any police

16  agencies respond at all?

17     A      No, sir.

18     Q      I realize there were a lot of different people

19  there doing a lot of different things, and right now

20  this question pertains to you specifically, Mr. Ratliff.

21         Did you make a list anywhere of the names of

22  the fellow campers that came to the site, that were

23  milling about, that might have information?

24     A      I did not make a list of names.

25     Q      Whether or not you know any of their names,

19

1  did you speak with any of them about what happened?

2      A    Yes, I did.

3      Q    Do you have any recollection, as you sit here

4  today, of what any of these people told you?

5      A    Well, I have different stories from each

6  individual.

7      Q    All right.  I know it would be difficult to

8  put a name with a story, but maybe you could do it

9  chronologically or in your mind, "This person that

10  looked like this said 'X'."  Can you kind of tell us the

11  various stories that you heard?

12          MR. STEPHAN:  I'll just object.  Vague as to

13  time.  I guess, talking about that night?

14          MR. MOORHEAD:  Yes.

15  BY MR. MOORHEAD:

16      Q    I'm just talking about there, at the site

17  things that were told to you.

18      A    Well, when I arrived on the site, I secured

19  the site, observed the individual.  We tried to help the

20  fire department take care of that individual, first.

21          At that time I had Randy continue to do --

22  stay with him and monitor him and the campsite itself.

23  I then went to the first campsite to the left of that

24  campsite -- those were the individuals that also made

25  the original call, I guess, for 911 -- and spoke to

20

1  them.

2         The one female in that group gave me a story

3  of -- that the guest in that site was trying to light

4  the campfire with the torch and it would not light, and

5  was banging the torch on the side of the fire ring.

6     Q    Okay.

7     A    Another guest --

8     Q    Now, I don't want to go further because I want

9  to make sure I understood the question.  A lady from the

10  campsite to the left of Mr. Shalaby's campsite --

11  Mr. Shalaby being the individual that was injured -- to

12  the left as you're facing --

13     A    Facing his campsite.

14     Q    His campsite.  A woman in that group told you

15  that she had observed him trying to light the campfire

16  unsuccessfully and banging the torch on -- what did you

17  say?  On the campfire ring?

18     A    On the campfire ring.

19     Q    Then, did somebody else give you a story?

20     A    Another individual in that same campsite said

21  that he heard the gentleman was frustrated at not being

22  able to fight -- or to light the campfire.  And that was

23  it in that group.

24     Q    Okay.  Before we move on, 'cause there may be

25  others, when you arrived, was there a campfire burning

21

 1  in Mr. Shalaby's fire ring?

 2      A    There was a small campfire that was -- that

 3  was lit.

 4      Q    All right.  We talked about the group that was

 5  in the campsite immediately to the left of the Shalaby

 6  campsite.  Did you speak with any other individual?

 7      A    I spoke with the other campsite to the right

 8  of them.

 9      Q    Okay.

10      A    They had a blanket partition, a man-made

11  blanket partition between them.

12      Q    Sort of a privacy thing?

13      A    Right.  Yes, sir.

14      Q    Okay.

15      A    Then the individual there said they heard a

16  explosion, a large flame.  Actually, all of them

17  explained that to me.  So there was a large ball of

18  flame and explosion.  And that was pretty much it from

19  them.

20      Q    Okay.  Was that a male or female that gave you

21  that story, if you remember?

22      A    I believe it was a male and -- a husband and

23  wife.

24      Q    All right.  That's all from the campsite

25  immediately to the right of the Shalaby campsite.  Did

22

1    you talk to any other campers?

2        A    No.  I cannot recall.

3        Q    Okay.  When you arrived at the campsite where

4    the incident happened, was Mr. Shalaby still there?

5        A    Yes.

6        Q    Where, physically, was he located in

7    relationship to the physical items that were there?

8        A    As I arrived, he was placed, I believe, by

9    other campers in a lounge chair and his feet placed in

10   another lounge chair within three feet from the campfire

11   ring.

12       Q    To prop his feet up, you mean?

13       A    Yes.

14       Q    And, I assume, someplace away from the fire

15   ring?

16       A    He was about three feet.

17       Q    Okay.  All right.  What about his girlfriend,

18   or wife?  Where was she when you arrived, if you

19   remember?

20       A    I don't recall.

21       Q    Okay.  You made reference to a child.  Where

22   was that child located, if you remember?

23       A    I believe the child was standing in the wind

24   break.  We have a wind break there in the corner, kind

25   of out of the way.

23

1     Q     And by "wind break," you're talking about,

2     like, a wooden fence?

3     A     Yes.

4     Q     Do you remember whether the child was male or

5     female?

6     A     No, I do not.

7     Q     Okay.  When you arrived at the scene, what is

8     your best recollection of where the cylinder and/or

9     torch were located?

10    A     From where Mr. Shalaby was sitting in the

11    chair, where he was placed by other guests, after that,

12    the cylinder was to his rear, facing the campsite.

13    Mr. Shalaby would be to the right, in the chair.  The

14    cylinder was behind Mr. Shalaby, in the dirt,

15    approximately four feet.

16    Q     Four feet from him.  How far from the fire

17    ring?

18    A     Circular, three feet, probably.  The same

19    distance as he was.

20    Q     Okay.  At that time, when you first noticed

21    the cylinder and the torch, were they attached to each

22    other?

23    A     They were still attached.

24    Q     Was there any flame coming from the cylinder

25    and torch at that point?

24

1    A    No, sir.

2    Q    As part of your duties that evening, did you

3  do anything specifically to inspect that equipment?

4    A    Yes, sir.

5    Q    What is it that you did, that you can recall?

6    A    First of all, I secured the site, picked the

7  cylinder up -- well, I inspected the cylinder to make

8  sure that it wasn't still in the explosive state, then

9  picked it up to remove it from being a potential hazard

10  from anybody else, held it in my possession the entire

11  time, and went to the fire department's engineer, who

12  was standing there, asked him if they needed this for

13  anything.

14          His reply to me was, he was going to speak to

15  his captain -- he was making a report in the

16  ambulance -- and he would get back to me.

17    Q    We'll get to that conversation in a minute.

18  Back to your observations:  What observations can you

19  recall making about the cylinder and the torch when you

20  first came into contact with them?

21    A    At that particular moment, the only

22  observation that I observed, that it was MAPP; MAPP gas.

23    Q    So you're familiar with the type of gas that

24  was in the cylinder?

25    A    Yes, sir.

25

1    Q    Okay.  When you first came in contact with the

2  cylinder and the torch, were they still hot?

3    A    I picked the cylinder up, and it was not hot

4  at that time.

5    Q    Okay.  How about the torch?  Was it hot?

6    A    I did not -- I don't recall, myself, touching

7  the torch end of it.

8    Q    Okay.  Did you observe any signs as if the

9  cylinder had exploded; by that I mean any holes in it,

10  any cracks, any fissures, anything like that, in the

11  sidewall or bottom or neck or anything else on the

12  cylinder?

13    A    At that particular time, the cylinder was not

14  an issue.  I did all my observation after the --

15  Mr. Shalaby was taken care of.

16    Q    Okay.  Well, let's move on in time, then, to

17  that point in time when you made your observations.  At

18  that point, after he had been taken care of, what

19  observations do you recall making about the cylinder or

20  torch at that point in time?

21    A    As I took the cylinder back to the gate, I

22  observed the cylinder had a right-angle bend to it at

23  the torch, where the connection to the cylinder is, and

24  appeared to be a crack in the cylinder at the bottom

25  thread level of the cylinder.

26

1    Q    Okay.  If we -- you're familiar with what they

2  look like when they are disassembled, the torch from

3  the --

4    A    Yes, sir.

5    Q    All right.  If you were to look at a MAPP gas

6  cylinder from the store before it goes through any type

7  of event like this one may have, it's shaped somewhat

8  like my soda bottle, maybe not as tapered, but it comes

9  basically straight up and then it tapers, and then it's

10 got a neck on the top, that's threaded, right?

11   A    Yes, sir.

12   Q    Okay.  And what color is it?

13   A    It is yellow.

14   Q    A MAPP gas cylinder is always yellow, right?

15   A    Yes, sir.

16   Q    And what you've just described for me is that

17 the neck of the cylinder that you observed at the gate

18 following taking care of Mr. Shalaby, was bent?

19   A    Not the neck.

20   Q    Okay.  What part was bent?

21   A    Well, I don't know if the neck -- 'cause I

22 never did disconnect the torch head from the cylinder.

23   Q    Then, I misunderstood you.

24   A    It just appeared to be a split along the very

25 bottom, the last thread of the neck.

27

1    Q    The lowest thread --

2    A    The lowest thread.

3    Q    -- as it's sitting on its bottom?

4    A    The main cylinder -- body of the cylinder, to

5 the first thread up on the neck.

6    Q    Now, this crack, or whatever you're

7 describing, is that going -- if the cylinder is sitting

8 on its bottom, is the crack going vertically or

9 horizontally, that you saw?

10    A    I believe it was kind of in both directions.

11    Q    And then you said something about something

12 being bent.  Maybe I misunderstood you.

13    A    The top torch nozzle itself was at a right

14 angle from that position, from the crack itself.

15    Q    Okay.  So let's stop a minute.  The torch --

16 you've seen these torches as they come from the store?

17    A    Yes, sir.

18    Q    And they have a bend in them when they're in

19 their correct format, right?  They just don't go

20 straight up?

21    A    Yes.  The nozzle itself has a normal operating

22 bend.

23    Q    You're talking about a bend different than the

24 one that would normally be there?

25    A    Yes.

28

1     Q   And where, along the course of the torch from

2  where it screws onto the neck of the cylinder to the

3  tip, where the fire comes out -- where did you observe

4  the bend that you're talking about, that didn't belong

5  there, so to speak?

6     A   Observed the bend pretty much at the base of

7  the nozzle and the torch -- the cylinder itself.

8     Q   Okay.  So --

9     A   At the explosion part, or whatever the break

10  in the cylinder was, is where it was actually bent.

11     Q   So what you are describing for me, if I

12  understand it -- and correct me if I'm wrong -- is that

13  the unusual bend that you saw was at or near the place

14  that the torch attaches to the cylinder?

15     A   That is correct, yes.

16     Q   Okay.  And did you make any observations of

17  the torch to determine -- and I don't know if you have

18  the expertise to do this or not, but, if you do, let us

19  know -- whether that appeared to be something that was

20  caused by the event or, for the sake of example, one of

21  those people said that Mr. Shalaby was banging it.

22         In other words, did it look more like damage

23  that somebody did to it before the event, or was it

24  melted and bent as a result of the event?  What did you

25  see?

1     A     I made my personal observation, and based on

2   what witnesses said to me, it could have been a number

3   of things.

4     Q     So you didn't come to a conclusion as to what

5   you thought it was?

6     A     No, sir.

7     Q     Was it inconsistent with having been melted

8   into that position from the fire ball you described?

9           MR. EPSTEIN:   Objection.  Vague and ambiguous.

10          Go ahead.

11          THE WITNESS:   Yes, it was inconsistent.

12   BY MR. MOORHEAD:

13    Q     Was it inconsistent with the story that the

14   camper to the left of Mr. Shalaby had said, that it had

15   been banged on the campfire ring?

16    A     No.

17    Q     So that was one possibility that was in your

18   mind?

19    A     Yes, sir.

20    Q     Can you remember any other thoughts that came

21   to your mind as to what might have caused the bend that

22   you saw in the torch?

23    A     Just the natural explosion itself could

24   have -- or a faulty -- you know, my personal experience

25   with these cylinders is faulty materials, manufactured

30

1  materials.

2      Q    Okay.  What observations did you make that

3  made you believe that it might be that as opposed to any

4  of the other things?

5      A    Just my past experience from other previous

6  places working with the stuff.

7      Q    So you did not do any type of a qualitative

8  analysis of the metals involved or anything like that to

9  determine if it was --

10     A    Negative.  No, sir.

11     Q    Okay.  Did you have discussions with

12 Mr. Shalaby at the scene?

13     A    No, sir.

14     Q    Did you overhear any discussions Mr. Shalaby

15 had at the scene with other people?

16     A    No, sir.

17     Q    Did you have -- if I already asked you this, I

18 apologize.  Did you have any conversations with his wife

19 or his girlfriend?

20     A    Yes, sir.

21     Q    Okay.  And what, if anything, did you learn

22 from her?

23     A    She was very frantic.  I couldn't get pretty

24 much any statements from her per se, as she was more

25 worried about his -- his well-being and that, which we

31

1  all were.  And the only conversation that took place was

2  trying to initially get their address and name, all my

3  original statements.  And I couldn't get that out of

4  her.

5      Q    Okay.  Before we get too far away from it,

6  back to the torch:  In addition to this bend, did you

7  see anything else that appeared to be wrong with the

8  torch?

9      A    Just that I thought that it could have been

10  put on wrong or not all the way in the on position.

11      Q    Okay.  You mean when it was attached to the

12  cylinder, it might not have been attached all the way?

13      A    Right.

14      Q    Okay.  How about missing paint, scratches,

15  dents, anything like that?

16      A    It appeared to me to be normal wear and tear.

17      Q    I don't think I asked you this.  About what

18  time was it that you learned of this incident, roughly?

19      A    That I learned of the incident?

20      Q    Yes.

21      A    Approximate times were between 10:15 p.m. and

22  10:30.

23      Q    P.m.?

24      A    Yes, sir.

25      Q    Were you able to determine from any source at

32

1    the scene of the incident how long before you learned of

2    it, it had happened?

3         A    I did not understand that question.

4         Q    Sure.  You learned of it, you said, somewhere

5    around 10:15 to 10:30, by your conversations with

6    Ms. Ruiz, the wife/girlfriend of Mr. Shalaby, and the

7    other campers.

8              Do you know how long, before that 10:15 or

9    10:30 time frame that you learned of it, that it had

10   actually happened?  Like a minute before or ten minutes

11   before or --

12        A    I do not know.

13        Q    Okay.  But, in any event, when they reported

14   it to you, they told you that they had called 911 and --

15        A    And it had already happened, yes.

16        Q    -- and the sirens were on their way?

17        A    Yes, sir.

18        Q    You indicated that when you arrived at the

19   scene, Mr. Shalaby was still there.  Was he conscious?

20        A    Yes, sir.

21        Q    Whether or not you heard anything he said, did

22   you observe that he was having conversations with

23   paramedics and ambulance personnel?

24        A    Yes.

25        Q    Did you observe that he had suffered burns?

1    A    Yes, sir.

2    Q    Where do you remember on his body seeing

3  burns?

4    A    I remember his legs, from his ankles up his --

5  would be above his knees, his hands and arms.

6    Q    How about his face?

7    A    I did not recall any on his face.

8    Q    How about his clothing?  Was it burned?

9    A    I don't recall the clothing to be burned.

10    Q    Did you take any photographs of the incident

11  scene, the victim, the equipment that we talked about or

12  anything else?

13    A    No, sir.

14    Q    Did you direct Randy to?

15    A    No, sir.

16    Q    So as far as you know, Campland on the Bay has

17  never had any photographs relevant to this incident?

18    A    No, sir.

19    Q    The cylinder that you observed when you got to

20  the scene, was it in a condition where it still had its

21  labels?

22    A    Yes, sir.

23    Q    Okay.  Do you remember whether the label was

24  damaged in any way, either burned or scratched off or

25  anything like that?

34

1    A    Appeared to be normal wear and tear.

2    Q    Did you make any observations, during the time

3  that the cylinder was in your care, custody, and

4  control, as to whether it still contained any gas?

5    A    No, sir, no more gas.

6    Q    It was all gone?

7    A    It was empty.

8    Q    Did you make any determinations, either

9  through your visual observations or the discussions you

10 had, as to whether there were any additional cylinders

11 on site?

12    A    No, sir.

13    Q    Did you make any determinations as to whether

14 there were any additional torches on site?

15    A    No, sir.

16    Q    Was there any soot or burn residue anywhere on

17 the exterior of the cylinder?

18    A    No, sir.

19    Q    You didn't see any anywhere?

20    A    No, sir, meaning soot.  There was some dust

21 from the ground, if that's what you are referring to.

22 That type of soot.

23    Q    I was specifically asking about -- let me

24 rephrase the question so we make sure we are

25 communicating -- any what I would call by-products of

35

1    combustion?

2        A     Any --

3        Q     Any soot?

4        A     No, sir.

5        Q     Okay.  All right.  Then, going back to

6    something you told us earlier, you gathered up the torch

7    and the cylinder and at some point in the process, I

8    believe, before you went back to the gate, you had a

9    first conversation with fire department personnel about

10   what to do with the cylinder and the torch?

11       A     Yes.

12       Q     And that was with an engineer?

13       A     Was the engineer that I talked to at the --

14   was the first person I brought it to his attention.

15       Q     Okay.  And he told you he would have to check

16   with his captain?

17       A     He said, "Let me check with my captain, and I

18   will get back to you."  He was making a report in the

19   ambulance with Mr. Shalaby at that time.

20       Q     Okay.  And then, at some later point in time,

21   did he answer your question as to whether you needed to

22   keep it or not?

23       A     Yes, sir.

24       Q     How much later was that answer?

25       A     I'd estimate four to five minutes.

36

1     Q    Okay.  So you were still at the incident

2  scene?

3     A    Yes, sir.

4     Q    Okay.  And at that point in time the engineer

5  came to you and said, "We don't need you to keep it"?

6     A    Yes, sir.  And he said to dispose of it

7  however we dispose of them.

8     Q    Did he say why he didn't want you to keep it?

9     A    No, sir.

10     Q    Did anybody connected with the fire

11  department -- captain, engineer, paramedics or anybody

12  else -- indicate to you what information they had

13  gathered about how the incident occurred?

14     A    No, sir.

15     Q    All right.  Then, after the engineer told you

16  he had checked with his captain and you didn't need to

17  keep the cylinder or the torch, what became of them?

18     A    Well, that's when I had made my initial -- or

19  my thorough investigation of the cylinder and then took

20  it to -- back to our ranger station, and it was to be in

21  our possession for about two to three days.

22     Q    That was the last time you saw it, anyway?

23     A    Yes, sir.

24     Q    Okay.  And by the "ranger station," are we

25  talking about that large building just beyond the guard

37

1   gate, or is there a different spot?

2       A    No.  The ranger gate itself.

3       Q    Were you the one who transported the equipment

4   from the incident site to the gate shack?

5       A    Yes, sir.

6            MR. EPSTEIN:  I don't mean to interrupt you.

7   We have about five minutes before we need to call in.

8            MR. MOORHEAD:  Aren't they supposed to call

9   us?

10           MR. EPSTEIN:  Oh, I apologize.

11           MR. MOORHEAD:  We can go off the record for a

12  second.

13           (Discussion off record.)

14  BY MR. MOORHEAD:

15      Q    Did you personally dispose of the cylinder and

16  torch, or did somebody else do that?

17      A    I believe another staff did during the day.

18      Q    Did you submit the torch or the cylinder to

19  anyone else for examination, evaluation, and testing

20  before telling somebody else to get rid of it?

21      A    No, sir.

22      Q    So as far as you know, you're the only one who

23  took a look at it?

24      A    Yes, sir.  I believe Randy was also there with

25  me at the time, and we were discussing it.

38

1    Q    Based upon anything that was told to you or

2 anything you observed while you were at the scene, did

3 any of the adjacent campers take any photographs?

4    A    I'm not aware of that.

5    Q    As far as you are aware from what you observed

6 or what you were told, did the fire department take any

7 photographs?

8    A    No, sir, I'm not aware.

9    Q    Give me your best estimate of the total number

10 of fire department personnel that showed up.  More or

11 less than ten, maybe, start with.

12    A    Approximately eight to ten.

13    Q    And they were all from the San Diego Fire

14 Department?

15    A    Yes, sir.

16    Q    Did they interview you at all?

17    A    No, sir.

18    Q    Whether it be the evening of the incident or

19 on subsequent occasions, did the fire department ever

20 tell you that they had determined the cause of the

21 incident?

22    A    No, sir.

23    Q    Were you present when any fire department

24 personnel interviewed or spoke with anyone else at the

25 campsite?

39

1   A    I was present, yes.

2   Q    Okay.  Did you hear any additional stories

3  above and beyond the ones you've told us that were

4  related to you by the campers on both sites?

5   A    I've heard additional stories from my staff

6  Randy and -- it was very vague, because I could hear

7  Mr. Shalaby having conversation with the fire personnel.

8  And I do not recall everything that was said.

9   Q    So you don't have any recollection of what

10  Mr. Shalaby said to the fire department?

11   A    Right.  Correct.  Yes.

12   Q    Do you have any recollection of any stories

13  given by anyone at the scene to fire department

14  personnel, other than the stories that you've told us

15  about that they told you; in other words, a new or

16  different story than the two that you told us about?

17   A    No.

18   Q    Okay.  Did you overhear, while you were at the

19  scene, anybody, whether it be Mr. Shalaby or the people

20  in his group, or adjacent campers, fire department

21  personnel or anyone, say anything about the incident

22  occurring as a result of the cylinder being kicked or

23  dropped into the campfire?

24   A    No.

25   Q    As a result of this incident, were any reports

40

1    prepared by Campland personnel?

2        A    One by myself, and one by my ranger, Randy

3    Stephens.

4            MR. MOORHEAD:  All right.  The crack staff

5    here at the hotel, that made copies for me, shorted me

6    on staples.  So I just kind of dog-eared them.   We'll

7    mark that as "1."  We'll mark this as Exhibit 1.  And

8    even though I understand that you may have the original

9    with you, I think this is an accurate photocopy.  So we

10    can work off of it until you find something in here

11    that's visibly unclear.

12            And I will represent to you that what I've got

13    here appears to be the sum and substance of the

14    information that would have been prepared at or about

15    the time of this incident.  And I'll go through it.  It

16    may not actually be one exhibit, but we're kind of

17    turning it into one --

18            MR. EPSTEIN:  A group exhibit?

19            MR. MOORHEAD:  -- a group exhibit.

20            (Exhibit 1 marked.)

21    BY MR. MOORHEAD:

22        Q    The first page is all typewritten, and on the

23    top it says "Inquire on Non-Active History."  Do you see

24    that, Mr. Ratliff?

25        A    Yes, sir.

41

1    Q    That's part of the documentation that Campland

2 has in connection with this incident?

3    A    Yes.

4    Q    Tell me what this is, how this would have been

5 generated, where it would be kept, things like that.

6    A    This was generated after the incident, to

7 receive information on the guest as far as address,

8 personal information that we needed to complete the

9 reports.

10    Q    Okay.  I am looking near the top.  I see "Room

11 D19."  Is that the space number where it happened?

12    A    Yes, sir.

13    Q    What does "Type L" mean to the right of that?

14    A    Would be, I believe, left-hand hookups in

15 our -- what they would call site category, so that they

16 know which way the RV is to be going into the campsite.

17    Q    Which way it should be oriented?

18    A    Yes.

19    Q    And then it looks like they've identified

20 Mr. Shalaby here with last name and first name.  They

21 indicate that in his group there were the two adults,

22 two children and a dog, basically?

23    A    I believe, no dogs.

24    Q    It looks like -- well, maybe I'm reading this

25 wrong.  It looks like adults, 2; 2 tots; dogs 01.

42

1      A     Well, it could be on the reservation form.  I

2  don't recall a dog.

3      Q     And then this address on Leviston Avenue is

4  Mr. Shalaby's address, as you understand it?

5      A     The address that he registered under.

6      Q     Okay.  All right.  Then, going to what is the

7  second page of what is -- has been marked as group

8  Exhibit 1 to this deposition, there is something with

9  the heading "Incident Report" at the top, and in

10 handwriting -- in typewriting it says "Report Taken By:"

11 and in handwriting it says "#3 R. Stephens."

12          That's Randy Stephens we've been talking

13 about?

14     A     That is correct.

15     Q     So this would have been something he prepared?

16     A     Yes, sir.

17     Q     All right.  Then, going to -- going to Page --

18 I'm going to say 3 and 4, because at the bottom of those

19 last two pages it says "Page 1 of 2" and "Page 2 or

20 2" -- this has "WL Ratliff" as the report taken by.  So

21 this would have been something you prepared?

22     A     Yes, sir.

23     Q     And that's your handwriting?

24     A     That is correct.

25     Q     Give me your best estimate of when this

43

1    document was prepared.

2         A    This particular document was rewritten on

3    7- -- July 12, 2006.

4         Q    That's what it indicates at the bottom of the

5    second of two pages?

6         A    Yes, sir.

7         Q    Okay.  Do you know why it was rewritten at

8    that time?

9         A    The original statement that I turned in for

10   this was not found.

11        Q    Okay.  So this was your account of what

12   happened as you recalled it on July 12, 2006?

13        A    Yes.  I always kept my own personal

14   documentation of incidents.

15        Q    Okay.  So let's back up.  You prepared one at

16   or about the time of the incident?

17        A    Yes, sir.

18        Q    And they couldn't find that one?

19        A    It was, yes, misplaced.

20        Q    Okay.  Did you have a duplicate of the one

21   that you prepared at or about the time of the incident?

22        A    Not a duplicate, but my notes as per se.

23        Q    Do you still have those notes?

24        A    I don't believe so.

25        Q    Okay.

44

1      A      I hand everything at the end of every year,

2 and then it is put in a file.

3      Q      So you prepared a handwritten report at or

4 about the time of the incident, and you had some

5 personal notes that you kept?

6      A      Yes.

7      Q      You found out from some source that the

8 incident report that you had submitted to Campland

9 couldn't be found, so you created Pages 3 and 4 of

10 Exhibit 1 from those notes?

11     A      Yes, sir.

12     Q      Did you write down verbatim what was in your

13 notes?

14     A      Yes, word for word.

15     Q      Okay.  So if we could find your old notes,

16 they would say just what I'm looking at?

17     A      Exactly.  Yes, sir.

18     Q      All right.  Then, looking down near the bottom

19 of Page 1 of your handwritten statement, it makes

20 reference to what you told us about speaking with the

21 fire department about keeping the stuff and they told

22 you that you didn't need to.  Is that basically correct?

23     A      That is correct.

24     Q      But they never told you why they did not want

25 you to keep it?

45

1        A      No, sir.

2        Q      Do you know from any source when Randy

3  Stephens' handwritten account was prepared?

4        A      The same evening.

5        Q      Okay.  So this is not another incident where

6  he had to duplicate his later on?

7        A      No, sir.

8        Q      Looking over the portion of Exhibit 1 that's

9  in your handwriting, do you see anything in it that, as

10  you sit here today, Mr. Ratliff, now looks to be

11  inaccurate?  Take a few moments to look at it if you

12  want.

13        A      I didn't understand you.  Inaccurate in which

14  way?

15        Q      Well, maybe you learned things since the day

16  of the incident that, when you look back on it, you say,

17  "Oh, that's what I thought at that time, but, in fact,

18  it was snowing that day," or whatever the case may be.

19              Is there anything in there that, as you look

20  at it now, you say, "I was wrong.  That's not what

21  happened"?

22        A      No, sir.

23              MR. MOORHEAD:  Okay.  We are going to mark

24  this as Exhibit 2.  But before I give it to the court

25  reporter, I'm going to give it to you.  I don't think I

46

1   have any extras, but it's just the deposition subpoena.

2   It's the subpoena for you to be here today, probably

3   ruining your Tuesday.

4           (Exhibit 2 marked.)

5   BY MR. MOORHEAD:

6       Q    If you would, turn to the second page of that

7   document.  And there is a list there of what we asked be

8   brought along.  All right.  Do you see that?

9       A    Yes, sir.

10      Q    All right.  And for the record, could you read

11  what the first category was.

12      A    "All reports and witness statements taken in

13  connection with the incident involving Andrew Shalaby on

14  April 21, 2007 at Campland."

15      Q    Is Exhibit 1 everything that would meet that

16  description?

17      A    I believe, yes, sir.

18      Q    Okay.  What's the second category?

19      A    "All correspondence generated and received in

20  connection with the incident involving Andrew Shalaby on

21  April 21, 2007 at Campland."

22      Q    Do you have anything that meets that

23  description at Campland, any letters to anybody, any

24  letters from the fire department, things like that?

25      A    I have the one letter.

47

1    Q    Okay.  You are holding up something?

2    A    I don't -- I never really reviewed it, myself.

3         MR. MOORHEAD:  Okay.  For the record, what

4  Mr. Ratliff has handed to us -- and I have additional

5  copies of this we can mark as the next exhibit -- is a

6  July 12, 2006, letter from Gary Gunther, adjuster for

7  Crawford, to Therese Kiel at Campland.  All right.

8         And it indicates that Mr. Gunther is

9  associated with Crawford & Company and that they were

10  assigned to look into this by Lexington Insurance

11  Company, "which insures BG Western/Western Industries,

12  the manufacturers of gas cylinders."

13  BY MR. MOORHEAD:

14    Q    This was something that was in Campland's file

15  when you went to look to find out what documents they

16  have?

17    A    Yes, sir.  It's from -- my manager at the time

18  received that.

19         MR. MOORHEAD:  I'm sure I've got extra copies

20  of this someplace.  Let me hand this back to you.  We'll

21  mark this as Exhibit 3.

22         (Discussion off record.)

23  BY MR. MOORHEAD:

24    Q    Other than this letter dated July 12 from Gary

25  Gunther, at Crawford & Company, to Therese Kiel, who, I

48

1  understand, was your supervisor at the time this

2  incident happened, any other correspondence that you are

3  aware of that Campland has in connection with this

4  incident?

5      A    Just the fax cover sheet that was with this,

6  to our company risk manager at the home office.

7      Q    Okay.  So this facsimile cover sheet would

8  have transmitted what we've marked as Exhibit 3 to

9  your -- who did you say Mr. Yu was?

10     A    Is the company risk manager.

11     Q    Okay.  So these would have come together?

12     A    I believe so.

13         MR. MOORHEAD:  Well, let's mark it as a

14 two-page exhibit, then; that being the July 12 letter

15 from Mr. Gunther and the facsimile cover sheet, which

16 bears the date "7-13-06" and the subject "4/21/06 Fire

17 Accident."

18         (Exhibit 3 marked.)

19 BY MR. MOORHEAD:

20     Q    Other than that, does Campland have anything,

21 in the form of correspondence or otherwise, that would

22 be responsive to category No. 2 there?

23     A    (Witness shakes head.)

24     Q    All right.  What's category No. 3?

25     A    Category No. 3.  "All photographs taken in

49

1  connection with the incident involving Andrew Shalaby on

2  April 21st, 2007 at Campland."

3      Q    I believe, based upon your previous testimony,

4  your testimony now would be that you don't have any

5  photographs?

6      A    Yes, that is correct.

7      Q    All right.  Category 4?

8      A    "The canister" or canisters "recovered in the

9  incident involving Andrew Shalaby on April 21, 2007 at

10 Campland."

11     Q    And do you still have that?

12     A    No, sir.

13     Q    All right.  Category No. 5?

14     A    "The torch recovered in the incident involving

15 Andrew Shalaby on April 21, 2007 at Campland."

16     Q    Do you still have that?

17     A    No, sir.

18     Q    As far as you are aware, does anybody know

19 where either the canister -- or the cylinder, I call

20 it -- or the torch are at this time?

21     A    No, sir.

22     Q    Other than meeting with us here today to talk

23 about this and meeting with your attorney, have you met

24 with anybody else in connection with this incident,

25 since the date it happened, in the months that have

50

1   intervened?

2       A    I don't understand that question. What do you

3   mean by meeting?

4       Q    Well, has anyone approached you -- I guess I

5   should make it broader -- has anyone called you, come to

6   Campland, called you to their office or anything else to

7   talk to you about this incident, the facts of this

8   incident, since everybody parted ways on April 21 of

9   2006?

10      A    Yes.

11      Q    How many times has that occurred?

12      A    One time.

13      Q    Okay. And how long ago was that?

14      A    Six, eight months ago.

15      Q    If you know, is that Mr. Gunther?

16      A    I don't know.

17      Q    Was that something that was done by a

18   telephone, face-to-face, or what?

19      A    First, by telephone correspondence. Then, in

20   person.

21      Q    Okay. Telephone call, written correspondence,

22   and then face-to-face?

23      A    I'm not aware of any written correspondence.

24      Q    Telephone call, then face-to-face?

25      A    Yes, sir.

51

1    Q    Where did the face-to-face meeting take place?

2    A    At Campland.

3    Q    Let's back up to the telephone call.  Someone

4    called you, six to eight months ago, to talk about this

5    incident?

6    A    They were -- yes.  Initially talked about the

7    incident, then wanted to have a meeting face-to-face to

8    review our records.

9    Q    Okay.  But you don't know the identity of this

10   individual?

11   A    No, not -- I don't recall, let's put it that

12   way.

13   Q    Okay.  And in the telephone conversation they

14   asked you some questions about the incident itself?

15   A    Yes.

16   Q    Do you remember anything that was talked about

17   in that telephone conversation, separate or different

18   from what we've talked about here today?

19   A    No, sir.

20   Q    And then in the course of that conversation,

21   he requested that he have an opportunity to meet with

22   you?

23   A    Yes.

24   Q    And that was at Campland?

25   A    Yes.

52

1     Q    And the stated reason for meeting with you was

2  to look at whatever documents you had?

3     A    Right.

4     Q    Okay.  And did that person come out?

5     A    Yes, he did.

6     Q    And it was a male?

7     A    Yes.

8     Q    Did that --

9     A    He identified himself as an investigator for,

10  I believe, the insurance company.

11     Q    So somebody that would not have been

12  inconsistent with Mr. Gunther, as far as same sort of

13  thing, investigating this incident, and a male?

14     A    Well, I do have his business card.  I just

15  don't have it with me.  And I believe my general manager

16  has -- I think it was left on his desk, but -- at the

17  time.

18     Q    Okay.  So there might be a way for us to find

19  out who it was that came out and talked to you?

20     A    Yes, sir.

21     Q    Okay.  In any event, when he came out, did he

22  ask you more questions about the incident, separate and

23  different from the ones that he had talked to you about

24  over the phone?

25     A    No, sir.

53

1     Q    Did he look at what we've marked as Exhibit 1?

2     A    No, sir.

3     Q    Did he look at any document?

4     A    No, sir.

5     Q    What, if anything, did he do when he came out?

6     A    Interviewed me.

7     Q    Okay.  So he asked more questions?

8     A    Yes.

9     Q    Were they the same questions he had asked over

10 the phone, essentially?

11    A    Basically, yes.

12    Q    Was he recording that interview in any way?

13    A    Not to my knowledge at all.

14    Q    So he wasn't writing anything down?

15    A    Yes, he was.

16    Q    As far as you know, he wasn't tape-recording

17 it?

18    A    As far as I know, he was not tape-recording.

19    Q    But he was taking notes during the

20 conversation?

21    A    Yes.

22    Q    Did he ever give you a copy of whatever notes

23 he took?

24    A    No, sir.

25    Q    Okay.  Did he ever tell you that he was going

54

1  to get back in touch with you and send you a copy of

2  those notes?

3      A    I don't recall the note aspect, but I do

4  recall he was probably going to be in future contact

5  with us.

6      Q    Did he ever get in contact with you again?

7      A    I don't believe so.  I believe it was somebody

8  else at that time.

9      Q    Do you think you got in touch with somebody

10 else?

11     A    Yes.  I was under the impression that he was

12 an investigator for the company and he was referring

13 information to them, so --

14     Q    Okay.

15     A    Then, they were going to correspond with us.

16     Q    Did your superiors ask you to come in so that

17 they could interview you about what had happened?

18     A    No, sir.

19     Q    Other than Mr. Gunther and the guy we've

20 talked about, who spoke with you over the phone and then

21 came out and asked you some questions, have you spoken

22 with anybody, for the sake of example, that they said

23 that they were with an insurance company investigating

24 the incident?  Any people other than what we've talked

25 about?

55

1    A    No.

2    Q    Not over the phone?  Not in person?  Not in

3  writing?

4    A    No, sir.

5    Q    Great.  I don't believe I have --

6    A    I believe, a Debbie.  But who is Debbie?  I

7  think she is with you guys.

8    Q    Oh.  Deirdre?

9    A    Deirdre.

10    Q    To set up the deposition?

11    A    That's it.

12    Q    Other than the conversation setting up today's

13  deposition --

14    A    That's it.

15        MR. MOORHEAD:  All right.  I don't think I

16  have any more questions.  Mr. Epstein probably does.

17        (Recess.)

18        MR. EPSTEIN:  Back on.

19

20                  EXAMINATION

21  BY MR. EPSTEIN:

22    Q    Mr. Ratliff, we met off the record.  I'm Mark

23  Epstein.  I represent plaintiffs in this case,

24  Mr. Shalaby and his wife.

25        You testified a little earlier about your --

56

1   it sounded like you have some experience with welding or

2   torches, some background that precedes your work at

3   Campland; is that correct?

4        A    That is correct, yes.

5        Q    Can you tell me:  What is the nature of your

6   prior experience with welding?

7        A    I was a certified welder for the Navy.

8        Q    Okay.

9        A    And in the civil service -- or civil world.

10       Q    Is that part of the Navy, or you were a

11   welder --

12       A    I was a Seabee, which is steelworker.

13       Q    When did you join the Navy?

14       A    That was 1979.

15       Q    Other than the Navy, is the Seabee -- is that

16   part of the Navy?

17       A    Yes.

18       Q    Have you served in any other branch of the

19   service?

20       A    No.

21       Q    And were you stationed here in San Diego?

22       A    No.

23       Q    Where were you stationed?

24       A    Gulfport, Mississippi.

25       Q    How long were you in the Navy before you --

57

1  did you start some sort of apprentice welding program

2  while you were --

3      A    Yes.

4      Q    How long had you been in the Navy when you

5  started that?

6      A    I was in the reserve program, so I was --

7  like, a year, a year and a half, something like that.

8      Q    And then you became involved in a welding

9  certification program?

10     A    Yes.

11     Q    And how long did that program last; the

12  certification?

13     A    Nine months, I think it was.

14     Q    And was there a name to the -- or a title to

15  the certification you received at the end of that?

16     A    Welding certification.

17     Q    It came in a nice little plaque?

18     A    Oh, yeah.  Yes.

19     Q    How long did you remain in the Navy?

20     A    Till March 23rd, 1982 -- '83.  I don't

21  remember.

22     Q    Early eighties sometime?

23     A    Yes.

24          MR. MOORHEAD:  Four-year tour?

25          THE WITNESS:  Well, I was in the reserve

58

1  program.

2  BY MR. EPSTEIN:

3       Q     While you were in the Navy, what applications

4  did you apply your welding skills to?

5       A     Oxyacetylene weld, mig weld, tig weld, arc

6  weld, brazing.

7       Q     Can you describe the types of projects you

8  worked on, or did you work on ships in dry dock repair?

9       A     Mainly, heavy structural steel.

10      Q     While you were a member of the Seabees, where

11 were you stationed then?

12      A     Gulfport, Mississippi.

13      Q     And did you work on projects, for example,

14 with the US -- the Army Corps of Engineers?

15      A     I'm not for sure.  I know there was Navy --

16 Army Corps of Engineer projects for girl scouts,

17 national forests, you know, that kind of stuff.

18      Q     You mentioned various types of -- it sounds

19 like welding gases or fuels you used.  Acetylene was one

20 of them?

21      A     Yes.

22      Q     Are you familiar with MAPP gas?

23      A     Yes, I am.

24      Q     While you were in the Navy, did you have

25 occasion to use MAPP gas torches?

59

1    A    Yes.

2    Q    Can you tell me what -- to the best of your

3  knowledge, what MAPP gas is, what its components are?

4    A    Well, no, not actually, I guess, but -- I know

5  about it, but --

6    Q    All right.  In your experience, what did you

7  use MAPP gas torches for?

8    A    Mainly for plumbing projects, when a lot of

9  condensation in the water was present.

10    Q    To your knowledge, is MAPP gas typically used

11  in the plumbing industry?

12    A    Yes.

13    Q    After you were discharged or got out of the

14  Navy, what was the next job you took?

15    A    I don't remember the place.  It was --

16    Q    What type of work?

17    A    It was a contractor doing water tanks for the

18  fire engines -- for fire trucks.

19    Q    Fabricating them or --

20    A    Fabricating them, yes.  Welding.

21    Q    So if I understand correctly, you were -- you

22  worked for a company that fabricated water tanks for

23  fire trucks?

24    A    Yes.

25    Q    And you would help weld the tanks together?

60

1      A    Yes.  Pressure-weld the tanks, yes.

2      Q    And that was part of the manufacturing

3  process?

4      A    Yes.

5      Q    Where was the -- where was your employer at

6  that time?

7      A    Rock Island, Illinois.

8      Q    What type of welding gas did you typically use

9  at that job?

10     A    It was -- it would have been acetylene.

11     Q    Acetylene?

12     A    Yes.  And oxygen.

13     Q    Can you tell me approximately how long you

14  remained at that job.

15     A    I think the contract ended, like, two years --

16  or it lasted two years.

17     Q    Sometime in the mid 1980's?

18     A    Yeah.  I think it was '80- -- I was still in

19  the Navy at the time.  I was in the reserve program.  So

20  it was around '81, '82.

21     Q    And you don't remember the name of that -- the

22  company you worked for?

23     A    No.

24     Q    I don't remember what I did yesterday, so it's

25  okay.

61

1      A    I know where it's at.

2      Q    After you left that job, where did you go to

3   work next?

4      A    I went into law enforcement.

5      Q    Okay.  Police?

6      A    Police, yes.

7      Q    Where?

8      A    Mercer County Sheriff's Department.

9      Q    In which state is that?

10     A    Illinois.

11     Q    Approximately how long were you with the

12  Mercer County Sheriff's Department?

13     A    Till election.  It was about two years.

14     Q    And were you a sheriff's deputy?

15     A    Yes.

16     Q    Did you have an occasion to do any welding on

17  the job?

18     A    No, sir.

19     Q    All right.  Any more jobs after you left --

20  after the Mercer County Sheriff's Department, did you

21  have any other jobs where you served as a welder?

22     A    Campland, right here.

23     Q    Okay.  All right.  Skipping forward in -- I

24  believe you said you've been in Campland for about five

25  years?

62

1     A    Yes.

2     Q    Between the time you left Mercer County

3 Sheriff' Department and came to work in Campland, did

4 you have any jobs where part of your official duties was

5 to weld?

6     A    Yes.

7     Q    Okay.  Where else would that have been?

8     A    I worked for myself.

9     Q    In what capacity?

10    A    Plumbing, electrical construction.

11    Q    Basically, self-employed contractor?

12    A    Yes.  Yeah.

13    Q    And where did you -- was that here in

14 California?

15    A    Yes.

16    Q    Approximately how many years did you do that?

17 Were you in business for yourself?

18    A    Probably two or three years, I think it was.

19    Q    Is this before you came to Campland?

20    A    Yes.

21    Q    And you did some plumbing during that time?

22    A    Yes.

23    Q    And while you did the plumbing work, did you

24 have occasion to weld or solder pipes together?

25    A    Yes.

63

1     Q    And when you did that, did you ever use MAPP

2  gas torches?

3     A    Yes, all the time.

4     Q    All right.  Do you remember the brand name of

5  the MAPP gas torches you used, that you tended to use?

6     A    Mainly, Benzomatic (sic).

7     Q    Does Burnzomatic sound right?

8     A    Burnzomatic.

9     Q    Is that the one with the yellow tank?

10    A    Yes.  Home Depot.

11    Q    You would buy it at Home Depot or other

12  hardware stores?

13    A    Yes.

14    Q    Is it accurate to say that you have some

15  working knowledge and familiarity with MAPP gas torches?

16    A    Yes.

17    Q    And with the Burnzomatic brand in particular?

18    A    Yes.

19    Q    Have you ever been able to -- strike that.

20  While you were self-employed as a plumber/fix-it guy --

21    A    Yeah, here you go.

22    Q    -- did you ever have occasion to purchase or

23  come upon MAPP gas torches manufactured by another

24  company other than -- strike that.

25          Let me rephrase my question.  Did you ever

64

1    have occasion to purchase another brand of torch, other

2    than Burnzomatic?

3        A    I don't recall.

4        Q    All right.  And I believe you mentioned

5    earlier that you've done some welding while you've been

6    at Campland?

7        A    Yes.  Soldering with MAPP gas, yes.

8        Q    Is part of your duties there to help maintain

9    the place?

10       A    That was my previous job before the park

11   ranger position I hold now.

12       Q    You were hired as a maintenance person?

13       A    Yes.

14       Q    And part of what you did at that time was to

15   fix -- or repair the plumbing?

16       A    Yes.

17       Q    And part of -- when you did plumbing work

18   there, part of what you did was to weld or solder pipes?

19       A    Yes.

20       Q    Do you still have occasion to do that at

21   Campland?

22       A    Not at Campland, no.

23       Q    I imagine you probably fix some things around

24   your home?

25       A    And other people's homes.

65

1    Q    Okay.  Do you happen to own -- at the present,

2   do you own a MAPP gas torch?

3    A    I just ran out and threw it away the other

4   day.

5    Q    Is there a reason that you did that?

6    A    I was done with it.  I was going to go buy a

7   new one.

8    Q    So is it accurate to say to this day you still

9   have occasion to use MAPP gas torches from time to time?

10    A    Yes.

11    Q    Can you give me an estimate of how many times

12   a year you might use one?

13    A    Whenever my friends call or somebody needs a

14   plumber.

15    Q    It's usually the most inopportune time?

16    A    Yes.

17    Q    So on the -- going back, then, for a moment to

18   the night of the incident in April of 2006, involving

19   Mr. Shalaby, when you -- I believe you testified that

20   you -- when you came upon the scene and did a survey,

21   you saw the torch on the ground some three feet behind

22   Mr. Shalaby; is that correct?

23    A    Yes.

24    Q    And at some point after you saw it, you went

25   and picked it up?

66

1      A      Yes.

2      Q      Okay.  When you did that, were you familiar

3  with the torch that you saw?

4      A      Yes.

5      Q      Was that the same type of torch that you had

6  used in the past?

7      A      Yes.

8      Q      And was there any -- was there any doubt in

9  your mind that it was a Burnzomatic brand torch?

10      A      No, I don't believe so.

11      Q      When you -- skipping a little bit ahead in

12  your testimony, when you spent some time observing the

13  torch, I believe you testified that that was after you

14  had spoken with the fire department personnel about

15  whether or not they wanted you to keep it or not?

16      A      Yes.  I secured the -- pretty much secured the

17  torch; in the meantime, was worried about Mr. Shalaby's

18  well-being, first.  I just did not want the torch to end

19  up in the wrong hands.

20      Q      Okay.  And when you -- can you tell me

21  approximately how long you spent examining the torch?

22      A      Oh, probably, I'd say an hour.  During my

23  entire report writing.

24      Q      And was that back at the -- I forget what you

25  call that -- the front gate?  Was that back at the

67

1  station?

2       A      In my -- in the office.  In my office.

3       Q      You call it the ranger station?

4       A      Well, the ranger station and my office are two

5  different places.

6       Q      Are they in the same general vicinity?

7       A      It's the next building behind it.

8       Q      I actually haven't had the benefit of seeing

9  the location.  But, basically, you spent an hour or so

10  examining the torch back at your office?

11       A      Yes.

12       Q      And I believe you testified that the labels

13  had not been destroyed on the torch, they had not been

14  burned off?

15       A      No, sir.  It appeared normal wear and tear to

16  me.

17       Q      To the best of your recollection, did the

18  front label say "Burnzomatic" on it?

19       A      I don't recall the -- the "MAPP" is what

20  catches -- caught my eye.

21       Q      Getting back to the breach or the hole you

22  described at the point where the nipple or the thread

23  joins the neck of the bottle, is that about roughly the

24  area of the tank where you saw the hole?

25       A      Yes.

68

1     Q    Was it, in fact, a hole that you saw, and was

2 there --

3     A    It appeared to be a crack forced open,

4 outward.

5     Q    It was forced open, outward?

6     A    Like an explosion outward.

7     Q    From inside the bottle towards the outside?

8     A    From inside the container, yes.  It was a

9 crack, and just one side of the crack appeared to be a

10 U-shape form.

11     Q    I apologize to the court reporter.  I think I

12 was jumping in and speaking over you, which is something

13 I always tell the witness not to do.  But in this case,

14 I was doing it, so --

15         And just so the record is clear, because I do

16 think I was speaking over you, you were saying that the

17 crack appeared to have been forced outward from inside

18 the neck of the tank?

19     A    Yes.

20     Q    And you believe that it was roughly a U-shaped

21 crack or hole?

22     A    No.  It appeared to be a straight line.  Just

23 the one side of the crack appeared to be more outward

24 than the other side of the crack.

25     Q    Okay.  Based on your experience working with

69

1  torches and the like, what did that indicate to you,

2  that hole, if anything?

3      A    Personally?

4      Q    Yes.

5      A    Abuse.

6      Q    In what -- why did it indicate abuse?

7      A    Appeared to me that the container was used

8  other than what it was for.

9      Q    Can you be any more specific?  In other words,

10  did it strike you that there had been some sort of force

11  applied, or what is it you're describing?

12      A    Just my personal opinion, you're asking me,

13  or --

14      Q    Yes.  That's all I can ask for.

15      A    Okay.  It appears to me that it was banged

16  against -- the top of the nozzle was banged against

17  something of a hard surface and not created the crack,

18  but maybe, in my experience, that weakened the

19  connection between the torch nozzle and the cylinder

20  itself.

21          I have experienced other employees, when

22  they -- in my presence, when they were not able to light

23  that torch, do several other abusive things to get it to

24  light.

25      Q    Have you ever -- in your experience, have you

70

1  seen a crack like that before?

2       A    Not that particular type of crack, no.

3       Q    Did the -- getting back to your testimony, you

4  described -- I'm going to roughly paraphrase it -- but

5  the crack appeared to have been forced outward.  Did

6  that give any indication to you of what had transpired

7  or caused the crack?

8       A    I was under the impression that was from the

9  explosion.

10      Q    Was there anything in particular about the

11 crack or otherwise about the tank you saw that suggested

12 to you that it had been -- may have been banged on a

13 hard surface?

14      A    It appeared to me that the torch was -- might

15 have been banged against something that might have

16 adjusted the thread area of where the torch nozzle and

17 the canister would connect and had -- may have weakened

18 that area in the process of being banged, I guess you

19 would say.

20      Q    Okay.  But was there anything -- other than

21 the existence of the hole or the crack itself, was there

22 anything else; for example, scratches in the paint,

23 blunt --

24      A    Oh, the threaded part was this -- from the

25 crack itself, was forced at a right angle of the

71

1  cylinder itself.

2      Q    Is that what you were testifying about

3  earlier, that right angle?

4      A    Yes, the right angle.  Not the torch nozzle,

5  but the cylinder and the torch nozzle.  The cylinder is

6  here.  The torch nozzle is on top, straight, and there

7  is a natural bend by manufacture at the connection of

8  the threaded area and the torch nozzle itself, at a

9  right angle.  And on the right side or the side that

10  was -- I don't know how to say this -- on the --

11          MR. STEPHAN:  Opposite.

12          THE WITNESS:  Opposite of the bend of the

13  side -- on the side of where the crack was, the angle

14  went to the right; right-side angle of that crack.

15  BY MR. EPSTEIN:

16      Q    When you say, "The angle went to the right," I

17  understand, or at least I think I do, that the torch

18  nozzle you saw, or the torch tip, was at a bend.  But

19  are you saying that the actual threaded portion of the

20  cylinder was bent off from the yellow painted --

21      A    The base of the threads.

22      Q    Right.  In other words, if I'm describing

23  correctly, you've got your yellow painted cylinder, if

24  you will?

25      A    Cylinder, yes, sir.

72

1     Q     It comes to a neck, kind of like

2   Mr. Moorhead's bottle here?

3          MR. MOORHEAD:  They call this portion

4   "threaded," which attaches to the top of the neck.  That

5   will help in the terminology when you are discussing it.

6          MR. EPSTEIN:  Sure.

7   BY MR. EPSTEIN:

8     Q     At the neck of this tank there is, then, a

9   threaded tip, if you want -- maybe made of copper.  Or

10  can you tell me what the metal is at the top?

11    A     I would assume, aluminum.

12    Q     Aluminum?

13    A     Aluminum.  Pressed aluminum.

14    Q     But, in any event, it's not painted yellow,

15  right, the part with the threads?

16    A     I don't recall.

17    Q     But at the point where the threaded metal

18  meets the neck of the tank that is not threaded, it

19  becomes bent?  If I understand you correctly, you saw

20  that bend, that right-angle bend you were talking about,

21  start at that point, where the threaded portion of the

22  bottle meets the neck?

23    A     Yeah.  At the end, the bottom of the last

24  thread, between the last thread and the cylinder itself

25  is where the bend took place, and the explosion -- or

73

1   the crack was in that same area.

2       Q    Got it.  Was it an actual 90-degree angle that

3   you saw?

4       A    No.  It was a slight-angle bend.

5       Q    Slight angle.  And the torch tip was still

6   attached to the threads?  It was still screwed on when

7   you picked it up?

8       A    When I picked it up, it was -- appeared to be

9   loose at the -- it didn't appear to be all the way

10  attached, or all the way screwed on.

11      Q    Got it.  And could you tell at that time

12  whether that was because -- and when I say that, I mean

13  the fact that the torch tip was not screwed all the way

14  on -- because it was not screwed all the way on

15  initially, or the force of whatever had happened had

16  forced --

17      A    I would not be able to tell you.  I don't have

18  that knowledge to answer that.

19      Q    Just bear with me.  I'm going to scan through

20  my notes.  I think Mr. Moorhead covered most of what I

21  was going to ask you, so I'm just going to condense

22  whatever remaining questions I do have.

23           Other than the one crack -- I'm going to use

24  the term "crack" -- you described up on the neck of the

25  bottle, did you see any other breaches in the metal

74

1    bottle of the cylinder or anywhere else?

2         A    No, sir.

3         Q    I believe you testified, in response to

4    Mr. Moorhead's question, you did not see any signs of

5    combustion residue anywhere on the bottle.

6         A    No, sir.

7              (Discussion off record.)

8    BY MR. EPSTEIN:

9         Q    As I am going down my list, I know you

10   answered most of these.  And did you -- was it your

11   testimony that Mr. Stephens or -- yes, Mr. Stephens, was

12   present with you at least for part of the time when you

13   examined the torch?

14        A    Pretty much all the time, I believe.

15        Q    All the time?

16        A    Yes.

17        Q    As you sit here now, can you remember --

18   strike that.  Let me back up.  To your knowledge, does

19   Mr. Stephens have any experience with welding?

20        A    He says he does.  I don't have any knowledge

21   that he does.

22        Q    We'll have the opportunity to ask him, of

23   course.  Do you remember him making any comments about

24   the torch, his observations, while you were examining

25   it?

75

1        A     We had had a discussion.  Experience versus

2   experience.

3        Q     I see.  All right.  Can you describe for me

4   what the nature of that -- was it a disagreement?

5        A     Yes.

6        Q     What was the nature of your disagreement with

7   him?

8        A     I disagreed with some of his observations

9   and -- and his idea of the torch.

10       Q     And this is not meant to compare you to him.

11  I just sort of would like to find out what it was

12  that -- not who was right and who was wrong, but what

13  was it that you guys disagreed about?

14            MR. MOORHEAD:  Could we get a time frame as to

15  when this happened?

16            MR. EPSTEIN:  Yes.  Sure.

17  BY MR. EPSTEIN:

18       Q     Let me back up.  I assume the discussion

19  you're talking about, with Mr. Stephens, where you had a

20  heated discussion, as you put it -- did this take place

21  during the roughly hour or so that you examined the

22  torch the evening of the incident?

23       A     Yes.  It was after the incident.

24       Q     I'm sorry, after the incident but after the

25  fire department --

1    A    Yes.

2    Q    And this was back at your office?

3    A    Yes.  And the following day, I believe.

4    Q    So later that evening of the incident and/or

5 sometime the following day, can you tell me to the best

6 of your recollection what it was that you and

7 Mr. Stephens had a disagreement about or the things you

8 disagreed about with regard to the torch?

9    A    He made the statement to me that he thought

10 that it was the wrong nozzle that was placed on the

11 cylinder itself.  And I disagreed with that.

12    Q    When you say "the wrong nozzle," you mean the

13 wrong type of torch tip?

14    A    Yes.  The torch nozzle.

15    Q    You happen to talk to a guy that doesn't know

16 half about torches as you do.  So he thought it was the

17 wrong kind of nozzle.  What do you recall him saying

18 about that?  Was it for a different type of canister, in

19 his opinion, or --

20    A    I believe, in his opinion, he thought there

21 should have been a different type that was on there for

22 the type of gas that we were talking about, for the MAPP

23 gas, so --

24    Q    And you did not share that opinion?

25    A    No, I did not.

77

1    Q    Was it your opinion that the type of torch tip

2  that was attached, as it were, to the tank, was designed

3  or meant for MAPP gas?

4    A    Yes.  It's been my experience.  I've used that

5  same torch and nozzle with MAPP gas all the time.  Still

6  do today.

7    Q    I've taken enough depositions to know I never

8  disagree with a witness about what they are talking

9  about, because they usually know far more than I ever

10  do.  All right.

11        Do you remember any other issues that you and

12  Mr. Stephens had a disagreement about with regard to the

13  torch?

14    A    It wasn't so much a disagreement.  We had a

15  discussion of our opinion.

16    Q    Okay.

17    A    We opinionized (sic) the -- from what we heard

18  and --

19    Q    Let me ask it differently.  Did you have, not

20  necessarily a disagreement, but a difference of opinion

21  about what you believed you thought might have caused

22  the incident or anything along those lines?

23    A    Well, he said to me he recalled what somebody

24  else had said -- and I don't know who he said stated

25  that, but -- and based on what people had told me, I

78

1  kind of went with what I had heard.

2      Q    So you had both heard different accounts of

3  what had happened?

4      A    I was interviewing other people that he didn't

5  interview, and he was interviewing other people that --

6  I had put him basically with Mr. Shalaby and his family

7  to talk to them.

8      Q    That's what we call, basically, double or

9  triple hearsay, but --

10     A    Right.

11     Q    -- for purposes of our discovery and our

12 trying to figure out what happened, looking back, can

13 you relay to me as best as you can what Mr. Stephens --

14 or what Randy said he had heard happened versus what you

15 had heard happened?

16     A    Well, he said that Mr. Shalaby had said that

17 he -- "I made a stupid mistake," you know, I guess,

18 while the fire department and all was there.  He made

19 the statement that he dropped it in the fire or

20 something like that.

21     Q    And this is what Mr. Stephens said he heard

22 Mr. Shalaby say?

23     A    Yes.  In our conversation between Randy and

24 myself -- or Mr. Stephens.

25     Q    Okay.  Do you remember Randy saying anything

79

1  else about what somebody else said about the occurrence

2  of the incident that was different from what you had

3  heard had happened?

4      A    That was pretty much all that I --

5      Q    Okay.  I estimate another ten minutes of

6  questions.

7      A    I thought you were going to be all day.

8      Q    I don't want to do that to you.  When you were

9  observing the tank with Randy Stephens after the

10  incident, at that time, did you feel that the tank posed

11  any immediate danger of explosion or fire?

12      A    Oh, no.  You mean after?

13      Q    After the fact.

14      A    No.

15      Q    I should have been more specific, because if

16  somebody hit somebody over the head with it, that would

17  be a danger.

18      A    Yeah, here you go.

19      Q    Earlier, you testified that in your experience

20  MAPP gas is typically used, and you typically use it,

21  for such uses as soldering and welding pipes and the

22  like.  Are you familiar with other intended use of MAPP

23  gas torches?

24      A    That's pretty much its primary use that I've

25  always experienced with it.  And my experience is from

80

1   forefathers before me.

2        Q    Okay.  Got it.  I'm definitely not doubting

3   your experience here.  I can't recall if you testified

4   about this or not, but to the best of your recollection,

5   what was the weather condition like on the evening of

6   the incident?

7        A    Clear.  Dark.

8        Q    Windy?

9        A    No, I don't believe, no wind.  Maybe a slight

10  breeze.

11       Q    Do you recall it being humid at all?

12       A    No.

13       Q    I was going to ask if it was, to the best of

14  your recollection, a warm evening, but I come from

15  Northern California, so every evening down here is warm

16  to me.  Was it a particularly warm or cool evening to

17  you?

18       A    It was a nice, cool evening.

19       Q    Have you, in your experience being in the Navy

20  or after, ever heard of another incident similar to the

21  one that Mr. Shalaby experienced, with a MAPP gas torch?

22       A    Exploding or --

23       Q    Yes.

24       A    Yeah.

25       Q    You have.  Have you actually witnessed it

81

1  before?

2      A      I have witnessed containers exploding, yes.

3      Q      MAPP gas in particular?

4      A      I -- I wouldn't say yes or no, because I know

5  we have that, so -- it's been a long time since I

6  recall.

7      Q      Can you give me -- tell me approximately how

8  many times.  Was it more than once that this happened?

9      A      I've seen it twice in my life.

10     Q      Was that while you were in the Navy or in

11 other --

12     A      Outside of the Navy.

13     Q      Can you describe the first such incident to

14 me?

15     A      The first incident was an acetylene tank that

16 exploded and went through the rooftop of the building.

17     Q      Did you ever find out why that occurred?  Or

18 did anybody figure it out?

19     A      Again, we figured it was -- the tank was old.

20 We know that much, so -- outdated, I think, at that

21 time.

22     Q      Was there anything in particular about the

23 conditions or the use of that acetylene tank that caused

24 that to happen?

25     A      Just that it was aged.

82

1     Q    Better to replace those tanks early?

2     A    Yeah.  There is a format to kind of go through

3  any kind of tank, to inspect it.

4     Q    What about the second such incident?

5     A    The second such incident was a -- I believe,

6  was just -- it was a propane cylinder and it was due to

7  a rusted -- a rusted bottom, that somebody had left in

8  a -- a lot of plumbers, you know, they work around water

9  and stuff like that.

10        Then, a lot of plumbers carry their tools and

11  supplies in a five-gallon bucket.  And he had some

12  moisture in the bottom of his bucket and, I believe, his

13  container, when we examined it, sat in that water a

14  little too long and rusted the bottom.

15     Q    In your experience doing plumbing work and

16  other handy work, have you had occasion to use propane

17  torches before?

18     A    Oh, yes.

19     Q    Are those also commonly used in plumbing

20  applications?

21     A    Yes.

22     Q    Can they be used to solder pipes, as well?

23     A    Yes.

24     Q    Okay.  Does propane burn at a different

25  temperature than MAPP gas?

83

1    A    Very much so, yes.

2    Q    Hotter or cooler?

3    A    Cooler.

4    Q    Cooler.  Okay.  Getting back for a moment to

5  the earlier testimony about Mr. Stephens' opinion that

6  there may have been the wrong torch tip on the MAPP gas

7  torch that was involved in the incident with

8  Mr. Shalaby, have you -- do you have any knowledge as to

9  whether or not a -- strike that.

10       To your knowledge, do MAPP gas torches and

11  propane torches have different -- differently designed

12  tips, say, with different threading or different --

13    A    No.

14    Q    To your knowledge, will a tip that is designed

15  for a propane torch -- will that fit on a MAPP gas

16  torch?

17    A    Well, there is a propane torch nozzle

18  that's -- that's only strictly for the propane torches,

19  so -- but it will not fit on the MAPP gas container.

20    Q    Is that because the threading is designed

21  differently?

22    A    I believe it's the whole dimension.

23    Q    I see.  It just will not fasten to a MAPP gas

24  torch?

25    A    Right.  Right.

84

1      Q    So in your opinion, could the torch tip that

2 was attached to the MAPP gas cylinder that was involved

3 in the incident with Mr. Shalaby -- could that have been

4 a propane torch tip on there?

5      A    I believe that you can use the same torch that

6 was on a torch bottle -- I mean on a propane bottle, I'm

7 sorry -- as well as the MAPP gas, but the torch nozzle

8 was designed for either/or.

9      Q    I'm sorry.  The nozzle -- maybe I'm

10 misunderstanding.  I thought you testified a moment ago

11 that the -- at least part of the torch tip -- the torch

12 for MAPP gas -- I'm sorry.  Strike that again.

13          I thought you testified that part of the torch

14 nozzle for propane will not fit on a MAPP gas tank neck.

15 And I realize this is somebody who doesn't understand

16 how these things work, but I'm trying to understand.

17      A    I wish I had my stuff here.

18          MR. MOORHEAD:  If you don't know or you don't

19 remember --

20          THE WITNESS:  Yeah.  I don't know.  I don't

21 know.  I understand, but I'm not -- you know, without

22 actually showing you what I'm talking about --

23          MR. EPSTEIN:  Okay.  That's fine.

24 BY MR. EPSTEIN:

25      Q    I'm sorry, I don't mean to put you in a

85

1  squeeze here.  This is for me learning.

2      A    Right.

3      Q    All right.  Getting back to the one question,

4  I'm not sure if I got a clear answer to that or not, but

5  in your opinion, was the torch tip that was attached to

6  the MAPP gas cylinder involved in the incident -- was

7  that one that was designed for a MAPP gas torch as

8  opposed to a propane torch?

9      A    In my opinion, yes.

10     Q    Then, we'll leave it at that.

11     A    I use that same torch.

12     Q    Have you spoken with any of the fire

13 department personnel who responded to the scene since

14 the evening of the incident?

15     A    No, sir.

16     Q    Okay.  What about any of the paramedics or

17 ambulance personnel?

18     A    No, sir.

19     Q    Any of the doctors that treated Mr. Shalaby?

20     A    No, sir.

21          MR. EPSTEIN:  Thank you.

22          THE WITNESS:  Okay.

23          MR. MOORHEAD:  I want to follow up on a few

24 things, because he asked questions I didn't even think

25 of.  See, he is a lot smarter than me.

86

FURTHER EXAMINATION

BY MR. MOORHEAD:

    Q    All right.  There is something that I want to follow up on.  You said that when you picked up the torch -- and I'm going to use "torch" instead of "nozzle."  I'm talking about the apparatus that you ignite and it makes the fire come out at the end.  I'm going to call that "the torch."  And I'm going to call the bottle that has the gas in it "the cylinder."

    A    Okay.

    Q    When you picked up the cylinder and the torch, it didn't appear to you that the torch was all the way on the cylinder; is that correct?

    A    The -- yes.

    Q    Now, I'm trying to figure out what gave you that impression.  Was it not all the way down on the threads or was it wobbling or a combination of those things?

    A    It appeared to be loose in nature as if you took a soda bottle cap and you loosened it up.

    Q    So it was not all the way down on the threads?

    A    Yes.

    Q    That's correct?

    A    That would be correct, yes.

    Q    And if you played with it, did it wobble some,

87

1  like a cap would?

2      A    No, sir.

3      Q    You've talked about your experience with other

4  people that probably shouldn't be handling these types

5  of products, using them in strange ways.  Did you ever

6  see anybody use a torch as a lever?

7      A    Yes.

8      Q    Bad plan, isn't it?  Do you know whether

9  Mr. Shalaby had done that with this particular --

10     A    No, sir.

11     Q    You don't know either way.  You mentioned

12  having plenty of experience buying torches and cylinders

13  with MAPP gas from Home Depot, correct?

14     A    Yes, sir.

15     Q    And you've also used propane.  Did you buy the

16  propane cylinders from Home Depot, too?

17     A    Yes, sir.

18     Q    Okay.  Any other types of gas -- I don't even

19  know what they sell at Home Depot.  Besides MAPP and

20  propane, are there other types of gases that they sell

21  in these little cylinders at Home Depot?

22     A    No, I don't believe so.

23     Q    So if you were going to go to the store

24  looking for gas for a torch, you'd either be looking for

25  propane or MAPP at Home Depot?

88

1      A      Yes.

2      Q      From your experience, do the cylinders come

3  sometimes matched with the torch and sometimes on their

4  own?

5      A      Yes.

6      Q      And are these cylinders a thing that -- they

7  can be refilled, can't they?

8      A      No, sir.

9      Q      Did you make any observations as to whether

10 the threads that were visible on the cylinder in the

11 Shalaby incident had any signs of rust or dirt or things

12 like that that would indicate perhaps it was not a good

13 cylinder to be using with a torch at that time?

14     A      The threads appeared normal.

15     Q      Okay.  You indicated, in answer to

16 Mr. Epstein's questions, that MAPP gas is typically used

17 in plumbing type applications and not in very much more.

18 Is that the type of product that you would think was

19 appropriate for lighting campfires?

20     A      No, sir.

21     Q      You mentioned a couple of incidents that I

22 believe you said you were actually an eyewitness to,

23 when tanks exploded.  And the first one you talked to

24 was acetylene.

25            When I think of acetylene -- was it one of

89

1    these great big tanks that welders use --

2         A    Yes, sir.

3         Q    -- not the little bitty one?

4              MR. MOORHEAD:  I think that's everything.

5    Well, let me look real quick here.  No, that's all I

6    have.  Thank you, Mr. Ratliff.

7              MR. EPSTEIN:  Be aware whenever a lawyer says

8    that.  Thank you.

9              MR. MOORHEAD:  Let me propose a stipulation,

10   then, with respect to how we're going to deal with this.

11   I propose that we relieve this nice court reporter of

12   her obligations under the California Code of Civil

13   Procedure, although I'm not sure they are applicable in

14   federal cases.

15             When she has completed the transcription of

16   today's proceedings, she will send them to Mr. Sessler,

17   at Campland on the Bay, which address is 2211 Pacific

18   Beach Drive, San Diego, California 92109.  The folks at

19   Campland, I guess, will be instructed to make it known

20   to you that it's come in, will make it available to you

21   to review it, make corrections, if necessary, in order

22   to make it accurate.  And then there will be a signature

23   line for you to date and sign your review.  And then I

24   will have the court reporter send to you a

25   postage-prepaid envelope so that you can send the

1   transcript to me.

2          And whatever corrections you make, if you make

3   them on the transcript, that's okay with me.  If you

4   want to make them on a separate sheet of paper, make

5   sure you enclose the separate sheet of paper, so we know

6   what changes were made.

7          If we give you 30 days, will that be enough

8   time?  You said you were going to go to Costa Rica.  But

9   it's not in the near future, right?

10          THE WITNESS:  Not in the fear future.

11          MR. MOORHEAD:  You'll have 30 days to do that.

12   You'll send it to me.  Within 10 days thereafter, I'll

13   let opposing counsel know whether or not it's been

14   corrected and signed and, if so, what corrections have

15   been made.  I'll make it available, if necessary, for

16   trial or other proceedings without the need for formal

17   request.

18          If the original transcript is lost, misplaced,

19   or otherwise unavailable, or if it's not corrected

20   and/or signed in accordance with the stipulation, then

21   we can use a certified copy as though it was a signed

22   original.

23          MR. STEPHAN:  That's fine.

24          MR. EPSTEIN:  So stipulated.

25          (Deposition concluded at 11:50 a.m.)

1    STATE OF CALIFORNIA   )

2                         ss:

3    COUNTY OF SAN DIEGO   )

4

5         I, Catherine A-M Gautereaux, Certified

6    Shorthand Reporter in and for the State of California,

7    do hereby certify that the witness in the foregoing

8    deposition was duly sworn by me to testify the truth,

9    the whole truth, and nothing but the truth in the

10   foregoing cause; that said deposition was taken before

11   me at the time and place herein named; that the

12   testimony of said witness was reported by me and was

13   thereafter transcribed in my presence.

14         I do further certify that I am a

15   disinterested person and am in no way interested in the

16   outcome of this action or connected with or related to

17   any of the parties in this action or to their

18   respective counsel.

19         IN WITNESS WHEREOF, I have hereunto set my

20   hand this 24th day of April, 2007.

21

22

23   _____

                  Catherine A-M Gautereaux
24                    CSR No. 3122

25